# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SABRINA SOFFER, ARI SHAPIRO, and<br>COMPLIANCE, ACCOUNTABILITY,<br>POLICY, ETHICS – ED ("CAPE-ED"), | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | **JURY TRIAL DEMANDED** |
| v. | ) <br> ) | Civil Action Case No. |
| THE GEORGE WASHINGTON UNIVERSITY<br>2121 I St NW,<br>Washington, DC 20052, | ) <br> ) <br> ) <br> ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiffs Sabrina Soffer, Ari Shapiro (the "Individual Plaintiffs"), and Compliance, Accountability, Policy, Ethics – Ed ("CAPE-Ed") (collectively, "Plaintiffs"), for their complaint against Defendant The George Washington University, allege as follows:

### INTRODUCTION

1. This action arises out of pervasive and severe antisemitic harassment at Defendant The George Washington University ("GWU" or the "University").

2. The failure of the GWU Board of Trustees and administration to respond to antisemitic discrimination has emboldened its perpetrators, and jeopardizes the safety, well-being, and educational opportunities of Jewish and Israeli students.

3. The Court's intervention is needed to compel GWU to act against antisemitic discrimination, eliminate the hostile environment for Jewish and Israeli students, and fulfill its obligations under its own policies, D.C. and federal law, and the U.S. Constitution.

4. In late Spring 2024, the Nation turned its collective attention to college campuses, as antisemitic anti-Israel encampments began to emerge at dozens of American universities.

5.      One of the worst arose at GWU. Protesters at GWU raised repulsive, antisemitic signs and shouted slogans, like "final solution"; "the irony of being what you once hated," a message that equated the swastika to the Star of David; and "Globalize the Intifada," an express call for violence against Jews.

6.      They also included: "Fuck you, Zionist, go die"; "There is only one solution, Intifada revolution"; "Hamas are freedom fighters"; "We don't want no Jewish state"; and "Zionists, go to hell."

7.      The protesters made it clear that any student in support of Israel should be excluded from the University community.

8.      The GW Hatchet reported one student participant saying, "when we don't want Zionists here, we really mean it."

9.      Protesters vandalized University property in what amounted to rioting and blocked Jewish students from traversing campus freely, attending class, and otherwise engaging in educational opportunities.

10.     They also blocked Jewish students from traversing campus freely and attending class.

11.     The protesters harassed, intimidated, and assaulted Jewish students and families walking peacefully through the campus, all while breaking barricades and throwing them in the center of University Yard.

12.     The collective fury had two unifying themes: hatred of Israelis and an attempt to strip Jews of their Zionism, which is integral to their identity.

13.     These themes did not arise out of the ether, and they were both prevalent and conspicuous at the University for years before the encampment arose.

14.     Indeed, the years-long failure of GWU to respond to pervasive antisemitic discrimination—among both the students and the faculty—has emboldened its perpetrators and continues to jeopardize the safety, well-being, and educational opportunities of Jewish and Israeli students.

15.     To be certain, GWU promises students (thereby affirming and recognizing its legal obligation) that it will not permit unlawful discrimination.

16.     For instance, in its Student Code of Conduct, GWU assures students that it will not tolerate any form of discriminatory harassment on campus or in digital environments, and it promises to act against harassment whether "blatant and intentional," or "subtle and indirect, with a coercive aspect that is unstated."

17.     Instead of fulfilling its obligation, GWU *nurtured* antisemitism on campus. A deeply entrenched pipeline of hate would fuel years of the hostile-educational environment that has given rise to this complaint.

18.     Antisemitism festered and became firmly entrenched on campus because GWU—specifically, its Elliott School of International Affairs—partnered with the Middle East Studies Association ("MESA"), allowing MESA to house itself within the University.

19.     MESA is an advocacy organization inextricably tied to the antisemitic Boycott, Divestment, and Sanctions Movement ("BDS")[1] and has leaders with public records of spewing anti-Jewish rhetoric and hatred.

---

[1] The Israeli government in 2019 made public a report that states "the Palestinian BDS National Committee (BNC) which leads the international boycott movement, is comprised of 28 Palestinian organizations. Foremost amongst them is the Palestinian National and Islam Forces (PNIF), which includes Hamas, the PFLP, and the Palestinian Islamic Jihad all designated terrorist organization." *See* https://www.gov.il/BlobFolder/generalpage/terrorists_in_suits/en/De-Legitimization%20Brochure.pdf (last visited October 8, 2024).

20.     MESA, which once billed itself as an academic outfit, is now an unabashed advocacy group that denies the Jewish people's historical connection to the land of Israel—and therefore, the shared ancestry of the Jewish people, the very core of Jewish identity—while promoting an academic boycott of Israeli institutions and academics.

21.     Nonetheless, GWU allowed MESA to embed itself deep in the University.

22.     MESA took advantage of the opportunity, thus beginning a long-running and official partnership that ensured that the pipeline of hatred at GWU would face no impediments.

23.     IMES is just one sector of the University and is a microcosm of the institution's culture that helped facilitate the pipeline of hate.

24.     IMES, in other words, is not an outlier at the University.

25.     To this day, that partnership has continued fostering an antisemitic and anti-Zionist culture at GWU, both in the classroom and throughout campus.

26.     Operating from within GWU's Elliott School of International Affairs, the leadership of MESA—which includes GWU faculty—developed and disseminated programming deliberately designed to incite anti-Zionist hostility within the GWU community.

27.     These activities were billed as legitimate academic inquiry, but they systematically suppressed intellectual diversity and ensured that students were not exposed to any pro-Israel perspectives or a full, accurate account of Jewish history.

28.     This pattern of forced ideological conformity exploited the developmental vulnerabilities of impressionable GWU students.

29.     In essence, GWU professors—acting under the authority of their professional responsibilities and academic duty of care—knowingly promulgated curricula, public programs, and academic conferences that fostered animus against Jewish students, Zionists, and supporters

of Israel, thereby contributing to a hostile educational environment and violating core institutional and contractual obligations.

30.    Consequently, antisemitism has been a consistent part of the GWU student experience.

31.    Examples abound. In October 2022, during the Jewish high holidays, GWU-funded student organizations plastered signs throughout campus and on the GWU Hillel Center with messages such as "Settlers Fuck Off," and "Zionists Fuck Off."

32.    Days later, those same student organizations staged a protest during prayer services at the Hillel Center, the center for Jewish life on campus.

33.    As Jewish students arrived at the Hillel Center to attend prayer services, they were confronted by classmates taking their photos and screaming epithets, including "Kikes, go kill yourself" and "there is only one solution, intifada revolution."

34.    In a graduate psychology program during the Fall 2022 semester, GWU Professor Lara Sheehi (who had publicly stated that it is not possible to be both a Zionist and a good clinician and described Israelis as "genocidal fucks") asked students to introduce themselves.

35.    After one student said she was from Israel, Professor Sheehi replied, "It's not your fault you were born in Israel."

36.    Despite documented complaints from multiple Jewish students regarding Professor Sheehi's conduct—including her overt hostility toward Israelis, repeated expressions of anti-Jewish animus, deliberate omission of Jews in her syllabus about diversity and confronting biases, and reversing roles of victim and offender to turn GWU faculty against Israeli students—GWU administrators willfully ignored clear violations of the Faculty Code of Conduct and basic professional standards.

37.    Rather than holding Professor Sheehi accountable for her discriminatory and unprofessional behavior, the University retaliated unlawfully by imposing formal disciplinary action against two of the Jewish students who came forward.

38.    After a complaint was filed with the U.S. Department of Education's Office of Civil Rights ("OCR"), GWU (which, after a biased internal investigation, deemed itself faultless and purported to exonerate Professor Sheehi) was (in January 2025) ordered to expunge the disciplinary actions from the Jewish students' academic records after OCR concluded that academic retaliation had occurred.

39.    Thus, it comes as little surprise that, in the days following Hamas's October 7th terror attack—which involved the slaughter, rape, and capture of hundreds of civilian Jews and non-Jews in Israel, all of which was gleefully broadcast throughout the internet by their tormenters—few faculty members or students on the GWU campus offered support to their Jewish or Israeli peers.

40.    Instead, many protested in explicit support of *Hamas* and its abhorrent violence while relentlessly mistreating GWU's Jewish and Israeli students.

41.    GWU-funded student groups gathered in the center of campus to celebrate the terrorist attacks, paying tribute to Hamas "resistance fighters," and honoring its "martyrs"; i.e., terrorists killed in the attacks.

42.    In front of a cheering crowd, a GWU Students for Justice in Palestine ("GWU SJP") spokesperson, his voice amplified by a sound system, read from an official GWU SJP public statement declaring that every Jew in Israel is a "settler," that any "settler is an aggressor," and that, accordingly, all are legitimate targets for violence.

43.    Among the 'legitimate targets' the killing of whom GWU SJP was justifying were innocent elderly and infirmed men and women, babies, and entire multi-generational families.

44.    That spokesperson was not the first to use those pejorative terms on the campus of GWU to stand in support of murderous terrorists; instead, they are the same used by the National Students for Justice in Palestine and (as discussed below) by GWU's own faculty.

45.    A 2021 Webinar organized by the IMES, with GWU and invited scholars, entitled "The Colonizing Self Or, Home and Homelessness in Israel/Palestine," discussed how "colonizers," like "Israeli Jews settle in the West Bank and in depopulated Palestinian houses in Haifa or Jaffa" continuously transform spaces of violence into spaces of home.

46.    The talk "offered a theoretical framework for understanding how settler-colonial violence becomes inseparable from one's sense of self," suggesting that Israeli national identity is rooted in settler-colonial violence.

47.    As a direct consequence of this egregious conduct—and the University's ongoing failure to intervene or enforce its own standards—George Washington University was ranked in the worst possible category of "Highest Antisemitic Hostility" in a national post–October 7th survey of Jewish students across fifty-one U.S. campuses.

48.    This designation reflects not only the severity of the campus climate but also the administration's shameful complicity in fostering an environment of unchecked antisemitism.

49.    While that celebration of terrorism in the immediate aftermath of October 7th was in full swing, Jewish and Israeli students, some of whom were mourning the loved ones they lost on October 7th and all of whom remained concerned for their safety while on campus, met with GWU President Ellen Granberg.

50.     In response, President Granberg directed the students to take a circuitous route to avoid the threatening demonstration taking place on campus.

51.     In other words, the GWU administration's response (then and still) put the onus on Jewish and Israeli students to protect themselves by staying away.

52.     Put bluntly, President Granberg told them, in so many words, "*we will not protect you while you traverse your campus*," despite the University's twin legal and moral duties to do just that.

53.     This was not a slip of the tongue, or a momentary lapse of judgment in the fog of exigent circumstances.

54.     Such conduct by the administration—advising Jewish students to avoid areas of campus rather than intervening to neutralize the source of the threat—constitutes a failure to uphold its obligations under Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin in any program receiving federal financial assistance.

55.     As clarified in OCR guidance, schools must "take prompt and effective steps to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring." (*Dear Colleague Letter, U.S. Department of Education, October 2010*).

56.     And President Granberg's directive did more than merely suggest that the students take the long way home.

57.     Most Jewish and Israeli students could not avoid University Yard (the epicenter of the demonstration), because it is ringed by academic buildings where classes are held, and its pathways are the main arteries through campus.

58.     Given the prevalence and placement of the antisemitic protests, her suggestion was, practically speaking, that GWU Jewish and Israeli students should forego accessing certain University buildings, facilities, and services that they were indisputably entitled to access.

59.     The stories do not end there. On November 3, 2023, following a demonstration that forced the rescheduling of President Granberg's inauguration due to "heightened safety concerns," a GWU student vandalized the Hillel Center (one of the few sanctuaries on campus for Jewish and Israeli students) by infiltrating it and tearing down posters of Israeli hostages taken by Hamas.

60.     On November 15th, shortly before another demonstration, a student threw a rock at a "JewBelong" truck parked along a street adjacent to campus, shattering a glass panel along the back of the truck.

61.     A sign behind the panel read: "Let's be clear, Hamas is your problem too."

62.     The perpetrator was found to have committed discriminatory harassment and disorderly conduct—but was neither suspended nor expelled. The consistent message of tolerance for anti-Jewish hatred was clear.

63.     Throughout the Winter of 2023 and Spring of 2024, the GWU faculty put on a series of one-sided, anti-Zionist programming that succeeded in keeping the tension on campus at a fever pitch.

64.     Later, when the anti-Israel encampment sprang up in the heart of the campus in April 2024 and remained for weeks, this outrageously deficient response from the University persisted. Instead of helping, the University once again betrayed the students they had promised to protect.

65.     To be certain, GWU saw this coming; indeed, in early 2024, the University proposed a plan for addressing "Free Expression at GW," which stated:

Free expression, however, is not unlimited. Speech may be regulated when it meets the legal definition of obscenity, involves true threats (serious or intentional threats of violence directed at specific individuals), incites violence, or involves illegal conduct. In addition, speech is not protected when it rises to the level of prohibited harassment based on a person's protected characteristic (examples include age, disability, ethnicity/national origin, gender, race, religion/faith tradition, sex, sexual orientation, veteran status, and many others) as defined by state, local, and federal anti-discrimination laws and university policies. Finally, speech may be regulated in a way that focuses on reasonable time, place, and manner restrictions that are not based on the content of the speech. One example of such time, place, and manner restrictions is that the university prohibits speech that disrupts university activities or operations or threatens, endangers, or harasses others.

66.    When the encampment arose, however, GWU declined to enforce either the terms or the spirit of its lofty pronouncement.

67.    On the first day of the encampment, Member No. 4**,** an Israeli graduate student who had been awarded a scholarship for his work on peace-building initiatives among Israeli and Palestinian youths, spoke to Jewish and Israeli students who were afraid to attend classes.

68.    To allay their anxiety, he picked up a small Israeli flag and walked to the sidewalk in front of University Yard.

69.    Standing silently holding his flag, he was immediately confronted by a mob, arms linked together and shouting slurs at him.

70.    The mob blocked his path to University Yard and crowded against him.

71.    A protester snatched his flag and ran into University Yard.

72.    The nearby University police officers, first, did nothing; then told *him* to leave for his own safety while allowing the protesters to harass other students; and, finally, warned him to stay away from University Yard.

73.    On the second day of the encampment, another student stood alone across the street, quietly holding an Israeli flag.

74.    As GWU police officers watched silently, and did nothing, protesters screamed at her, among other things: "Fuck you, Zionist, go die," "There is only one solution, Intifada revolution," "Hamas are freedom fighters," "We don't want no Jewish state," and "Zionists, go to hell."

75.    She later received an anonymous message on Instagram that said, "Kill yourself, Jew. Filthy kike. Watch your back."

76.    As others walked through campus, protesters, sometimes numbering in the double digits, would surround and, in a show of physical force, coerce them away.

77.    During this time, GWU professors supported, often rewarded, and openly encouraged these perpetrators by forgoing important class time to laud or even attend the protests.

78.    Through the present day, entire GWU academic departments continue to sponsor and invite their students to anti-Israel events that distort Jewish history and make false comparisons (e.g., between the 1943 Warsaw Ghetto uprising and Palestinian Liberation), actions that are intended to legitimize and encourage violence against Israelis and create a hostile environment for Jewish students.

79.    GWU's Jewish and Israeli faculty members have not been spared from hateful discrimination, either.

80.    Recently, the office of an Israeli economics professor was vandalized.

81.    Signs with an antisemitic and threatening message were posted on his office door and littered throughout the building.

82.    The sign called the Israeli professor a "pernicious symptom of the **bloodthirsty Zionism** permeating our campus [emphasis original]."

83.    The sign concluded with a threat:

If you choose to remain on the premises, and if GWU continues to harbor your malignant presence on this campus, every sector of this community will be mobilized against you. The students of GWU will hold you and this university accountable for your crimes.

84.    The University appears to have taken no action in response to this incident.

85.    To be certain, the GWU Administration had every chance to get ahead of this antisemitism, both blatant and subtle.

86.    Before the encampment, GWU took it upon itself to announce that, due to finals week, protests would not be tolerated on campus.

87.    Moreover, a concerned and organized group composed primarily of GWU parents (GW University Jewish Parent United Leading Students Empowerment, or "GW JPULSE")— given its awareness of the unfolding encampment and escalation at Columbia University—sent a formal letter to the GWU administration and Board of Trustees, warning them of the likelihood of similar disruptions occurring on GWU's campus.

88.    GW JPULSE urged the University to implement proactive measures to prevent comparable chaos, antisemitic escalation, and threats to student safety.

89.    Rather than enforcing its directive or adopting the GW JPULSE proposal, the GWU administration allowed the encampment to take root on April 25th and then to persist for more than two weeks.

90.    During that time, protesters engaged in hateful, antisemitic actions, including spitting on Jewish students, surrounding students and yelling slurs in their faces, and calling for violence against Jews.

91.    Signs featured Nazi imagery and antisemitic slurs.

92.     Speakers, their voices amplified by powerful sound systems and megaphones, celebrated Hamas, called for the destruction of the State of Israel, and led crowds in chants such as "Intifada now," and "get out of the way, we don't want no Israeli pigs."

93.     Protesters also chanted "from the river to the sea, Palestine will be free."

94.     Refuting any claim that the protesters were calling for equality, they followed in the original Arabic: "min il-mayye la-l-mayye, Falasṭīn ʿarabiyye," which means "from the water to the water, *Palestine will be Arab.*"

95.     GWU professors joined the protests, justifying these awful activities, encouraging them, and even implicitly taking credit for them, since, as a GWU Professor declared, "students enact what we teach."

96.     Further compounding the situation, the administration's inaction enabled an environment in which hate, harassment, and hostility were allowed to persist—effectively encouraging others to support, normalize, and participate in the ongoing unlawful activities.

97.     Time has progressed, but Jewish and Israeli students continue to be targeted for harassment and placed in hostile situations that the University promises to rectify, but doesn't.

98.     For instance, in May 2025, a renowned Jewish guest lecturer, who was not present to speak about Israel, was shouted down by an anti-Zionist student protester, while the faculty who invited her did nothing—and then apologized to the class for inviting her.

99.     Despite consistent assurances, the University has not addressed this discriminatory hostility, relying instead on platitudes and lip service that have effected no change whatsoever.

100.   Consequently, the individual Plaintiffs and members of CAPE-Ed are isolated, anxious, and unwelcome on campus—to the extent that they are also denied the educational rights

and benefits to which they are legally entitled, and in some instances even physically restrained from accessing them.

101.    Because of the hostile environment, many Jewish and Israeli students still feel compelled to hide their identity on campus, avoid Judaic Studies classes, and refrain from participating in Jewish community life.

102.    Like Harvard and other universities around the country, GWU has "failed," and continues to fail, these students. *Kestenbaum v. President & Fellows of Harvard Coll.*, 2024 WL 3658793, at *6 (D. Mass. Aug. 6, 2024).

103.    According to GWU's written policies, "[t]he university strives to maintain an ethical culture" and encourages social, professional, and legal behavior.

104.    GWU promises it "will not permit unlawful discrimination . . . in any university-recognized area of student life."

105.    At bottom, GWU's nondiscrimination policy promises students that it will not permit unlawful discrimination based on national origin, religion, or sex—i.e., the same guarantees required by federal law.

106.    Despite having these explicit policies and legal obligations, GWU has refused to enforce them when those who violate those policies do so against Jewish and Israeli students.

107.    Even when GWU *admitted* that students and faculty repeatedly violated these policies, the administration *refused* to enforce them or to protect Jewish students.

108.    Indeed, GWU was among eleven schools with an "appalling record[]" of antisemitism on campus—precisely because of its "systemic failure to enforce rules, impose

discipline, and protect Jewish communities among institutions of higher education throughout the country."[2]

109.    Because GWU accepts taxpayer money, it has a legal obligation under Title VI of the Civil Rights Act of 1964 to ensure that students of every race, color, and national origin enjoy their academic studies free from a hostile environment.

110.    GWU is required to take all reasonable measures to prevent the sort of hatred that the GWU Jewish and Israeli students have experienced both in the classroom and across campus.

111.    It has willfully failed to do so.

112.    Accordingly, GWU remained (and remains) deliberately and shamefully indifferent to the plight of these Jewish and Israeli students, and at times even actively complicit in the discrimination against them.

113.    And it has deeply affected the Plaintiffs and CAPE-Ed members, one of whom changed majors, and another of whom quit his fraternity, all of whom feel unable to fully participate in University life, because of the antisemitism they experienced from the outset.

114.    Some individuals have reportedly transferred because of the antisemitism they experienced.

115.    Despite Jewish students desperately seeking redress and remedies for harassment and discrimination, GWU chose platitudes over action, remaining deliberately indifferent.

116.    Parents voiced their concerns about this vitriol, and GWU chose platitudes over action, remaining deliberately indifferent.

---

[2] Republican Staff Report, *Antisemitism on College Campuses Exposed*, House Committee on Education & the Workforce (October 31, 2023) ("House Report"), https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_st aff_report_-_antisemitism_on_college_campuses_exposed.pdf.

117.    Legal action was threatened, and GWU chose platitudes over action, remaining deliberately indifferent.

118.    Congress called out the University, and GWU chose platitudes over action, remaining deliberately indifferent.

119.    In November 2021, the editorial board of the GW Hatchet, GWU's student newspaper, acknowledged what everyone on campus knew: "GW has an alarming history of antisemitism."

120.    It then urged the administration to act: "GW has an obligation to work toward solving it," and "needs to make clear what kinds of disciplinary actions will be given out to students who commit hate crimes and perpetuate antisemitism and bigotry."[3]

121.    In response, GWU chose platitudes over action, remaining deliberately indifferent.

122.    GWU has turned a blind eye to the hateful, one-sided academic programming explicitly driven by activism, which shutters any attempts to provide a counternarrative, thereby stripping it of the protected-speech or academic-freedom veneer.

123.    By failing to act as required by GWU's policies and law, the GWU administration has enabled the normalization of anti-Jewish hatred on campus and created an unbearable educational environment, all while refusing to hold the antisemitic bad actors accountable.

124.    Plaintiffs have great pride in GWU, and, for that reason, the discrimination they have experienced has only hardened their resolve to restore trust in the University they love.

125.    They seek this Court's intervention to set things right by requiring GWU to enforce its policies in an evenhanded way; enforce serious accountability for perpetrators—both students

---

[3] Editorial Board, *GW needs a cultural shift against antisemitism*, GW Hatchet (Nov. 21, 2021), https://gwhatchet.com/2021/11/08/gw-needs-a-cultural-shift-against-antisemitism/.

and faculty—of misconduct; prohibit discrimination and bias as required by law; adopt a clear definition of antisemitism; provide proper training to its administration, faculty and staff to ensure a broad understanding of GWU's obligations to prohibit antisemitic discrimination and bias under the law and GWU's policies and rules; allow for robust scholarly debate instead of censoring pro-Israeli and Zionist viewpoints; and provide for oversight to ensure that Jewish and Israeli students are treated in the same manner as their non-Jewish, non-Israeli counterparts.

## JURISDICTION & VENUE

126.    The Court has subject matter jurisdiction over Counts I and II of this action under 28 U.S.C. §§ 1331 and 1343 because these claims arise under federal law.

127.    The Court has supplemental jurisdiction over Counts III and IV because they are "so related to [the] claims in [this] action within" the Court's "original jurisdiction that [they] form[] part of the same case or controversy." 28 U.S.C. § 1367.

128.    The Court has personal jurisdiction over GWU because it is located and conducts business in the District of Columbia.

129.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because GWU is located in the District of the District of Columbia, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District.

## PARTIES

130.    Plaintiff Sabrina Soffer is a dual citizen of the United States and Israel, and a Jewish undergraduate student who participated in the University Honors Program and studied at GWU's Columbian College of Arts and Sciences.

131.    Among other things, Ms. Soffer, who changed her major due to classroom ostracism and a thirst for free inquiry (realizing the Elliott School's IMES would be no place for it) led a Student Government Task Force to Combat Antisemitism.

132.    She consistently met with GWU administrators to report antisemitic incidents and tried to collaborate with the administration to address the issues.

133.    However, she stopped initiating regular meetings in frustration after administrators told her they could "not do anything" about protests on campus organized by students from banned groups like SJP and JVP, unless the protests became "overtly violent."

134.    Plaintiff Ari Shapiro is a United States citizen, and a Jewish undergraduate student at GWU's Columbian College of Arts and Sciences.

135.    Among other things, Mr. Shapiro reported to the Administration that, during the April 2024 GWU encampment, he and his friends were surrounded by a mob of protesters that intimidated and then coerced them out of University Yard.

136.    Plaintiff Compliance, Accountability, Policy, Ethics – Ed ("CAPE-Ed") is a voluntary membership organization composed of GWU students, alumni, and other GWU stakeholders.

137.    CAPE-Ed's mission is to protect GWU students and the greater GWU community against antisemitism and discrimination, and to ensure equal access to educational opportunities for all students through lawful means, including litigation.[4]

138.    Other than Plaintiffs Ms. Soffer and Mr. Shapiro, CAPE-Ed members are not identified by name in this Complaint because of reasonable fear that they would face retaliation and harassment.

139.    CAPE-Ed Member No. 1 is a Jewish student at GWU and rising junior at the Elliott School of International Affairs. She is a United States citizen.

---

[4] *See* GW JPULSE, *GW University Jewish Parent United Leading Student Empowerment*, https://GWU JPULSE.org/ (last accessed Nov. 21, 2024).

140.    Among other things, Member No. 1 has lost confidence in the administration's willingness to protect the safety and educational opportunities of Jewish and Israeli students after GWU declined to investigate an incident during which she was spat at while raising money with other members of GW for Israel.

141.    CAPE-Ed Member No. 2 was a Jewish undergraduate student at GWU's Colombian College of Arts & Sciences and graduated from GWU in May 2024. She is a United States citizen.

142.    Among other things, Member No. 2 received an anonymous direct message on Instagram that said, "Kill yourself, Jew. Filthy kike. Watch your back" after she was confronted by protesters during the encampment.

143.    CAPE-Ed Member No. 3 is a Jewish graduate student at GWU's Columbian College of Arts & Sciences, pursuing a PsyD. in Clinical Psychology.

144.    Among other things, Member No. 3 was present during the May 2025 incident in which a Jewish guest lecturer—who was not present to speak about Israel—was shouted into silence by an anti-Zionist student protester, while the faculty member who invited her, Dr. Joshua DeSilva, did nothing, and then applauded the protester who shouted at her.

145.    CAPE-Ed Member No 4 was a Jewish graduate student at GWU's Elliot School for International Affairs.

146.    Among other things, Member No. 4 was left unaided by GWU police when, during the encampment, protesters forcibly snatched the Israeli flag he was carrying and desecrated it.

147.    Defendant the George Washington University is a private, federally chartered, not-for-profit university located in the District of Columbia.

148.    At all times relevant to the allegations included in this Complaint, GWU was and continues to be a recipient of federal funds, primarily received in the form of student loans.[5]

149.    In fiscal year 2023, GWU reportedly received $200 million in federal funds.[6]

## FACTUAL ALLEGATIONS

### I.    ON JEWISH IDENTITY AND THE MEANING OF ANTISEMITISM.

150.    The Jewish people are indigenous to the land of Israel, and their shared history and ancestry is inexorably tied to the land.

151.    Despite periods of forced exile, a continuous Jewish presence has endured there for millennia.

152.    This historical bond, along with the Jewish people's right to self-determination in their ancestral homeland, is, for the vast majority of Jewish people across time and space, a fundamental aspect of their Jewish identity.

153.    While the Jewish people share a common faith, their identity is not defined by faith alone.

154.    Zionism is the movement for the re-establishment, and now the development and protection, of a sovereign Jewish nation in its ancestral homeland. It is *not* just a political movement; for the vast majority of Jewish people across time and space, Zionism is and always has been an integral part of their Jewish, often religious, identities.

155.    Zionism recognizes the Jewish people's ancient and enduring connection to the land

---

[5] Federal loans, referred to as "grants and loans of federal funds" by the U.S. Department of Justice, are an example of federal assistance. *See* Civ. Rights Div., U.S. Dep't of Just., *DOJ Title VI Legal Manual*, https://www.justice.gov/crt/book/file/1364106/dl?inline, Section V at 5 (last visited July 26, 2024).

[6] Kyle Morris, *Billions of taxpayer dollars fund schools with anti-Israel protests*, FOX NEWS (April 29, 2024), https://www.foxbusiness.com/politics/billions-taxpayer-dollars-fund-schools-anti-israel-protests.

of Israel, and their right to self-determination in their ancestral homeland.

156.    Zionism or Zionists believe the right of the Jewish people to self-determination in their ancestral homeland—Israel.

157.    In truth, Zionism is a liberation movement for a people who have faced centuries of exile, discrimination, and genocide.

158.    The International Holocaust Remembrance Alliance ("IHRA") defines antisemitism as "a certain perception of Jews, which may be expressed as hatred toward Jews."

159.    Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.

160.    The IHRA working definition acknowledges that Zionism cannot be separated from the identity of most Jews, and therefore incorporates examples such as:

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the state of Israel.

161.    The IHRA working definition of antisemitism recognizes that Jews share more than a common faith; instead, they are a people with a shared history and heritage deeply rooted in the land of Israel.

162.    The United States, along with forty-two other countries, has adopted the IHRA

working definition.[7]

163.    Similarly, thirty-three states have adopted the IHRA working definition of antisemitism, through either executive orders, resolutions, or laws.[8]

164.    A number of colleges and universities have expressly incorporated in policy guidelines the IHRA working definition of antisemitism with the incorporated examples, including Harvard University, New York University, University of Pennsylvania, George Mason University, University of Pittsburgh, Florida State University, Occidental College, as well as nearly every university in the United Kingdom and Israel.

165.    To this day, the GWU the administration has declined to adopt the IHRA definition of antisemitism, which leaves Jewish students vulnerable and strips them of equal protections afforded to other groups facing discrimination.

166.    Denying Jews the right to define their own oppression—or their right to a homeland—is not academic freedom.

167.    It is discrimination.

168.    Zionism does not preclude criticism of the political or military policies of the State of Israel, or advocacy for Palestinian human rights.

169.    Criticism of Israel is not inherently antisemitic, as the definition itself takes pains to explicitly spell out.

170.    Expressions of hatred against "Zionists," however, always is.[9]

171.    According to the Anti-Defamation League ("ADL"), the vast majority of Jews

---

[7] *Defining Antisemitism*, U.S. Dep't of State, https://www.state.gov/defining-antisemitism/.

[8] *States Adopt IHRA Antisemitism Definition, Jewish Virtual Library* (2024). https://www.jewishvirtuallibrary.org/states-adopt-ihra-definition-of-antisemitism.

[9] U.S. House of Representatives Staff Report on Antisemitism (Dec. 18, 2024).

around the world identify as Zionists or feel a connection or kinship with Israel, regardless of their opinions on the policies of the Israeli government.[10]

172.    A 2020 Pew study likewise found that more than 80 percent of Jews in the United States view Israel as integral to their Jewish identity.[11]

173.    Similarly, a 2024 American Jewish Committee survey reported that over 80 percent of Jews in the United States view Israel as important to their Jewish identity, and over 85 percent of *all* Americans believe that the statement "Israel has no right to exist" is antisemitic.[12]

174.    Discrimination against Zionists is therefore discrimination against the vast majority of Jews based on their shared identity.

175.    The ADL's Pyramid of Hate explains that antisemitic harassment and violence does not arise in a vacuum.[13]

176.    It invariably starts with "biased attitudes"—with speech that stereotypes, justifies stereotypes, and demonizes Jews—which forms the base of the Pyramid of Hate.

177.    When biased attitudes are left unaddressed, as they were at GWU, they do not disappear; instead, they escalate.

178.    According to the ADL, the biased attitudes at the base of the pyramid provide the scaffolding upon which hateful harassment, discrimination, and violence is constructed.

---

[10] *See* https://www.adl.org/resources/glossary-terms/zionism.

[11] https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/

[12] American Jewish Committee, *The State of Antisemitism in America 2024,* https://www.ajc.org/AntisemitismReport2024#:~:text=81%25%20of%20American%20Jews%20say,right%20to%20exist%20is%20antisemitism

[13] ADL Pyramid of Hate, https://www.adl.org/sites/default/files/pyramid-of-hate-web-english_1.pdf.

179.    Not only have these biased attitudes been allowed to run amok in GWU's academic sphere, but they have also enabled discriminatory activism to become the bread and butter of many of their scholars, with impunity.

## II.    THE PARTNERSHIP BETWEEN THE GWU FACULTY AND THE MIDDLE EAST STUDIES ASSOCIATION CREATED A PIPELINE OF HATE THAT HELPED CULTIVATE THE RAMPANT ANTISEMITISM PERMEATING THE UNIVERSITY.

180.    The type of systemic and institutional antisemitism described throughout this Complaint does not materialize on its own.

181.    Instead, it requires fertile institutional ground to propagate.

182.    GWU provided the soil, cultivated it, and then let it grow without any limits.

183.    And although academic freedom remains sacrosanct in the halls of the academy, the vitriol that GWU invited within its walls demonstrates its awareness that antisemitism was an ever-increasing problem, and it put GWU on notice that, eventually, antisemitism would metastasize to the point at which it would violate the federal rights of GWU's Jewish and Israeli students.

184.    For that reason, the following incidents show GWU's knowledge, complicity, and—critically—deliberate indifference to the hostile antisemitic environment that eventually brought the University to its knees.

185.    And indeed, lest there be any doubt about the motivation behind certain well-known members of the GWU faculty, at least one was brazen enough to state publicly that "students enact what we teach."

186.    Another, who stood in solidarity with the students at the encampment, expressed in a news interview: "We teach our students to not only utilize their voice but to also make sure that they are paying attention to the world around them"; "we want to help them become the change that they want to see in the world"; and "liberation movements start with the young."

A.        **The emergence of the Elliott School's Institute for Middle East Studies.**

187.    In 2007, GWU founded the Institute for Middle East Studies ("IMES") and housed it within the University's Elliott School of International Affairs.

188.    According to GWU, IMES is "a broad, University-wide initiative to support academic work on the Middle East."[14]

189.    As described at greater length below, IMES is the GWU organization responsible for hosting the unrelenting anti-Zionist and antisemitic events in the wake of the October 7th terror attacks.

190.    GWU still touts its IMES faculty as "represent[ing] a breadth of disciplines from political science to media and public affairs to religion to international business," and it brags that they "are instrumental in coordinating major grant proposals, organizing research workshops and conferences for the [IMES], and contributing original research to current academic and policy debates."[15]

191.    IMES faculty includes Dr. Ilana Feldman, a professor of Anthropology, History, and International Affairs at GWU.

192.    Dr. Feldman, who served as a MESA board member, has a history of anti-Israel activism and helped spearhead an American Anthropological Association attempt "to adopt a boycott of Israeli academics and institutions."[16]

---

[14] Institute for Middle East Studies, *Upcoming Events,* WWW.IMES.COM, https://imes.elliott.gwu.edu/ (last accessed Nov. 21, 2024).

[15] *Institute for Middle East Studies*, *supra* .

[16] Melissa Weiss, *GW University Under Fire for Appointing BDS Activist to Head International Affairs School*, Jewish Insider (May 20, 2020), https://jewishinsider.com/2020/05/gw-university-under-fire-for-appointing-bds-activist-to-head-international-affairs-school/.

193.    Despite GWU's stated position against the BDS movements. Dr. Feldman openly supported and actively propagated BDS ideology—both through her public statements and affiliations. Her conduct aligns with the broader BDS campaign, which seeks to delegitimize and economically destroy the State of Israel

194.    She was considered for appointment as the interim dean of the Elliott School in 2020.

195.    This generated significant opposition because of her well-known antipathy to Israel and advocacy for a boycott.

196.    For example, the President of Hillel International wrote to the GWU administration to urge against the appointment, because it would be "potentially understood as your administration's support for Professor Feldman's spearheading boycotts of Israeli institutions of higher education. It will likely also have a chilling effect on faculty and students who wish to engage in scholarly activity in Israel and freely express and act on their support for Israel."

197.    Dr. Feldman was nonetheless appointed interim dean, serving from 2020 to 2021.

198.    She has served as the Executive Committee Chair on GWU's Faculty Senate.

199.    During the Spring 2024 encampment, Dr. Feldman negotiated with the GWU Administration on behalf of the protesters.

200.    IMES faculty also includes Dr. Michael Barnett, a professor of International Affairs and Political Science.

201.    Dr. Barnett has minimized and legitimized the October 7th massacre, stating that Palestinians have "a right of resistance."

202.    Dr. Shira Robinson is an associate professor of History and International Affairs at GWU's Elliott School.

203.    She has "demonized Israel, defended antisemitism, engaged in anti-Israel activism," and supports the BDS movement.[17]

204.    She has also accused Jewish and Israeli students for weaponizing antisemitism, including in a May 2, 2024 tweet, stating: "This is what Biden and those who weaponize the charge of antisemitism brings."

205.    Dr. William Youmans is an associate professor of Media and Public Affairs and the Director of the Institute for Public Diplomacy and Global Communication at GWU.

206.    Dr. Youmans was a founding leader of Students for Justice in Palestine.

207.    He has described Hamas as a justified "uprising against Israel," and he has publicly defended Hamas leader and mastermind of the October 7th massacre, Yahya Sinwar.[18]

208.    His public statements also include abhorrent libels, among others. Youmans and other GWU faculty like Amr Madkour (https://gwhatchet.com/2023/11/17/op-ed-silencing-palestinians-and-their-supporters-speaks-volumes-of-gw/), publicly claimed that Israel fabricated confirmed reports that Hamas decapitated babies during the October 7, 2023 attacks, and fabricated confirmed reports that Hamas terrorists committed mass rapes—both designed to fan hate against Israelis, Zionists and Jews.

209.    As of the time of this filing, IMES programming surrounding Israel is uniformly and unreasonably hostile toward Israel with some of the rhetoric invited scholars employ echoing those that student protesters have used referring to "the occupation," "settler-colonial" and "Israel's an apartheid state."

---

[17] *Shira Robinson*, Canary Mission, https://canarymission.org/professor/Shira_Robinson (last updated Sept. 16, 2024).

[18] *William Youmans*, Canary Mission, https://canarymission.org/professor/William_Youmans (last updated Sept. 16, 2024). Sinwar is under indictment by the United States for, among other things, conspiracy to commit murder U.S. nationals, kidnapping, and conspiracy to use weapons of mass destruction resulting in death.

210.    Alternative perspectives to many of these views have not been allowed to be portrayed to the GWU students enrolled in its programming.

211.    And to be certain, pro-Israeli speakers have been suggested, yet each effort has been ignored, rendering those efforts largely fruitless.

212.    This is true even though there are some professors within the University who have a pro-Israel perspective and who were ready, willing, and able to participate.

213.    Students and advocacy groups expressed concern and proposed that Dr. Mona Atia and Dr. Alyssa Ayres broaden the academic discussion around Israel and Gaza by including scholars and historians with expertise from a pro-Israel perspective.

214.    The suggestion, however, was never implemented, further narrowing the scope of dialogue and excluding balanced, diverse viewpoints.

215.    This type of censorship—marked by the denial of intellectual honesty, omission of historical facts, misappropriation of academic frameworks, and absence of genuine scholarly debate—goes far beyond a difference of opinion.

216.    It represents manipulation, exploitation of student vulnerabilities, and the incitement of hateful rhetoric under the guise of academic freedom, all of which motivates further hostility, intimidation, and harassment.

217.    Instead, it represents the sort of scholarly censorship and indoctrination that makes a mockery of the academic-freedom concept and does a tremendous disservice to the impressionable students who rely on GWU to provide them with well-rounded and accurate tutelage regarding the complexities of, among other things, the geopolitics of the Middle East.

218.    When department heads and university administrators exclude pro-Israel scholars and historians from academic discussions about Israel and Gaza, they deny students access to education and rigorous debate.

219.    In turn, portraying Hamas—a designated terrorist organization—as a legitimate resistance group not only distorts reality, but it also legitimizes violence and fuels antisemitic sentiment and behavior on campus.

220.    The anti-Israel bias evident in the IMES department is not isolated to it; other academic departments at GWU, like American Studies, are plagued by similar issues.

221.    For instance, the GWU American Studies department sent a department-wide email to its students mobilizing them toward an anti-Israel "Freedom Seder" that likened the Warsaw Ghetto uprising to Palestine Liberation efforts, specifically the release of Palestinian terrorists from Israeli prisons.

222.    The GWU History Department, moreover, used its "gwhistory" Instagram account to condemn GWU's decision not to acquiesce to the unlawful GW encampment protesters' demands: e.g., "One day every administrator will pretend that they supported divestment from the beginning," and "History will absolve this movement and justice will prevail!"

223.    As discussed at greater length below, over one hundred GWU faculty members signed a letter supporting the unlawful encampment where Jewish students were harassed, and some even downplayed the harassment by calling it "peaceful" in an October 2024 op-ed where, among other things, they announced the establishment of the GW Faculty and Staff for Justice in Palestine.

224.    Their effort was extended during the fall 2024 semester, as GWU allowed these faculty and staff to form a Faculty and Staff for Justice in Palestine chapter, not limited to IMES or MESA scholars.

225.    In an op-ed announcing the formation of FSJP, professors of clinical law, psychology, medicine, Women's, Gender and Sexuality studies, and American studies wrote that "Participants were peaceful, welcoming and disciplined" and invited colleagues to join them in this "civic action."

226.    This mischaracterization was intended to whitewash the antisemitic and anti-Israeli sentiment, legitimize, and encourage it. https://gwhatchet.com/2024/10/28/op-ed-in-forming-fsjp-faculty-seek-justice-for-students-palestinians/.

227.    This article ignored that "Jewish and Israeli friends [being] heckled and spat at," with comments, like "death to Zionists" and "Zionists go to hell."

228.    Signs like "go back to [your] real homes in Europe" appeared, and GWU administrators were "put on trial" and sent to the "guillotine."

229.    Encampment participants stalked students with their cameras during a Holocaust Memorial Day walk and, one night, repeatedly shoved them in their faces.

230.    Human chains and beating drums, compounded with shouts that call for the annihilation of the Jewish people, like "Intifada" and "we don't want no Zionists here," permeated the encampment.

231.    The article ignored that "exams were rescheduled," and students "avoided walking to class fearing physical assault." (https://gwhatchet.com/2024/11/14/op-ed-in-forming-fsjp-faculty-perpetuate-a-pipeline-of-hate/)

232.    IMES has also forged a partnership with the Middle East Research & Information Project" ("MERIP") "to translate academic research into content designed for a broad public audience."

233.    MERIP is well-known for promoting an anti-Zionist ideology.

234.    For example, its Winter 2023 Middle East Reports issue, published just weeks after Hamas' October 7th attacks, focused entirely on "Israel's war on Gaza and surging violence across all of Palestine," as well as "the US and Israel's war machine on one side and the 'Resistance Axis' and popular anti-normalization movements on the other."

235.    Its Winter 2024 Middle East Report is dedicated to "Resistance—The Axis and Beyond." The Axis of Resistance is a reference to Iran and sponsored network of terrorist organizations, including Hamas in Gaza, Hezbollah in Lebanon, and the Houthis in Yemen.

236.    That issue is composed of articles that address "the constellation of regional forces fighting Israeli domination and, with it, broader US imperialism."

**B.    IMES's partnership with the Middle East Studies Association.**

237.    In addition to IMES's presence, in 2019, GWU announced that the Middle East Studies Association ("MESA") had decided to move its operations from the University of Arizona to GWU, where it would be affiliated with IMES at GWU's Elliott School.

238.    Founded in 1996, MESA is a Section 501(c)(3) organization describing itself as "a non-profit association that fosters the study of the Middle East, promotes high standards of scholarship and teaching, and encourages public understanding of the region and its peoples through programs, publications and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom."[19]

---

[19] *Mission Statement*, Middle E. Stud. Ass'n, https://mesana.org/ (last visited Oct. 11, 2024).

239.    For decades, though, MESA has been recognized as an antisemitic outpost masquerading as an academic organization.

240.    Indeed, in 2007, the Association for the Study of Middle East and Africa was established as an ideological alternative to MESA, given MESA's reputation as an organization that was politicized and dominated by academics who were critical of both the United States and Israel.

241.    As Martin Kramer wrote in *Ivory Towers on Sand* in 2001, MESA had transformed the field of Middle East studies and "rejected the idea of objective standards, disguised the voice of politicization as the virtue of commitment, and replaced proficiency with ideology."

242.    In 2017, MESA designated itself as an advocacy group by amending its bylaws to remove its nonpolitical status.

243.    This shift enabled the organization to promote anti-Zionist ideology and pass politicized resolutions that compromised academic integrity and contributed to hostility toward Israel.

244.    This was two years before GWU installed MESA in the Elliott School of International Affairs.

245.    In March 2022, from its headquarters in the Elliott School, MESA adopted a resolution endorsing the Boycott, Divestment, and Sanctions ("BDS") movement.

246.    The BDS movement operates as a coordinated and sophisticated effort to disrupt the economic and financial stability of the State of Israel. It also attempts to cause direct harm to the economic interests of persons conducting business in and with Israel, or with people that the movement deems to be affiliated with Israel in some way, often simply because they are Jewish.

247.    Especially in its "cultural and academic boycotts," the movement targets people who are Jewish or who do business with persons who are Jewish.

248.    MESA's BDS resolution also called on its board—including its then-President, GWU faculty member Dina Khoury—to implement the spirit and intent of the resolution.

249.    MESA's adoption of the BDS resolution violated GWU's own policy, which rejects calls for divestment and academic boycotts of Israel.

250.    While GWU issued a statement that MESA's BDS resolution did not reflect the position of GWU, it nonetheless continued its partnership with MESA and allowed it to remain on campus and pursue its advocacy.

251.    The BDS movement is not new, and its effects on campus have been well-documented.

252.    Studies show that universities whose faculty actively support BDS are 3.6 times more likely to have acts targeting Jewish and pro-Israel students for physical harm on campus, and that the presence of a BDS campaign is the single strongest predictor of campus antisemitism.[20]

253.    The partnership, moreover, was riddled with conflicts of interest.

254.    GWU professors frequently served on MESA's board, which allowed GWU (and in particular, IMES) to become an extension of MESA and amplify its voice.

255.    In April 2023, for instance, Nathan Brown who was a board member of MESA and a GWU professor, held a conference (attended by, among others, Michael Barnett) to promote his book, falsely claiming that Israel is an apartheid state.

---

[20] *See* AMCHA Initiative, "New Study: Faculty-Driven BDS is Fueling Campus Antisemitism"(March 16, 2022), https://amchainitiative.org/faculty-bds-driving-antisemitism-3-16-22pr/.

256.    Another GWU professor on the panel and espoused the view of Israel being mired in "Jewish supremacy" ringing akin to the notion of "Jewish world domination."

257.    No counternarrative was featured at this event.

258.    In October 2024, Professor of American Studies Melani McAlister, who served on MESA's Committee on Academic Freedom from 2010–15, held an event in 2024 promoting her book that lauded Palestinian "resistance" as "resilience."

259.    A prominent line of discussion during the event was that Israel's actions aimed at "perfecting genocide" in attempts to "eradicate Palestinian-ness."

260.    The discussion included no opposing account, which left unchallenged a narrative that equated Israel's right to self-defense with baseless accusations of bigotry promoted by an entire population.

261.    GWU was fully aware that antisemitism was being cultivated throughout the University.

262.    On May 2, 2023, the Louis D. Brandeis Center for Human Rights Under Law authored a letter to then-GWU President Mark Wrighton  expressing concern over the continued presence of MESA on GWU's campus.[21]

263.    The Brandeis Center Letter noted that the University's partnership with MESA "fosters antisemitism on [GWU's] campus" by singling out the world's only Jewish state for destruction.

---

[21] Letter from The Louis D. Brandeis Center to Mark S. Wrighton, Pres., George Washington Univ. (May 2, 2023) (on file with Investigative Project, at https://www.investigativeproject.org/documents/1173-brandeis-center-letter-to-gw-re-mesa.pdf).

264.     Despite once touting MESA's move across the country to affiliate with GWU's Elliott School, in a June 3, 2023 response to the Brandeis Center letter, GWU claimed that MESA was an independent Section 501(c)(3) organization *unaffiliated* with GWU.

265.     In so doing, GWU was (in effect) disclaiming any responsibility for the antisemitism that its partnership caused and was (in fact) demonstrating profound indifference to the plight of its Jewish and Israeli students.

266.     In other words, by displacing blame, GWU absolved itself of having to correct the damage.

267.     At the time, the Elliott School's website still listed MESA as an affiliated organization: "MESA's headquarters ha[d] been incorporated into IMES, a GW academic department under GW's purview."

268.     MESA also remained dependent "on GW's provision of resources to ensure its ongoing mission and continued success."

269.     In other words, "MESA and GW ha[d] formed a mutually symbiotic relationship where 'MESA members [would] continue the organization's work studying the Middle East' and 'GW [would] provide a new home for the body's executive functions, elevating the University's profile as a leading center for studying the region.'"

270.     Indeed, MESA was at the time "recognized as part of the GW community," a fact that, given its new, brazen approach to geopolitics, posed a threat to GWU's Section 501(c)(3) tax-exempt status as an "educational organization."

271.     In its June 3rd response, GWU indicated that it would allow its partnership agreement with MESA to expire at the end of the year.

272.    This announcement, however, amounted to little more than a performative gesture—an empty platitude aimed at appeasing critics, with no meaningful structural reforms implemented across the University.

273.    The IMES–MESA partnership remained fully intact, continuing to sponsor programming, conferences, and scholarship that promote a singular ideological narrative while actively excluding accurate and balanced historical perspectives on the Israeli–Palestinian conflict.

274.    GWU's decision to end its partnership with MESA tacitly acknowledged MESA's corrosive effect on campus.

275.    But the GWU administration did nothing to remedy the corrosion, and MESA, through its members on the GWU faculty, continues to foster and legitimize antisemitism.

276.    As of early 2025, IMES was still listed as an "institutional partner" on MESA's website; the institutional partner page of the site has since been removed.

277.    As discussed at greater length below, the IMES administration and faculty members, many of whom are MESA members and serve on MESA's board, continue to sponsor programs and events that not only are wholly biased against Israel but also teach that Jews in Israel constitute foreign colonialist settlers committed to maintaining an oppressive apartheid regime and pursuing genocide of the Palestinian people.

278.    Despite the absence of any moral equivalence between Hamas—a designated terrorist organization—and the democratic State of Israel, GWU and certain faculty members have continued to deny and deprive students of an accurate, objective understanding of the historical context and the true nature of Hamas's actions and ideology.

279.    And GWU allows it.

280.     Faculty members, in their roles as educators and scholars, hold a duty of care and a position of authority that significantly influences their students.

281.     Rather than upholding academic integrity, several professors have used their classrooms and educational platforms to promote political agendas under the guise of scholarship.

282.     Students were mobilized—sometimes incentivized with extra credit—to attend rallies, protests, programs, and conferences that advanced the professors' personal political ideologies.

283.     In so doing, these faculty members acted not as educators, but as political activists aligned with external advocacy groups, while simultaneously depriving students of balanced and academically sound narratives.

284.     On one hand, they offered perks and extra credit to students who engaged with anti-Israel events, while simultaneously denying pro-Israel and Zionist students, (and those who may wish to remain neutral) equal opportunities—further reinforcing ideological bias and creating a discriminatory academic environment.

**C.    MESA and the GWU IMES faculty have incited and legitimized antisemitism under the false pretense of academic freedom and scholarship.**

285.     The GWU administration has been aware of the wholly imbalanced and uniformly anti-Zionist programming within IMES (particularly when discussing Israel), having received numerous complaints from students and parents that the sole ideological scholarship and tutelage were inculcating conformity to antisemitism among the GWU student body.

286.     Speech often contributes to a hostile environment, and at GWU, it did.

287.     For years, MESA and some of GWU's faculty (along with the organization "Faculty for Justice in Palestine") have taught that, despite the Torah, the Talmud, and all of Jewish history, Jewish identity as understood by Jewish people Jewish identity is a fraudulent contrivance;

that Zionism is borne of Jewish supremacy rather that the Jewish people's indigenousness to the land of Israel; that Zionism is a settler colonial project, rather than a return to the Jewish people's ancient homeland; that Zionism is racist; that Israel is an apartheid state; and that Israel promotes genocide.

288.    In short, they have taught that Zionism is evil, and Israel is the evil product of Zionism.

289.    In so doing, MESA's conduct and some of the GWU faculty's lessons set the stage for the eruption of blatant and aggressive antisemitic harassment on the GWU campus.

290.    Those programs and events, including those that arose in the immediate aftermath of Hamas' October 7th attacks (described below in paragraphs 455 to 543), validated, legitimized, and incited aggressive antisemitism and anti-Israeli sentiment on the GWU campus.

291.    Any pretense that IMES programming represents academic freedom in pursuit of scholarship was betrayed by the flat-out refusal to include *any* pro-Israeli scholarship or speaker in its presentations.

292.    Also, by the ironic fact that many of its scholars pleading for academic freedom are the same ones who support a boycott of Israeli institutions—a betrayal of academic freedom itself.

293.    By doing so, IMES perpetuated an orchestrated and deliberate omission of facts that teach the vilification of Israel and distort Jewish identity.

294.    To do so is shameful; professors are viewed by their students as experts in their respective fields, which means any deliberately one-sided portrayal or programming deprives

students of the entire purpose behind higher education—the search for truth.

295.    MESA, meanwhile, continues to be a force on GWU's campus through its members and adherents among the GWU faculty who have continued to promote MESA's programming and remain engaged with the GWU Administration.

## III.    THE CULTURE OF HATE SPREADING FROM IMES PERMEATED GWU'S CAMPUS LONG BEFORE THE OCTOBER 7TH HAMAS TERROR ATTACKS.

296.    The foregoing sets the stage and provides abundant context for the following allegations.

297.    For years, Jewish and Israeli students at the GWU campus have experienced pervasive and severe antisemitic discrimination and harassment.

298.    Acts of antisemitic harassment have been documented and widely acknowledged within the University community.

299.    Reports of antisemitic discrimination have been made by students, parents, and other members of the GWU community.

300.    Numerous media outlets, including the University's student newspaper, the GW Hatchet, have reported such incidents.

301.    Currently, the U.S. House of Representatives Committee on Education and the Workforce ("House Committee") is investigating GWU as part of its broader investigation into antisemitism on college and university campuses.

302.    Indeed, the Department of Justice Task Force on Antisemitism recently included GWU among the ten universities it visited as part of its investigation of antisemitism on college

and university campuses.[22]

303.    In just the two years leading up to October 7, 2023, GWU's administration was confronted with a persistent pattern of blatant acts of antisemitic discrimination and harassment on campus, yet it failed to act to protect the safety and rights of Jewish members of the community.

304.    For example, within just two weeks during the month of October 2021, GWU received reports of at least four serious incidents of antisemitic harassment:

- On October 19th, a student reported being harassed with Nazi imagery anonymously sent to her residence hall room.[23]

- On October 24th, another student reported that her mezuzah, a religious object affixed to the doorways of Jewish homes, had been defaced.[24]

- On October 31st, a campus fraternity house was broken into, and the fraternity's Torah scroll was desecrated.[25]

- A few days after the Torah desecration, the executive director of the Rohr Chabad Center of GWU, a center of Jewish learning and worship, received an anonymous email that stated the Torah desecration was an "Act of Resistance Against The Oppressor," compared Jews to Nazis, and stated that Jews "must have a death wish."[26]

305.    The entrenched and pernicious pattern of antisemitism prompted the editorial board of the GW Hatchet to publish an op-ed in November 2021:

---

[22] United States Department of Justice, Office of Public Affairs, *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism* (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

[23] *Crime log: Student harassed with image of swastika on Mount Vernon Campus,* GW Hatchet (Nov. 1, 2021), https://gwhatchet.com/2021/11/01/crime-log-student-harassed-with-image-of-swastika-on-mount-vernon-campus/

[24] I. Trivedi and Z. Blackburn, *Tau Kappa Epsilon reports Torah scroll vandalized at on-campus house*, GW Hatchet (October 31, 2021), https://gwhatchet.com/2021/10/31/tau-kappa-epsilon-reports-torah-vandalized-at-on-campus-house/.

[25] *Id.*

[26] A. Kennedy, *How recent antisemitism has affected GW community*, GW Hatchet (Nov. 8, 2021), https://gwhatchet.com/2021/11/08/timeline-how-recent-antisemitism-has-effected-gw-community/

> GW has an alarming history of antisemitism, and this is just one of a string of
> similar events that have taken place over the last couple of years. . . . GW has an
> obligation to work toward solving it. Combating hate requires an all-hands-on-deck
> approach from the University as an institution and the GW community. In the
> immediate term, GW needs to make clear what kinds of disciplinary actions will be
> given out to students who commit hate crimes and perpetuate antisemitism and
> bigotry. . . . This kind of behavior should be met with disciplinary action, and
> students should know exactly what kinds of consequences they will incur if they do
> similar things. [Then-GWU President] LeBlanc said in an email that the GW
> community will not tolerate hate—GW needs to prove it.[27]

306.    The editorial board of the GW Hatchet was right—GWU needed an all-hands-on-

deck response to antisemitism on campus.

307.    The GWU administration had a legal and moral duty to show the community that

antisemitic harassment would be investigated, and its perpetrators met with serious consequences.

308.    The GWU administration, however, refused to take action to protect the Jewish and

Israeli members of the GWU community.

309.    GWU did not respond, and even when it identified perpetrators of discrimination

and harassment, it refused to impose any meaningful disciplinary consequences on the

perpetrators.

310.    GWU's deliberate and shameful indifference to antisemitism lent the vandals and

antisemitic provocateurs a veneer of legitimacy, emboldened perpetrators to take more aggressive

discriminatory actions, and encouraged others to escalate the hatred.

311.    On October 7, 2022—one year before the Hamas terrorist attacks on October 7,

2023, and immediately after the Jewish high holiday of Yom Kippur—Jewish students discovered

signs posted throughout campus and on the property of the GWU Hillel Center, the center of

Jewish community life and worship on campus, with messages such as "Zionists Fuck Off."

---

[27] *GW needs a cultural shift against antisemitism*, GW Hatchet, (Nov. 8, 2021),
https://gwhatchet.com/2021/11/08/gw-needs-a-cultural-shift-against-antisemitism/.

312.    The signs on the Hillel Center property were plastered with an extra-strong adhesive, and the removal caused thousands of dollars in property damage.

313.    The students who organized the posting of antisemitic imagery during the holiest time of the Jewish calendar gleefully claimed credit.

314.    The Hillel Center and individual students filed reports with GWU's Office for Students Rights and Responsibilities ("SRR").

315.    The GWU administration chose to investigate only the property damage to the Hillel Center, but even that did not result in any disciplinary action, ostensibly because the University claimed that it was unable to identify the specific student(s) who used the adhesive that caused the property damage.

316.    The leaders of the student organizations that had committed these unlawful acts, and the organizations themselves, faced no discipline.[28]

317.    Days later, on October 11, 2022, during the Jewish holiday of Sukkot, a protest was organized at the Hillel Center, which was hosting prayer services.

318.    A student organization, GW for Israel, had separately arranged for a former Israeli Defense Forces intelligence official to speak at the Hillel Center about the situation in Israel.[29]

319.    As Jewish and Israeli students arrived at, and were leaving, the Hillel Center, they were confronted by a crowd of protesters carrying banners, screaming epithets including "Kikes, go kill yourself" and "there is only one solution, intifada revolution."

---

[28] A. Rosenfeld, *GW clears student activist and club of wrongdoing in 'F— Zionists' postering*, The Forward (Dec. 19, 2022), https://forward.com/fast-forward/529048/gw-clears-student-activist-and-club-of-wrongdoing-in-f-zionists-postering/.

[29] Bobby Miller, *George Washington University's Shameful Response to Campus Antisemitism*, Nat'l Rev. (Nov. 1, 2022), https://www.nationalreview.com/2022/11/george-washington-universitys-shameful-response-to-campus-antisemitism/.

320.    The term "intifada" refers to violent uprisings involving attacks on civilians in Israel, and "one solution" is an allusion to Hitler's "final solution"; i.e., the genocide of the Jewish people.

321.    The protesters also held posters declaring "Zionists, Fuck Off."

322.    One of the protesters was positioned in bushes to take photos of Jewish and Israeli students.

323.    Many of the students were frightened for their safety and concerned that they would be targeted for more harassment.

324.    The protest at the Hillel Center laid bare the lie that the protesters were acting out of anti-Israel, not antisemitic, animus.

325.    They did not ask anyone about their views on Israeli policy and made no distinction between Jewish students attending prayer services and those attending the GW for Israel event.

326.    The protesters targeted Jewish students simply because they were Jewish, and on that basis called one out as a "kike" and others as Zionists.

327.    Multiple reports were filed with SRR, but the University administration took no action whatsoever.

328.    The fear of being targeted while on campus prompted some Jewish and Israeli students to conceal their Jewish identity.

329.    In March 2023, Sabrina Soffer, the commissioner of a then-existing GWU Student Government Presidential Task Force to Combat Antisemitism, explained in a news article: "My own school [GWU] has not been spared from this wave of hate. A number of my Jewish friends

tend to conceal their Jewish insignia when walking around campus. They're often confronted or heckled."[30]

330.    Several months after her article was published, and the Task Force work was underway, the GWU Student Government Presidential Task Force to Combat Antisemitism was disbanded by the incoming president of the GWU Student Government.

331.    Since then, Ms. Soffer and GW JPULSE have on separate and repeated occasions urged the current GWU administration to reestablish a collaborative antisemitism task force or other university-led efforts to combat antisemitism, and to provide greater transparency as to whether, and how, antisemitic rulebreakers are punished and/or otherwise held accountable by the University.

332.    Ms. Soffer was able to meet with the GWU administration countless times about these matters, but upon requesting concrete steps, was given empty promises or, on other occasions, was told nothing could be done.

333.    As for GW JPULSE, GWU has refused to entertain those discussions.

**IV.    DESPITE KNOWING OF THE ANTISEMITISM INFECTING ITS CAMPUS AND ITS CLASSROOMS, GWU HAS HISTORICALLY TRIED (AND FAILED) TO EXONERATE ITSELF.**

334.    In April 2023, the Office for Civil Rights of the U.S. Department of Education ("OCR") commenced a formal investigation of GWU arising out of antisemitic discrimination of first-year Jewish and Israeli students in GWU's Professional Psychology Program ("Program").[31]

---

[30] Sabrina Soffer," I've Been Asked to Help Tackle Antisemitism at George Washington University; Here's My Take," The Algemenier, (March 13, 2023), https://www.algemeiner.com/2023/03/13/ive-been-asked-to-help-tackle-antisemitism-at-george-washington-university-heres-what-i-plan-to-do/

[31] 1.C. Kitson, Office for Civil Rights to investigate antisemitism, discrimination allegations in psychology course, GW Hatchet (April 7, 2023), https://gwhatchet.com/2023/04/07/office-for-civil-rights-to-investigate-antisemitism-allegations-in-psychology-course/

335.    The complaint alleged that, in a mandatory diversity course taught by Professor Lara Sheehi in the fall of 2022, Jewish and Israeli students were singled out for harassment and retaliation.

336.    Professor Sheehi has spoken publicly of her disdain for Jewish and Israeli students.

337.    In public statements, she said that it is not possible to be both a Zionist and a good clinician, issued calls to "destroy Zionism," and described Israelis as "genocidal fucks."

338.    In previous publications, Professor Sheehi claimed that Zionism is a mental illness, and that Jews commit "violence" against every Palestinian they encounter.

339.    On her X (formerly Twitter) account, now deleted, she declared all Israelis to be "fucking racist" and that she wants to "destroy" Zionism.

340.    Another tweet proclaimed that "Zionists are the most boldfaced assholes."

341.    In a public appearance shortly before the Fall semester, Professor Sheehi taught: "This is my own urgent call to the clinicians among us. . . . [W]e must support boycott, divestment, and sanction efforts despite threats and efforts to derail solidarity. This needs to be done not as an offshoot of our clinical work, but as a central working tenet of any clinical praxis that purports to be interested in alleviating the suffering of others."[32]

342.    Professor Sheehi's antisemitism extended far beyond legitimate classroom debate over political issues.

343.    Even though her speech outside the classroom (like all others) is protected by the First Amendment, it nonetheless underscores the extent to which her in-class conduct was fueled by her hatred of Jews and makes crystal clear that her Jewish students were right to ascribe hate to her in-class conduct.

---

[32] (https://www.youtube.com/watch?v=4JFqgJr9iJ4).

45

344.    On the podcast titled "Rendering Unconscious," Professor Sheehi accused all Zionists of suffering from a "settler psychosis" from which they must be "liberated" to interact with "indigenous" people.

345.    She taught her classes with consistent hateful public statements—that Jewish and Israeli students could not claim their shared ancestry and identity and be true to their professional mission of alleviating the suffering of others.

346.    In the Diversity Sequence 1 Course, which was mandatory for all students in the program, Professor Sheehi asked students to introduce themselves, including where they were from.

347.    After a Jewish Israeli student introduced herself and said that she was from Israel, Professor Sheehi responded: "It's not your fault you were born in Israel," conveying that Israeli nationality is a source of shame.

348.    The following week, Professor Sheehi encouraged her students to attend a brown-bag presentation by a guest lecturer, Dr. Nadera Shalhoub-Kevorkian.

349.    Dr. Shalhoub-Kevorkian is known for patently false accusations reminiscent of historic antisemitic blood libels, including that Israel tests its weapon systems on Palestinian children.

350.    Throughout her lecture, Dr. Shalhoub-Kevorkian demonized Israel, and Israelis in general, while also referring to "the Jews."

351.    She also said that "Jews use money for nefarious purposes."

352.    Among other things, she said Israel uses humanitarian aid to camouflage its oppressive power and sinister activities, advocated violent resistance to what she called white Israeli racism, and lionized a Palestinian teenager who stabbed a Jewish Israeli child leaving a

candy store.

353.    Purposefully, and in an effort to target Zionism, Judaism, and Israelis, no alternative viewpoints were provided to Dr. Shalhoub-Kevorkian's assertions.

354.    Dr. Shalhoub-Kevorkian had been briefly suspended by the Hebrew University of Jerusalem, where she works as a senior lecturer, following her comments on the atrocities of October 7th.

355.    In response, MESA sent a letter to the Hebrew University of Jerusalem accusing the institution of engaging in "incitement of violence" against Dr. Shalhoub-Kevorkian when it publicly announced its decision to suspend her for denying Hamas's atrocities.[33]

356.    Professor Sheehi began the next class, as was her usual practice, by inviting students to share thoughts and feelings.

357.    Five Jewish and Israeli students volunteered that Dr. Shalhoub-Kevorkian's remarks were antisemitic and left them feeling vulnerable and unsafe in class.

358.    Professor Sheehi denied that Dr. Shalhoub-Kevorkian was antisemitic and denied that she had said anything that could be construed as antisemitic.

359.    She declared that anti-Zionism is not antisemitism—and that, according to Professor Sheehi, was a non-negotiable truth and historical fact.

360.    Professor Sheehi also rejected the students' personal concerns.

361.    An Israeli student tried to explain her feelings of vulnerability and isolation by asking her classmates to imagine her reality—the apprehension of going to a bar in Tel Aviv on a Saturday night and suddenly being confronted by a terrorist attack.

---

[33] Aslı Ü. Bâli, *Letter to the Hebrew University of Jerusalem protesting suspension of faculty member Nadera Shalhoub-Kevorkian*, THE MIDDLE EAST STUDIES ASSOCIATION (Mar. 21, 2024), https://mesana.org/advocacy/committee-on-academic-freedom/2024/03/21/letter-to-the-hebrew-university-of-jerusalem-protesting-suspension-of-faculty-member-nadera-shalhoub-kevorkian.

362.    Professor Sheehi took offense at the term "terrorist attack," which she said was Islamophobic, and refused to entertain further discussion.

363.    In subsequent classes, Professor Sheehi assigned antisemitic readings that referred to Jews as white supremacists and violent aggressors.

364.    When Israeli students brought up some concerns with the reading content, one student told them they were "ruining Halloween" and suggested that they leave the class.

365.    They did.

366.    Several Jewish and Israeli students sought help from the Chair of the Program, but he merely referred the matter to the Dean of the College of Arts and Sciences, Chad Heap.

367.    On behalf of herself and three other students, a Jewish student met with Dr. Heap and requested an alternate arrangement for Jewish and Israeli students who felt unsafe in Professor Sheehi's class.

368.    Dr. Heap refused, and said the students' only recourse was to file a bias complaint—but made clear that they would still be required to remain in Professor Sheehi's class.

369.    Professor Sheehi thereafter failed to respond to the Jewish and Israeli students' emails, to meet with them outside of class, or to entertain their questions in class.

370.    In retaliation against two Jewish students, Professor Sheehi instigated baseless disciplinary proceedings, falsely accusing them of Islamophobia and of being combative.

371.    She also falsely accused one student of calling the guest speaker a terrorist.

372.    On November 11, the two Jewish students were notified that they had been put on "remediation."

373.    On January 11, 2023, a complaint against GWU was filed with the OCR.

374.    On April 14, 2023, the OCR announced it had commenced a formal investigation of GWU arising from Professor Sheehi's discriminatory harassment of Jewish and Israeli students, and the GWU administration's complicity in discriminatory retaliation.

375.    In the meantime, GWU engaged the law firm Crowell & Moring LLP to conduct a "third-party investigation" into the allegations.

376.    In a letter to GWU, MESA objected to the University's investigation of Professor Sheehi's discriminatory harassment of Jewish and Israeli students.

377.    The MESA officers who signed the letter had not seen the students' reports, had no first-hand knowledge of the facts, and had no expertise in graduate-level psychology.

378.    But they nonetheless argued that Professor Sheehi had done nothing wrong, and blamed the victims, whom they accused, without any evidence, of "weaponiz[ing] allegations of anti-Semitism."

379.    MESA's protest was not the product of an academic association dedicated to scholarship, but a patent defense of antisemitism, which should have raised alarms within GWU's administration about its partnership with MESA.

380.    On March 27, 2023, GWU released its Summary of Findings of Independent Investigation by Crowell & Moring LLP, which asserted that Professor Sheehi had been fully "exonerated" from any allegations of antisemitism and stating that the firm had found "no evidence substantiating the allegations of retaliatory conduct alleged in the complaint," because the allegations were supposedly "inaccurate or taken out of context and misrepresented."

381.    In January 2025, following a mediation and settlement, OCR resolved the complaint against GWU, and ordered GWU to review and revise its anti-discrimination policies, institute antisemitism training, investigate whether Professor Sheehi's social media posts created

a hostile environment for Jewish students, and expunge the remediation disciplinary actions from the Jewish students' academic records.[34]

382.    In other words, OCR inexorably did not exonerate Professor Sheehi the way that the GWU-instituted Crowell & Moring, LLP investigation purported to do.

383.    Professor Sheehi has since left GWU and apparently accepted a teaching assignment at the Doha Institute for Graduate Studies in Qatar.

384.    Simply put, GWU was far more concerned with parading about the results of its self-funded, non-transparent "investigation," instead of complying with its legal and moral obligation to provide its Jewish and Israeli students with a discrimination-free educational experience.

385.    All of this occurred while inflicting tremendous emotional distress, trauma, and immeasurable harm on the students who dared to speak up about their mistreatment.

386.    This was not an isolated incident at GWU—it reflects a broader pattern of institutional disregard for student welfare and accountability.

387.    It also represented a breach of the University's duty and legal obligation to uphold its own code of conduct and to enforce state and federal laws designed to ensure a safe and non-discriminatory learning environment.

## V.    THE OCTOBER 7TH ATROCITIES BRING ANTISEMITISM TO THE FOREFRONT OF THE GWU COMMUNITY, AND THE GWU ADMINISTRATION ALLOWS IT TO BOIL OVER.

388.    During the Fall 2023 semester, the already-hostile environment on campus became even more intolerable for Jewish and Israeli students.

---

[34] *George Washington University Retaliated Against Jewish Students Who Lodged Antisemitism Complaint, Federal Probe Finds* Washington Free Beacon (Feb. 22, 2025), https://freebeacon.com/campus/george-washington-university-retaliated-against-jewish-students-who-lodged-antisemitism-complaint-federal-probe-finds/; *Not one sentence of exoneration for Sheehi*, Times of Israel (Feb. 23, 2025), https://blogs.timesofisrael.com/not-one-sentence-of-exoneration-for-sheehi/.

389.    On October 7, 2023, during the Jewish holiday of Simchat Torah, Hamas terrorists from Gaza perpetrated the most gruesome attack against Israel and its citizens in the Nation's history.

390.    They murdered, tortured, and mutilated hundreds of innocent men, women, children, and babies; they brutally raped and sexually assaulted women; and they kidnapped hundreds of innocent civilians, including the elderly, the infirmed, and young children.

391.    By the end of this horrid day, more than 1,200 people had been murdered, including more than forty Americans.

392.    Two-hundred fifty-one people were abducted.

393.    October 7, 2023, was the most fatal day in Jewish history since the Holocaust.

394.    Leaders across the United States immediately and forcefully condemned the attack and expressed sympathy for the Jewish people.

395.    At a press conference days later, President Biden described the attack as follows:

Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage. Children slaughtered. Babies slaughtered. Entire families massacred. Rape, beheadings, bodies burned alive. Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world. There is no rationalizing it, no excusing it. Period. The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel. October 7, which was a sacred to—a sacred Jewish holiday, became the deadliest day for the Jewish people since the Holocaust.[35]

396.    Critically, President Biden explained how the October 7th attack had so profoundly and painfully affected Jews around the world and how it "brought to the surface painful memories and scars left by millennia of anti-Semitism and the genocide of the Jewish people."[36]

---

[35] President Joe Biden, Remarks on the October 7th Terrorist Attacks and the Resilience of the State of Israel and its People -|Tel Aviv, Israel (Oct. 18, 2023), https://www.whitehouse.gov/briefing- room/speeches-remarks/2023/10/18/remarks-by-president-biden-on-the-october-7th-terrorist-attacks- and-the-resilience-of-the-state-of-israel-and-its-people-tel-aviv-israel/.

[36] Id.

**A.    GWU-funded student organizations celebrate Hamas while threatening Jewish and Israeli students, without meaningful repercussions.**

397.    The University was unmoved.

398.    In the wake of the October 7th attacks, several GWU student groups and supporters openly celebrated Hamas' terrorist attacks and honored the "martyred" terrorists killed in the attacks, while taunting pained and grieving Jewish and Israeli students.

399.    On October 9, 2023, while Jewish and Israeli students were still reeling from the attacks, the University issued its first statement.

400.    In an open letter to the University community, GWU President Ellen Granberg stated that she was "deeply shocked and saddened"—but not specifically by the carnage inflicted by Hamas on Jews and Israelis.

401.    She chose *not* to call out Hamas by name, condemn its attacks as terrorism, or condemn the antisemitic celebrations of the attacks.

402.    And in contrast to University statements issued in the wake of other terror or bias attacks, President Granberg did not even extend condolences to the devastated Israeli students on campus.

403.    She offered only that "[t]imes of war are fraught with many difficult and complex emotions, and I recognize that we all may feel a combination of fear, anxiety and anger right now."

404.    Her equivocation left Jewish and Israeli students abandoned and gave purchase to virulent antisemitism.

405.    Within hours, GWU SJP issued its own statement, cheering Hamas' terrorist attacks on unarmed civilians.

406.    GWU SJP declared Hamas "our resistance fighters," and proclaimed that it maintains "unwavering support for our people's resistance, in all its forms."

407.    GWU SJP also "call[ed] upon all our people and those in solidarity with us to join us in this struggle."

408.    And GWU SJP made clear that "this struggle" was not confined to peaceful protest.

409.    Instead, it rejected any distinction between civilians and soldiers.

410.    According to its statement, every Jew in Israel is a "settler," and a "settler is an aggressor, a soldier, and an occupier even if they are lounging on our occupied beaches."

411.     On the other hand, "[e]very Palestinian is a civilian even if they hold arms."

412.    The GWU SJP statement added that "[t]he settler colony"—Israel and its people—will fall," and "Palestine will be free, from the river to the sea."

413.    GWU SJP's statement and its celebrations of Hamas, particularly in light of the pattern of antisemitic harassment on campus, caused even more anxiety among Jewish and Israeli students.

414.    Moreover, it constituted a violation of, among other things, (i) GWU's Policy on Threats and Acts of Violence, which prohibits threats, defined as "words or actions intended, causing, or reasonably likely to cause fear, pain, harm, injury, or damage to any person or property"; and (ii) GWU's Student Code of Conduct, Prohibitions Against Discriminatory Harassment, and of Disorderly Conduct, which prohibits "[a]cting in a way that threatens, endangers, or harasses others, including verbal, written, or any other form of communication."

415.    Jewish and Israeli students reported the GWU SJP statement to the administration and explained the threatening language, and the fear and anxiety it provoked.

416.    The administration, however, determined that the "[a]llegations if true would not have constituted a violation of GW policy."[37]

417.    On October 10, 2023, GWU SJP hosted a "Vigil for Martyrs" on Kogan Plaza, the center of the mid-campus yard, which is bordered by the Gelman Library, academic buildings, residence halls, and dining halls.

418.    A crowd of approximately 120 protesters filled Kogan Plaza, and using megaphones and drums, cheered Hamas' attacks and mourned the terrorists killed during the attack.

419.    The protesters filled the Plaza with such chants as "We will honor all our martyrs," and "Intifada, intifada, long live the intifada."

420.    The crowd of protesters then engaged in in a loud call and response of "From the River to the Sea, Palestine will be free.

421.    The crowd followed by shouting the chant in its original Arabic, the cornerstone of the Hamas charter: "min il-ṃayye la-l-ṃayye, Falasṭīn ʿarabiyye," which means "from the water to the water, Palestine will be Arab";[38] i.e., free from Jews.

422.    In other words, in the middle of the GWU campus, a crowd of protesters were calling for the elimination of Jews from the land of Israel.

423.    A protest leader, his voice amplified by megaphone, shouted that Jews would be vanquished through "intifada," more terrorist attacks on civilians.

424.    Describing the Hamas terrorists' attacks on civilian communities within Israel's

---

[37] Letter to the Hon. Virginia Foxx, Chair, Committee on Education and the Workforce dated October 11, 2024, and attachment entitled George Washington University Incident Overview ("House Committee Submission").

[38] MaryMargaretOlohan,    X    (October    10,    2023), https://x.com/MaryMargOlohan/status/1711888705093353931/video/1.

internationally recognized borders, he proclaimed that "over the past few days, Palestinians in Gaza and across occupied Palestine have mobilized against the Zionist entity and seizing settlements imposed on our land in violation of international law," and that "the settler colony will fall."

425.    He then broadcasted GWU SJP's October 9th statement, exhorting the crowd that every Jew in Israel is a "settler," and a "settler is an aggressor, a soldier, and an occupier."

426.    For Jewish and Israeli students on campus, a target had been placed on their backs.[39]

427.    As the "Vigil for Martyrs" was getting underway, Ms. Soffer and approximately fourteen other Jewish students met with President Granberg and Dean Coleman to make sure the administration was aware of the increasingly hostile environment on campus for Jewish and Israeli students.

428.    The students explained they felt unsafe on campus and asked President Granberg and Dean Coleman to take concrete action to protect the safety of Jewish and Israeli students.

429.    They also told President Granberg that her statement in response to the October 7th attacks was disappointing because, among other things, it failed to acknowledge the loss and pain of Jews and Israelis, and, intentionally or not, may have exacerbated antisemitic hostility towards Jewish and Israeli students.

430.    Ms. Soffer expressed concerns of the upcoming IMES events, like the screening of the anti-Israel film, *Israelism*, which she had priorly researched upon her professor's encouragement to attend the screening and bring her friends. Ms. Soffer was given extra credit to attend the screening and write a reflection on.

---

[39] MaryMargaretOlohan,                    X              (October                10,              2023), https://x.com/MaryMargOlohan/status/1711887828806738386/video/1

431.    To be certain, the students were not asking for the University to stifle free speech.

432.    They did, however, plead for protection against the violence and threatening conduct that was beginning to rear its head throughout campus.

433.    President Granberg acknowledged the students' concerns.

434.    But her only concrete response to the students' concern for their safety was emblematic of the administration's tolerance of antisemitism—she instructed them to *avoid* Kogan Plaza, where the "Vigil for Martyrs" was taking place.

435.    Rather than protecting Jewish and Israeli students from antisemitic harassment in the center of campus, President Granberg (1) refused to do *anything* but (2) admitted that the students would be safer if they avoided certain areas of *their own campus*.

436.    Jewish and Israeli students reported the "Vigil for Martyrs" to the administration, because it violated, among other things, (i) GWU's Policy on Threats and Acts of Violence; (ii) GWU's Policy on Demonstrations; and (iii) GWU's Student Code of Conduct, Prohibitions Against Discriminatory Harassment, and of Disorderly Conduct, which prohibits "[d]isrupting, obstructing, or interfering with the activities of others, including university events" and "[a]cting in a way that threatens, endangers, or harasses others, including verbal, written, or any other form of communication."

437.    Although President Granberg's directive to the Jewish and Israeli students recognized the threat posed to them, the GWU administration nonetheless concluded that the "[a]llegations if true would not have constituted a violation of GW policy," despite the clear transgressions of the policies listed in the previous paragraph.

438.    On October 11, 2023, President Granberg issued another statement to the University community, which said that "as the extent of this brutal violence and the staggering

56

loss of innocent lives has continued to come to light," she felt moved to "condemn these acts of terrorism."

439.    She added:

[M]embers of the GW community, including our student organizations, have the right to be vocal and engaged within the boundaries of the law and our university policies. However, we are also a shared community, and I not only condemn terrorism, but I also abhor the celebration of terrorism and attempts to perpetuate rhetoric or imagery that glorifies acts of violence.

440.    While her statement finally, belatedly, condemned Hamas' attacks as terrorism and stated her abhorrence for the celebrations of terrorism on the GWU campus, she did not announce any concrete plans or actions to protect the safety and educational access of Jewish and Israeli students.

441.    President Granberg offered only to "continue to advocate for peace on campus and abroad."

442.    But Jewish and Israeli students needed more than platitudes to try to dissuade others from discriminating against and harassing them.

443.    They needed the GWU administration to invoke and apply existing University policies designed for the very purpose of protecting their safety from those who would do them harm.

444.    This approach, however, has been (and remains) GWU's playbook: announcing, but never enforcing, rules, and then engaging in tortuously slow accountability measures that do little to deter or impose consequences on those antisemitic bad actors who feel emboldened to terrorize GWU's Jewish and Israeli students.

445.    Ms. Soffer, an American-Israeli student, publicly identifies as Jewish and Israeli.

446.    She was an active member of the Student Government Association during her commissioning of the Antisemitism Task Force and wrote articles in the GW Hatchet and other

news publications.

447.    She has written and spoken about her experiences as a Jew and dual American-Israeli citizen, and she emailed many of her articles and writings to GWU faculty, leadership, and administrators.

448.    Member No. 1 is a member of Jewish-related student organizations, wears clothing and jewelry that identifies her as Jewish, and proudly acknowledges being Jewish in class and on campus.

449.    Ms. Soffer and some of the CAPE-Ed members are readily identifiable on campus as Jewish and are in classes, and come into contact, with GWU SJP members and its other supporters.

450.    They fear being targeted for abuse.

451.    The abundant hateful rhetoric and harassment of Jewish and Israeli students has led a number of students to hide their Jewish identity.

452.    Many stopped wearing clothing that was identifiably Jewish or Israeli, and tucked necklaces with Jewish pendants under their clothing.

453.    Some Jewish students avoided attending Jewish prayer services, enrolling in Judaic Studies courses, and events to escape being ostracized, accosted, or photographed and targeted by protesters.

454.    Some avoided areas of campus entirely out of fear for their physical safety.

**B.    A series of antisemitic events, all of which left out speakers with a firm stance on Israel, arose in the aftermath of October 7th.**

455.    Although President Granberg statement condemned the celebration of terrorism, the administration permitted IMES to sponsor not just one but a whole series of purportedly educational programs about the conflict, but which uniformly vilified Israel and lent academic

validity to antisemitism.

456.    The IMES programs were not only themselves biased, but IMES refused to permit scholars, diplomats and experts with diverse viewpoints—namely, those with Zionist viewpoints—to participate in their programs.

457.    Indeed, among the IMES faculty are, albeit few, pro-Israel perspectives---for example, Israeli economics and law professor Joseph Pelzman. He has never been invited to provide his viewpoint at IMES events.

458.    GW JPULSE, students, and parents notified the administration of IMES' biased programming, its deliberate censoring of viewpoints, and its likelihood of inciting more antisemitic harassment on campus.

459.    But GWU declined to act.

460.    *Every* IMES event surrounding Israel has been, and remains, explicitly hostile toward Israel.

461.    *All* participants have reinforced, and continue to reinforce, the same vilifying rhetoric.

462.    There is never any counter perspective allowed from scholars who, for example, support Israel's military actions in Gaza, or consider it not an apartheid or settler state.

463.    For all intents and purposes, pro-Israeli and even simply non-antisemitic positions have been censored by GWU.

464.    This one-sided approach transgresses GWU policy stating that curriculum and academic speech must be accurate, balanced and fully factual—meaning that the censorship of viewpoints, deliberate omission of facts, and the promotion of Israel vilification are a form of

misconduct, with nothing to do with free speech.

465.    GWU's failure to enforce these policies allow professors and scholars to incite hate, which in turn facilitates the actionable conduct described throughout this complaint—as Youmans proudly admitted and confirmed, the students are following what they have been taught.

466.    At a minimum, it demonstrates that GWU was aware that antisemitism had infected all areas of the University and annihilates any argument that the University was caught off guard when the tinderbox they had allowed ignited into violence, vandalism, and disruption.

467.    The reason why IMES participants distort facts about Israel is to vilify it, and the reason IMES does not invite scholars with opposing viewpoints to encourage free inquiry and open debate is to promote this demonization.

468.    And, ultimately, it promotes MESA's interests.

469.    The way IMES portrays Israel differs from the way in which IMES discusses any other country, including many (like Iran) that commit human rights abuses.

470.    This one-sided, unchallenged ideology promotes the idea that boycotts and "resistance"—i.e., terror—against Israel is not only justified but imperative.

471.    It also allows the idea to spread that the people themselves (i.e., Jewish and Israeli GWU students) are proxies for the vilified country, thus encouraging the students to get involved with anti-Israel campus activity.

472.    Almost immediately following October 7, 2023, IMES produced a series of programs that denied the Jewish people's historical connection to the land of Israel, painted them as foreign oppressors, and taught that Israel was engaged in a genocide of the Palestinian people.

473.    For example, on October 16, 2023, scarcely a week after Hamas' terrorist attacks, IMES sponsored a panel discussion among GWU faculty and other MESA members to address

the developments in the Israel-Palestine conflict, entitled "The Developments in the Israel-Palestine Conflict, including attacks by an array of Palestinian resistance groups and the resultant Israeli military operations."

474.    Some IMES faculty members cancelled classes and urged students to attend.

475.    The very title of the event—which mischaracterized Hamas and related groups designated by the United States as terrorist organizations as "an array of Palestinian resistance groups"—promoted an anti-Zionist and antisemitic agenda.

476.    Before the panel discussion, a group of Jewish and Israeli students (including Plaintiff Sabrina Soffer) emailed the Dean of the Elliott School and expressed concern about the prospective speakers' uniformly biased record.

477.    The students proposed other speakers, including a GWU faculty member and a diplomat with expertise in the Middle East, both of whom were willing to provide an Israeli perspective of the conflict.

478.    They received no response.

479.    During the panel discussion, IMES faculty members Ilana Feldman, Michael Barnett, and Arie Dubnov; MESA members Shay Hazkani and Laila El-Haddad; and IMES invitee Yousef Munayyer, all justified the October 7th attacks by Hamas, which included murders, rapes, and abductions, as legitimate acts of resistance in response to a foreign colonial regime.

480.    Ms. Haddad falsely accused Israel of engaging in genocide of Palestinians, thereby not only legitimizing Hamas' terrorist attacks, but casting it as an exercise of self-defense.

481.    None of the panel members took issue with her accusation.

482.    Ms. Soffer asked Ms. Haddad to square her assertions with the 1988 Hamas

Charter, which includes such provisions as:

- Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it.

- The day the enemies usurp part of Moslem land, Jihad becomes the individual duty of every Moslem. In the face of the Jews' usurpation, it is compulsory that the banner of Jihad be raised.

- The Day of Judgment will not come about until Moslems fight Jews and kill them.

483. Ms. Haddad defended the 1988 Hamas Charter by fallaciously comparing it to the Israeli Declaration of Independence, falsely suggesting that the Israeli Declaration of Independence calls for the genocide of Palestinians.

484. The  Israeli Declaration of Independence literally calls for peace.

485. Ms. Haddad's commentary validates hatred of Jews and Israelis by falsely teaching that the State of Israel's founding document is premised on the genocide of Palestinians, and that Israel, its citizens, and its supporters are committed to, and complicit in, that most horrific crime.

486. Again, none of the other panel members, nor any school administrators, did anything to correct Ms. Haddad's misrepresentation.

487. In the fall of 2023, Ms. Soffer and other Jewish and Israeli students, alarmed by the pervasive anti-Israel bias and antisemitism in IMES's programming so soon after the October 7th attacks, reported their concerns to the GWU administration.

488. The Jewish and Israeli students *did not* seek to cancel IMES' discriminatory events, but they did ask that IMES include academic diversity in the programming.

489. The administration refused to get involved and instead told the students to speak to the Dean of the Elliott School.

490. In or around late October 2023, the students met with Dean Alyssa Ayres of the Elliott School and expressed their concerns.

491.    Dean Ayres suggested the students propose speakers for another panel.

492.    The students soon thereafter presented Dean Ayres with a list of academics, prominent diplomats and other experts on the Middle East—including GWU faculty members—who were willing to appear on IMES panels.

493.    Dean Ayres, however, never invited any of the proposed speakers.

494.    All future panels in discussions about Israel continued to feature only scholars who were ferociously critical of Israel or rejected Jewish self-determination in the land of Israel.

495.    Others who sought alternative viewpoints were responsible for organizing those events themselves.

496.    On October 18, 2023, IMES hosted a screening of the film *Israelism*, which, according to the IMES announcement, portrays how two young American Jews are heartbroken to discover that "the Jewish institutions that raised them not only lied, but built their Jewish identity around that lie."

497.    The film thereby reinforces a narrative that erases and denies Jewish peoplehood and Jewish history.

498.    The film was followed by a panel discussion, including the film's producers.

499.    IMES Professor Arie Dubnov, who accused Israel of "ethnonationalist ideologies" and pursuing a "settler colonial paradigm," not only hosted the event but promoted it to students in his classes.

500.    He even offered extra credit to students who attended and wrote a reflection.

501.    To be clear, Ms. Soffer, and other Jewish and Israeli students in his classes, in order to improve their class grade and to keep up with the curve, were compelled not only to view an antisemitic propaganda film followed by a biased panel discussion, but then to write a personal

reflection on their experience.

502.    On October 26, 2023, IMES hosted a panel discussion entitled "Gaza in History."

503.    The announcement of the event presented a preview of the panel members' vilification of Israel and its supporters:

> We are together experiencing a catastrophic unfolding of history as Gaza awaits a massive invasion of potentially genocidal proportions. This follows an incessant bombardment of a population increasingly bereft of the necessities of living in response to the Hamas attack in Israel on October 7th. The context within which this takes place includes a well-coordinated campaign of misinformation and the unearthing of a multitude of essentialist and reductionist discursive tropes that depict Palestinians as the culprits, despite a context of structural subjugation and Apartheid existence on which most Human Rights organizations have established consensus.

504.    The message was clear: Israel was preparing for genocide, aided by a well-coordinated campaign—i.e., by the Jews—of misinformation.

505.    On November 16, 2023, IMES hosted another event titled "Between the Colonial, the National, and the Authoritarian: The Two Faces of Israel's Regime Overhaul."

506.    According to the IMES announcement of the event, the faculty panel would address the question: "How is Israel's current crisis related to colonial practices, past and present?"

507.    The announcement itself provided the panelists' answer: the panel will "delineate[] the relations between Israel's colonial control over Palestinians and the authoritarian overhaul, demonstrating how Israel's activities against Palestinians across Israel/Palestine and the "judicial reform" launched in 2023 to diminish Israel's "rule of law" are two parts of a regime change: colonial and authoritarian.

508.    By calling Israel a colonial regime, the panelists repeated the well-worn antisemitic trope of the Jewish people as aggressive foreign interlopers, even in their own homeland, ignoring not only more than three-thousand years of Jewish history in the land of Israel but also the history

of terror attacks that have been perpetrated on Israeli civilians.

509.    On December 4, 2023, IMES and the GWU School of Medicine hosted a faculty panel webinar titled "Understanding the Conflict in Israel and Palestine."

510.    The panel included GWU faculty members Michael Barnett, Arie Dubnov, Shira Robinson, and William Youmans.

511.    But rather than a balanced discussion, the panel presented a unified denunciation of Israel, denying the identity of the Jewish people based on their indigenous connection to the land of Israel.

512.    The faculty members argued that Israel was pursuing a campaign of "ethnic cleansing," and that Hamas terrorists acted out of a "right of resistance" against Israel.

513.    Several students and faculty tried to ask clarifying questions, but they were ignored by the panel.

514.    Many were berated anonymously in the webinar Zoom chat box.

515.    The event was so egregiously antisemitic that the Medical School's Diversity and Inclusion Dean, Yolanda Haywood, issued an apology to the medical-school community, explaining that "[t]he primary goal was to offer an experience that would result in thoughtful reflection and be a stimulus for broader, open communication," but "[a]s the webinar proceeded, it became clear that this program was not a balanced presentation on this most divisive and difficult subject."[40]

516.    On December 12, 2023, IMES hosted yet another panel discussion, this one entitled "Repression of Palestine Activism Amid the War on Gaza."

---

[40] J. Christenson, *GWU faculty ignore Hamas atrocities, defend attack on Israel: 'Right of resistance'*, New York Post (Dec. 10, 2023), https://nypost.com/2023/12/10/news/gwu-med-faculty-panel-defended-hamas-right-of-resistance/.

517.    The very title of the program was ironic, given IMES's repression of open and balanced scholarship in its stream of anti-Zionist programming, as well as GWU's refusal to exercise any restraint on Palestinian activism even when it included antisemitic harassment.

518.    On December 19, 2023, GW JPULSE sent an email to President Granberg, warning that certain curricula, programs, and conferences were inciting hatred and spreading falsehoods under the guise of scholarship.

519.    The message reminded her of the University's own stated commitment: "GW is committed to freedom of speech in and out of the classroom; however, we expect speech to be accurate, true, and free from manipulation," as stated by Metjian in a previous university communication.

520.    In response, President Granberg deflected and failed to address the substance of the concerns—offering no acknowledgment of the ongoing harm or commitment to corrective action.

521.    Between January 2024 and April 2024, IMES continued holding events promoting a singular ideology while simultaneously censoring any counter-scholarship.

522.    On April 19, 2024, IMES presented a conference inside the Elliott School entitled "Middle East Knowledge Production in the Aftermath of October 7."

523.    The program, which featured the MESA President and other MESA scholars, was unabashedly designed to develop strategies for promoting anti-Zionist hate, not scholarship.

524.    In fact, and most insidiously, a panelist from Princeton University suggested that fellow academics should teach pro-BDS material "quietly in the classroom" where they have the power, notably in states where the BDS movement has been outlawed.

525.    During the first panel, led by Shay Hazkani (a GWU visiting professor and MESA member), MESA President Aslı Bâli began by challenging Jewish identity, portraying Jewish

66

communities in the United States and on university campuses as "exhibiting ultra loyalty to a national imagined identity and participation in an imagined community."[41]

526.    That statement alone contains multiple classic antisemitic tropes, including dual loyalty and the erasure of Jewish national identity.

527.    She urged her colleagues to confront those students with alternative paradigms.

528.    In a panel led by GWU faculty member Ilana Feldman and Tamir Sorek, another MESA member stated that acknowledging how Israel is committing genocide of the Palestinian people is a "litmus test to even be affiliated with Palestine study," which was widely accepted by all panelists.[42]

529.    Another panelist, Negar Razavi, also a MESA member, urged instructors to exploit their power in the classroom to promote their ideology: "you have to do things quietly within your classroom. And that's the space where you have power."[43]

530.    This statement is telling, as abusing the power of the academy is the textbook way in which ideologues groom impressionable students and indoctrinate them into radical worldviews.

531.    By mischaracterizing Israel as a colonial authority, those IMES programs peddled pervasive antisemitism; i.e., denying the Jewish people's indigenous connection to the land of Israel, thereby erasing Jewish shared ancestry and peoplehood.

532.    And by casting Jews as foreign oppressors, and the murder of innocent babies as legitimate retaliation, the IMES faculty vilified the State of Israel and the Jewish people, normalized hatred, justified rape, violence, murder, and abduction, and legitimized antisemitism

---

[41] 2024 IMES Annual Conference, *Middle East Knowledge Production In the Aftermath of October 7, Part I*, https://www.youtube.com/watch?v=aZJGeTrm0N8&t=262s (at 1:16).

[42] 2024 IMES Annual Conference, Middle East Knowledge Production In the Aftermath of October 7, Part I, https://www.youtube.com/watch?v=1zzze763cHs&t=128s (at 0:39).

[43] *Id.*, at 1:25.

by giving it the false credibility of scholarly judgment.

533.    Censoring the opinions of others and refusing to defend intellectual honesty is not an exercise of academic freedom, but rather propaganda intended to mobilize students and the greater GWU community to display hate toward Zionists and Israelis and to discriminate based on these tenets of Jewish identity.

534.    The GWU's administration was fully aware of the issues consistent in IMES programming surrounding Israel yet allowed it to continue.

535.    Notwithstanding any concerns about academic freedom, GWU has long been on notice that this double standard contributes tremendously to the antisemitic hostility on campus.

536.    In other words, by exploiting the concept of academic freedom and abusing the power that University faculty wields, IMES was able to function as the proximate cause of the actionable conduct that still permeates GWU's campus.

537.    Academic freedom at GWU has been misused as a shield to promote censorship, enforce double standards, and results in a systematic deprivation of Zionist students' equal access to educational opportunities.

538.    Instead of fostering open inquiry, the University has permitted the dissemination of manipulated information while denying students access to factual, balanced, and scholarly sound instruction.

539.    This failure undermines the University's own stated commitments and violates its duty to provide a safe, inclusive, and intellectually honest learning environment.

540.    Moreover, scholars participating in these programs have openly acknowledged that, because they perceive their academic freedom to be "under attack," they have chosen to "teach

quietly"—a tactic that allows them to advance controversial political agendas, such as BDS, without transparency or accountability.

541.    In doing so, they have not only eroded trust in the academic enterprise but also incited hostility and harassment, particularly against Jewish and Zionist students.

542.    At a minimum, this antisemitic double standard obliterates any suggestion that GWU was unaware that the undeniably actionable antisemitic conduct was just over the horizon.

543.    All of this was done intentionally; in the words of Professor William Youmans, once IMES Interim Director, "students enact what we teach" and Professor Imani Cheers, "Liberation movements start with the young."

    C.    **As expected, GWU-funded student organizations, with the tacit approval of the GWU faculty and administration, increase their hostility toward, and disruption of life on campus for, GWU's Jewish and Israeli students.**

544.    On October 24, 2023, during another GWU SJP protest in Kogan Plaza, four GWU SJP students projected antisemitic phrases on the exterior wall of Gelman Library, including "GLORY TO OUR MARTYRS, "DIVESTMENT FROM ZIONIST GENOCIDE," FREE PALESTINE FROM THE RIVER TO THE SEA, and "YOUR TUITION IS FUNDING GENOCIDE IN GAZA."

545.    The images celebrated those who engaged in violence against Jews, blamed "Zionists" for Hamas' terrorist attacks on Israeli civilians, and demonized "Zionists" for supporting a genocide of Palestinians.

546.    When individuals or institutional actors assert that anti-Zionism is distinct from antisemitism or characterize their conduct as merely supporting Palestine (while simultaneously glorifying or justifying acts of terrorism committed by Hamas and omitting the group's well-documented atrocities), such behavior constitutes antisemitism under the widely adopted International Holocaust Remembrance Alliance ("IHRA") Working Definition.

547.    This pattern of conduct reflects not only a discriminatory bias against Jewish identity as expressed through Zionist affiliation, but it also creates a hostile and threatening educational environment for Jewish students.

548.    After two hours, a GWPD officer, accompanied by Assistant Dean of Student Life Brian Joyce, directed the four students to stop the projection.

549.    The students refused and argued with Dean Joyce and the officer for fifteen minutes before finally ending it.

550.    The following day, President Granberg issued a statement acknowledging the "images included antisemitic phrases that have caused fear and anxiety for many members of our Jewish and broader GW community" in "violation of our university policy."

551.    She added that, although the images were taken down, "I know this does not heal the deep and painful wounds it has opened across our campuses."

552.    Dean Liesl Riddle of the College of Professional Studies likewise expressed her "profound shock and sorrow in the aftermath of the recent incident that has deeply shaken our campus," which "compromises the safety and sense of belonging for our students."

553.    President Granberg assured the community that the administration "is reviewing this incident and will take appropriate steps in accordance with university policies."

554.    But GWU SJP was undeterred.

555.    On November 3rd, the day of President Granberg's inauguration at the Smith Center, GWU SJP led a "Shut It Down" march from Kogan Plaza to the inauguration venue.

556.    Protesters wore keffiyehs and masks to hide their faces, and carried banners, including one that read "From the River to the Sea"; led chants by megaphone including "Granberg you can't hide, you're complicit in genocide"; and banged on pots.

557.    One GWU SJP leader was recorded referring to President Granberg as a "fucking Jew."

558.    When they arrived at the Smith Center, speakers used a megaphone to disrupt the inauguration.

559.    During the protest at the Smith Center, a couple Jewish students, and thereafter Ms. Soffer, requested that a protester with a camera stop taking pictures of them.

560.    When Ms. Soffer asked, they confronted her, saying something akin to "shut the fuck up Sabrina, we know who you are."

561.    As they stood in front of the Smith Center, one speaker urged the protesters to "Make sure that every single person inside can hear what we are saying"—and the crowd of protesters did just that, disrupting all activities in and around the Smith Center.

562.    The protesters continued to chant, among other things,

> We are here to make it clear that every single day, from now to Granberg's inauguration to the end of her f*cking term, that we will be here on the streets demanding that she divest and that she end all financial ties between this University and the Israeli occupation of Palestine.[44]

563.    The protesters achieved exactly what they wanted—they shut down the inauguration.

564.    GWU decided that the protest posed a "heightened safety risk" and rescheduled the inauguration to a later date and virtual format.[45]

565.    The irony here, of course, is that when students begged President Granberg to ensure their safety while on campus, she declined and instead instructed the students themselves

---

[44] *Pro-Palestinian students protest outside Granberg inauguration*, GW Hatchet (Nov. 4, 2024), https://gwhatchet.com/2023/11/04/pro-palestinian-students-protest-outside-granberg-inauguration/.

[45] F. Riley and R. Moon, *Pro-Palestinian students protest outside Granberg inauguration*, The GW Hatchet (Nov. 4, 2023), https://gwhatchet.com/2023/11/04/pro-palestinian-students-protest-outside-granberg-inauguration/.

to stay away from the threats permeating the University.

566.    When President Granberg herself became the subject of potential criticism or harassment, she capitulated to the very students promoting hostility—rather than holding them accountable for their threats and disruptive conduct.

567.    This reflects a failure of leadership—marked by appeasement over accountability, silence over integrity, and the abandonment of the university's duty to protect all students equally.

568.    The protests clearly constituted disorderly conduct under D.C. criminal law, which prohibits, among other things, "loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering."[46]

569.    The protests also violated the Student Code of Conduct provisions on Student-Sponsored Forums, which prohibits demonstrations that interfere with the processes of the university, and the prohibitions against discriminatory harassment and interference with University events, and the Policy on Demonstrations and Disruptions of University Functions.

570.    Under the Student Code of Conduct, the student groups involved in the protests "may be held collectively responsible," and their officers "may be held individually responsible when violations of the Code by those associated with the group or organization have occurred."

571.    The Hillel Center had been one of the few sanctuaries on campus for Jewish and Israeli students.

572.    But that too ended on November 3, 2023, following GWU SJP's successful protest to shut down President Granberg's inauguration.

573.    At least one protester turned his attention to the Hillel Center, which is one block from the Smith Center.

---

[46] D.C. Code § 22–1321 (2024).

574.    Shortly before the Jewish Sabbath, the protester, a GWU student, entered the Hillel Center without authorization and tore down posters of Israeli hostages held by Hamas.

575.    On November 10, 2023, at 1 pm, GWU SJP and other student organizations led a student walkout of classes and sit-in at the entrance to Gelman Library, in another call to "Shut It Down for Palestine" protest.

576.    About two-hundred students (and also some professors) "engulfed the right side of Gelman Library, wearing face masks, keffiyehs draped over their shoulders and holding up cardboard and poster signs."[47]

577.    Throughout the three-hour demonstration, additional students joined the crowd, which reached from the top of the Gelman Library staircase to the base of the Kogan clock.

578.    One demonstrator waved a large Palestinian flag from the balcony of the library.

579.    The protest prevented students from entering Gelman Library.

580.    Finally, after three hours, the protesters marched to the State Department.

**D.    GWU's s response emboldens the antisemitic perpetrators.**

581.    President Granberg's remarks in a meeting with alumni on November 16, 2023, revealed the University's double-standard in the enforcement of its nondiscrimination policy, which tolerates a far greater range of discriminatory harassment of Jewish and Israeli students than any other racial or ethnic minority.

582.    In that meeting, a number of alumni questioned her on the University's failure to discipline students who engaged in blatant antisemitic harassment.

583.    President Granberg explained the University's standard for determining when

---

[47] *Students gather at library steps for pro-Palestinian sit-in, march on State Department*, GW Hatchet (November 10, 2024), https://gwhatchet.com/2023/11/10/students-gather-at-library-steps-for-pro-palestinian-sit-in-march-on-state-department/#.

discipline for antisemitic harassment is warranted:

> Would that be something that, say, the FBI would arrest someone for? And if the answer is no, then it's not a speech that GW can punish. And I really wish it were.

584.    But GWU's own policies and Rules of Conduct authorize the University to act when students actively engage in discrimination and harassment, even if it that falls short of a federal crime.

585.    Indeed, D.C. and federal law, including Title VI, actually compel it to do so.

586.    On November 14, 2023, President Granberg announced that the administration had completed its review of the antisemitic imagery that had been projected onto Gelman Library.

587.    Following a hearing, the administration formally determined the students who projected the images, including GWU SJP president Lance Lokas, violated the Gelman Library Buildings Use Policy, which limits where students may post, and prohibits offensive postings and postings that do not identify student organization sponsorship; and their refusal to stop projecting the images as directed by the GWPD officer and Dean Joyce constituted "non-compliance" under the Code of Conduct, which prohibits "[f]ailure to comply with reasonable directions of university officials."

588.    On December 19, 2023, GW JPULSE sent an email to President Graneberg, alerting her of the risk to national security due to the radicalization of students at GWU.

589.    The letter cited then-FBI Director Christopher Wray's testimony that domestic terrorism was on the rise, and it tied his warning to the one-sided scholarship being advanced at GWU.

590.    Even though 27 percent of GWU's student body is Jewish, President Granberg

never addressed the issue.

591.    It was incumbent on the administration to take meaningful disciplinary action.

592.    The administration had already acknowledged that the images were antisemitic, caused fear and compromised the safety of Jewish and Israeli students, and that ending the projection was not sufficient to heal the community's deep and painful wounds.

593.    All that occurred *before* GWU SJP led the "Shut It Down" protest that caused President Granberg's inauguration to be moved to a private venue, the vandalization of the Hillel Center, and individual acts of antisemitic harassment that had been reported to the administration.

594.    The administration, however, failed to take meaningful disciplinary action to protect the safety and educational opportunities of Jewish and Israeli students.

595.    The University instead announced a wholly empty and meaningless gesture.

596.    It suspended GWU SJP and another student organization, and only for ninety days.

597.    It only suspended one student.

598.    Despite this toothless punishment, on November 20th, 2023, MESA's president sent a letter to GWU's administration, this time demanding an explanation for its decision to suspend GWU SJP.

599.    MESA challenged President Granberg's determination that images projected on Gelman Library were antisemitic by disingenuously arguing that "*many*" of those phrases should be understood "in other ways," such as criticisms of Israel's policies and of Zionism.

600.    The letter did not even address the phrases on other images, which could only be understood as antisemitic.

601.    Nor did it justify any interest MESA might have in defending the projection of

antisemitic images on the side of the Gelman Library.

602.    Meanwhile, the students actually responsible for the antisemitic imagery, and for noncompliance with directions of University officials, remained on campus, free to organize and continue their campaign of disruption and antisemitic harassment under a different temporary banner from their nominally suspended groups.

603.    Thus, Lance Lokas—the GWU SJP president who (1) claimed credit for antisemitic postings on Yom Kippur in 2022, (2) organized antisemitic and disruptive protests before and after the October 7th attacks, including one ten days earlier that shut down President Granberg's inauguration, and (3) harassed two female Jewish students whose reports had been submitted to the administration—remained free to pursue and promote Jew hatred on GWU's campus.

604.    His charges were dropped in April 2024, after Palestine Legal—a legal organization that defends anti-Israel rule-breaking students from accountability and is promoted by MESA—had announced a lawsuit against the university.

605.    In the eyes of his supporters, and Jews on campus, he was given not even a slap on the wrist, but instead a pat on the back.

606.    The student leaders of GWU SJP proved immediately just how toothless the University's action was; indeed, in a video, they laughed and mocked the GWU administration as weak.

607.    Hours after the GWU SJP suspension was announced, its leaders announced they had formed a new organization, the "George Washington University Student Coalition for Palestine" ("GWU SCP"), an organization that described itself as dedicated to the destruction of the "violent Zionist system."

608.    In other words, the GWU SJP student leaders simply reconstituted the same

organization under a new name and promptly resumed their antisemitic agenda without missing a beat.

609.    The students involved in SJP, who committed the misconduct, were not held accountable in the same way the suspension of their organization merited they should be.

610.    Indeed, GWU SCP announced that it would be holding a protest at Kogan Plaza the following day, November 15th, to demand the reinstatement of GWU SJP.

611.    GWU SCP was not a GWU recognized student organization, and—like the suspended GWU SJP—had no right to stage a protest on GWU's campus.

612.    But the administration did nothing to stop it.

613.    On November 15th, in the lead up to GWU SCP's protest, a protester threw a rock at a bright pink "JewBelong" box truck parked along an adjacent street.

614.    JewBelong is an independent organization, unaffiliated with GWU, "supporting Judaism and combating antisemitism."[48]

615.    The truck had a glass panel across the back, behind which was a large sign that read "Let's be clear, Hamas is your problem too."

616.    A GWU student walked up to the JewBelong truck, in full view of everyone, shouted "Free Palestine" and threw a rock, shattering the glass panel.

617.    The image below shows the shattered glass along the truck's back panel:

618.    The University identified the perpetrating student, who was found to have committed discriminatory harassment and disorderly conduct.

619.    But, once again, the University decided not to remove the violent student from

---

[48] *Person throws rock, damages truck showing anti-Hamas message*, GW Hatchet (November 15, 2023), https://gwhatchet.com/2023/11/15/person-throws-rock-damages-truck-showing-anti-hamas-message/.

campus, and she remained an everyday threat to Jewish and Israeli students.

620.    GWU's Submission to the House Committee listed the rock-throwing at the JewBelong truck.

621.    But the Submission falsely characterized the JewBelong truck as a "doxing truck"—a truck that publicly displays protesting students' names photos and other identifying information.

622.    As the photo above shows, the JewBelong truck displayed no information about protesters.

623.    It was intended only to show support for Jews and happened to be parked on the street before an event on the National Mall later that evening.

624.    Shortly after, GWU SCP began its protest on Kogan Plaza "in solidarity with GW SJP," and led a crowd of protesters in chants, including "No Justice, No Peace."

625.    This protest violated the Student Code of Conduct and University Policies.

626.    The GWU administration received reports of antisemitic harassment during the protests.

627.    The reports were listed as a possible act of "community disturbance," but the administration declined to hold the perpetrators responsible.

628.    Parents of Jewish and Israeli students sent a joint letter dated November 16, 2023, to President Granberg, making sure the administration was aware that GWU SCP "appears to be nothing more than a reconstituted version of SJP and Jewish Voices for Peace, which were banned from campus."

629.    The parents asked the administration, among other things, to ban GWU SCP from campus; to take disciplinary action against students who organized GWU SCP to evade the

suspension of GWU SJP; and to reconsider its decision to allow protesters to wear masks to shield their identities.

630.    Despite the obvious evasion of its disciplinary action, the administration did nothing—not even reply to the parents' letter—and declined to investigate whether the formation of GWU SCP violated the intent of the suspension of GWU SJP.

**E.    GWU's decision to suspend GWU SJP, but none of its members, allowed GWU SJP's members to continue terrorizing Jewish and Israeli students under a new banner.**

631.    On November 17, 2023, GWU SCP held another protest, returning to the front of Gelman Library.

632.    Announcements for the event reminded attendees to wear kaffiyehs and masks to conceal their identities.

633.    A crowd of nearly two-hundred protesters, led by speakers using megaphones, blocked the entrance to Gelman Library, preventing access to students.

634.    Protesters shouted chants, including "From the River to the Sea, Palestine will be free," and again in Arabic: "min il-mayye la-l-mayye, Falasṭīn ʿarabiyye"—From the water to the water, Palestine will be Arab.

635.    The GWU SCP protest violated the Student Code of Conduct and University Policies.

636.    On November 29, 2023, GWU SCP held a sit-in at the Elliott School, which obstructed the entrance to the building and disrupted classes.

637.    The protesters shouted chants, including "From the River to the Sea, Palestine will be free," and again the original Arabic, "min il-mayye la-l-mayye, Falasṭīn ʿarabiyye"—"From the water to the water, Palestine will be Arab."

638.    At least one professor was forced to cancel class because of the protest.

639.    The University took no action against the organization, its leaders, or other persons who participated in the protests.

640.    To reiterate: GWU SCP was not some sort of anonymous pop-up group of unnamed persons that were outside of the GWU administration's control.

641.    The administration knew that GWU SCP was a transparent proxy for the suspended GWU SJP, and that it was organized by the leaders of GWU SJP.

642.    The administration had advance knowledge of their scheduled events, and knew all along that GWU SCP had not complied with requirements to be a recognized student organization and therefore was ineligible to schedule an event on campus.

643.    The administration also knew that the very purpose of GWUSCP's protests was to disrupt University functions—indeed, many of its protests, including its march on President Granberg's scheduled inauguration were expressly advertised as "Shut It Down" protests.

644.    And the administration knew the identities of the student leaders of GWU SCP *and were even in contact with them*.

645.    The administration, however, declined to prohibit GWU SCP's disruptive and antisemitic protests and discriminatory harassment of Jewish and Israeli students, or to hold its leaders to account.

646.    For example, on December 8, 2023, GWU SCP announced on social media that it would hold another protest at Kogan Plaza later that afternoon.

647.    Ms. Soffer alerted Dean Coleman and Dean Joyce to the planned protest, which would almost certainly feature antisemitic slurs, harassment and intimidation, and would disrupt classes and interfere with students studying for finals at Gelman Library and adjacent classrooms and residence halls.

648.    Since GWU SCP was not a recognized student organization, it had no right to stage a protest in the middle of GWU's campus, especially during finals.

649.    Dean Coleman responded, stating that "we are aware and have been in contact with the organization."

650.    But neither Dean Coleman nor anyone else in the administration took any action to prevent or police the protest and instead allowed GWU SCP to hold its disruptive and antisemitic protest unimpeded and in violation of University policy.

651.    On December 5, 2023, GW JPULSE sent President Granberg a letter outlining proposed safety measures and formally requesting a meeting to address rising concerns.

652.    The request was ignored.

653.    On December 8, 2023, GW JPULSE once again raised concerns regarding the University's enforcement of its own policies.

654.    Despite being under formal suspension, GWU SJP (has continued to actively operate its Instagram account, which prominently uses the University's name.

655.    Through this platform, the group has promoted events and activities that appear to incite hostility and harassment on campus.

656.    This behavior is deeply concerning and poses a potential threat to the safety and well-being of the broader university community.

657.    According to the terms of the suspension, the organization was prohibited from engaging in any activities during this period.

658.    The continued use of university-affiliated branding and the promotion of events may constitute a clear violation of those terms.

659.    The University never responded to the December 8th correspondence.

660.    On April 11, 2024, GWU SCP and a number of official student organizations organized a racist and antisemitic protest against U.N. Ambassador Linda Thomas-Greenfield, the first African American woman to serve as U.N. ambassador.

661.    Ambassador Thomas-Greenfield was a featured speaker at a GWU event on diversity in international relations.

662.    GWU SCP's announcement of its scheduled protest featured not only antisemitic tropes, but racist invective aimed at Ambassador Thomas-Greenfield, calling her a "blackface" puppet of an imperialist empire and a genocidal war criminal.

663.    Before her presentation, as participants entered the building, the protesters, led by a speaker using a megaphone, chanted racist slurs and phrases, and demanded that GWU sever ties with "Zionist institutions."

664.    Member No. 1 texted Ms. Soffer that she could not focus on her class during the protest due to the disruption.

665.    They also distributed pamphlets littered with inflammatory and racist themes, including, "the United States of Amerikkka"—so as to imply that the KKK is a part of the American founding—"has always used Black bodies as puppets to carry out repression and dissent."[49]

666.    During her presentation, from the roof of an adjacent residential hall, protesters unfurled a huge Palestinian flag that reached down seven floors, in violation of the University policy prohibiting the hanging of banners or signs from University buildings.

---

[49] *Pro-Palestinian students denounce UN ambassador at Elliott protest*, GW Hatchet (April 11, 2024), https://gwhatchet.com/2024/04/11/pro-palestinian-students-denounce-un-ambassador-at-elliott-protest/.

667.    The GWUSCP protest also violated the Student Code of Conduct prohibitions against discrimination and disrupting University functions, and University Policies.

668.    According to GWU's submission to the House Committee panel, the administration investigated only the flag drop, not the ugly racist and antisemitic invective or the disruption to a University function.

669.    The administration absolved all student organizations that had been involved.

670.    It held only two students responsible for unfurling the flag and imposed only probation.

671.    On April 16, 2024, a GW JPULSE parent emailed a letter to President Granberg, Dean Coleman, and other members of the GWU administration.

672.    She wrote to "express my deep concerns regarding the current situation on campus, particularly in relation to the ineffective measures taken to address the escalating issues of destructive activism and the pervasive atmosphere of toxicity."

673.    She reminded the administration that:

[The GW JPULSE] team has dedicated countless hours to compiling a comprehensive report on the rampant antisemitism present on GWU Campus, complete with evidence and links pinpointing the root causes of these issues. Additionally, we have proposed solutions and urged the establishment of an antisemitism task force to address these pressing concerns. However, despite our efforts, we have been met with disappointment in the lack of follow-up from your end.

674.    GW JPULSE also pointed out the "glaring disparity in responses" between the response of the University to the use of language deemed offensive to some racial or ethnic groups, and the lack of any responsiveness to antisemitic discrimination.

675.    This email also included the congressional hearing report of Jonathan Schanzer and told GWU that "we seek clarification on your plans to investigate instances of hateful rhetoric and incitement to hatred within the curriculum and among faculty members," while noting that it "is

imperative that immediate and resolute steps be taken to rectify these shortcomings and uphold the integrity of our academic institutions," since "[a]nything less would be a disservice to the principles of equity, inclusivity, and intellectual rigor upon which our university stands."

676.    She concluded by asking for the administration's plan for eliminating the hostile environment for Jewish and Israeli students.

677.    GWU took no action in response.

**F.    Congress alerts the University that it is aware of pervasive campus antisemitism, worse at GWU than virtually any other school.**

678.    By December 2023, the GWU administration not only knew the campus was a hostile environment for Jewish and Israeli students, but it was also warned by Congress that antisemitic harassment on college campuses demanded "steps to provide Jewish students the safe learning environment they are due under law."

679.    In a statement on December 7, 2023, Chairwoman Foxx announced that the Committee was opening a formal investigation of several universities based on "the rampant antisemitism displayed on their campuses by students and faculty."

680.    And she warned: "The disgusting targeting and harassment of Jewish students is not limited to these institutions, and other universities should expect investigations as well, as their litany of similar failures has not gone unnoticed." [50]

681.    Within months, the Committee's investigation formally included GWU.

682.    Still, the administration declined to act.

---

[50] *Foxx Announces Formal Investigation into Harvard, UPenn, and MIT*, House Committee on Education and the Workforce (Dec. 7, 2023), https://edworkforce.house.gov/news/documentsingle.aspx?DocumentID=409851.

683.    During these months of intense hostility to Jewish and Israeli students—while Jewish and Israeli students were still grieving the terrorist attacks and the near constant rocket barrages on Israel—the University failed its most fundamental duty of leadership.

684.    It failed to use its own voice to call out and condemn the antisemitism on its campus.

685.    It failed to publicly assure Jewish and Israeli students that their safety, rights and educational opportunities would be protected.

686.    It failed even to demand basic civility on its campus as required by the Student Code of Conduct.

687.    The vacuum of leadership allowed antisemitism to flourish and increasingly alienate Jewish and Israeli students.

**G.    Despite receiving reports from GW JPULSE about pervasive antisemitism on campus, the GWU Administration chose to ignore the problem and instead cut off the dialogue with GW JPULSE.**

688.    After trying since December 2023 to get an audience with President Granberg, Granberg acquiesced to a meeting with GW JPULSE in late January 2024 and committed to meeting with them frequently.

689.    On January 30, 2024, GW JPULSE parent members met with President Granberg and Dean Coleman.

690.    Those parents wanted to make sure the administration was aware of the scope and extent of antisemitic discrimination on campus, and they wanted to understand what sort of accountability measures the University was going to implement.

691.    During those meetings, they expressed concerns about the creation of GWU SCP to evade the suspension of GWU SJP, the disruptive antisemitic protests, the targeting and harassment of Jewish and Israeli students, and IMES's biased and incendiary programming.

692.    The GW JPULSE parents also noted that Jewish and Israeli students were reluctant to report antisemitic incidents because of the administration's failure to respond to earlier reports of retaliation.

693.    The GW JPULSE members urged the administration to create a task force on antisemitism, as other colleges and universities had done, and to enforce the Students Code of Conduct and the University's policies.

694.    They stressed the need for accountability measures and the announcement of consequences.

695.    The GW JPULSE parents told President Granberg and Dean Coleman that they would be forwarding a report on the extent of antisemitism on campus, and the adverse impact it has had on Jewish students, as well as recommended actions to eliminate antisemitism on campus.

696.    President Granberg and Dean Coleman agreed to schedule a follow-up meeting with GW JPULSE parents on February 26th to discuss the report.

697.    On February 22, 2024, GW JPULSE sent to Dean Coleman and other members of the administration a detailed report on antisemitic discrimination on campus, as well as specific proposals for eliminating the hostile environment for Jewish and Israeli students on campus.

698.    They again urged the administration to immediately form an antisemitism task force to investigate antisemitism and make recommendations for eliminating the hostile environment for Jewish students.

699.    After receiving the GW JPULSE report, the administration abruptly cancelled the scheduled February 26th meeting with GW JPULSE.

700.    The administration thereafter refused to respond to the GW JPULSE report, despite repeated emails and letters by GW JPULSE parent members seeking to continue the dialogue with the administration.

701.    GW JPULSE sent additional emails to President Granberg Provost Bracey, and Dean Coleman, which never elicited a response.

702.    By April 2024, the planned collaboration between GW JPULSE and the administration had clearly failed because the administration had reneged once again both on its commitments and its responsibilities.

## VI.    AN ANTISEMITIC ENCAMPMENT OCCUPIES CAMPUS FOR MORE THAN TWO WEEKS, BUT WHILE JEWS AND ISRAELIS ARE HARASSED DAILY, GWU DECLINES TO ENFORCE ITS OWN RULES AND POLICIES.

703.    On April 25, 2024, GWUSCP organized a takeover of University Yard and established an encampment of hundreds of people, including many unaffiliated with GWU, and remained there for fifteen days.

704.    The report released by the House Committee on Education and the Workforce on its investigation of GWU and ten other universities provided a summary that precisely describes what happened at GWU:

The spring of 2024 was marked by the establishment of unlawful antisemitic encampments at universities throughout the country. These encampments were generally organized by students associated with or members of anti-Israel student organizations, often with lengthy histories of engaging in antisemitic harassment, intimidation, and disruption. Jewish university students, faculty, and staff who faced the onslaught of antisemitic hate on campus after October 7 frequently felt *abandoned by the muted and passive responses of their institutions' leaders.* The Committee's investigation found that in multiple cases, *these failures came not from mere ignorance or lack of forethought, but rather from intentional decisions by university leaders not to provide their campuses' Jewish communities the necessary support needed to ensure they felt safe* to live on campus or attend classes. (emphasis added)[51]

705.    The takeover of University Yard violated GWU's policies, and with each passing day, the GWU administration witnessed firsthand an increasingly ugly assault on Jewish and Israeli students.

706.    As usual, GWU failed to take appropriate action to protect those vulnerable students.

A.    **GWU knew that an antisemitic occupation was in the works, but it nonetheless promised its students a quiet campus during finals week.**

707.    The GWU administration knew that student organizations on other college campuses had taken over campus centers and erected encampments, filling yards with tents and holding chaotic 24-hour protests that had created hostile environments for Jewish and Israeli students.

708.    The GWU administration was also monitoring GWU SCP's social-media sites and knew that it was organizing an April 25th takeover of University Yard, the largest green space on campus with diagonal pathways that are the main arteries through campus, bordered by the GWU School of Law, other academic buildings, and residence and dining halls.

---

[51] Republican Staff Report, *Antisemitism on College Campuses Exposed,* U.S. House of Representatives Committee on Education and the Workforce (Oct. 31, 2024) (emphasis added), https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_st aff_report_-_antisemitism_on_college_campuses_exposed.pdf

709.     The GWU administration also knew that an occupation of University Yard would disrupt final exams, exacerbate the harassment of Jewish and Israeli students, and limit even further their ability to participate in campus life and educational opportunities.

710.     On April 23, 2024, the GWU administration sent an email to the University community announcing that Kogan Plaza and University Yard were designated as "24-hour quiet areas" until May 20, 2024:

> To ensure all students are able to study and prepare for finals, Kogan Plaza and University Yard will have adjusted availability for activities. Consistent with our practice this past fall, these locations are unavailable for events, programming, and unplanned activities effective May 2 through May 12. . . .

> Due to the proximity of these areas to many study spaces and classrooms, these locations are designated 24-hour quiet areas. No planned or unplanned activities or amplified noise (including amplification by handheld devices) will be permitted. Making any excessive noise either inside or outside a building remains prohibited under the Code of Student Conduct at all times. Excessive noise includes but is not limited to shouting, pounding objects or surfaces, or playing music or other electronics at a loud volume in a manner that disturbs others.

> During this period, any individuals or student groups organizing social activities, demonstrations or other events may use Potomac Square or another reservable and available space.

711.     These words, however, were hollow; the administration failed to take any meaningful measures to prevent the takeover of University Yard, and did not have plans in place to mitigate the impact of an occupation.

712.     It did not fence off University Yard, post sufficient GWPD officers to prevent a takeover, or take immediate disciplinary action against anyone attempting to occupy University Yard.

713.     It did nothing more than designate University Yard a "quiet zone," and wistfully hope that protesters who had ignored every other directive might abide this one.

**B.    The encampment arose.**

714.    On April 25, 2023, GWU protesters, led by the leaders of GWU SCP (the same student organizers who had led GWU SJP), wrapped their faces in keffiyehs and masks to hide their identities, and descended on University Yard.

715.    They fortified blockades and marked the sidewalk with warnings, "No Zionists here," while others screamed, "Death to Zionists!"

716.    Most Jewish people, including most Jewish students and professors at GWU, are Zionists.

717.    Speakers broadcast hate-filled speech over sound systems and megaphones, while hundreds of protesters chanted in response and banged drums, buckets, and pots.

718.    The protesters had the backing of well-funded organizations with direct links to the Hamas terrorist organization.

719.    Osama Abuirshaid, the Executive Director of American Muslims for Palestine ("AMP"), which is the fiscal sponsor of National Students for Justice in Palestine and currently is under investigation, was one the first speakers of the day.[52]

720.    Abuirshaid has written articles for the website of Hamas' military wing, the al-Qassam Brigades.[53]

721.    To cheers, he exhorted the growing crowd that "Zionism is no less evil than white

---

[52] Office of the Attorney General, Commonwealth of Virginia New Release, *Attorney General Miyares Holds American Muslims for Palestine Accountable for Refusing to Comply with Investigation,* (Jan. 14, 2025), https://www.oag.state.va.us/media-center/news-releases/2825-january-14-2025-attorney-general-miyares-holds-american-muslims-for-palestine-accountable-for-refusing-to-comply-with-investigation#:~:text=RICHMOND%2C%20Va.,immediate%20compliance%20with%20the%20CID.

[53] Izz al-Din al-Qassam Brigades (July 19, 2014), https://www.alqassam.ps/arabic/%D9%85%D9%82%D8%A7%D9%84%D8%A7%D8%AA-%D8%A7%D9%84%D9%82%D8%B3%D8%A7%D9%85/4746/%D8%B9%D8%B1%D8%A8-%D9%8A%D9%85%D9%83%D8%B1%D9%88%D9%86-%D8%A8%D9%85%D9%82%D8%A7%D9%88%D9%85%D8%A9-%D8%BA%D8%B2%D8%A9

supremacy," and that "we will bring this poison of Zionism to an end."

722.    Hours after the takeover, the GWU administration sent an alert to the GWU community that "GW Police Department officers and other university officials responded on site to confirm all participants are GW students and to explain the university's demonstration and related policies."

723.    But the administration then reported what everyone on campus already knew: "GW students [had] gathered on University Yard and placed tents," and that "there also are non-GW individuals on public property."

724.    Instead of enforcing its designation of University Yard as a 24-hour quiet zone, the administration agreed to allow the protesters to occupy University Yard for that day, subject to the following conditions:

- Demonstrators must move with their tents to Anniversary Park at F Street NW between 21st and 22nd streets. GW will prohibit all non-GW individuals from participating in any demonstration on university property.

- GW does not permit overnight encampments on university property.

- Students may demonstrate until 7 p.m. if they abide by the university's free expression guidelines, the Code of Student Conduct, and other applicable policies.

- At 7 p.m., the students will be required to remove tents and disperse.

725.    President Granberg issued her own statement that day, warning:

Occupying campus grounds, establishing outdoor encampments, and blocking access to buildings create safety concerns and can disrupt learning and study, especially during this critical final exam period. . . . [W]e will not allow students from other local colleges or unaffiliated individuals to trespass on our campus.

726.    By the 7 p.m. deadline to disperse, approximately six-hundred protesters, including individuals not affiliated with GWU, remained crowded into University Yard.

727.    As usual, the GWU administration took no action to enforce its 7 p.m. deadline.

728.    Many of the protesters stayed through the night, in dozens of pitched tents and out in the open on the Yard.

729.    Faced with flagrant violations of its policies and authority, the GWU administration capitulated.

730.    The following day, April 26th, President Granberg announced that no other protesters would be permitted to enter University Yard, and the University would initiate disciplinary proceedings to suspend and administratively bar from campus protesters who had not abided the prior 7 p.m. deadline to leave University Yard.

731.    GWPD placed barricades around the encampment to curtail new protesters from entering University Yard.

732.    But at the same time, the administration accommodated the protesters by permitting food deliveries, allowing access to restrooms, and authorizing other persons to enter University Yard.

733.    More protesters soon swelled H Street, taking it over and erecting approximately thirty additional tents in the street.

734.    On April 28th, President Granberg and Provost Bracey issued a joint statement, acknowledging the protesters had violated the law, University policies, and clearly defined rules of conduct and behavior:

> Free expression and activism, however, are not unlimited. Our highest priority is, and always will be, maintaining a safe campus environment that allows for the world-class academic experience our students and their families have entrusted us with providing. The encampment on University Yard violates our clearly defined rules of conduct and behavior. Further, the actions of some protesters have been highly offensive to many members of our community. The protest is jeopardizing our ability to meet the priorities of our university community, and the hateful language being displayed has no place on our campus.

735.    But President Granberg and Provost Bracey refused to act.

736.   They refused even to acknowledge the ugly antisemitism taking place on their campus, dismissing the exclusion of Zionists from University Yard, and shouts of "Death to Zionists" as merely "highly offensive."

737.   Their refusal even to acknowledge that allowing antisemitism reflects a deliberate indifference to the hostile environment.

738.   GW JPULSE sent another email to President Granberg, demanding that (at a minimum), the University take the following actions:

1)   Allow any student who does not feel safe or does not feel they can concentrate on campus to take their exams remotely.

2)   For students who do not have the ability to leave campus, yet do not feel safe, find quiet and secure areas for them to take their exams.

3)   Allow students extra time on final projects or extended time to take their finals as the campus environment has been toxic and has not been conducive to studying and producing academic work.

4)   Insist that professors who grade for attendance excuse students who have not felt safe for attending class and excuse them if they missed class for this reason.

5)   Allow students alternative ways to demonstrate their learning at the end of the semester if the environment is not conducive to taking finals and completing final projects.

739.   The email concluded:

As many finals have already begun and as students are in the midst of working on final projects and papers, we are asking for immediate action to be taken on the items we listed above, and that these actions are promptly communicated to all students and families.

740.   That evening, a large contingent of protesters on H Street overwhelmed police officers stationed along the barricade of University Yard and overran the barricade.

741.   Protesters hauled sections of the metal barricade and piled them in the middle of University Yard. The protesters then planted a Palestinian flag.

742.    More protesters began pitching tents throughout University Yard.

743.    GWPD took no action to stop the additional protesters from unlawfully trespassing and occupying University Yard.

744.    H Street remained blocked with the overflow of protesters and larger tents and shade structures.

745.    That same evening, Dean Coleman arrived at University Yard and spoke to GWPD and Metropolitan Police Department officers outside the northwestern corner of University Yard.

746.    A protest leader called out over a microphone: "Unless Dean Colette Coleman is here to meet our demands, get the fuck out of our liberation zone."

747.    *She acquiesced and left.*

748.    Provost Bracey also was at the encampment after the barricades had been overrun and personally witnessed the protesters' aggressiveness.

749.    According to the GW Hatchet, a "protester used his body to physically block Provost Chris Bracey from entering the northwest entrance of the encampment."[54]

750.    Provost Bracey managed to enter the encampment and was confronted by a crowd of protesters, with one protester shouting at him "this is your biggest nightmare."

751.    But unlike Jewish and Israeli students on campus, Provost Bracey was physically safe because at all times he was protected by the three GWPD officers flanking him.

752.    By the following day, the number of protesters, many without any affiliation to GWU, swelled University Yard and H Street, limiting access to campus buildings.

753.    Nearly sixty tents filled the Yard.

---

[54] *Live Coverage: Protesters Overrun U-Yard Barricades on Day Four of Protest,* GW HATCHET (Apr. 28, 2024), https://gwhatchet.com/2024/04/28/live-coverage-pro-palestinian-encampment-reaches-day-four-of-protest/.

754.    The photo below illustrates the extent to which access to campus was obstructed by protesters and left Jewish and Israeli students anxious to traverse.



755.    The protest, in the middle of GWU's campus, was neither peaceful nor open to all GWU students.

756.    The protesters were explicit—Jewish and Israeli students were not welcome.

757.    They chalked the entrances to University Yard with clear warnings: "No Zionists."

758.    And signs affixed to barricades around the encampment stated, among other things, "zionist pigs get out"; "[s]tudents will go back home when Israelis go back to Europe, US, etc (their real homes)"; and "Students will leave when Israelis leave."

759.    And if those were not sufficiently threatening to keep out Jews and Israelis, there were others in the encampment more explicit, including:  Zionism is Fascism—Colonizers Out of DC," "Final Solution," and swastikas.

760.    The images below are just a sampling:




761. In addition to signs warning Jewish and Israeli students to keep out, protest speakers, their voices amplified by powerful speaker systems, regularly declared that Zionists were not allowed in University Yard or anywhere else on campus.

762. They declared, for example that "[e]ach and every one of you believes in a world liberated from colonialism, imperialism, white supremacy, capitalism, and Zionism. We are here to create that world."

763. Protest leaders, using megaphones, regularly led crowds of protesters in

discriminatory chants, including:

- "We want justice, you say how - Zionists off our campus now";

- "Say it loud and say it clear, we don't want no Zionists here";

- "There is no solution but intifada revolution";

- "We don't want no Israeli pigs";

- "Settlers go back home, Palestine is ours alone."

764.    Protest leaders also led chants of "From the River to the Sea, Palestine will be free," followed in Arabic: "Min al-nahr ila al-bahr, Filastin sa-takun 'Arabiyah"—"from the water to the water, Palestine will be Arab."

765.    On April 29th, GW JPULSE sent another letter to President Granberg, Provost Bracey and the GWU Board of Trustees. GW JPULSE implored GWU to take action and close down the encampment.

766.    The letter stated:

According to GW Hatchet, GWPD believes that 400 additional security offers are needed to dismantle the illegal tent encampment on U-Yard. We call on GW administration to immediately release funds in order to secure an additional 400 officers in order to clear out U-Yard from protesters and restore order to the campus.

We ADVOCATE for you to take any and all actions necessary to immediately clear the campus of lawbreaking protesters and return the campus to the students.

1.    Press charges against any individuals who have broken the law by trespassing, engaging in unlawful demonstrations pursuant to DC Code 22-1307, or any other law

2.    Permanent sanctions and expulsions should be levied on all individuals who have breached school policy and codes of conduct, including but not limited to: access without authorization, community disturbance, discriminatory misconduct, creation of a hostile environment, destroying and defacing property, non-compliance, and regulation violations.

3.    Revoke GWorld privileges immediately for all protesters who have

participated

4.    Immediately and permanently ban all organizations that make up Student Coalition for Palestine, including SJP, JVP and other organizing groups

5.    Require tap access to all buildings and have extra security posted around campus so no additional 'encampments' can be set up in any area not designated as a protest area by GWU administration

6.    Take adequate measures against any faculty members who have engaged in gross personal misconduct by aiding and abetting the unlawful actions of the student protesters

You have been entrusted to lead not only in peaceful times but also to demonstrate strong leadership in tumultuous times. GWU must not allow the actions of a relative few to dictate the workings and proceedings of the entire university.

767.    GW JPULSE cited, among other things:

Racist, antisemitic and anti-American chants, rants and threats such as these have been heard and are on record: "Death to Zionism, Death to America", "This time we're bringing Israel down", "Fuck Zionism", "America is responsible for the exploitation of humanity" and many more. Signs prominently displayed read "Students will leave when Israelis Leave", "Students will go back home when Israelis go back to Europe, US, etc (their real homes)" and the Nazi sympathizing "Final Solution" which refers to the extermination of all Jews. The mob has invited speakers, unauthorized by the university, who preach hate and allegiance to terrorist and anti-American ideals and organizations. Protesters have engaged in disorderly conduct disturbing the peace, unlawful assembly, threats, harassment and have overall created a toxic environment on campus.

768.    The GWU administration neither responded to the letter nor took action to address their urgent concern for the safety and well-being of Jewish and Israeli students.

769.    During the encampment, the prominent statute of George Washington in the center of University Yard was defaced and damaged:



770.    Other monuments in University Yard and the surrounding buildings were vandalized or destroyed.

771.    A GWU flag was cut down, and in its place, the Palestinian flag was raised.

772.    On May 5th, in the afternoon, the protesters gathered in the middle of University Yard and held a mock tribunal to try GWU administrators, each of whom was sentenced to death.

773.    They first "tried" President Granberg, found her guilty, and chanted "Guillotine! Guillotine! Guillotine!"

774.    The protesters then moved on to Provost Christopher Bracey, chanting "Bracey, Bracey, we see you! You assault students too. Off to the motherfucking gallows with you."

775.    The crowd of protesters likewise called for the heads of the members of the Board of Trustees to be chopped off.

776.    During the two weeks of the encampment, the protesters hosted a regular assortment of speakers, including many who had no connection to GWU, and many who spewed incendiary and hateful exclusionary messages.

777.    For example, on May 7th, Rafiki Morris, a self-described outside agitator, fired up the assembly with threats to Jews and Israel:

> Smashing Zionism is undercutting the institutions that prop up this capitalist experiment that is ruling the world. When we destroy Zionism, you destroy George Washington University. When you destroy Zionism you really weaken the White House, you weaken the Congress you weaken all these [unintelligible] for the good of Humanity.

778.    With the crowd cheering, he added, "we getting ready to destroy Israel."

779.    Morris then led the crowd in a celebration of Hamas:  "Hamas is me. Hamas is you. Hamas is our children. I don't care what the imperialists called them."

780.    Finally, Morris closed with a call and response of "Smash Zionism is a universal call by all humanity."[55]

781.    Vice Provost and Dean of Students Colette Coleman was in the encampment during Morris's entire speech.

782.    She did nothing.

783.    If the signs, speeches, and chants were not enough to deter Jewish and Israeli students from entering University Yard, they often were met by a phalanx of protesters who *physically forced* them out.

784.    Jewish and Israeli students spotted in or around the encampment—including Mr. Shapiro, CAPE-Ed Member No. 2, and CAPE-Ed Member No. 4—were confronted by coordinated and aggressive patrols of protesters.

785.    With linked arms and often chanting antisemitic slurs, the protesters encircled Jewish and Israeli students and physically coerced them out of University Yard.

---

[55] Stu    (@thestustustudio),    X    (May    8,    2024,    7:20    PM), https://x.com/thestustustudio/status/1788348395146326095.

786.    GWU SCP designated certain protesters as "marshals," who wore yellow vests and ostensibly were responsible for maintaining order.

787.    In the GWU SCP encampment, the "marshals'" duties also included intimidating Jewish and Israeli students.

788.    When the GWU student leaders spotted a Jewish or Israeli student, they called for marshals to follow and intimidate them and organized other protesters to confront Jewish or Israeli students, forcing them to leave.

**C.    President Granberg acknowledges the antisemitic bedlam paralyzing her campus but declines to take any immediate action.**

789.    On May 1st, a group of U.S. Representatives visited GWU's campus, and they immediately scheduled a hearing regarding it on May 9th.

790.    Only then was President Granberg finally prompted to act.

791.    In a May 5th community message, President Granberg finally, belatedly, acknowledged what everyone knew:

> [W]hen protesters overrun barriers established to protect the community, vandalize a university statue and flag, surround and intimidate GW students with antisemitic images and hateful rhetoric, chase people out of a public yard based on their perceived beliefs, and ignore, degrade, and push GW Police Officers and university maintenance staff, the protest ceases to be peaceful or productive. All of these things have happened at GW in the last five days.

792.    President Granberg's statement squarely acknowledged that protesters were not peaceful and were engaged in discriminatory harassment of Jewish and Israeli students.

793.    She recognized that protesters literally were chasing Jewish and Israeli students out of the campus center—which indisputably constitutes a hostile environment.

794.    That recognition triggered an obligation on the part of the GWU administration to respond, to do something to eliminate that hostile environment.

795.   But the administration chose to do nothing.

796.   The unmistakable message to Jewish and Israeli students was as clear as her directive immediately after the October 7th attacks—you're on your own.

797.   While President Granberg correctly acknowledged the virulent antisemitic harassment occurring on campus, she failed to grasp its roots.

798.   The protesters' animus toward Jewish and Israeli students was not related to the Jewish and Israeli students' viewpoints or opinions.

799.   None of the protesters bothered to ask the Jewish and Israeli students about their "beliefs" before harassing them.

800.   Protesters intimidated and chased out Jewish and Israeli students because of their Jewish identity and Israeli nationality.

801.   President Granberg was not present at University Yard during the encampment, presumably out of concern for her own safety.

802.   Provost Bracey and other members of the administration regularly observed the protests, typically beyond the perimeter of University Yard in the company of police officers.

803.   When they entered University Yard, they almost invariably were flanked by police and security officers to protect their safety.

804.   The administration's concern for the safety of President Granberg, Provost Bracey, Dean Coleman and other members of the administration was prudent and warranted in light of the risk of violence.

805.   But the administration's concern for their own safety demonstrates and highlights its deliberate indifference to the safety of Jewish and Israeli students.

806.    The administration knew Jewish and Israeli students were the targets of severe harassment and intimidation, and that their personal safety, too, was at risk.

807.    But unlike the administration, Jewish and Israeli students were forced to continue their studies without the protection of security or police officers looking out for their safety.

808.    Jewish and Israeli students who entered University Yard, even if only to walk to class, were left on their own to contend with hundreds of protesters occupying the center and main thoroughfare of campus, amid signs warning them to keep out, chants of antisemitic slurs, and roaming bands of organized enforcers intimidating Jewish and Israeli students who dared to enter University Yard.

809.    GWPD officers were stationed across the street from University Yard, without clear lines of sight into University Yard.

810.    On information and belief, the GWU administration deliberately chose to refrain from posting GWPD officers within the encampment out of a concern it might spark a violent response.

811.    And so, concerned about a risk of violence, instead of stopping the perpetrators, the administration decided that Jewish and Israeli students would be left on their own, and alone, in that hostile environment.

812.    At least one faculty member notified students that classes for the remainder of the semester would be conducted remotely because of her own discomfort.

813.    Professor Donna Hoffman decided to conduct classes remotely not only because she was not comfortable on campus, but because she also recognized that Jewish and Israeli students  may feel unsafe on campus because of the protests.

814.    She sent the following email to her "AI and Marketing Strategy" class:

Due to today's GW advisory regarding the protests today, I do not feel comfortable on campus. Others of you may have similar feelings. As a consequence, I have decided to hold our class virtually. Presentations will be virtual and this should go quite smoothly. All teams need to do is arrange for one presenter to share their screen and then other members of the team can present their parts.

815.    While everyone on campus suffered disruption caused by the protests, the experiences of Jews and Israelis were exceptional precisely because they were Jewish and Israeli.

816.    Jewish and Israeli students who entered or walked along University Yard risked being targeted for abuse.

817.    The protesters did not need to ask each passerby if they were a Zionist before denying entry or hurling calls of "dirty Zionist."

818.    The protesters instead singled out for abuse students known to be Jewish or Israeli and those wearing outward signs of their Jewish identity, such as Stars of David, clothes with Hebrew lettering or Jewish references, or yarmulkes, proving again that "Zionist" was merely a proxy for "Jew" in the minds of the harassers.

**D.    When voices of reason were needed the most, many GWU's faculty and staff members join in the antisemitic propaganda.**

819.    The GWU administration also knew that GWU students were not the only members of the community violating the law and University policies by participating in the encampment.

820.    GWU faculty members promoted and joined the encampment, defying the GWU administration's direction to protesters to leave University Yard.

821.    Indeed, the faculty's encouragement and indoctrination of students fueled the animus that led to the encampment on GWU's campus.

822.    Several faculty members participated in the encampment.

823.    For instance, Professor Youmans spoke publicly at GWU's encampment, sharing words of support for the antisemitic protesters.

824.    Professor Youmans is a faculty member formally affiliated with IMES who previously stated, "[e]ven the faculty that don't turn up, many have sympathy for you [encampment protesters] because you are enacting what we teach."

825.    Professors hold a position of immense influence within the classroom and across campus.

826.    With that influence comes a duty to foster critical inquiry, uphold academic integrity, and protect the intellectual and emotional safety of all students.

827.    Yet, when educators misuse their standing to promote ideological agendas, foster division, or incite hostility—particularly against specific groups—they not only violate their ethical and professional responsibilities, but also betray the trust placed in them by the institution and the students they serve.

828.    Moreover, GWU faculty members actively frustrated the University's directives by linking arms with other faculty members, including with individuals not affiliated with GWU, around the protesters for the express purpose of preventing police officers who might try to enforce the law and University policies.

829.    During the encampment, Member No. 1 witnessed twenty to thirty faculty and staff members with their arms linked to "protect" the encampment protesters.



830.    Some GWU faculty members used class time and resources explicitly to encourage students to express their solidarity with the protesters by joining the encampment—and thus also outed Jewish and Israeli students who declined.

831.    In shows of support for the protesters, faculty members altered class formats and schedules, changed exam formats or eliminated exams, and some even abandoned grades altogether.

832.    Their actions were not aimed at advancing scholarship in their respective disciplines and thus violated the Faculty Code of Conduct, which states that a faculty member's exposition "shall be guided by the requirements of effective teaching, adherence to scholarly standards, and encouragement of freedom of inquiry among students."

833.    Rather than fostering genuine inquiry, these faculty members advanced an extremist ideological agenda—alienating Jewish and Israeli students, subjecting them to targeted hostility, depriving them of equal access to education and a safe learning environment, and inciting hatred against them.

834.    And rather than fulfilling their duty to deescalate tensions and maintain a safe academic environment, these professors effectively conferred tacit approval upon the perpetrators,

enabling the escalation of destructive activism and violence. Their conduct not only condoned but actively contributed to an environment of hostility, thereby exacerbating the threat to student safety and institutional integrity.

835.    For example, Aryn Kelly, a teaching assistant to Professor Elisabeth Anker, canceled class and invited students to join her "in solidarity" with the protesters.

Dear class,

In solidarity with the sit-in for Gaza currently happening at U-Yard, we will not hold discussion today. I will be in our regular classroom at class time, and anyone who is inclined is welcome to walk over to the encampment with me at that time.

Thank you,

Aryn

836.    The instructor's invitation to demonstrate "solidarity" with the protesters outed Jewish and Israeli students in the class who declined to participate.

837.    In Member No. 2's class, nearly a third of the class had joined the encampment.

838.    Professor Attiya Ahmad, who was a regular presence at the encampment, announced that all classes would be conducted remotely via Zoom, to the detriment of Jewish and Israeli students who were deprived of the benefits of live classroom instruction.

839.    GWU had permitted professors to conduct classes over Zoom for at least some of the duration of the encampment.

840.    Member No. 2 requested to take the final exam over Zoom due to fear over being on campus as a Jewish student during the encampment. This fear was particularly acute, given Professor Ahmad, as well as many of her classmates, were in attendance at the encampment.

841.    On April 29th, in Mr. Shapiro's Geography of Africa class, the professor decided to forgo the scheduled class lesson and instead dedicated the class to discuss his support for the

encampment.

842.    Students who had participated in the encampment shared their own praise and experiences.

843.    This particular class had been set aside as the review session before the final exam, but due to the professor's unwavering support for the antisemitic encampment at the center of campus, the class did not have its final review session for the exam.

844.    Instead, Mr. Shapiro and other Jewish students in the class were forced to listen to their professor and classmates pay tribute to an encampment that had incited an enormous crowd in the center of campus to hate and threaten Jewish and Israeli students.

845.    After class, Mr. Shapiro reported the incident in an email to the administration, adding that the University was "not just failing to combat antisemitism. It is actively fostering a culture and environment in which it thrives."

846.    He was absolutely correct.

847.    And he received no response from the administration.

848.    On April 30, 2024, Ms. Soffer and Member No. 2 were in Prof. Mark Ralkowski's class, when he opened the lecture with the following announcement to the class: "I just want to take a moment to empathize with some of the students here who have been camping outside, they haven't showered, they're dirty and might be hungry, and are tired, so let's just take it easy and have some empathy for them."

849.    Not a single mention was made of the rampant antisemitism that pervaded the Encampment.

850.    Given the number of faculty members who either attended the encampment, modified class schedules, or voiced approval of the encampment, it is unsurprising that at least two petitions in support of the encampment were circulated among GWU faculty.

851.    While some professors signed their names, others signed anonymously.

852.    One petition, featuring 129 signatures, called upon the GWU Administration to "rescind the suspensions of students who are peacefully encamping in University Yard," to stop "further requests for MPD to come onto our campus and for MPD or GWPD to arrest students," and to meet with Encampment protesters "to hear their demands directly and in-person."

853.    It continued:

We, the undersigned faculty and staff of different backgrounds and political viewpoints from Universities across the DC, Maryland, and Virginia area, come together to support the student protests and encampment at George Washington University. . . .

These protests are anchored in a clear moral compass in the face of Israel's genocidal campaign against the Palestinians in Gaza through mass killing, widespread destruction, and other acts condemned by the International Court of Justice. These students' visions are based on an understanding of our collective well-being and, often, in a principled objection to that which impedes it. As faculty, we take our obligation to prepare our students for leadership, critical thinking, global citizenship, and political engagement seriously in an increasingly divided and global society.[56]

**E.    The encampment is cleared, and then immediately reforms in front of a GWU freshman residence hall (i.e., *home* for GWU students).**

854.    On May 8, 2024, the MPD cleared the encampment in University Yard and arrested thirty-three people (many of whom were not students).

855.    After the encampment was finally cleared, protesters lost no time instigating another protest on the GWU campus.

---

[56] *DMV Faculty for Academic Freedom: Open Letter from Faculty and Staff Across the DC, Maryland, and Virginia Region*, JADALIYYA REPORTS (Apr. 26, 2024), https://www.jadaliyya.com/Details/45945/DMV-Faculty-for-Academic-Freedom-Open-Letter-from-Faculty-and-Staff-across-the-DC,-Maryland,-and-Virginia-Region.

856.    On May 9, 2024, the protest resumed a few blocks away from University Yard, in front of Thurston Hall, a freshman residence hall.

857.    The crowd of protesters erected nine tents on F Street, NW, and numbered in the hundreds.

858.    By early evening, the GWU administration issued a safety alert, announcing that Thurston Hall was in emergency mode, which meant that no one was allowed to enter or leave the building.

859.    Jewish and Israeli students returning home from exams discovered GWU administrators, including Dean Coleman, protected by police officers at the entrance to Thurston Hall.

860.    The students were told the building was on lockdown, and they were prohibited from entering their residence hall.

861.    The exhausted Jewish and Israeli students were left standing in the middle of an antisemitic protest, deemed by the administration to present a heightened security risk, with nowhere to go and no one to protect them.

862.    Thurston remained on lockdown until well past midnight, when MPD finally shut down the protest.

863.    For the Individual Plaintiffs and CAPE-Ed members, the protests provoked significant anxiety and fear.

864.    Many were compelled to seek accommodations, and some left campus altogether.

865.    The protesters on the other hand, many not even associated with GWU, were

permitted free reign of campus, despite violating University policy and the law.

**VII.    GWU'S DOUBLE STANDARD (PUNISHING HATE DIRECTED TOWARD ALL GROUPS *EXCEPT* JEWISH AND ISRAELI STUDENTS) UNDERSCORES THE LEGAL AND MORAL VIOLATION PERPETUATED BY THE UNIVERSITY.**

866.    In the face of widespread complaints about the University's indifference to discriminatory harassment on campus, President Granberg offered an excuse:

> As a university, we are not equipped to single-handedly manage an unprecedented situation such as this. The GW police force is, and should only be, prepared to protect our community during normal university operations and to respond to routine and urgent incidents. When unlawful activities go beyond these limits, we must rely on the support and experience of the DC Metropolitan Police Department.[57]

867.    President Granberg's excuse is none at all.

868.    The antisemitic encampment did not occur in a vacuum.

869.    It arose directly and predicably from the University's persistent failure to address longstanding antisemitic harassment and discrimination.

870.    These events were not only predictable but stemmed from a willful disregard for repeated warning signs.

871.    From November 2023 through April 2024, members of the GW JPULSE group sent multiple emails to President Granberg outlining specific concerns and recommendations.

872.    These communications were met with total disregard and a consistent refusal to acknowledge, engage with, or implement any of the proposed measures.

873.    This disregard was nothing new.

874.    In January 2024, the GWU administration issued a public announcement purporting to address rising campus tensions; however, the University failed to implement or enforce any of

---

[57] Pres. Ellen M. Granber, Message Regarding the Ongoing Campus Protests (May 5, 2024), https://president.gwu.edu/message-regarding-ongoing-campus-protests.

the substantive measures outlined therein.

875.    The January 2024 announcement amounted to hollow rhetoric—lacking any meaningful deterrent effect or mechanisms for accountability—further evidencing the institution's ongoing pattern of deliberate indifference.

876.    The GWU administration was not entitled to abdicate its obligations to Jewish and Israeli students and simply rely on MPD.

877.    The administration was obligated to use the resources, procedures, and tools at its disposal to check antisemitism and maintain order on its campus.

878.    As a preeminent university in the Nation's capital, with an endowment of approximately $2.5 billion, if, as President Granberg indicated, the GWPD lacked the resources to maintain order, GWU should have tapped a tiny fraction of its $2.5 billion endowment and hired officers and security, and used available technology to help GWPD protect Jewish and Israeli students and the broader GWU community.

879.    The two-week unlawful encampment was the foreseeable result of the University's longstanding willingness to tolerate antisemitic harassment on campus.

880.    Since before the Hamas' October 7th attacks, the administration has refused to meaningfully discipline students who, among other things, have engaged in a consistent pattern of antisemitic discrimination and harassment, vandalized the center of Jewish life on campus, smashed the window of a truck of an organization dedicated to challenging antisemitism, disrupted University functions and events, refused to comply with the administration's directions, and incited an enormous crowd in the middle of campus (including GWU students, faculty members, and outsiders) to hate and intimidate Jewish and Israeli students.

881.    During that entire time, the administration failed to call out and condemn the

pervasive antisemitic discrimination, intimidation, and harassment on its own campus.

882.    The administration declined to clearly state that targeting Jewish and Israeli students because of their identity, calling for Jews and Israelis to "go back to Europe," and calling for the clearing of Zionists from campus, is antisemitic harassment and will not be tolerated on the GWU campus.

883.    President Granberg failed in her leadership responsibilities.

884.    Rather than unequivocally condemning the acts of harassment and intimidation, she justified and legitimized them under the guise of free speech, First Amendment protections, and academic freedom.

885.    In doing so, she neglected to enforce the university's Code of Conduct, failed to ensure the safety and well-being of all students, and allowed hostility toward Jewish and Israeli students to escalate unchecked.

886.    Simultaneously, both she and Dean Coleman enacted heightened security measures prior to meeting and negotiating with SJP-affiliated students following the illegal encampments—demonstrating selective responsiveness and an alarming double standard.

**A.    The University's Student Code of Conduct, and other relevant policies.**

887.    The University chooses not to enforce its nondiscrimination policy when discrimination is directed at Jewish and Israeli students.

888.    The Student Code of Conduct expressly prohibits "discriminatory misconduct," which includes: (i) Unlawful Discrimination, which is adverse treatment of an individual based on a protected characteristic, rather than individual merit; and (ii) Discriminatory Harassment, which is any unwelcome conduct based on a protected characteristic where such conduct creates a hostile environment.

889.    As defined in the Student Code of Conduct, unlawful discrimination includes

singling out or targeting an individual for different or less favorable because of their protected characteristic and restricting an individual's continued access to an educational program or activity or participation in a student organization or activity based on a protected characteristic.

890.    The Student Code of Conduct separately promises that GWU will not tolerate discriminatory harassment, whether blatant and intentional and involving an overt action, a threat or reprisal; or subtle and indirect, with a coercive aspect that is unstated.

891.    The Student Code of Conduct explains that discriminatory harassment, among other things: (i) does not have to include intent to harm or be directed at a specific target, (ii) may occur in the classroom, in the workplace, in residential settings, or in any other context or setting connected to the university or related activities, (iii) may occur in digital environments including but not limited to social media, web sites, educational platforms, and electronic mail, and (iv) may be a one-time event or may be part of a pattern of behavior.

892.    The Student Code of Conduct also includes the following prohibitions:

- Disorderly Conduct, which includes acting in a manner that threatens, endangers, or harasses others; and disrupting, obstructing, or interfering with the activities of others;

- Interfering with University Events, which is defined as "Interfering with any normal university or university-sponsored events, including but not limited to studying, teaching, research, university administration, fire, police, or emergency services";

- Non-compliance, which is the failure to comply with reasonable directions of university officials, including University Police officers and representatives of Enrollment and the Student Experience acting in performance of their duties;

- Safety Measures Violations, including the intentional or unintentional throwing, lowering of, or in any way putting any object out of a window or from any building structure including but not limited to a balcony, rooftop deck, stairwell, or any equivalent interior structure of any building;

- Sanction Violation, defined to mean violating the terms of any student

conduct sanction assigned in accordance with this Code;

- "Trespass," defined to mean entering or remaining on or in any part of any university premises without proper authorization.

893.    Moreover, the Student Code of Conduct states that a student leader may be held responsible for an organization's violations of the Code of Conduct.

894.    A student leader who fails to respond to an administration's direction to take action to prevent or end an organization's violations of the Code is individually responsible a violation of the Code.

895.     The University's Policy on Demonstrations states that the University maintains the right to define the time, place, and manner of, as well as objects utilized during, demonstrations that occur on its campuses and at its facilities.

896.    It expressly prohibits demonstrations that "endanger the safety or security of the university community, infringe upon the rights of other members of the community, or cause damage to property.

897.    This includes the rights of others to conduct class, hold their own meetings, or hear another speaker.

898.    In addition, the University has the authority to "require demonstrators to remove any mask, hood, or device whereby any portion of the face is hidden, concealed, or covered as to conceal the identity of the wearer."

899.    Under the University's Policy on Barring People from Campus, the University "reserves the right to determine who can and cannot access and/or use university facilities or be present on university property."

900.    The University's Policy on Threats and Acts of Violence states that the University will respond promptly to reports of threats or acts of violence and reserves the right to take

immediate action to protect members of its community.

**B.** **While the antisemitism spread, the University refused to enforce its Code of Conduct and other policies or to otherwise hold accountable any antisemitic rulebreakers.**

901.    The GWU administration has applied a double standard when it comes to enforcing its nondiscrimination policy and Code of Conduct.

902.    It promptly investigates discrimination against minorities other than Jews and Israelis, and then metes out serious discipline to offenders.

903.    When the victims of discrimination are Jewish or Israeli, however, the GWU administration is slow to respond, quick to excuse, and fast to forget.

904.    For example, when Mr. Shapiro experienced active discrimination and harassment from two of his fellow fraternity brothers—Brothers A and B—because of his Jewish identity, GWU determined that verbal harassment was too challenging to prove.

905.    Following October 7, Mr. Shapiro had brought up antisemitism within his fraternity at a fraternity meeting, during which Brother A stormed out of the meeting. Mr. Shapiro was aware that Brother A had posted pro-Hamas content on his Instagram.

906.    In another meeting, Brother B began screaming conspiratorial antisemitic epithets about "Jews and money" and "Jews and loyalty," which Mr. Shapiro perceived as a response to his concerns about growing antisemitism.

907.    Nobody in either meeting intervened.

908.    Brother B was supposedly the "big" or fraternity mentor of Mr. Shapiro. Yet, following October 7 and Mr. Shapiro sharing his concerns regarding antisemitism, Brothers A and B refused to participate in social events at which Mr. Shapiro was present.

909.    Mr. Shapiro confirmed with two other fraternity brothers that the negative treatment and social ostracization he was receiving from Brothers A and B was a function of his Jewish

identity.

910.    Mr. Shapiro withdrew from the fraternity due to this antisemitic harassment and intimidation.

911.    Following the event, Mr. Shapiro was contacted in November 2023 by E'Quince Smith, the Area Coordinator for Fraternity and Sorority Life at GWU, to discuss the incidents. No action was taken by Mr. Smith vis-à-vis the two fraternity brothers.

912.    Mr. Shapiro then raised the matter with GWU's Students Rights & Responsibility Office ("SRR"), now called Conflict Education & Student Accountability ("CESA"), which supposedly performed an investigation.

913.    After Mr. Shapiro filed a report with SRR, he was contacted by a member of the national office of his fraternity, who promised to submit a report to GWU regarding his decision to withdraw from the fraternity.

914.    The individual responsible for receiving the report within the GWU Administration alleges to never have received such a report. This individual is an alumnus of the fraternity.

915.    Meanwhile, SRR eventually concluded that none of the incidents described by Mr. Shapiro were actionable because, among other things, verbal harassment was too difficult to prove, and the pro-Hamas Instagram posts from Brother A did not tag Mr. Shapiro directly.

916.    Neither Brother A nor Brother B was ever punished.

917.    Meanwhile, in Member No. 1's case, although she and another student positively identified the harassing student and his misconduct, and the administration acknowledged that the conduct constituted discriminatory harassment and disorderly conduct, the administration refused to discipline the student, purportedly because the incident was not captured on security camera

footage.

918.    And when Member No. 2 was harassed and threatened because she is Jewish, the administration said it was unable to take any action because the offender had recently graduated, even though the administration disciplined recently graduated Jewish students.

919.    The administration often claimed it could not identify perpetrators.

920.    But the administration's purported inability to identify perpetrators was more often because of lack of willingness, rather than capability.

921.    In some instances, readily available photo and videographic images clearly show unmasked GWU students engaged in ugly and severe antisemitic harassment.

922.    In other cases, positive identification by multiple witnesses could not overcome the administration's willful blindness.

923.    GWU's purported inability to identify GWU students and faculty who taunted, harassed, intimidated, surrounded and assaulted Jewish and Israeli students in the encampment ultimately prompts the question—why not?

924.    Those persons were in University Yard for at least two weeks, and many, emboldened by the lack of any consequences, had shed their masks.

925.    GWPD officers and administration members should have been in University Yard to protect Jewish and Israeli students and to identify wrongdoers.

926.    And if they were not there at the time of the offense, GWPD officers should have followed up and identified offenders, rather than permitting them to remain and harm other Jewish and Israeli community members.

927.    And if they were too frightened to enter University Yard, the administration at the

very least should have monitored University Yard security cameras to identify offenders.

928.     The University deliberately averted its eyes to avoid pursuing offenders.

929.     On April 26, 2024, President Granberg *said* that the University was initiating disciplinary action against all protesters who failed to leave University Yard by the 7 p.m. deadline.

930.     Hundreds remained after the deadline.

931.     Over the next two weeks, more GWU students and faculty members joined the encampment.

932.     GWU students violated local law, vandalized and destroyed University property, held events and occupied University space in violation of University Policies and the Student Code of Conduct, and harassed and intimidated Jewish and Israeli students.

933.     By May 5, 2023, President Granberg said protesters had "overrun barriers established to protect the community, vandalize[d] a university statue and flag, surround[ed] and intimidate[d] GW students with antisemitic images and hateful rhetoric, chase[d] people out of a public yard based on their perceived beliefs, and ignore[d], degrade[d], and push[ed] GW Police Officers and university maintenance staff."[58]

934.     When MPD finally cleared the encampment, only six GWU students were arrested *after* refusing officers' repeated directions to leave University Yard *and* resisting the officers' attempts to clear University Yard.

935.     But for the entire year following October 7, 2023, the GWU administration suspended only a single student.

---

[58] Pres. Ellen M. Granber, Message Regarding the Ongoing Campus Protests (May 5, 2024), https://president.gwu.edu/message-regarding-ongoing-campus-protests.

936. It placed sixteen students on disciplinary probation, censured three students, and issued warnings to three others.

937. All but the single suspended student were welcomed back to campus for the Fall semester.

### C. The University's impermissible double-standard is demonstrated by the immediacy with which it has policed discrimination against other minority groups.

938. The GWU administration's responsiveness to discriminatory harassment of students of other racial and ethnic identities starkly reveals the double standard applied to antisemitic harassment.

939. For example, in September 2022, a GWU Human Rights professor, during his class on universal human rights, requested permission from the students to read aloud an original text that included the N-word.

940. The request was made explicitly for academic purposes, in the context of analyzing the role of language in systemic prejudice.

941. Although he did not use the N-word in class, three student complaints were filed against him, the University promptly announced he would be replaced with another instructor, and he was forced to leave the University.[59]

942. At no point did the professor target African American students, nor did he label or demean any individual or group.

943. His intent was solely academic, rooted in a critical analysis of human rights and the historical use of discriminatory language.

---

[59] *GW Replaces Professor Who Defended Racial Slur, as Ongoing Racism Frustrates Students*, GW HATCHET (Sept. 26, 2022), https://gwhatchet.com/2022/09/26/gw-replaces-professor-who-defended-use-of-racial-slur-as-ongoing-racism-frustrates-students/.

944.    In January 2022, a professor teaching anti-racism in STEM was suspended after a lecture on a Norman Rockwell painting that features the N-word.

945.    While describing the painting, the professor inadvertently uttered the N-word.[60]

946.    In September 2019, in response to a sorority president's private Snapchat post of a photo of a plantation gift ship with the caption, "I wonder if they sell slaves," then Vice President of Student Affairs and Dean of Students Cissy Petty rightly determined that "[t]he post was insensitive, insulting and racist, . . . [and] also part of a larger challenge of building the appropriate culture on our campus."

947.    Dean Petty levied discipline against *all* sororities on campus, banning them from informally recruiting new members or participating in any social activities this fall."[61]

**D.    Rather than punish those who terrorized Jewish and Israeli GWU students, the GWU Administration initially chose to negotiate their demands.**

948.    Faculty and students who harassed, intimidated, and threatened Jewish and Israeli students, however, did not face discipline.

949.    Despite extensive reports documenting faculty members inciting hate and placing a target on Jewish and Israeli students, and repeated requests to investigate both the curriculum and involved professors, Provost Bracey, Dean Coleman, and President Granberg collectively dismissed these concerns.

950.    They concealed institutional bias and inaction under the guise of academic freedom, thereby enabling continued hostility and failing to uphold the University's obligation to provide a

---

[60] *Officials Planning Future of Anti-Racist GWTeach Course After White Professor Reads N-Word*, GW HATCHET (Jan. 31, 2022), https://gwhatchet.com/2022/01/31/officials-planning-future-of-anti-racist-gwteach-course-after-white-professor-reads-n-word/.

[61] *GW Suspends Panhel Informal Recruitment, Social Activities This Fall Amid Racist Post*, GW HATCHET (Sept. 7, 2019), https://gwhatchet.com/2019/09/07/officials-suspend-panhel-informal-recruitment-social-activities-amid-racist-snapchat-post/.

safe and nondiscriminatory learning environment.

951.    On the contrary, the GWU administration's immediate action was to reward GWU SJC with a private meeting to negotiate its demands of the University.

952.    On May 10, 2024—the day after a protest caused an emergency alert that locked down Thurston Hall, a freshman residence—Dean Coleman sent an email to GWU SJP inviting it to a "private dialogue" to discuss its demands.

953.    At that time, the GWU administration still had not responded to most of the Jewish and Israeli students and their parents' letters, emails and telephone messages.

954.    Dean Coleman's email confirmed what already had been clear—despite its suspension, GWU SJP organized the campus protests, and its student leaders remained firmly in charge.

955.    GWU invited GWU SJP student leaders to private negotiations involving the most senior members of the GWU administration—President Granberg, Provost Christopher Bracey, Chief Financial Officer Bruno Fernendes, and Dean Coleman—even though GWU SJP was under suspension, which, according to GWU's statement announcing the suspension, "prohibited SJP from participating in activities on campus."

956.    Her invitation to GWU SJP became public only because GWU SJP posted it on its Instagram page.

957.    Rather than disciplining the student protest leaders for violating GWU's Code of Conduct and policies and propagating hatred of Jewish and Israel students, GWU's administration elevated them to negotiating partners on improving campus relations.

958.    On May 21, 2024, Dean Coleman sent an email to Ms. Soffer, Mr. Shapiro and other Jewish and Israeli students, inviting them to a May 28th "conversation on rebuilding trust in

our community" that would discuss "how to create a safe and welcoming campus environment that is free of antisemitism for our Jewish students."

959.    The Jewish and Israeli students thought the meeting was a long-overdue response to their calls, emails, letters and reports urging the GWU administration to protect Jewish and Israeli students on campus.

960.    But it was not.

961.    They did not know that Dean Coleman also invited student (Jewish) leaders and participants (JVP and JSTREET) of the encampment—an ironic and unforgivable omission in a call to "rebuild trust."

962.    The meeting was largely consumed by a debate on the meaning of antisemitism, which was left unresolved.

963.    Nothing constructive arose from the meeting.

964.    As Mr. Shapiro explained in an email to Dean Coleman the following day:

I find it concerning that people who were part of the encampment were participants in this process. They broke university policy; they should be suspended, much less be allowed to influence university policy. The lack of action taken against them represents another issue of discrimination, as it is wildly inconsistent and disproportionate to how GW handled far less severe issues in the past.

965.    Mr. Shapiro and other Jewish students who were critical of the GWU administration were not invited back to meet with GWU administrators.

966.    The GWU administration has continued to meet with and negotiate the demands of GWU SJP.

967.    GWU SJP remains officially suspended from campus activities, and over the past year it has disrupted University functions and students' academic pursuits, violated University policies and the Code of Conduct, promoted antisemitic discrimination and harassment, and demanded the University adopt antisemitic and unlawful policies.

968.    It, and its student leaders, should be disciplined, and others made aware that unlawfully occupying University property and promoting discrimination will be punished.

969.    The administration, however, has rewarded GWU SJP and its leaders by continuing to meet with them and negotiate their demands.

## VIII.    ANTISEMITISM CONTINUES TO FESTER ON GWU CAMPUS AND IN THE GWU CLASSROOMS, SHOWING THAT GWU HAS ALLOWED HATE TO WIN.

970.    During the summer, the University installed fencing around University Yard and limited access only during specified daylight hours.

971.    While the fencing presents an obstacle to large-scale extended protests, it is no obstacle to antisemitic harassment.

972.    At this time, the provost of the university also launched six faculty working groups to address campus climate matters: out of the six, not a single one addressed matters of Israel, antisemitism, or Jewish students. The six groups were the following: Community Conversations, Free Speech & Community, Humanitarian Efforts in Gaza and Beyond, Lecture Series, Pathways to Greater Inclusion, and Sustainable Investing

973.    At the very start of the Fall 2024 semester, on August 22, 2024, GWU SCP protesters, led by GWU students (and joined by members from affiliated pro-Hamas groups), marched on President Granberg's home and vandalized a University monument.

974.    At least one Jewish student on campus at the time was surrounded by a group of protesters and physically intimidated.

975.    On the anniversary of the October 7th Hamas attacks on Israel, GWU SCP, again led by GWU students, held a vigil for Hamas terrorists killed in the attacks.

976.    Earlier that day, Ms. Soffer was in class when the lecture was interrupted by the chanting and drums.

977.    The protest re-emerged that night.

978.    GWU SCP was ineligible to reserve University space, so it announced that its vigil would be held at nearby James Monroe Park.

979.    About two-hundred people amassed there.

980.    Despite being prohibited from holding an event on campus, GWU SCP almost immediately began to march on University Yard.

981.    Once there, the crowd of protesters, amplified by megaphones and backed by drums, shouted antisemitic statements and bullied Jewish students in the area.

982.    A Jewish student filming the event for a documentary stood behind the protest.

983.    He was suddenly surrounded by about fifteen protesters dispatched by organizers to intimidate him, many shoving signs in his face, shouting antisemitic slurs, and ordering him to stop filming.

984.    The Jewish student asked the protesters to back out of his personal space, but he was ignored until he finally managed to push his way out of the crowd.

985.    On the following day, October 8, 2024, an unauthorized protest took place in Kogan Plaza during afternoon classes.

986.    Approximately one hundred fifty protesters filled Kogan Plaza, and Palestinian and Lebanese flags and signs were draped from the tops of Rome and Phillips halls in violation of University Policy.

987.    The protesters, amplified by megaphones, called for "Intifada," chanted, and banged on drums, disrupting classes in the neighboring buildings.

988.    Dean Coleman stood nearby observing the protest, and Assistant Dean of Student Life Brian Joyce watched alongside it.[62]

989.    But neither they, nor anyone else in the GWU administration, did anything to stop the unauthorized, disruptive protest or to later discipline the organizers.

990.    Ms. Soffer had just finished class and walked to meet a friend during the October 8, 2024 protest.

991.    She was anxious about being targeted by the protests, particularly since she had been photographed and confronted at earlier events.

992.    She was thus forced to take a long detour to her meeting to avoid the protest.

993.    Ms. Soffer's friend told her that he felt unsafe leaving his residence hall at all due to the protest. This was not just one occasion in which he expressed the need, or indeed did, isolate himself due to fear of being harassed by anti-Israel protesters.

994.    The House Committee released its Staff Report on December 4, 2024, which summarized the results of its investigation of the responses of eleven colleges and universities—including GWU—to protests following the Hamas' October 7, 2023 attacks on Israel.

995.    The Staff Report was an unqualified condemnation of each institution's failure to protect Jewish students from antisemitic harassment.

996.    It announced that, among other things:

[The Committee's] investigation found that universities it has examined have utterly failed to impose meaningful discipline for the numerous antisemitic conduct violations that warrant it. This comes despite many university leaders' stated commitments that antisemitism would not be tolerated and that their rules would be enforced. The examples cited below reveal that a significant issue at numerous

---

[62] *Pro-Palestinian Protesters Walk Out of Classes, Rally on Day Two of 'Week of Rage,'* GW HATCHET (Oct. 11, 2024), https://gwhatchet.com/2024/10/11/pro-palestinian-protesters-walkout-of-classes-rally-in-day-two-of-week-of-rage/.

universities, of which Columbia and Harvard serve as prime examples, is the faculty's role in obstructing disciplinary processes .

The appalling records of these eleven universities make clear that there is a systemic failure to enforce rules, impose discipline, and protect Jewish communities among institutions of higher education throughout the country. [63]

997.    Although GWU SJP remains under suspension, it continues to post notices on social media accounts (using the GWU trademark) and to host events on campus or off campus still using the GWU name.

998.    The administration still refuses to discipline the student leadership individually (who under the Student Code of Conduct are to be held to account for the actions of the organization) or to otherwise take effective measures against GWU SJP. The mere disciplinary probation suspension or suspension of the organizations have not, and do not, deter them from acting.

999.    On February 25, 2025, the office of Israeli GWU faculty member Joseph Pelzman, an economics professor with expertise in international trade policy, was vandalized by supporters of GWU SJP.

1000.    Academic papers were torn down, and a sign with an antisemitic and threatening message was posted on his office door.

1001.    Dozens of copies of the sign were littered throughout the building.

1002.    The sign, a purported "Notice of Eviction," accused Professor Pelzman of "incepting the genocide and planned ethnic cleansing of Gaza," "defilement of the pursuit of

---

[63] Republican Staff Report, *Antisemitism on College Campuses Exposed,* U.S. House of Representatives Committee on Education and the Workforce (Oct. 31, 2024), https://edworkforce.house.gov/uploadedfiles/10.30.24_committee_on_education_and_the_workforce_republican_st aff_report_-_antisemitism_on_college_campuses_exposed.pdf

education and knowledge by weaponizing it toward U.S. imperialism and the mass slaughter of

Palestinians," and "Islamophobia, xenophobia, Zionism, racism and fascism."

1003.   It added that "Pelzman is only one pernicious symptom of the **bloodthirsty**

**Zionism** permeating our campus." (emphasis in original).

1004.   The reference to "bloodthirsty Zionism" is rooted in historical blood libels against

Jews.

1005.   The United States and non-Jewish figures are referred to as imperialist, but Jews

and Israelis are invariably called Zionists.

1006.   The sign concluded with a clear and present threat to Prof. Pelzman:

The proprietors of this eviction notice demand your **immediate** removal. If you
choose to remain on the premises, and if GWU continues to harbor your malignant
presence on this campus, every sector of this community will be mobilized against
you. The students of GWU will hold you and this university accountable for your
crimes. (emphasis in original).

1007.   That same day, GWU SJP posted photos of the defaced door of Prof. Pelzman's

office, copies of the signs strewn along the hallway, and the text of the sign.

1008.   Its post also included threats:

Pelzman's tenure is only one pernicious symptom of the bloodthirsty Zionism
permeating this campus and the students demand his immediate removal. If
Pelzman wants [sic] plan the mass expulsion of the people of Gaza from their land,
we will remove him from his ivory tower office. . . . Pelzman and GWU
administration will be held accountable for their crimes.

1009.   These are the same set of protesters who had publicly called for the murder of

several administrators just a few months prior.

1010.   GWU SJP urged its followers to lobby for firing Professor Pelzman by signing a

petition, available from its social media site, and emailing it to GWU SJP.

1011.   GWU continues to fail to enforce its policies and Code of Conduct, and to take any other action to protect the safety, well-being and educational opportunities of Jewish and Israeli community from the hostile environment on campus.

1012.   The faculty and administration of GWU's Professional Psychology Program continue to foster antisemitism and to discriminate against Jewish and Israeli students—after OCR investigated that same Program because of egregious discrimination against Jewish and Israeli students in Professor Sheehi's mandatory diversity class, and after OCR ordered GWU to take action to remedy the discrimination.

1013.   Despite the OCR order, the GWU administration continues to tolerate antisemitic discrimination by the Program's administration and faculty.

1014.   On October 21, 2024, during an event titled "The Colonizing Self Or, Home and Homelessness in Israel/Palestine" that discusses how colonizers continuously transform spaces of violence into spaces of home and, in referencing Israel, offers a theoretical framework for understanding how settler-colonial violence becomes inseparable from one's sense of self: this gives rise to the notion that Israelis, by their very nature, are colonizers worthy of demonization—a view expressed by GWU students in the public square as they vilify their Zionist peers.

1015.   A recent example arose during a March 25, 2025 mandatory guest lecture for students in the Program's mandatory colloquium, led by Professor Joshua DeSilva, the Deputy Director of the Program and Director of Clinical Training.

1016.   The guest lecturer was a groundbreaking scholar in the fields of feminist therapy theory, trauma treatment, lesbian and gay issues, assessment and diagnosis, ethics and standards of care in psychotherapy, and cultural responsivity.

1017.   She identified herself at the outset of her presentation as a Jewish, lesbian feminist.

1018.   In the middle of her lecture (on the subject of decolonial, intersectional feminist therapy), she was abruptly interrupted by a student leader of anti-Zionist protests.

1019.   The protester demanded to know how the guest lecturer could use the term "decolonizing" without referring to Palestine, and then asked if she was a Zionist.

1020.   After the guest lecturer confirmed that she is a Zionist and supported a peaceful two-state solution, the student protest leader shouted and screamed at the guest lecturer, refusing to let her proceed with the lecture, calling her, among other things, a "Nazi," and a "murderer," and asserting that she had blood on her hands.

1021.   Professor DeSilva and an adjunct professor physically in attendance failed to intercede and instead allowed the student protest leader's ugly and hateful attack to continue unabated for around twenty minutes.

1022.   Only after the student protest leader completed his diatribe did Professor DeSilva speak.

1023.   But rather than condemn the hateful speech, or apologize to the guest lecturer, Professor DeSilva praised the protest leader, and declared that he was doing the work of the group.

1024.   At that, the guest lecturer decided not to continue with her lecture.

1025.   On information and belief, the entire incident was captured on video.

1026.   In the aftermath, Program faculty have reported to students that the guest lecturer should not have been invited to speak to the class, and that she had been the provocateur and instigated the attack on herself.

1027.   They also rejected Jewish students' concerns that the student's attack—calling an American scholar, who happened to be Jewish, a Nazi and a murderer simply because she refused to *renounce* Zionism—was antisemitic.

1028.   As a result, Jewish and Israeli students are compelled to take graduate classes in psychology taught by professors, and seated alongside classmates, who believe (because GWU faculty actively teach them) that they too are Nazis and murderers who deserve to be called out and abused.

1029.   Professor DeSilva's decision to allow a student to openly berate a Zionist professor in front of the class—and their subsequent support of that student—sends an alarming message to the entire academic community.

1030.   It signals that any viewpoint supporting Zionism is unwelcome, and that students or faculty who express such views will be targeted, harassed, and silenced.

1031.   To this end, discourse supporting Zionism has been systematically suppressed in violation of the principles of academic freedom and the First Amendment.

1032.   Anti-Zionist narratives are allowed to proceed unchallenged, while individuals who express pro-Zionist views are routinely ostracized, threatened, and labeled with defamatory or false accusations.

1033.   This pattern of intimidation has not only been tolerated but actively supported by certain professors, whose conduct reinforces a campus climate hostile to Jewish and Zionist students.

1034.   Such actions create a chilling effect on constitutionally protected speech by fostering an environment of antisemitic harassment and discrimination based on shared ancestry and ethnic identity.

1035.   In response, the Plaintiffs have continued to raise the antisemitism alarm to GWU's faculty and staff.

1036. For instance, on October 3, 2024, Ms. Soffer sent the following email to Professor

Atia:

> Since my time at GWU, most to all of the IMES programs have been anti-Israel. In light of the upcoming one-year anniversary of October 7th and the IMES events slated for October and the rest of the year, I am wondering if any changes have been made to the faculty, curriculum, and conferences this year to include pro-Israel perspectives and general viewpoint diversity.
>
> I look forward to your response.

1037. On October 4, 2024, Professor Atia responded by denying that "IMES

programming [is] anti-Israel."

1038. On October 8, 2024, Ms. Soffer replied as follows:

> I'd like to address the anti-Israel bias in IMES from my experience and that of my peers. Since my freshman year at GW, I have taken courses in IMES and attended various events. At events like "The One State Reality" which occurred before 10/7, the screening of "Israelism" which occurred just after 10/7, and "Middle East Knowledge Production in the Aftermath of October 7" which took place last April, among others, I was astonished by the deviant and at times cynical reactions to questions I posed and the lack of viewpoint diversity presented.
>
> The conference last April surrounding "decolonizing knowledge" and "producing knowledge for resistance practices" contributed to the hate espoused in the anti-Israel encampment. For your knowledge, my friends and I have been stalked and harassed with the rhetoric of Israel being a "genocidal," "apartheid," "settler-colonial" entity that IMES events have been espousing.
>
> This year, with October 7, 2024 marking the one year anniversary since the worst terror attack in Israel's history, IMES still lacks viewpoint diversity and continues holding events justifying the attempted genocide of Israel, celebrating "Palestinian resistance and resilience." I also noticed that IMES will hold an event discussing refugees without a single mention of displaced Israelis of all ethnicities and faiths due to rockets fired by Hamas and Hezbollah.
>
> Once again, I am not contending that the events IMES holds should not take place or that faculty critical of Israel should not express their opinions. What I am wondering is what will be done to promote viewpoint diversity in IMES whereby Israel's positive characteristics of democracy, diversity, and innovation will be presented. Indeed, it is a part of your faculty code of conduct to present the truth.

In this light, I am wondering: Have there been any changes in IMES since last year, or the year prior—for instance adding faculty with moderate to conservative perspectives, or on the Israeli Center/Right on the conflict in the Middle East?

1039.    Professor Atia did not respond.

1040.    In effect, Jewish, Zionist, and pro-Israel individuals are prohibited from having the equal platform to voice their perspectives, in direct violation of the university's commitments to academic integrity, nondiscrimination, and free expression.

1041.    This chilling effect extends beyond Jewish and Israeli students.

1042.    It also impacts any member of the campus community who supports the democratic State of Israel, signaling that their views are neither respected nor protected.

1043.    In conclusion, this reflects an alarming state of affairs at George Washington University—where ideological bias overrides academic responsibility, and the safety, dignity, and rights of Jewish, Israeli, and Zionist students are continually compromised.

## IX.    THE EXPERIENCE OF THE PLAINTIFFS AND THE CAPE-ED MEMBERS SHOWS THE EXTENT TO WHICH GWU'S HOSTILE ENVIRONMENTAL HAS DEPRIVED GWU JEWISH AND ISRAELI STUDENTS OF THEIR EDUCATIONAL OPPORTUNITIES.

1044.    Antisemitic discrimination and GWU's double standard have taken a significant psychological, emotional, and physical toll on the Individual Plaintiffs and on the CAPE-Ed members.

1045.    All have been subjected to discriminatory harassment on a pervasive basis, and some have been victims of severe harassment.

1046.    In addition, all have been denied their rights to equal access to educational benefits, including an inclusive environment free of threats of assault and mob violence, unimpeded access to classrooms, libraries, and professors and other University resources, the ability to freely participate in classes and extracurricular activities, and the ability to express their shared Jewish identity in class and on campus.

1047.   Because of pervasive and severe instances of discriminatory harassment, the safety of Individual Plaintiffs and members of CAPE-Ed is in jeopardy, and they are clearly unwelcome on the GWU campus.

1048.   The Individual Plaintiffs and members of CAPE-Ed have at times been forced to withdraw from class discussions and to sanitize their Jewish identity from class participation and presentations.

1049.   They also have felt compelled to avoid classes and professors inhospitable to Jewish and Israeli students, to forgo attending certain events, and to refrain from walking through certain areas of campus—all out of fear that they will be discriminated against based on their shared identity.

1050.   And many Jewish and Israeli students, anxious about being targeted on campus just because they are Jewish, have taken steps to hide their identity and withdraw from Jewish life on campus.

### A.    Sabrina Soffer

1051.   At present, Ms. Soffer is well-known on the GWU campus for being a Jewish and Israeli advocate and writer.

1052.   She spoke about her identity during a freshman Jewish event about antisemitism in response to some incidents on campus.

1053.   Compelled to speak out by what she was observing, she became more vocal in speaking engagements like the GW Diversity Summit and increasingly wrote about Jewish and Israeli topics in the GW Hatchet, the Jerusalem Post, and other media as antisemitic acts increased on campus.

1054.   Many of her articles about Jewish life on campus were sent to University

administrators and faculty to spread awareness about antisemitism and education about Israel.

1055.   Ms. Soffer was accepted into GWU's Honors Program and planned on majoring in International Politics at GWU's Elliott School. She was particularly interested in the Middle East studies and intended to take courses offered by IMES.

1056.   Ms. Soffer did not know about the antisemitism or anti-Israel bias at GWU before entering GWU. She applied to GWU precisely because of the vibrant Jewish life, which would, in her mind, mean antisemitism was not a problem.

1057.   During her first year, she was already experiencing its effects before knowing about its existence or causes.

1058.   Entering her first semester Honors Program seminar and international relations class Ms. Soffer was open about her Jewish and American-Israeli identity, and expressed that she was interested in human rights and international law and aspired to serve as an Israeli diplomat or State Department official related to such matters.

1059.   During her freshman year, classmates began referring to her as, among other things, "racist," "extremist," and "nativist" during and outside class discussions.

1060.   These students also tried to shut down open inquiry about race and sought to target a professor by opening it up. The professor was later disciplined by the university, forced to publicly apologize and supervised during classroom sessions.

1061.   Soffer intervened in a discussion supporting the professor's efforts, when one student told her "the Holocaust is much more sensitized in schools than slavery because Jews are white."

1062.   Soffer was confused by the source of this comment among others.

1063.   During her freshman year, Soffer came home for a week due to distress over the

ostracism and confusion about her course of study.

1064.   She even wrote a paper about the impacts of ostracism and self-censorship in education during her freshman year, influenced by her experiences.

1065.   Eventually, she figured that she needed to change her major to a field that fostered open inquiry and enabled her to examine the sources of this sort of ideologically-driven hostility and ostracism she felt.

1066.   Finding that the foundations of civic discourse could be explored in Philosophy, she reluctantly decided to change her major.

1067.   These vilifying labels continued as Soffer attempted to pass an antisemitism task force—composed of Jews and non-Jews, pro- and anti-Israel students—in the student government; SJP and JVP students tried to convince other members that she was unfit to lead the charge because she was "racist" against Palestinians by citing Soffer's condemnations of Palestinian terrorism and BDS in her public writings.

1068.   By 2022, as Ms. Soffer got more involved with Jewish life on campus, she was invited to speak at an event featuring the then-Israeli ambassador.

1069.   After the event, a friend told her some SJP students intended to vandalize the venue at which the event was taking place by throwing beer bottles.

1070.   Her friend successfully diverted the protesters that night, but from that moment on, Ms. Soffer's fear on campus increased, and she did not feel safe walking alone around campus due to this threat levied at her and knowing that SJP students knew, and had a target on her back.

1071.   She expressed her fears to her family friends and a couple professors whom she trusted.

1072.   She feared walking around campus alone for a week and asked friends to

accompany her to classes.

1073.   In connection with her Philosophy studies, Ms. Soffer intended to pursue a Judaic Studies Major so she could continue her studies on Israel and the Middle East.

1074.   She planned on taking a class entitled Land/Power in Israel/Palestine with Professor Shira Robinson among other Middle East-oriented courses.

1075.   After completing the first assignment which entailed listening to a podcast that promoted the aims of BDS entitled "Occupied Thoughts" and reviewing the class syllabus, a complete anti-Zionist slant was revealed.

1076.   The podcast description states, "Maha [Dr. Maha Nassar] discusses how she navigates different audiences and invitations as well as her thoughts on anti-normalization, engaging with campus Hillels, and why and how it is imperative to keep returning to Palestinian lives and experiences."

1077.   On July 10, 2019, Nassar posted on Facebook, praising Ghassan Kanafani. Kanafani was a leading member and spokesperson for the Popular Front for the Liberation of Palestine ("PFLP") during the organization's early years.

1078.   "Anti-normalization is a political stance and set of practices within the pro-Palestinian movement that opposes engagement with Israelis or Israeli institutions. This concept has become a significant component of Palestinian activism, particularly in connection with the Boycott, Divestment, Sanctions (BDS) movement."

1079.   Anti-normalization thus contradicts the very definition of academic freedom.

1080.   Shocked that this podcast constituted the first assignment, Ms. Soffer proceeded to read about Professor Robinson's history of demonizing Israel, leading her to believe that she would receive biased instruction and have to compromise her Jewish identity in order to obtain a good

grade.

1081.   Ms. Soffer also attended a number of IMES events, such as "The One State Reality: What is Israel/Palestine," a discussion of a book edited by three IMES faculty members who purport to specialize in Middle East politics.

1082.   The book encourages "different readings of history," and in doing so erases the Jewish people's indigenous connection to the land of Israel and vilifies Jewish Israelis as colonial oppressors who have imposed a regime of apartheid and "Jewish Supremacy."

1083.   Ms. Soffer realized that the rhetoric being spouted in SJP protests had echoes of the information disseminated in IMES programming surrounding Israel.

1084.   Ms. Soffer repeatedly expressed these concerns to the University administration.

1085.   She realized later that this culture pervaded not just the IMES department alone but extended to the psychology program where Lara Sheehi harassed Israeli students, American Studies, and beyond.

1086.   Ms. Soffer published an editorial in the October 30, 2023, edition of the GW Hatchet, calling out the fear and trepidation of Jewish students on the GWU campus.  In it, she explained the irony of her Israeli family members asking about her welfare on a college campus in the Nation's capital:

> It feels odd—wrong, even—that my family and friends scattered across Israel are asking me if I'm okay and safe. But I'm not and nor are many of my Jewish peers at GW. What we're witnessing in rallies around the world and on our campus echoes the antisemitic fervor that led to the Holocaust.

1087.   On November 3, 2023, she and some Jewish friends walked to the Smith Center to observe the protest of President Granberg's inauguration. During the protest, a member of GWU SJP began taking photos of Ms. Soffer and her friends, using a telescopic lens to zoom in close.

1088.   Ms. Soffer and her friends were concerned that the photos would be used to target

them for harassment. She and other Jewish and Israeli students often had been photographed without their permission at GWU SJP protests, and Ms. Soffer had previously received some anonymous hate mail and threats. So her friend asked the photographer to stop photographing her and to delete the photos that he had.

1089.   When he did not respond, Ms. Soffer repeated the request. Two other protesters wearing kaffiyehs across their faces then confronted Ms. Soffer, and said "Sabrina, shut the fuck up. We know who you are; you're always at our events."

1090.   Ms. Soffer and her friends left, frightened that they had been marked for retribution.

1091.   On November 15th, Ms. Soffer filed a report with the GWPD. Her report was prompted by the November 3rd confrontation and implicit threat, and she also described the previous anonymous threats she had received. She did not know the names of the November 3 protesters.

1092.   During winter break, an officer from the SRR (Nicole Faison) arranged a Zoom meeting with Ms. Soffer.

1093.   During the meeting, Ms. Soffer repeated what happened at the November 3rd protest.

1094.   A few days later, Ms. Faison emailed Ms. Soffer, attaching a copy of a report detailing the information provided to Ms. Faison.

1095.   In the email, Ms. Faison stated that a complete copy of the report, with Ms. Soffer's name and account, would be sent to the protesters who confronted her at the November 3rd protest, unless Ms. Soffer responded otherwise within forty-eight hours.

1096.   Ms. Soffer immediately replied, asking how the University had discovered their

identities.

1097.   Ms. Faison explained that SRR had received other complaints about the same persons, which enabled them to determine the identities

1098.   Ms. Soffer expressed concern that the report, including her name, would be sent to the persons who had confronted her, particularly since those persons had also been the subjects of other complaints.

1099.   Ms. Soffer was worried about retaliation, particularly since the perpetrators knew who she was and had close-up photos of her, and especially since Ms. Soffer did not know their identities and had received numerous threats on multiple occasions.

1100.   Because of her reasonable concern for her safety, Ms. Soffer told Ms. Faison not to send the unredacted report to the perpetrators.

1101.   Ms. Soffer's justifiable fear of disclosing her name and incident report to the persons who had confronted her should not have impeded the administration from taking disciplinary action. Under the Code of Conduct, SRR is required only to provide "access" to the case file three days of before a hearing—but "with the identifying information of other students removed." Code of Conduct, IX.J.iv.

1102.   Under circumstances in which a student is confronted because she is Jewish and Israeli—especially by perpetrators who had been named in other incident reports submitted to SRR—it is irresponsible to disclose the complete unredacted incident report to the perpetrators.

1103.   SRR's proposal to disclose the complete incident report at the very outset of its investigation served no purpose other than to quash her complaint and avoid a formal proceeding.

1104.   Tellingly, GWU's submission to the House Committee, which purports to list all incidents reported to the administration or GWPD between October 7, 2023, and October 9, 2024,

omits Ms. Soffer's report.

1105.  By this time, however, GWU's administration was well aware that Ms. Soffer feared for her safety and that they were wrong for not disciplining the perpetrator.

1106.  In February 2024, Ms. Soffer met with Dean Coleman and Vice Dean Joyce to notify the administration about antisemitic incidents that were occurring on campus, including the protests, inflammatory signs, and harassment of Jewish and Israeli students.

1107.  The administrators told her they could not take action against antisemitic incidents unless they were "overtly violent."

1108.  In other words, it would take an overt act of physical violence against Jewish or Israeli students before the University administration would take action to protect them.

1109.  Ms. Soffer was so frustrated that she stopped meeting with the GWU administration, convinced it was a fruitless exercise.

1110.  Given the University's decision to protect the protesters at the expense of her safety, Ms. Soffer was painfully reminded of the University's double standard and failure to hold accountable the individuals that were terrorizing campus.

1111.  One day, she was nonetheless confronted by a large crowd of protesters on H Street.

1112.  She and Member No. 2 were across the street from University Yard, and they spotted Rudy Rochman, a local Israeli activist they knew.

1113.  Mr. Rochman was having a respectful conversation with a protester on H Street, which was then on the edge of the encampment. Ms. Soffer and Member No. 2 joined Mr. Rochman.

1114.  Within minutes, a protest leader on a megaphone called attention to Mr. Rochman, and they were almost immediately confronted by about fifty protesters.

1115.   Ms. Soffer and Member No. 2 were forced to flee for their safety.

1116.   The GW Hatchet described the incident:

About 50 protesters circled around Rochman chanting 'Settler, settler go back home, this campus is our freedom zone,' pressing closer with two drums and a large speaker. Some demonstrators recorded on phones as the crowd closed in. Others clapped along or banged on buckets with sticks.  Throughout the confrontation, Rochman stood at the center of the swarm of protesters. He stood stone-faced, making little move to react or respond to the protesters. . . . Protesters remained circled around him while holding a speaker amplifying their chants next to his face and banging on two drums in front of him.  At about 3:04 p.m., Rochman left campus walking toward 20th and H streets, escorted by five MPD officers, while protesters followed behind him chanting "Rudy, Rudy went back home. This campus is a freedom zone."

1117.   The following images, from a longer video of the incident, show Mr. Rochman

chatting with the protester, and then being confronted by a mob of protesters:



1118.   A GWU SCP organizer made clear that warnings that Zionists were prohibited from

entering University Yard should be taken seriously. As the GW Hatchet reported, the organizer

shouted through a megaphone: "When we say Zionists off our campus, we mean it so f*cking

literally."[64]

1119.   Despite her frustration, Ms. Soffer met with Dean Coleman and Christy Anthony

in the beginning of the Fall 2024 to offer suggestions for curbing antisemitism.

---

[64] *Live Updates:  Encampment's tenth day met with rain, temperature drops*, GW Hatchet (May 4, 2024, 3:47 pm.).

1120.   She offered suggestions, like adding an antisemitism faculty working group to the array of the six other working groups created which included "Academic Freedom" and even a group on "Humanitarian Aid in Gaza and Beyond."

1121.   Her efforts remain unanswered.

1122.   This Spring, Ms. Soffer expressed concern over a student awardee who was a recipient of an academic accolade in the Political Science Department.

1123.   The student awardee, Vidya Muthupillai, was featured on the website wearing a Keffiyah, and whose bio publicly stated her intent to pursue a legal career as a "movement lawyer to protect and defend anti-imperialist, anti-Zionist, decarceral, and all communities fighting for liberation."

1124.   On May 9th, Ms. Soffer wrote an email to Provost Bracey, President Granberg, and Dean Coleman:

> Given that Ms. Muthupillai openly espouses and is committed to these views, how does the university view her selection as aligning with its core values of respect, diversity, and "raising high" to be a leader in the world?

> While I respect the importance of recognizing students who are committed to advancing social justice, I find it deeply troubling that a student openly espousing anti-Zionist views—an ideology that has contributed to violence against Jews worldwide and has resulted in assaults on our campuses and city streets, calls for the destruction of Israel, and promotes virulence toward the United States—is being honored by the University with such prestigious distinction. Allow me to elaborate: Anti-Zionism serves as a disguise for modern-day antisemitism. Had similar rhetoric been directed toward other minority groups, such recognition surely would not have been granted. Indeed, would the University have granted this distinction to a student expressing intent to become a legal advocate for the dismantling of Black civil rights or in support of white supremacist organizations? I believe the answer is self-evident.

> As an American-Israeli student who has faced antisemitic hostility driven by this anti-Zionist ideology on campus, and who has actively worked to support the University in uprooting such hatred, I urge you to reflect on the message this award sends. I would appreciate your insight into the selection process for these awards.

1125.   Bracey responded with a shocking response:

Dear Sabrina,

Thank you for your email. I can confirm that the selection process for these awards is based on academic criteria. I also want to make clear that when the university became aware of this content on the Political Science Department awards webpage, we ascertained that the selected awardees were asked to submit their own biographical information, and this content was posted without proper administrative review. As a result, the biographical content of all awardees was removed.

Thank you again for your inquiry.

1126.   Ms. Soffer pushed back, stating:

Thanks again for your attention to this matter, although unfortunately, your response has raised additional concerns.

Respectfully, the decision to remove the offending student's bio misses the point entirely. But more troubling is the removal of all other student bios—a decision that is punitive toward uninvolved students and shifts attention away from the core issue: the decision to honor a student who publicly advances anti-Zionist rhetoric, delegitimizes Israel's legitimacy, and disseminates hate toward the Jewish people.

It is hard to imagine that academic merit alone would justify the award, with no regard to the student's ethical conduct or character. By allowing the award to stand not just normalizes hate speech, but signals the University's implicit endorsement of rhetoric that should have disqualified this student in the first place.

As I previously noted, advocating for the dismantling of a sovereign nation—and by extension, the erasure of its people—should disqualify any candidate from recognition. If a student with similar academic credentials had endorsed the KKK, called for violence against African-Americans, or advocated for the destruction of America, France or any other country, would those views have been similarly overlooked?

Ultimately, the award should be reconsidered. I'd also appreciate some clarity on the University's award criteria—specifically, those involved in the review process, the standards applied, and whether character or public conduct are factored into the decision.

Sincerely,

Sabrina

1127.   Ms. Soffer has yet to receive a response, and Ms. Muthupillai was allowed to keep the award.

1128.   After three and a half years of working to rid her University of its chronic antisemitism issue, Ms. Soffer is crestfallen that her efforts have remained largely ignored by GWU.

**B.    Ari Shapiro**

1129.   Mr. Shapiro periodically observed the encampment.

1130.   In the first two days of the protest, he wore identifiably Jewish clothing and pendants in and around University Yard, but after being subjected to harassment, he stopped wearing anything that overtly identified him as Jewish.

1131.   In light of his reputation on campus, he remained a target of protesters, who regularly shouted slurs and screamed at him.

1132.   Mr. Shapiro also was confronted by signs conveying antisemitic tropes, such as those accusing Jews of controlling money.

1133.   As he approached University Yard, he was typically monitored by approximately three to ten protesters, who would follow him closely in a show of intimidation.

1134.   On at least two occasions, he was physically confronted by groups of protesters dispatched to intimidate and force him out of University Yard.

1135.   The protesters, including so-called "marshals," crowded against him, shouting and sometimes banging drums, and invaded his personal space to coerce him to leave the area.

1136.   At those times, he felt concerned for his physical safety.

1137.   He returned to University Yard only because he believed it was important to document the hostile environment, and he would only return with friends for support.

1138.   Mr. Shapiro submitted reports to the administration asking for protection for Jewish students.

1139. In a May 4 report to SRR, he complained that while he and his friends were in University Yard, they were surrounded by a mob of protesters that intimidated and then coerced them out of University Yard.

1140. He received no response.

1141. On May 4, Mr. Shapiro and a Jewish friend were in University Yard to observe the protest.

1142. He saw a crowd of as many as forty protesters confront a GWU student and his parents.

1143. A protest leader with a megaphone identified them as "Israeli pigs," and the protesters crowded around them, banging drums and chanting "Zionists get out, we don't want no Israeli pigs."

1144. He saw one protester attempt to strike the mother of the student, but she fended off the blow.

1145. While Mr. Shapiro was recording the incident, a separate gang of protesters surrounded him and his friend (obscuring their view of the harassment of the Jewish family), linked arms, and then forcefully walked him and his friend out of University Yard.

1146. On May 4, Mr. Shapiro emailed SRR to report the protesters' discriminatory harassment of the Jewish student and his family.

1147. Even outside of University Yard, Mr. Shapiro was harassed.

1148. He was a victim of "doxing," in which two student-maintained social-media accounts shared screenshots of his private Instagram account, and added captions, including "he's a Zionist."

### C.     CAPE-Ed Member No. 1

1149. Member No. 1 is identifiably Jewish.

146

1150.   She wears jewelry and clothing with Jewish symbols and is on the executive board of a pro-Israel student organization. She has friends and family in Israel and knows of several people who were killed at the Nova Festival and in the subsequent war.

1151.   Member No. 1 is studying for a minor in Arabic and Hebrew Language and Culture. During the Fall of 2023, she was in a small Egyptian dialect Arabic class.

1152.   A number of her classmates were members of GWU SJP, including its president, Lance Lokas.

1153.   Those classmates did not speak to her.

1154.   Member No. 1 appeared in her first class immediately following the October 7th attacks visibly upset, as she had previously left class to speak with friends in Israel regarding loved ones who had been killed or were missing.

1155.   Lokas and other students stared, laughed, and pointed at her in a taunting fashion in front of the professor, who said and did nothing.

1156.   Member No. 1 was afraid to complain to the administration because she feared retaliation by the students and the professor.

1157.   Instead, to avoid the anxiety caused by being in a class with Lokas and other GWU SJP supporters, she decided at the end of the semester to change her course study from Egyptian dialect to Lebanese dialect.

1158.   Member No. 1 was devastated, and shared her frustration with Jewish friends, including other members of GW for Israel.

1159.   On October 17, 2023, Member No. 1 and other members of GW for Israel were staffing a table in University Yard to raise money for a nonprofit medical and disaster emergency response service that is Israel's official representative to the International Red Cross.

1160.   Member No. 1 noticed Lance Lokas nearby.

1161.   Lokas was wearing a hooded sweatshirt and headphones, and while looking at her, began to walk towards the table.

1162.   As Lokas approached the table, he slowed, stared at Member No. 1 and her friend, Witness No. 1, and then spat at them.

1163.   He then continued along the pathway. Member No. 1 and Witness No. 1 were shocked and frightened.

1164.   Member No. 1 was particularly anxious, because of her regular contact with Lokas in their Arabic class.

1165.   Member No. 1 and Witness No. 1 submitted an incident report to the GWU Office of Students Rights and Responsibilities ("SRR").

1166.   In the report, both Member No. 1 and Witness No. 1 unequivocally identify Lance Lokas as the perpetrator, and notes that Member No. 1 and Lokas were in the same Arabic class.

1167.   The report adds that Witness No. 1 was anxious about filing the report knowing that he leads an organization on campus that has a huge following.

1168.   In response to the report, Anna Martin, an SRR officer, scheduled a Zoom meeting with Member No. 1.

1169.   Member No. 1 described the incident in detail, including positively identifying Lokas as the perpetrator, and describing the anxiety she was experiencing.

1170.   Ms. Martin offered to refer Member No. 1 to the University's mental health services for counseling.

1171.   Member No. 1 told the SRR officer that she was not interested in counseling and instead wanted the University to condemn the incident and pursue disciplinary action.

1172.   On October 27th, Ms. Martin sent Member No. 1 a clip from the Kogan Plaza security cameras and asked if the GWI for Israel table was visible.

1173.   Member No. 1 replied by email, reporting that the table was beyond the range of the camera.

1174.   In her email, Member No. 1 "reaffirm[ed] that I do want the university to take disciplinary action against this antisemitic incident (being spat at). I would like to know what actions you are taking against this issue."

1175.   Ms. Martin assured Member No. 1 that the "we are going to do all we can to take disciplinary action. If you want to participate and be involved, we would use you as a witness. If not, we'll will [sic] still pursue the case without you."

1176.   SRR, however, did not investigate any further or pursue a disciplinary action.

1177.   Member No. 1 contacted Ms. Martin about the status of the investigation.

1178.   Although Ms. Martin had assured her that the University would continue to investigate the report, notwithstanding that the event took place outside the range of the security camera, Ms. Martin now said the University had decided not to proceed.

1179.   Member No. 1 was shocked and felt wholly abandoned by the University.

1180.   Witness No. 1 was scheduled to speak to a different SRR officer, Cameron Furbeck, on October 27th, but she was ill and asked to reschedule the meeting. By the time she felt better, Member No. 1 told her SRR decided not to pursue disciplinary action against Lokas.

1181.   Based on Member No. 1's experience, Witness No. 1 concluded that a meeting with SRR would be a waste of time, since SRR had already decided not to pursue disciplinary action, and she did not reschedule her SRR meeting.

1182.   In February 2024, Ms. Soffer met with Dean Coleman and Christy Anthony.

1183.   During that meeting, Ms. Soffer relayed the concern of many Jewish and Israeli students that, despite reports of clear discriminatory harassment, the administration failed to take meaningful action. Ms. Soffer added that many students, including herself, were reluctant to report new incidents because of the administration's inaction, given the ever-present fear of retaliation.

1184.   She specifically mentioned the administration's failure to pursue disciplinary proceedings against Lokas for spitting at Member No. 1.

1185.   Ms. Anthony emailed Ms. Soffer the following day to thank her, and to assure that Ms. Anthony would contact Member No. 1 and follow up.

1186.   No one, however, ever followed up with Member No. 1.

1187.   GWU's submission to the House committee investigating antisemitism mischaracterized its response to Member No. 1 and Witness No. 1's incident report. The letter submission included a chart listing reports of antisemitism and Islamophobia on campus since October 7, 2023, and the disposition of each report.

1188.   That chart reflects the report filed by Member No. 1 and Witness No. 1, which was described as "Report of spitting at pro-Israel student organization table."

1189.   The chart indicates that the alleged conduct would constitute "Disorderly Conduct (i.e., Threatens, Endangers, Harasses)" and "Discriminatory Harassment" under the GWU Student Code of Conduct.

1190.   But the GWU chart falsely describes the reason GWU did not pursue disciplinary action in response to the report:

> Insufficient information provided. Additional reporting party provided information indicating that initial accusation was mistaken identification.

1191.   GWU's mischaracterization of its failure to respond reflects a tacit admission of deliberate indifference to misconduct that constituted discriminatory harassment of Jewish

students.

1192.  GWU knew the identity of the perpetrator and chose not to discipline him but rather than admit that, it mischaracterized its failure to respond in its report to Congress.

1193.  During the Spring 2024 semester encampment, Member No. 1 suffered anxiety and avoided University Yard.

1194.  She took longer routes to get to class, adding up to four blocks to her walk.

1195.  She had a class in Bell Hall, which bordered University Yard, and during class, heard a constant refrain of antisemitic chants, amplified by megaphones and speakers, and banging drums, which disrupted her focus and ability to focus on the lecture or course material.

1196.  She stopped using the CVS pharmacy due to its proximity to the encampment.

1197.  She also avoided the library and the GWU student center due to the close proximity of both to the encampment.

1198.  She similarly avoided main areas of campus in fear of being spotted by encampment supporters who knew her.

1199.  As a result, she generally limited her extra-curricular activities to the Hillel Center, where she sought and shared solace with other Jewish and Israeli students, and to her residence hall dining room.

1200.  Member No. 1 had no interest in seeing the encampment, but she did enter it once. Member No. 1 and five other Jewish students had lunch with a representative of the Tikvah Fund, an organization that sponsors Jewish learning.

1201.  The Tikvah representative was interested in seeing the encampment, so they all decided to enter it together.

1202.   On their way into the encampment, they saw signs that read "Jews go back to Poland" and "You don't belong here."

1203.   As the group walked into the portion of the encampment that had spilled onto the street, Member No. 1 was spotted by Lance Lokas, the former president of the then-suspended GWU SJP, who was an organizer of the encampment. Upon seeing Member No. 1, Lokas called out for "marshals."

1204.   Member No. 1 was immediately approached by two "marshals"—student protesters wearing yellow safety vests—who stood uncomfortably close to her.

1205.   As Member No. 1 and her friends tried to walk away, one of the "marshals" closely followed.

1206.   As he followed, the "marshal" loudly called out "Imagine being a Zionist, they're so ugly, fat, and stupid."

1207.   At one point, the Tikvah representative tried to take a photo of a sign, but the "marshal" shoved a keffiyeh against her face, obscuring her camera lens.

1208.   Member No. 1 felt targeted and anxious, but she feared that reacting would only attract more attention to her and lead to more harassment, so she quickly left University Yard.

1209.   Member No. 1 chose not to report the discriminatory harassment she faced in the encampment because of the administration's failure to take action on the prior complaint she and Witness No. 1 had filed, and because of its failure to take any action to reign in the protesters or otherwise protect Jewish and Israeli students.

1210.   She had lost confidence in the administration's willingness to protect the safety and educational opportunities of Jewish and Israeli students.

1211.   The encampment and antisemitic harassment she experienced, and the University's

failure to respond to it, has deeply affected Member No. 1. During the encampment, she sought help from a GWU mental health counselor. The counselor, however, suggested that the emotional distress she felt was within her control, and she just needed to handle it.

1212.   The harassment and the failures of the University administration and its mental health services to recognize and support her as a victim of discrimination has left her fearful and adversely affected her sense of well-being and academic focus.

1213.   Many of the protesters in University Yard had no affiliation with GWU and seemed to pose a greater threat to the safety of Jewish and Israeli students, especially since outsiders were not easily identifiable nor subject to University disciplinary action.

1214.   The outsiders included aggressive and potentially deranged racists carrying antisemitic banners and signs bearing swastikas, as well as other Nazi imagery and ugly slurs against the Jewish people.

1215.   The following image represents just an example of the variety of outsiders

permitted on GWU's campus:



### D.    CAPE-Ed Member No. 2.

1216.   On April 25, the first day of the encampment, Member No. 2 stood just inside the perimeter of University Yard, holding an Israeli flag, alongside three other students. While Member No. 3 was standing quietly, she was heckled and cursed at by protesters. One protester spat at her.

1217.   The following day, on April 26th, despite being unnerved and frightened by her experience the day before, Member No. 2 returned to show support for Israel. But this time, she stood across the street from University Yard.

1218.   She quietly held the Israeli flag, while protesters screamed epithets at her and others, including, among other things, "Fuck you, Zionist, go die"; "There is only one solution, Intifada revolution!"; "Hamas are freedom fighters!"; "We don't want no Jewish state!"; "It is our right to rebel, Israel go to hell"; "Zionists, go to hell!"; "Say it loud say it clear we don't want any Zionists here!"; "From the river to the sea, Palestine will be free"; and, in Arabic, "From the water to the water, Palestine is Arab," a reference to ethnically cleansing Israel of Jews.

1219.    Member No. 2 entered the encampment one other time to observe it, but without an Israeli flag, since her decision to stand with an Israeli flag alongside the encampment had made her an easily recognizable target for abuse.

1220.    She was quickly stalked by protesters.

1221.    A student protester who was in one of her classes, nicknamed "Beans," confronted her, shoved a camera into her face, and began filming her.

1222.    With the camera in her face, he snickered, "how's your night going," and may have called her by name.

1223.    Feeling anxious and concerned for her safety, Member No. 2 left.

1224.    Soon thereafter, Member No. 2 later received an anonymous direct message on Instagram, image below, that said, "Kill yourself, Jew. Filthy kike. Watch your back."



1225.  Member No. 2 reported the incident to the GWPD and the MPD, and she also informed them about being spat at and cursed by protesters, as well as her interaction with "Beans."

1226.  The incident report was later referred to the FBI, but the perpetrator could not be identified.

1227.  The GWPD also sent a copy of the incident report to the University administration.

1228.  In June 2024, an SRR officer contacted Member No. 2, and advised her that "Beans" had graduated, and there was nothing else that could be done.

1229.  SRR subsequently closed its investigation.

1230.   On May 4, Member No. 2 was chatting with Ms. Soffer and Rudy Rochman on H Street, when a protester with a megaphone summoned a crowd to confront Mr. Rochman.

1231.   Member No. 2 saw protesters rushing toward her, Ms. Soffer and Mr. Rochman, which frightened her, and she rushed away from the scene.

1232.   She did not return to the vicinity of University Yard because of her fear of being targeted by the protesters.

### E.    CAPE-Ed Member No. 3

1233.   Despite assurances from the GWU administration that antisemitism has been properly addressed in the wake of the encampment, Member No. 3 does not find such assurances to be accurate.

1234.   Indeed, during a March 25, 2025, a groundbreaking scholar, Dr. Laura Brown, in the fields of feminist therapy theory visited campus to give a guest lecture to students in Member No. 3's Clinical Psychology program.

1235.   The guest lecturer identified herself as a Jewish, lesbian feminist.

1236.   In the middle of her lecture (on the subject of decolonial, intersectional feminist therapy), she was abruptly interrupted by a student leader of anti-Zionist protests.

1237.   The protester demanded to know how the guest lecturer could use the term "decolonizing" without referring to Palestine and then asked if she was a Zionist.

1238.   After the guest lecturer confirmed that she is a Zionist and supported a peaceful two-state solution, the student protest leader shouted and screamed at the guest lecturer, refusing to let her proceed with the lecture, calling her, among other things, a "Nazi," rapist, and a "murderer," and asserting that she had the blood of his family and the Palestinian people on her hands.

1239.  After a long period of being berated, the guest lecturer decided not to continue with her lecture.

1240.  Two GWU professors were physically in attendance, including the Director of Clinical Training, Dr. DeSilva, who failed to intercede and instead allowed the student protest leader's ugly and hateful attack to continue unabated for around twenty minutes.

1241.  Afterwards, Dr. DeSilva praised the disrupter. Faculty member, Dr. Helen DeVinney, later told her students that the guest lecturer should not have been invited.

1242.  Faculty also ignored Jewish students' concerns that the student's attack that happened in vivo—calling an American scholar, who happened to be Jewish, a Nazi, and a murderer simply because she affirmed her Judaism and Zionism.

1243.  Member No. 3 attended the lecture (as the program mandated all students to attend either in -person or virtually) and was horrified by the support that the protester received from faculty members.

1244.  Several people attending the lecture over Zoom voiced their disapproval of the protester's comments, while others expressed approval of his harassment.

1245.  Following the lecture, the Clinical Psychology department issued a statement but failed to condemn the behavior of the protester or directly address antisemitism.

1246.  Meanwhile, having found the behavior deeply antisemitic, Member No. 3's contact information was provided to GWU officials to provide her accounting of the incident.

1247.  After doing so, Member No. 3 spoke with a GWU official who handles cases of student misconduct.

1248.  However, to Member No. 3's knowledge, GWU never pursued the investigation further regarding the department's failure to intervene or faculty behavior generally

G.    CAPE-Ed Member No. 4.

1249.   Member No. 4 is a 32-year-old native Israeli who was a graduate student in the Elliot School for International Affairs.

1250.   He received a scholarship to attend GWU because of his work in Israel on peace-building initiatives between Palestinian and Jewish populations, particularly among children.

1251.   He worked for the Peres Center for Peace and Innovation as an educator to build coexistence between Palestinian and Jewish children.

1252.   He also worked for the municipality of Lod, an Israeli city with a population nearly evenly divided between Palestinian and Jewish Israeli citizens, where he developed projects such as teaching the other side history, sports leagues, leadership program, among other things, that brought together Palestinian and Jewish children in hopes of building lasting peacebuilding relationships.

1253.   On April 25th, the first day of the encampment, Member No. 4 stopped by the Hillel Center for coffee and saw a number of young GWU students anxious and despondent about the encampment.

1254.   He overheard one young Jewish woman sobbing on the phone to her parents, urging them to pick her up that day because she was too fearful to remain on campus.

1255.   The sight of Jewish and Israeli students afraid to attend classes in the U.S. capitol was horrifying to him.

1256.   Member No. 4, older and over six feet tall, decided to show the Jewish and Israeli students that there was no need to be frightened, and that he would stage a unitary, silent, and peaceful protest in the encampment.

1257.   He picked up a small hand-held Israeli flag and walked to the sidewalk just in front of the entrance to University Yard.

1258.   He went there alone and stood there alone.

1259.   He silently held his Israeli flag in a generally open space, but almost immediately, he was confronted by a mob of protesters, their arms linked together, shouting slurs at him.

1260.   The mob not only blocked his path into University Yard but also crowded and pressed against him.

1261.   He began repeatedly shouting that he was "pro peace and against terror and violence."

1262.   Member No. 4 began to be concerned by the press of hostile strangers against him, and he called to nearby police officers for help.

1263.   The police officers refused to step in.

1264.   He asked the police why they were letting the protesters make a human chain around him, since he just wanted to stand with a flag.

1265.   Even though the protesters got closer and closer to him while and threatening him, the police declined to protect him, instead repeating over and over again that he needed to leave.

1266.   After a few minutes, Member No. 4 became very uncomfortable and decided to leave.

1267.   As he turned around and walked away, one protester snatched his Israeli flag and ran into the encampment.

1268.   Member No. 4, with Jewish and Israeli students watching, decided he could not leave on that note, his Israeli flag stolen and desecrated.

1269.   He reached into his backpack, pulled out a tiny flat Israeli flag, and turned back to the encampment.

1270.   One of them pushed him from behind when they stole his flag.

1271.   When he walked away, some of them followed him, threatened his life, saying that they would find him and kill him, and shouted racist slogans against him as a Jew.

1272.   This is the main reason he came back: to make sure they understood that violence and racism would not win, and that it was unacceptable to hear such things at the university, and in the capital of the United States.

1273.   He again was hemmed in by a mob of protesters, tighter still, with individual protesters bumping into him.

1274.   He called to the officers for help, agitated that he was being trapped in a circle, unable to walk in the center of his own campus.

1275.   Finally, the nearby officers forcefully grabbed him, removed him from the demonstration, and told him not to return to the Yard anymore.

1276.   Member No. 4 did not return to the Yard.

1277.   To the Jewish and Israeli students who witnessed firsthand his unitary protest and the ensuing abuse, and those who quickly heard about it, Member No. 4 was their champion.

1278.   And he also was their lesson—they saw what he endured, and for many, that was confirmation of their anxiety and fear on campus.

1279.   To walk on campus as an identifiably Jewish or Israeli student defined by a connection to the land of Israel was to risk abuse, harassment, and dismissal by police officers.

1280.   And it also put into stark contrast the double standard experienced by GWU's Jewish and Israeli students.

**F.     Witness No. 1.**

1281.   Witness No. 1's residence hall and classrooms were not near University Yard, so she was largely able to avoid the encampments.

1282.   But on some occasions, she was forced to walk through them. She recognized many of the protesters and has mutual friends with some of them.

1283.   Those with whom she had mutual friends appeared to know that she is Jewish and a member of GW for Israel.

1284.   On at least three occasions as she walked through the encampment, a pack of protesters quickly coalesced around her and followed her closely.

1285.   They did not make eye contact or speak to her but seemed determined to block her view of the encampment and to coerce her out of it.

1286.   On one occasion, she asked why the protesters were following her, but none responded. They just stood uncomfortably close to her.

1287.   Witness No. 1 shared her experiences with other Jewish students, including at Shabbat services and meals, and her friends.

1288.   She learned that many of them had had similar experiences.

1289.   She also learned that a number of her friends had reported similar incidents and feelings of not being safe on campus to SRR and to Dean Coleman, and did not receive any substantive response.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000D
### (DIRECT DISCRIMINATION)

1290.　Plaintiffs re-allege and incorporate by reference paragraphs 1 through 1289 as if fully set forth herein.

1291.　Title VI of the Civil Rights Act of 1964 prohibits all forms of harassment tied to a person's ancestry or ethnic characteristics, including antisemitism. It applies to any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

1292.　On December 11, 2019, President Trump issued Executive Order 13899— Combating Anti-Semitism, which states that Title VI prohibits discrimination rooted in anti-Semitism to the same extent as all other forms of discrimination prohibited by Title VI, and that in enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies charged with enforcing Title VI shall consider the IHRA working definition of antisemitism.

1293.　On September 28, 2023, the Biden Administration noted in a Fact Sheet that "eight federal agencies clarified . . . that Title VI of the Civil Rights Act of 1964 prohibits certain forms of antisemitic, Islamophobic, and related forms of discrimination in federally funded programs and activities."

1294.　It also reiterated that "Title VI of the 1964 Civil Rights Act applies to all programs and activities supported by federal financial assistance.

1295.   Thus, these protections are wide-ranging and provide important tools to prevent and curb discrimination."[65]

1296.   On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they:

> [H]ave a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . . Harassing conduct can be verbal or physical and need not be directed at a particular individual.

U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics 2 (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

1297.   On May 7, 2024, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that:

> The fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs, however, does not relieve a school of its obligation to respond under Title VI as described below, if the harassment creates a hostile environment in school for a student or students. Schools have a number of tools for responding to a hostile environment—including tools that do not restrict any rights protected by the First Amendment. To meet its obligation, a university can, among other steps, communicate its opposition to stereotypical, derogatory opinions; provide counseling and support for students affected by harassment; or take steps to establish a welcoming and respectful school campus, which could include making clear that the school values, and is determined to fully include in the campus community, students of all races, colors, and national origins.

---

[65] *Fact Sheet: Biden-Harris Administration Takes Landmark Step to Counter Antisemitism*, White House (Sept. 28, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-antisemitism/.

1298.   OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* And it repeats its longstanding admonition that "[s]chools must take immediate and effective action to respond to harassment that creates a hostile environment." *Id.*

1299.   On January 29, 2025, President Trump issued an Executive Order titled Additional Measures To Combat Anti-Semitism.  In Section 1. Purpose, the Order reaffirms Executive Order 13899, which ensured that the "enforcement of the Nation's civil rights laws would 'protect American Jews to the same extent to which all other American citizens are protected,'" and further:

> [D]irects additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses.  Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault.

1300.   In Section 2, the Order states:  "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

1301.   GWU receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

1302.   Individual Plaintiffs and CAPE-Ed Members No. 1–4 are all of Jewish descent, and therefore, are members of a protected class within the scope of Title VI's protection.

1303.   Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed who at all relevant times paid tuition to GWU—were qualified to continue the pursuit of their education.

1304.   Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed are entitled to the benefits of educational and other programs at GWU.

1305.   While on notice of the discrimination against and hostile environment for Jewish members of the community (as shown by, inter alia, their public statements, and as evidenced by multiple instances in which the instances of anti-Semitic harassment have been brought to the University's attention), GWU has failed to take adequate and effective corrective action.

1306.   As a direct result of being a member of a protected class, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed suffered several adverse actions while at GWU and were subjected to discrimination by GWU based on their Jewish ethnicity and ancestry.

1307.   GWU violated Title VI by subjecting Individual Plaintiffs and CAPE-Ed No. 1–4 and other members of CAPE-Ed to a series of intentional hostile acts and adverse actions while they were in pursuit of their education.

1308.   These acts were designed to deprive Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed of the benefits of their education and derail their academic pursuit because of their national origin, ethnicity, and ancestry.

1309.   GWU's failure to enforce its policies has created an environment that is hostile towards Jews. The hostility towards Jewish members of the GWU community is severe enough that it interferes with their ability to participate in the programs and activities of the school. Students are not free to move about campus without being stopped and harassed.  Jewish members of the community receive hate mail.

1310.   Jewish and Israeli students face physical intimidation from student protesters. Many students have had to miss class as a result of the hostile environment on campus, or

participate in classes remotely to avoid the hostile environment on the GWU campus. Students have refrained from using the dining halls, libraries, and other public areas.

1311.  While on notice of the discrimination against and hostile environment for Jewish members of the community, GWU has failed to take adequate and effective corrective action.

## COUNT II
## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D
## (HOSTILE EDUCATIONAL ENVIRONMENT)

1312.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 1289 as if fully set forth herein.

1313.  The May 25, 2023 OCR Letter states, "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment."

1314.  The August 24, 2023 OCR Letter notes: "OCR could find a Title VI violation in its enforcement work if: (1) a hostile environment based on race existed; (2) the school had actual or constructive notice of the hostile environment; and (3) the school failed to take prompt and effective steps reasonably calculated to (i) end the harassment, (ii) eliminate any hostile environment and its effects, and (iii) prevent the harassment from recurring.[66]

1315.  "OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome race-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive, that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). . . . To redress a hostile environment, a school has a legal duty to take prompt and effective steps that are reasonably calculated to: (1) end the harassment,

---

[66] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rts., U.S. Dep't of Educ. to Colleague at 4-6 (Aug. 24, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20230824.pdf.

(2) eliminate any hostile environment and its effects, and (3) prevent the harassment from recurring."[67]

1316.    Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed are Jewish, and therefore, are members of a protected class within the scope of Title VI's protections.

1317.    As a direct result of their being members of a protected class, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed suffered several adverse actions while at GWU and have been subjected to discrimination by GWU based on their Jewish shared ancestry and Israeli identity.

1318.    GWU had actual knowledge of the discrimination against Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed, and yet it was deliberately indifferent to such discrimination.

1319.    Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed have been denied the benefits of educational and other programs at GWU.

1320.    Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed faced harassment because of their race, national origin, and/or religion and were subject to a hostile educational environment.

1321.    GWU had actual knowledge of these incidents and was deliberately indifferent to them because their response to reports were either inadequate, delayed, or nonexistent.

1322.    The harassment was so severe and objectively offensive that it deprived Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed of access to educational benefits and opportunities provided by GWU.

---

[67] *Id.*

1323.  As a direct and proximate result of GWU's actions and inactions, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed were deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time and group learning.

**COUNT III**
**DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**D.C. CODE ANN. §§ 2.1401.01**
**(DISCRIMINATION)**

1324.  Plaintiffs re-allege and incorporate by reference paragraphs 1 through 1289  as if fully set forth herein.

1325.  The D.C. Human Rights Act ("DCHRA"), D.C. Code Ann. §§ 2.1401.01 *et seq.*, provides that every individual is entitled to an equal opportunity to partake in "all aspects of life," including, but not limited to, education. § 2.1402.01

1326.  Under Section 2-1402.41, an educational institution may not "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason," including on the basis of race, religion, and national origin.

1327.  Individual Plaintiffs and CAPE-Ed Members No. 1–4 are all Jewish and/or of Israeli descent.

1328.  GWU intentionally subjected, and/or failed to sufficiently respond to, frequent harassment, discrimination, and intimidation of Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed because they were all Jewish and/or of Israeli descent.

1329.   Individual Plaintiffs and CAPE-Ed Members No. 1–4 were denied access to GWU's facilities, services, programs and benefits on account of harassment, discrimination, and intimidation.

## COUNT IV
## BREACH OF CONTRACT

1330.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 1289  as if fully set forth herein.

1331.   GWU offered admission to attend the University, subject to and consistent with GWU's policies and its Student Code of Conduct, to the Individual Plaintiffs and CAPE-Ed Members No. 1–4, and the Individual Plaintiffs and CAPE-Ed Members No. 1–4 accepted GWU's offer of admission and have since paid tuition and other fees and charges to matriculate in the University.

1332.   At all relevant times, an implied and/or express contractual relationship existed between GWU and the Individual Plaintiffs and CAPE-Ed Members No. 1–4 by matriculation in the University, and as defined by and through GWU's policies, procedures and its Student Code of Conduct, including but not limited to, GWU's (i) Student Code of Conduct, including the Basic Assumption of Freedom from Unlawful Discrimination; (ii) Policy on Disruptions of University Functions; (iii) Policy on Demonstrations; (iv) Non-Retaliation Policy; and (v) Policy on Threats and Acts of Violence.

1333.   Through the documents and materials it publishes and provides to students, GWU makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

1334.   The relationship between a student and a university is contractual in nature, and that the terms of Code of Conduct, student handbooks, university bulletins, regulations, codes,

policies, and procedures become part of that contract.

1335.   The Individual Plaintiffs and CAPE-Ed Members No. 1–4 complied with their obligations under these contracts.

1336.   GWU breached its agreements with the Individual Plaintiffs and CAPE-Ed Members No. 1–4, and failed to comply with its obligations under these contracts, throughout the course of their enrollment at GWU, including by, among other things, failing to comply with the following provisions:

- The university will not permit unlawful discrimination on grounds of age, color, disability, gender, gender identity or expression, genetic information, marital or familial status, national origin, pregnancy, race, religion, sex, sexual orientation, veteran status, and/or other characteristics protected by applicable law in any university-recognized area of student life. (Student Code of Conduct, Basic Assumptions, Freedom from Unlawful Discrimination).

- Meeting rooms, technological resources, other university facilities, and funding should be made available, on an equitable basis, only to registered student organizations. (Student Code of Conduct, B. Student Organizations, 3. Use of University Facilities).

- Students shall have the right to assemble, to select speakers, and to discuss issues of their choice, provided that the assembly is lawful in nature, does not interfere with the processes of the university, and does not infringe upon the rights of others. The university reserves the right to prohibit assemblies having in its judgment the clear likelihood of failing to meet one or more of these conditions.   (Student Code of Conduct, C. Student Sponsored Forums).

- Therefore, student organizations and individual students shall have the right to engage in behaviors such as distributing pamphlets, collecting names for petitions, and conducting orderly demonstrations provided these actions are not disruptive of normal university functions and do not encompass the physical takeover or occupation of university facilities and spaces, whether or not they are in use at that time.  (Student Code of Conduct, D. Assembly, Petitions and Demonstrations).

- Community Disturbance: Making excessive noise either inside or outside a building, including but not limited to shouting, pounding objects or surfaces, or playing music or other electronics at a loud volume in a manner that disturbs others. (Student Code of Conduct, V. Prohibited Conduct, C.

Community Disturbance).

- Discriminatory Misconduct: Prohibited Discrimination and Discriminatory Harassment Prohibited Discrimination is the adverse treatment of an individual or group(s) that meets both of the following criteria:  (i) Based on a protected characteristic, rather than individual merit and (ii) Interferes with an individual's participation in a university program or activity.  This could include, but is not limited to, restricting an individual's continued access to or participation in an education program or activity, including co-curricular and residential experiences. This also includes singling out or targeting an individual for different or less favorable treatment (for example, higher expectations, denial of a leadership role).  Discriminatory Harassment is (i) is any unwelcome conduct (ii) based on a protected characteristic (iii) where such conduct creates a  hostile environment. (Student Code of Conduct, V. Prohibited Conduct, D. Discriminatory Misconduct: Prohibited Discrimination and Discriminatory Harassment).

- Prohibited Conduct, Disorderly Conduct: Disorderly conduct may include but is not limited to: Acting in a way that threatens, endangers, or harasses others, including verbal, written, or any other form of communication; Disrupting, obstructing, or interfering with the activities of others, including university events.  (Student Code of Conduct, V. Prohibited Conduct, F. Disorderly Conduct).

- Responsible demonstration may not be exercised in such a manner as to endanger the safety or security of the university community, infringe upon the rights of other members of the community, or cause damage to property. This includes the rights of others to conduct class, hold their own meetings, or hear another speaker. The University may require demonstrators to remove any mask, hood, or device whereby any portion of the face is hidden, concealed, or covered as to conceal the identity of the wearer. (GWU Policy on Demonstrations).

- Property owned, controlled, or leased by the university is private property, and the university reserves the right to determine who can and cannot access and/or use university facilities or be present on university property.  (GWU Policy on Barring People from Campus).

- The university will respond promptly to reports of threats or acts of violence and reserves the right to take immediate action to protect members of its community.  (GWU Policy on Threats and Acts of Violence).

1337.  GWU has also breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Individual Plaintiffs and CAPE-Ed Members No. 1–4.

1338.  Among other things, the University selectively applies or enforces its Student Code

172

of Conduct, policies, student handbooks, university bulletins, regulations, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including Individual Plaintiffs and CAPE-Ed Members No. 1–4 in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

1339.   As a direct, proximate, and foreseeable consequence of the foregoing breaches, the Individual Plaintiffs and CAPE-Ed Members No. 1–4 have suffered irreparable harm, and continue to suffer irreparable harm, which can be remedied only through an order of specific performance compelling GWU to adhere to its contractual obligations.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court the following relief:

a.     Entry of judgment against Defendant on all Counts;

b.     An injunction preliminarily and permanently requiring Defendant to adopt a definition of antisemitism as part of its nondiscrimination policies and codes of conduct, and to include examples of activities that target Zionists which would constitute a violation of its nondiscrimination policies and codes of conduct.

c.     An injunction preliminarily and permanently enjoining Defendant from (i) funding any student organization that harasses or excludes Zionists or, more generally, Jews; and (ii) granting official recognition to any student organization that harasses or excludes Zionists or, more generally, Jews.

d.     An injunction preliminarily and permanently ordering Defendant to enforce its Student Code of Conduct and hold the leaders of student organizations personally responsible for discriminatory harassment of Jewish and Israeli students and other violations of the Student Code of Conduct.

e.     An injunction preliminarily and permanently requiring Defendant to enforce its Policy on Nondiscrimination, Student Code of Conduct, Policy on Demonstrations, Policy on and Disruptions of University Functions on an evenhanded basis, consistent with the level of enforcement of those policies provided where the victims are in protected categories other than of Jewish shared identity, and ensuring that Jewish members of the GWU community are protected, with respect to their physical safety and otherwise, from discrimination on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

f.     An injunction preliminarily and permanently mandating that Defendant take action to end the hostile environment on campus by (i) communicating to the entire GWU community via broadcast e-mail or a similar medium that GWU will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others, on the basis of their ethnic or ancestral background, including harassment of Zionists; and (ii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that deny equal protection to Jewish members of the GWU community including those for whom Zionism is an integral part of their identity.

g.     An injunction preliminarily and permanently mandating that Defendant provide expert training on combating antisemitism and the IHRA definition for SRR and DEI staff involved in reviewing complaints of discrimination,

and broadly require annual training for the University community focused on recognizing and combating anti-Semitism in all its forms.

h.    An injunction preliminarily and permanently mandating that Defendant take all necessary action to remedy the culture of antisemitic bias and the hostile antisemitic environment and to stop the harassment of Jewish and Israeli students at GWU.

i.    Appointment of an independent outside monitor, subject to approval and in in collaboration with the Plaintiffs, to oversee and ensure Defendant's full compliance with all injunctive and equitable relief ordered by the Court. The monitor shall be empowered to audit, report, and recommend corrective actions for such duration and scope as the Court deems just and necessary.

j.    A declaratory judgment that the failure of Defendant to enforce its policies to protect Jewish members of the GWU community has violated Plaintiffs' rights under (i) Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and (ii) D.C. Code Ann. §§ 2.1401.01.

k.    A declaratory judgment that Defendant has breached its express and implied contractual obligations to Individual Plaintiffs and CAPE-Ed Members 1–5.

l.    An award to Plaintiff of compensatory, consequential, and punitive damages in amounts to be determined at trial or through settlement, including but not limited to damages for emotional distress, reputational harm, educational disruption, economic losses, and any other injuries suffered as a direct and proximate result of Defendants' misconduct, negligence, and/or willful and malicious conduct.

m.    Equitable and injunctive relief as deemed appropriate by the Court, including but not limited to the implementation of structural reforms, training mandates, oversight mechanisms, and/or other corrective actions necessary to remedy the harms alleged herein and prevent future violations.

n.    An award of attorneys' fees and costs under 42 U.S.C. § 1988. And

o.    Such other and further relief as this Court may deem just and appropriate.


Dated May 22, 2025                        Respectfully submitted,

Mark Goldfeder*
Ben Schlager*
Lauren Israelovitch*
Matthew Mainen (DCB# 90021723)
Adela Cojab*
Abra Siegel*
Anat Beck*
NATIONAL JEWISH ADVOCACY CENTER INC
3 Times Square
New York, NY 10036
(332) 278 1100
mark@jewishadvocacycenter.org
ben@jewishadvocacycenter.org
lauren@jewishadvocacycenter.org
matthew@jewishadvocacycenter.org
adela@jewishadvocacycenter.org
abra@jewishadvocacycenter.org
anat@jewishadvocacycenter,org

*Jason B. Torchinsky*
Jason B. Torchinsky (DCB# 976033)
Edward M. Wenger (DCB# 1001704 )
Erielle Davidson (DCB# 90002903)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, N.W., Suite 643
Washington, DC 20037
(202) 737-8808
jtorchinsky@holtzmanvogel.com
emwenger@holtzmanvogel.com
edavidson@holtzmanvogel.com

Douglas S. Brooks*
LIBBY HOOPS BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA 02110
(617) 338-9300
dbrooks@lhbmlegal.com

*Counsel for Plaintiffs*
*\*Pro Hac Vice Forthcoming*