# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SABRINA SOFFER, ARI SHAPIRO, and COMPLIANCE, ACCOUNTABILITY, POLICY, ETHICS – ED (CAPE-ED), | |
| *Plaintiffs,* | |
| v. | Case No. 1:25-cv-01657-LLA |
| THE GEORGE WASHINGTON UNIVERSITY, | Judge Loren L. AliKhan |
| 1918 F St., N.W. Washington, D.C. 20052 | **ORAL HEARING REQUESTED** |
| *Defendant.* | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Brian A. Richman (s# 230071)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

Jason C. Schwartz (# 465837)
Stuart F. Delery (# 449890)
Jacob T. Spencer (# 1023550)
Abigail B. Dugan[*] (# 1743216)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-5404
(202) 955-8500

*Attorneys for Defendant*

July 28, 2025

---

[*] D.D.C. application forthcoming

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

STANDARD OF REVIEW ................................................................................. 5

ARGUMENT ...................................................................................................... 6

I.    The Court Should Dismiss Plaintiffs' Claims Under Rule 12(b)(6)..................................... 6

    A.    Plaintiffs' Discrimination Claims Fail As A Matter Of Law. ..................................... 7

        1.    Plaintiffs' Claims Target Protected Expression, Not Actionable Discrimination. ..................................... 8

        2.    The Complaint Does Not Allege That The University Itself Discriminated..................................... 11

        3.    The University Was Not Deliberately Indifferent. ..................................... 13

    B.    Plaintiffs' Contract Claims Fail As A Matter Of Law..................................... 18

        1.    Plaintiffs Identify No Enforceable Promise..................................... 19

        2.    The Implied Covenant Claim Also Fails. ..................................... 20

II.    At Minimum, The Court Should Strike The Claims For Injunctive Relief And Dismiss CAPE-Ed Under Rule 12(b)(1)..................................... 22

    A.    Plaintiffs Lack Standing To Seek Injunctive Relief. ..................................... 22

    B.    CAPE-Ed Must Be Dismissed. ..................................... 23

CONCLUSION..................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)................................................................5

*Alden v. Georgetown Univ.*,
734 A.2d 1103 (D.C. 1999) ...............................................................21

*Alexander v. Sandoval*,
532 U.S. 275 (2001)...........................................................................7

*Allworth v. Howard Univ.*,
890 A.2d 194 (D.C. 2006) ............................................................21, 22

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006)............................................................24

*Am. Foreign Serv. Ass'n v. Trump*,
2025 WL 2097574 (D.D.C. July 25, 2025)............................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................5

*Basch v. George Washington Univ.*,
370 A.2d 1364 (D.C. 1977) ...............................................................20

*Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*,
420 U.S. 128 (1975)..........................................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................5

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ......................................................23

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011)..........................................................................11

*Brown v. Hartlage*,
456 U.S. 45 (1982)............................................................................10

*Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*,
357 F. Supp. 2d 89 (D.D.C. 2004) ......................................................21

\*  *Canel v. Art Inst. of Chi.*,
2025 WL 564504 (N.D. Ill. Feb. 20, 2025) .................2, 6, 11, 12, 17, 18

*Chamber of Com. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011)........................................................23, 24

*Chang v. United States*,
738 F. Supp. 2d 83 (D.D.C. 2010) ......................................................23

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Chenari v. George Washington Univ.*,
  847 F.3d 740 (D.C. Cir. 2017) .......................................................................21

*Ciralsky v. CIA*,
  355 F.3d 661 (D.C. Cir. 2004) .........................................................................6

\*   *City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) .........................................................................................22

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .......................................................................................23

*Concerned Jewish Parents & Tchrs. of Los Angeles v. Liberated Ethnic Stud.*
  *Model Curriculum Consortium*,
  2024 WL 5274857 (C.D. Cal. Nov. 30, 2024) ...............................................10

*Cook v. Hopkins*,
  795 F. App'x 906 (5th Cir. 2019) ...................................................................11

\*   *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) .........................................................................13, 15, 16

*Delbert v. Duncan*,
  2013 WL 6222987 (D.C. Cir. Nov. 14, 2013) ...............................................12

*Doe v. George Washington Univ.*,
  321 F. Supp. 3d 118 (D.D.C. 2018) ...............................................................20

\*   *Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) ...............................8, 9, 10, 11, 16, 17, 18

*Gartenberg v. Cooper Union for Advancement of Sci. & Art*,
  2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ....................................................9

*Gartenberg v. Cooper Union for Advancement of Sci. & Art*,
  765 F. Supp 3d 245 (S.D.N.Y. Feb. 5, 2025) ...............................................9, 14

*Gebretsadike v. Dist. of Columbia*,
  2024 WL 3291744 (D.D.C. July 3, 2024) .........................................................7

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) .......................................................................................13

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .......................................................................................10

*Gerwaski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*,
  2025 WL 1294107 (D. Nev. May 5, 2025) ......................................................9

*Hajizadeh v. Blinken*,
  2024 WL 3638336 (D.D.C. Aug. 2, 2024) ......................................................12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hajur El-Haggan v. Bd. of Educ. of Montgomery Cnty.*,
  2025 WL 1952516 (D. Md. July 16, 2025)...................................................................9

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).................................................................................................23, 24

*Jauquet v. Green Bay Area Catholic Educ., Inc.*,
  996 F.3d 802 (7th Cir. 2021) .......................................................................................17

*Jideani v. Dist. of Columbia*,
  2025 WL 1444499 (D.D.C. May 20, 2025)..................................................................12

*Karasek v. Regents of Univ. of Calif.*,
  956 F.3d 1093 (9th Cir. 2020) .....................................................................................16

*Kestenbaum v. President & Fellows of Harvard Coll.*,
  743 F. Supp. 3d 297 (D. Mass. 2024)..........................................................................13

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967)......................................................................................................10

*Khadr v. United States*,
  529 F.3d 1112 (D.C. Cir. 2008) .....................................................................................5

*Krukas v. AARP, Inc.*,
  376 F. Supp. 3d 1 (D.D.C. 2019) .................................................................................22

* *Landau v. Corp. of Haverford Coll.* (*Landau I*),
  — F. Supp. 3d —, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025)...................................2, 6, 7, 8, 18

* *Landau v. Corp. of Haverford Coll.* (*Landau II*),
  2025 WL 1796473 (E.D. Pa. June 30, 2025)........................................2, 6, 8, 9, 11, 13, 16, 17

*Lin v. Dist. of Columbia*,
  2022 WL 4007900 (D.C. Cir. Sept. 2, 2022)..................................................................7

*Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*,
  498 F. Supp. 2d 187 (D.D.C. 2007)..............................................................................24

*Louis D. Brandeis Ctr. for Human Rights Under Law v. President & Fellows of
  Harvard Coll.*,
  2024 WL 4681802 (D. Mass. Nov. 5, 2024) ................................................................14

*McBride v. Mnuchin*,
  2019 WL 3323412 (D.D.C. 2019) .................................................................................5

*Menzia v. Austin Indep. Sch. Dist.*,
  47 F.4th 354 (5th Cir. 2022) ........................................................................................14

*Mero v. City Segway Tours of Washington, DC, LLC*,
  826 F. Supp. 2d 100 (D.D.C. 2011) .............................................................................21

### TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018)........................................................................................10

*Nat'l Socialist Party of Am. v. Skokie*,
    432 U.S. 43 (1977)..........................................................................................11

\*    *Newman v. Howard Univ. Sch. of Law*,
    715 F. Supp. 3d 86 (D.D.C. 2024).................................................7, 8, 13, 14, 19, 20

*Richter v. Catholic Univ. of Am.*,
    2019 WL 481643 (D.D.C. Feb. 7, 2019) ...........................................................20, 21

*Shaffer v. George Washington Univ.*,
    27 F.4th 754 (D.C. Cir. 2022)..........................................................................20

\*    *Snyder v. Phelps*,
    562 U.S. 443 (2011).........................................................................................8

\*    *StandWithUs Ctr. for Legal Just. v. MIT*,
    742 F. Supp. 3d 133 (D. Mass. 2024)................................2, 7, 8, 13, 14, 15, 16, 24

\*    *Telecomm. Rsch. & Action Ctr. ex rel. Checknoff v. Allnet Commc'ns Servs., Inc.*,
    806 F.2d 1093 (D.C. Cir. 1986).........................................................................24

*Thompson v. Trs. of Ind. Univ.*,
    2024 WL 4289642 (S.D. Ind. Sept. 24, 2024) ....................................................22

*Truesdale v. Dist. of Columbia*,
    436 F.2d 288 (D.C. Cir. 1970)..........................................................................22

*Univ. of Baltimore v. lz*,
    716 A.2d 1107 (Md. Ct. Spec. App. 1998) ..........................................................21

*Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Md.*,
    2024 WL 4361863 (D. Md. Oct. 1, 2024) ............................................................9

*Vatel v. All. of Auto Mfrs.*,
    627 F.3d 1245 (D.C. Cir. 2011)..........................................................................7

*Wanko v. Catholic Univ. of Am.*,
    2009 WL 3052477 (D.D.C. Sept. 22, 2009) ........................................................19

\*    *Warth v. Seldin*,
    422 U.S. 490 (1975).......................................................................................24

\*    *Wright v. Howard Univ.*,
    60 A.3d 749 (D.C. 2013) .................................................................................21

\*    *Yakoby v. Trs. of Univ. of Pa.*,
    2025 WL 1558522 (E.D. Pa. June 2, 2025)....................................2, 6, 7, 8, 11, 16, 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................................2, 8, 9, 10, 11

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................6

Fed. R. Civ. P. 12(b)(1) .......................................................................................5, 22

Fed. R. Civ. P. 12(b)(6) .......................................................................................5, 6

**Other Authorities**

*College Faculty Are the 'Root of the Problem': Sabrina Soffer*, Fox News
    (Apr. 28, 2024)....................................................................................................15

*Israel Is Fighting for Humanity as We Know It: Sabrina Soffer*, Fox News
    (Nov. 19, 2023)................................................................................................1, 14

## INTRODUCTION

Plaintiff Sabrina Soffer sues the George Washington University ("GW" or the "University") for the same response to ugly, antisemitic campus protests that she commended publicly, declaring on national television, "I think, in principle, [the University] did it right." *Israel Is Fighting for Humanity as We Know It: Sabrina Soffer*, Fox News (Nov. 19, 2023), https://www.foxnews.com/video/6341448235112.   Now, Soffer and her co-plaintiffs ask this Court to impose liability on the University for not responding to those protests in precisely the manner they would have preferred.  But their own Complaint—and Soffer's own words—confirm that GW did not ignore antisemitism.  The University condemned it—publicly, repeatedly, and unequivocally.  GW disciplined students and organizations.  It collaborated with law enforcement. It backed initiatives to support its Jewish community—including a task force led by Soffer herself.

Plaintiffs' theory of liability—that GW should have adopted their preferred response to campus unrest—is legally untenable.  Title VI imposes liability only for a university's *own* intentional discrimination, or where the institution acts with deliberate indifference to conduct so severe that it effectively denies access to education.  Despite the length of the Complaint, Plaintiffs' allegations (even assumed to be true) do not come close to meeting that standard.  They do not establish intentional discriminatory animus by GW itself.  They do not show that GW made an "official decision not to remedy" harassment.  And they do not show that Plaintiffs were denied access to educational services in any meaningful sense.  On the contrary, the Complaint's allegations about the University's official speech and actions refute the possibility that GW was deliberately indifferent to reports of antisemitism on campus.

What Plaintiffs really complain about is speech—specifically, speech they found offensive or hostile to their views.  But that speech, as their Complaint makes clear, came from students, faculty, or outside speakers—not from the University itself.  And much of it, while reprehensible,

is plainly protected by the First Amendment.  Plaintiffs object to chants, signs, and slogans used at protests; to academic programming they view as ideologically biased; and to commentary by faculty and guest speakers that they believe crosses the line into antisemitism.  But the law draws a sharp distinction between offensive speech and unlawful discrimination.  Courts have repeatedly held that universities are not liable under Title VI for failing to suppress constitutionally protected expression, even when that expression is deeply offensive or controversial.

Plaintiffs' contract claim fares no better.  They point to general University policies and aspirational statements, but identify no specific, enforceable promise that GW breached.  Courts have consistently rejected similar contract theories in the campus unrest context, and this case is no different.

Nor do Plaintiffs have standing to pursue the relief they seek.  None of the individual plaintiffs alleges a credible threat of future harm sufficient to support injunctive relief.  And the organizational plaintiff, CAPE-Ed, lacks standing to seek either injunctive relief or damages on behalf of its members.

Courts across the country have rejected nearly identical claims arising from post–October 7 campus unrest.  *See Landau v. Corp. of Haverford Coll.* (*Landau II*), 2025 WL 1796473 (E.D. Pa. June 30, 2025); *Yakoby v. Trs. of Univ. of Pa.*, 2025 WL 1558522 (E.D. Pa. June 2, 2025); *Canel v. Art Inst. of Chi.*, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025); *Landau v. Corp. of Haverford Coll.* (*Landau I*), — F. Supp. 3d —, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025); *StandWithUs Ctr. for Legal Just. v. MIT*, 742 F. Supp. 3d 133 (D. Mass. 2024).  This Court should do the same.

## BACKGROUND

This case follows a wave of campus protests and academic debates following the October 7, 2023 Hamas terrorist attacks on Israel.  Plaintiffs, two individuals formerly affiliated with the University and a "voluntary membership organization" (Compl. ¶ 136), base their claims on the

suggestion that the University failed adequately to respond to reported antisemitic incidents and academic expression Plaintiffs found objectionable. But the Complaint tells a different story: one of a university that has long supported a vibrant Jewish community, responded promptly and decisively to campus unrest, and taken meaningful steps to address student concerns. The following background, drawn from Plaintiffs' own allegations, underscores the University's sustained commitment to its Jewish community members.

### A.    The University's Commitment To Its Jewish Community.

The George Washington University has long supported an inclusive Jewish community. Approximately 27% of its undergraduate population is Jewish. Compl. ¶ 590. The University hosts active Hillel and Chabad chapters, Jewish student organizations (including GW for Israel), and Jewish fraternities and sororities. *Id.* ¶¶ 304, 1199. GW also employs Jewish and pro-Israel faculty, hosts speakers with pro-Israel perspectives, and offers numerous Judaic Studies courses. *Id.* ¶¶ 318, 457, 1068, 1073. The University is deeply committed to ensuring that its campus remains safe and welcoming for Jewish students.

### B.    The University's Response To Campus Protests.

Following Hamas's October 7, 2023 terrorist attacks on Israel, protests erupted on campuses nationwide, including at GW. Compl. ¶ 4. Much of the conduct the Complaint describes at these protests was ugly, antisemitic, and deeply offensive. *See, e.g.*, *id.* ¶¶ 5–8. The University unequivocally condemned these incidents. Its senior leadership issued multiple public statements denouncing antisemitism and reaffirming the University's commitment to protecting its Jewish community. For example:

- On October 11, 2023, President Granberg stated: "I not only condemn terrorism, but I also abhor the celebration of terrorism and attempts to perpetuate rhetoric or imagery that glorifies acts of violence." *Id.* ¶ 439.

- On October 25, 2023, she wholly denounced the projection of antisemitic phrases on the Gelman Library, acknowledging the "fear and anxiety" it caused and affirming that such messages do not speak on behalf of the University. *Id.* ¶ 550.

- On May 5, 2024, she condemned the encampment that had formed on campus as unlawful and in violation of University policy, citing incidents of vandalism, intimidation, and anti-semitic rhetoric. *Id.* ¶ 791.

When protesters crossed the line, the University took concrete disciplinary action. It worked with the D.C. Metropolitan Police Department ("MPD") to clear the spring 2024 encampment at University Yard and installed fencing around the area. Compl. ¶¶ 866, 970. MPD arrested 33 individuals, including 6 GW students. *Id.* ¶¶ 854, 934. Over the course of the year, GW disciplined 16 students (including suspensions, probations, and censures) and 9 student organizations. *Id.* ¶¶ 935–36. Students for Justice in Palestine, which organized several of the protests described in the Complaint, was suspended. *Id.* ¶ 596.

Beyond discipline, GW engaged directly with affected students and families. It created six faculty working groups to address campus climate and backed a Student Government Task Force to Combat Antisemitism—led by Plaintiff Soffer. Compl. ¶¶ 131–32, 972. The Complaint references numerous meetings between senior University leadership and Jewish students and parents to address concerns and develop solutions. *See, e.g.*, *id.* ¶¶ 958–64.

### C. Plaintiffs' Criticisms Of Protected Academic Expression.

Plaintiffs devote substantial attention to criticizing the University's academic programming, faculty commentary, and campus speech. As in other recent cases, they attempt to reframe protected academic expression as evidence of institutional bias. Specifically, Plaintiffs allege that certain departments—particularly the Institute for Middle East Studies—promoted a "singular

ideology" hostile to Israel and Zionism, and that faculty members affiliated with the Middle East Studies Association used their academic platforms to advance anti-Zionist narratives. *See* Compl. ¶¶ 26–30, 522–28. Plaintiffs object to conferences, lectures, and course materials that they claim excluded pro-Israel perspectives and fostered "forced ideological conformity." *Id.* ¶¶ 28, 523–24. They also cite statements by faculty and guest speakers that, in their view, challenged Jewish identity or promoted antisemitic tropes. *Id.* ¶¶ 525–26.

## STANDARD OF REVIEW

"On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction." *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 2097574, at \*5 (D.D.C. July 25, 2025) (citing *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead facts that permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* For purposes of this motion only, the University accepts Plaintiffs' factual allegations as true, as required by Rule 12(b)(6), but does not concede the truth of those allegations or adopt Plaintiffs' characterizations of the conduct at issue. If the Court cannot "infer" from the "well-pleaded facts," assumed to be true, more than "the mere possibility of misconduct," then the complaint has not shown "that the pleader is entitled to relief." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023). The Court need not credit a "'legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor must it accept "bald assertions" or "conclusions." *McBride v. Mnuchin*, 2019 WL 3323412, at \*3 (D.D.C. July 24, 2019).

## ARGUMENT

Plaintiffs' claims fail as a matter of law.  As a threshold matter, their 1,300-paragraph Complaint violates the basic pleading requirements of Rule 8, which demands "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  As in *Yakoby*, the Complaint's sheer length, density, and editorial tone obscure rather than clarify the alleged basis for relief, burdening both the Court and Defendant with the task of disentangling legal theories from narrative and commentary.  2025 WL 1558522, at *1.  That alone warrants dismissal.  *See, e.g.*, *Ciralsky v. CIA*, 355 F.3d 661, 669 (D.C. Cir. 2004) (affirming dismissal of 61-page, 105-paragraph pleading that was "prolix and burdened with a bloated mass of unnecessary detail").

Even setting aside its form, the Complaint's substance fares no better.  Plaintiffs' discrimination claims do not allege intentional conduct by the University, nor do they meet the high bar for deliberate indifference or denial of educational access under Title VI.  While Plaintiffs may disagree with the University's academic environment, their Complaint reflects a sustained, multifaceted response to antisemitism on campus.  GW's actions—public condemnation, disciplinary enforcement, policy reform, and community engagement—demonstrate its ongoing commitment to protecting Jewish students and upholding its institutional values.  Their contract claim identifies no enforceable promise and rests on aspirational policy language.  And their claims for injunctive relief fail for lack of standing.  Courts have consistently rejected similar claims arising from campus unrest, and this Court should do the same.

## I.    The Court Should Dismiss Plaintiffs' Claims Under Rule 12(b)(6).

Plaintiffs' claims fail here for the same reasons nearly identical claims failed against MIT, the University of Pennsylvania, Haverford College, and the Art Institute of Chicago.  *See Landau II*, 2025 WL 1796473; *Yakoby*, 2025 WL 1558522; *Canel*, 2025 WL 564504; *Landau I*,

2025 WL 35469; *StandWithUs*, 742 F. Supp. 3d 133.  The protests at issue were, as Plaintiffs themselves describe, in significant part "inflammatory," "repulsive," and "shameful."  Compl. ¶¶ 5, 294, 665.  But offensive speech—even deeply offensive speech—does not create "a violation of federal law," let alone a violation of federal law *by the University*.  *Landau I*, 2025 WL 35469, at *10.

As in *Yakoby*, *Canel*, *Landau I*, *Landau II*, and *StandWithUs*, there are simply no facts showing intentional discrimination "on the part of" the University itself.  *Yakoby*, 2025 WL 1558522, at *7.  Nor do Plaintiffs identify—nor *can* Plaintiffs identify—any "'*specific contractual promise*'" the University made to them, let alone breached.  *Id.* at *9 (dismissing claims).  Plaintiffs' allegations, while lengthy and impassioned, do not meet the legal standards required to state a claim under federal or D.C. law.

### A.    Plaintiffs' Discrimination Claims Fail As A Matter Of Law.

Plaintiffs bring discrimination claims under Title VI (Counts I and II) and the D.C. Human Rights Act (Count III).  The legal frameworks are "identical."  *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 105 (D.D.C. 2024); *accord Gebretsadike v. Dist. of Columbia*, 2024 WL 3291744, at *6 (D.D.C. July 3, 2024); *see also Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) (Kavanaugh, J.) ("We analyze discrimination claims under the D.C. Human Rights Act in the same way that we analyze discrimination claims under the federal anti-discrimination laws.").  Each count fails "for the same reasons."  *Lin v. Dist. of Columbia*, 2022 WL 4007900, at *14 (D.C. Cir. Sept. 2, 2022) (applying "same . . . test" to both laws).

To state a claim under either statute, Plaintiffs must plausibly allege intentional discrimination.  *Cf. Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI applies "only [to] intentional discrimination").  That requires either (1) discriminatory animus or (2) deliberate indifference to known harassment so severe that it effectively denies access to educational opportunities.

*See, e.g.*, *Newman*, 715 F. Supp. 3d at 105–06; *Yakoby*, 2025 WL 1558522, at *7; *StandWithUs*, 742 F. Supp. 3d at 141–42 & n.8.

Plaintiffs allege neither.  Indeed, much of the conduct they allege—student protests, faculty commentary, and academic programming—is plainly protected by the First Amendment and cannot support a discrimination claim.  Courts have repeatedly held that universities are not liable under Title VI for failing to suppress offensive but constitutionally protected speech.

### 1.    Plaintiffs' Claims Target Protected Expression, Not Actionable Discrimination.

Plaintiffs' allegations fail at the threshold because a "very substantial portion" of the Complaint's 1,339 paragraphs concern "pure political speech and expressive conduct." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (dismissing Title VI claim).  Such speech cannot be regulated "under the guise of nondiscrimination."  *Landau II*, 2025 WL 1796473, at *2 (same). As the Supreme Court has emphasized, speech on matters of "public concern"—that is, expression that "can 'be fairly considered as relating to any matter of political, social, or other concern to the community'"—is "entitled to 'special protection' under the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).  That protection applies even when the speech "fall[s] short of refined social or political commentary" and incorporates ugly, offensive, and outrageous statements.  *Id.* at 454; *see id.* at 458 (signs with messages like "God Hates Fags," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," and "Thank God for 9/11").

Like the complaints in other campus-environment cases, the Complaint here targets precisely this kind of "protected First Amendment expression." *Landau I*, 2025 WL 35469, at *2. Plaintiffs object to offensive "chant[s]," "sign[s]," and "slogan[s]" used by student protesters— such as "From the river to the sea," "Zionists go to hell," and "Hamas are freedom fighters." Compl. ¶¶ 5–6, 61, 74, 82–83, 92–93, 412, 419, 421, 556, 562, 615, 624, 634, 637, 663, 717, 763–

64, 767, 773–74, 783, 785, 808, 976, 987, 1000–02, 1006–07, 1116, 1143, 1195, 1207, 1218, 1271. They complain about faculty "commentary" and academic "programming" that they view as "hostile toward Israel" or Zionism.  *Id.* ¶¶ 26, 63, 122, 209–10, 238, 273, 285, 291, 294–95, 337-39, 353, 359, 458, 460, 485, 487–88, 517, 534, 691, 1030–31, 1037, 1083.  And they ask the Court to "requir[e]" the University to "adopt" a particular "definition of antisemitism."  *Id.* at 174 (Prayer for Relief (b)).

These are quintessential examples of political speech on matters of intense public debate. *See, e.g.*, *Gerwaski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 2025 WL 1294107, at *7 (D. Nev. May 5, 2025); *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Md.*, 2024 WL 4361863, at *8–9 (D. Md. Oct. 1, 2024); *Hajur El-Haggan v. Bd. of Educ. of Montgomery Cnty.*, 2025 WL 1952516, at *11 (D. Md. July 16, 2025).  Courts have consistently held that such expression, even when deeply offensive, is fully protected by the First Amendment and cannot form the basis for liability under Title VI.  *See, e.g.*, *Landau II*, 2025 WL 1796473, at *1 (explaining that even though plaintiffs "paint a picture of a stressful campus climate for Jewish students, many of the incidents pled fall within the protection of the First Amendment"); *Gartenberg v. Cooper Union for Advancement of Sci. & Art*, 2025 WL 602945, at *1–2 (S.D.N.Y. Feb. 25, 2025) (declining "to expose Cooper Union to possible civil liability based on" pro-Hamas protesters' "speech on matters of public concern"); *Gartenberg v. Cooper Union for Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 264 (S.D.N.Y. Feb. 5, 2025) (recognizing that Title VI does not "require censorship" of anti-Semitic protests); *Felber*, 851 F. Supp. 2d at 1187–88.

That protection extends not only to student speech and protests, but also to academic content and curricular decisions.  Plaintiffs' suggestion that a "biased" curriculum violates Title VI (Compl. ¶¶ 179, 277, 456, 458, 501, 691) would require the Court to opine on patently non-

justiciable issues—such as "the Jewish people's historical connection to the land of Israel" (*id.*
¶¶ 20, 152, 472)—and to police the content of university programming on matters of public con-
cern.  *See Brown v. Hartlage*, 456 U.S. 45, 61 (1982) ("[U]nder the regime of [the First] Amend-
ment, 'we depend for . . . correction not on the conscience of judges and juries but on the compe-
tition of other ideas.'" (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974))).  That
approach would "cast a pall of orthodoxy over the classroom," in direct conflict with the First
Amendment.  *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).  "[T]he best test of truth is
the power of the thought to get itself accepted in the competition of the market, and the people lose
when the government is the one deciding which ideas should prevail."  *Nat'l Inst. of Fam. & Life
Advocs. v. Becerra*, 585 U.S. 755, 772 (2018) (cleaned up); *see, e.g.*, *Concerned Jewish Parents
& Tchrs. of Los Angeles v. Liberated Ethnic Stud. Model Curriculum Consortium*, 2024 WL
5274857, at *2, *10, *22 (C.D. Cal. Nov. 30, 2024) (dismissing Title VI challenge to curriculum
allegedly including "statements that the existence of the State of Israel is based on ethnic cleansing
and land theft, apartheid and genocide" and that "Zionism is distinct from Judaism").

    *Felber* is particularly instructive.  There, as here, plaintiffs of Jewish ancestry claimed that
a university had violated Title VI by failing to prevent the creation of a "dangerous anti-Semitic
climate."  851 F. Supp. 2d at 1184; *cf.* Compl. ¶ 1033 (a "climate hostile to . . . Zionist[s]").  Stu-
dents on campus "carried signs depicting the Israeli flag with a swastika in the middle," accosted
other students at "check points" and demanded that they state "whether they are Jewish or not,"
chanted "Death to Israel" and "Death to the Jews," "accused Israel of starting another Holocaust,"
"equated Israelis to Nazis," and circulated a magazine that was "highly-critical of Israel and laud-
atory of Hamas and Hezbollah."  851 F. Supp. 2d at 1184–85.  The court dismissed the claim,

holding that "a very substantial portion" of the plaintiffs' allegations concerned "pure political speech" protected by the First Amendment. *Id.* at 1188.

That is even more true here. Plaintiffs' allegations are simply "not legally actionable under Title VI." *Landau II*, 2025 WL 1796473, at *6; *cf. Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 801 n.8 (2011) ("the problem of encouraging anti-Semitism" "cannot be addressed by governmental restriction of free expression" (citing *Nat'l Socialist Party of Am. v. Skokie*, 432 U.S. 43 (1977) (per curiam))).

### 2. The Complaint Does Not Allege That The University Itself Discriminated.

Even setting aside the First Amendment protections that bar liability for much of the conduct alleged, Plaintiffs' claims still fail because they do not plausibly allege that the University itself engaged in discriminatory conduct. While Plaintiffs "spend an inordinate amount of space expounding on long-past injustices and incidents" in their 176-page complaint and complaining that the University did not "respond to their" complaints "in the manner [in] which [they] wanted, Plaintiffs have failed to plead any facts showing . . . intentional discrimination . . . on the part of" the University. *Yakoby*, 2025 WL 1558522, at *7. That is, they do not allege that the University denied them an educational benefit "*because of*" their Jewish identity. *Canel*, 2025 WL 564504, at *15.

As in *Yakoby*, there are simply "no allegations that [the University] or its administration has *itself* taken any actions or positions which . . . could be interpreted as antisemitic with the intention of causing harm to the Plaintiffs." 2025 WL 1558522, at *7 (emphasis added). To the contrary, the Complaint concedes that the University "hope[d]" its actions would *protect* the Plaintiffs. Compl. ¶ 713. That is the "opposite of intentional discrimination." *Cook v. Hopkins*, 795 F. App'x 906, 916 (5th Cir. 2019); *see also Yakoby*, 2025 WL 1558522, at *7 (dismissing

direct discrimination claim where the University "*has* responded to . . . antisemitic incidents," albeit allegedly ineffectively).

Far from *aligning* with the protesters, the University was a *target* of their antisemitic vitriol. *See, e.g.*, Compl. ¶ 557 (protester "referring to [University] President Granberg as a 'fucking Jew'"); *id.* ¶ 663 (protesters chanting "racist slurs and phrases" and "demand[ing] that GWU sever ties with 'Zionist institutions'"); *id.* ¶ 228 (protesters putting "GWU administrators" "'on trial'" and "sen[ding] [them] to the 'guillotine'"); *id.* ¶ 773 (protesters finding President Granberg "guilty," "chant[ing] 'Guillotine! Guillotine! Guillotine!'"); *id.* ¶ 774 (protesters "mov[ing] on to Provost Christopher Bracey," "chanting . . . 'Off to the motherfucking gallows with you'"). The University "condemned," not supported, the protesters' actions. *Id.* ¶¶ 440, 455; *see also id.* ¶ 439 (quoting President Granberg: "I also abhor the celebration of terrorism"). And as detailed above, the University did not merely issue statements—it took appropriate concrete disciplinary and security measures in response to campus unrest, and maintained institutional procedures to address other antisemitic incidents, including through meetings with students, task forces, and faculty working groups. *See* pp. 3–4, *supra*; pp. 14–15, *infra*.

Conclusory allegations aside, *see Hajizadeh v. Blinken*, 2024 WL 3638336, at *6 (D.D.C. Aug. 2, 2024) (AliKhan, J.), there are no specific "facts to support a reasonable inference" that the University—the institution at which 33 protesters were *arrested* (*see* Compl. ¶ 854)—was *aligned* with the protesters or otherwise acted to deny Plaintiffs educational benefits "*because of*" their Jewish identity, *Canel*, 2025 WL 564504, at *15. That alone defeats any claim of intentional discrimination. *See, e.g.*, *id.* (dismissing direct discrimination claim); *Delbert v. Duncan*, 2013 WL 6222987, at *1 (D.C. Cir. Nov. 14, 2013) (affirming dismissal of Title VI claim because plaintiff failed to "lin[k] [his] claim" to discriminatory animus); *Jideani v. Dist. of Columbia*,

2025 WL 1444499, at *9 (D.D.C. May 20, 2025) (dismissing Title VI claim where, as here, plain-tiff failed to show that defendant's actions "were motivated by discrimination").

### 3.    The University Was Not Deliberately Indifferent.

Nor was the University "deliberately indifferent." Compl. ¶ 1318. Title VI imposes lia-bility "only for [a school's] *own* misconduct." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (emphasis added). There is no vicarious liability for actions of students or faculty. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998). Nor is a university required to adopt a plaintiff's "particular remedial demands." *Davis*, 526 U.S. at 648.

To state a claim for deliberate indifference under Title VI, Plaintiffs must show that: (1) the university had actual knowledge of harassment; (2) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] [Plaintiffs'] access to an educational opportunity"; and (3) the university responded with deliberate indifference—that is, it made "'an official deci-sion . . . *not* to'" act. *Davis*, 526 U.S. at 633, 642 (emphasis added); *see also Newman*, 715 F. Supp. 3d at 109; *StandWithUs*, 742 F. Supp. 3d at 142 ("deliberate indifference means affirma-tively choosing to do the wrong thing").

That is an "[e]xceedingly [h]igh" bar. *Landau II*, 2025 WL 1796473, at *6. It is not enough to allege that the university could have done more, or that its response was imperfect or even negligent. *See, e.g.*, *Newman*, 715 F. Supp. 3d at 109. Courts have consistently rejected Title VI claims where universities took meaningful, if imperfect, steps to address campus unrest and stu-dent concerns.

As in other recent post–October 7 cases, Plaintiffs' "hostile environment claim falls apart as it funnels through" these "core principles." *Landau II*, 2025 WL 1796473, at *3, *6. This is not a case where the university "did not respond at all," *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 310 (D. Mass. 2024), "fail[ed] (for more than a year) to take

any remedial action," *Louis D. Brandeis Ctr. for Human Rights Under Law v. President & Fellows of Harvard Coll.*, 2024 WL 4681802, at *5 (D. Mass. Nov. 5, 2024), or simply "launch[ed] an investigation . . . without any further follow-through," *Gartenberg*, 765 F. Supp. 3d at 277. The Complaint itself acknowledges that GW took numerous actions in response to campus unrest: it issued public condemnations of antisemitism, disciplined students and organizations, collaborated with law enforcement, and backed initiatives to support Jewish students. *See, e.g.*, Compl. ¶¶ 131–32, 439, 550, 596, 791, 854, 866, 874–75, 934–36, 970–72. These actions are the opposite of deliberate indifference—and they defeat Plaintiffs' claims as a matter of law.

### a)  The University Responded To Campus Incidents.

"Far from sitting on its hands," the University took concrete, escalating "steps to contain the . . . on-campus protests." *StandWithUs*, 742 F. Supp. 3d at 142. When students "projected antisemitic phrases on the exterior wall of Gelman Library," University police officers intervened and directed them to stop. Compl. ¶¶ 544, 548–49. The University then charged the students with violating the Buildings Use Policy (*id.* ¶ 587) and subsequently suspended one student and two student organizations (*id.* ¶¶ 596–97). These actions reflect a prompt and meaningful response—not institutional indifference. *Cf. Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 361 (5th Cir. 2022) (the school's reprimanding of harassers and launching of investigations "establish that [it] was not deliberately indifferent as a matter of law"); *Newman*, 715 F. Supp. 3d at 109 (plaintiff "failed to allege conduct meeting [the] deliberate indifference standard" where University "sought to address" harassment). As Plaintiff Soffer put it during an appearance on Fox News, "I think, in principle, [the University] . . . did the right thing." *Israel Is Fighting for Humanity as We Know It: Sabrina Soffer*, Fox News (Nov. 19, 2023), https://www.foxnews.com/video/6341448235112.

Similarly, when the University learned that student protesters planned to occupy University Yard, it proactively designated the area a "'24-hour quiet are[a]'" and prohibited amplified noise.

Compl. ¶ 710.  When protesters violated those restrictions, the University ordered them to disperse (*id.* ¶ 724), deployed campus police (*id.* ¶ 731), erected barricades (*id.*), and ultimately coordinated with the Metropolitan Police Department (*id.* ¶ 866), which cleared the encampment (*id.* ¶ 854)—removing over 600 people within thirteen days (*see id.* ¶¶ 714, 726, 854).  Thirty-three protesters were arrested.  *Id.* ¶ 854.  These actions again reflect what courts have recognized as an "evolving and progressively punitive response" to a volatile situation, *StandWithUs*, 742 F. Supp. 3d at 142—not an "official decision . . . not to remedy" harassment.  *Davis*, 526 U.S. at 642.

While Plaintiffs now fault the University for not acting sooner (*cf.* Compl. ¶¶ 876–79), they skip over the fact that the University could not unilaterally clear the encampment without MPD support.  *See id.* ¶ 866 (quoting President Granberg explaining that when incidents "go beyond" "normal university operations," the University "must rely on the support and experience of the DC Metropolitan Police Department").  That "rel[iance]" on external law enforcement (*id.* ¶ 876)—particularly in a high-risk, fast-evolving environment—does not plausibly reflect indifference; it reflects a prudent response to a complex public safety challenge.  As Plaintiff Soffer herself publicly recognized:  "I do have to commend the school's leadership, in terms of, well, requesting the Metropolitan PD . . . to basically try to clear out these antisemitic protests," despite the lack of cooperation from "Mayor Bowser."  *College Faculty Are the 'Root of the Problem': Sabrina Soffer*, Fox News (Apr. 28, 2024), https://tinyurl.com/5yfvr4rj.

Plaintiffs, ultimately, may disagree with the University's judgments.  They may have taken different approaches—such as "hir[ing]" even more "officers," Compl. ¶ 878, or providing police escorts instead of recommending alternative routes, *cf. id.* ¶¶ 50–51, 802–03, 807.  But Title VI does not require the University to adopt Plaintiffs' preferred response—or even a "good" one.

*Landau II*, 2025 WL 1796473, at *10; *see Karasek v. Regents of Univ. of Calif.*, 956 F.3d 1093, 1105 (9th Cir. 2020) (even "a 'negligent, lazy, or careless' response" does not trigger liability).

Courts must "refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. Title VI requires only that the institution not make "'an official decision . . . not to remedy'" harassment. *Id.* at 642. As shown by the Complaint's allegations, the University's actions here—disciplinary measures, police coordination, emergency alerts, and protest clearances (*see* pp. 3–4, 14–15, *supra*)—easily meet that standard as a matter of law. They demonstrate a consistent and reasonable effort to address campus unrest. That falls well short of the "deliberate indifference" required to state a claim under Title VI.

Courts have consistently dismissed Title VI claims where universities took similar or even less extensive steps to address campus unrest or antisemitism on campus. *See, e.g.*, *Yakoby*, 2025 WL 1558522, at *7 & n.3 (the University "formulated and announced an 'Action Plan to Combat Antisemitism,'" "created a Student Advisory Group", and formed a "Presidential Commission on Countering Hate and Building Community"); *Landau II*, 2025 WL 1796473, at *12; *StandWithUs*, 742 F. Supp. 3d at 142; *Felber*, 851 F. Supp. 2d at 1188. In each case, courts found that the universities' responses—though not perfect—were sufficient to defeat claims of deliberate indifference under Title VI. *See, e.g.*, *Felber*, 851 F. Supp. 2d at 1188 ("plaintiffs fail to show how defendants have acted with 'deliberate indifference,'" where "campus police . . . made arrests of disruptive protestors" and the administration "engaged in an ongoing dialogue with the opposing parties"); *Landau II*, 2025 WL 1796473, at *12 (the University may have taken "too soft an approach" and "failed to communicate . . . boldly" enough, but its response was not "so indifferent" to "plausibly support a finding of deliberate indifference"); *StandWithUs*, 742 F. Supp. 3d at 142

16

("MIT could have done [things] differently," but its "evolving" response was not "clearly unreasonable").

This case fits squarely within a growing body of precedent rejecting Title VI claims based on nearly identical allegations of campus unrest.  As courts have repeatedly held, that "the University may not have acted as plaintiffs would prefer" simply does not "rise to 'deliberate indifference.'"  *Felber*, 851 F. Supp. 2d at 1188.

### b) Plaintiffs Have Not Alleged Facts Showing That They Were Denied Access To Educational Services.

Even apart from their failure to show deliberate indifference, Plaintiffs' claim fails for another independent reason: they do not allege facts showing that they were denied "access to the University's educational services in any meaningful sense."  *Felber*, 851 F. Supp. 2d at 1188.  They identify no "tangible impact" on their education: named Plaintiffs cite no "drop in grades, increase in absenteeism, or retention of a therapist for serious anxiety."  *Landau II*, 2025 WL 1796473, at *15; *see also Canel*, 2025 WL 564504, at *10.  Instead, like the plaintiffs in other recent campus unrest cases, they rely on vague, conclusory assertions that unnamed individuals, at unspecified times, had "forgo[ne] attending" unidentified events.  *E.g.*, Compl. ¶ 1049.  But such generic, "phantom quasi-class action" pleading does not satisfy Rule 8; it makes it "impossible to connect the dots" to any "concrete resultant harm stemming from [Plaintiffs'] allegations." *Landau II*, 2025 WL 1796473, at *2; *cf. Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 810 (7th Cir. 2021) (affirming dismissal because "the complaint does not specify what program or benefit Student A was not able to access").

The Complaint's allegations of personal shunning (Compl. ¶ 908), anxiety (*id.* ¶ 100), and self-suppression (*id.* ¶ 1048) are troubling and regrettable.  But they do not "amount to a concrete deprivation of educational benefits."  *Landau II*, 2025 WL 1796473, at *15 (rejecting Title VI

claim where plaintiffs alleged emotional distress, social ostracization, and self-censorship, but failed to plead any specific academic harm such as missed classes or reduced grades); *see also, e.g.*, *Canel*, 2025 WL 564504, at *8 ("again, plaintiff does not allege a drop in grades, an increase in absenteeism, or some other 'concrete, negative effect' on her education").

*Felber*, again, is instructive.  There, too, plaintiffs alleged that protesters occupied a university plaza.  851 F. Supp. 2d at 1188; *cf., e.g.*, Compl. ¶ 703.  And the complaint described hostile encounters with protesters—even an assault.  *See* 851 F. Supp. 2d at 1188; *cf., e.g.*, Compl. ¶ 1117. But the court dismissed the Title VI claim, holding that even though the occupied area was "an important campus thoroughfare and gathering place," the plaintiff had failed to show that the protesters' activities had impeded her access to specific educational services.  851 F. Supp. 2d at 1188. The court likewise concluded that alleged incidents, such as the complained-of assault, occurred *outside* "the context of [plaintiff's] educational pursuits"—when, for example, the plaintiff was "attempting to exercise free speech rights in a public forum."  *Id.*  The same dynamic is alleged here.  *See, e.g.*, Compl. ¶¶ 1111–13 (Soffer was "confronted by a large crowd" when she crossed the street to join "a local Israeli activist [she] knew" in "a respectful conversation with a protester," not while trying to attend class).

Plaintiffs, in short, have not alleged facts showing a denial of meaningful access to the University's educational services.  That failure is fatal to their Title VI claims.  *See, e.g.*, *Felber*, 851 F. Supp. 2d at 1188.

### B.    Plaintiffs' Contract Claim Fails As A Matter Of Law.

Plaintiffs' contract claim fails for the same reasons courts have rejected nearly identical claims in other campus unrest cases.  Plaintiffs identify no enforceable promise that the University breached.  *See, e.g.*, *Landau I*, 2025 WL 35469, at *9 ("absent more specific pleading as to a precise policy provision at issue and one or more specific instances that demonstrate a violation,

Plaintiffs' claim fails"); *Yakoby*, 2025 WL 1558522, at *9 ("In the absence of an alleged failure by Penn to perform a specific contractual *promise*, I cannot find that the alleged agreements' terms are sufficiently definite or enforceable, or that there was a manifestation by the parties that they intended to be bound by the agreement.").

### 1.    Plaintiffs Identify No Enforceable Promise.

Plaintiffs cite various University policies—including the Student Code of Conduct, the Policy on Demonstrations, and the Policy on Threats and Acts of Violence—as forming a binding contract. Compl. ¶¶ 1332–33. But these policies contain no language indicating mutual assent or an intent to be bound. As the court recently held in *Yakoby*, "there is no foundation upon which a finding could be made that the foregoing policies constituted a promise or guarantee" enforceable as a contract. 2025 WL 1558522, at *9.

The cited provisions are largely aspirational or mirror existing legal duties. For example, the Code's statement that the University "will not permit unlawful discrimination" (Compl. ¶ 1336) is not a bargained-for promise but a restatement of Title VI—insufficient to create contractual liability. *See, e.g.*, *Wanko v. Catholic Univ. of Am.*, 2009 WL 3052477, at *4 (D.D.C. Sept. 22, 2009) (dismissing plaintiff's "breach of contract claim" because the university did not promise "to provide anything . . . more than it was already obligated to provide . . . under Title VI"); *Newman*, 715 F. Supp. 3d at 104 (same, where many of the alleged "rights and obligations are simply restatements of rights and obligations that already exist" under federal law). And in any event, the University complied with Title VI, *see* pp. 7–18, *supra*—further foreclosing any claim of breach. Other provisions explicitly reserve discretion to the University, also undermining any claim of enforceability. *See, e.g.*, Compl. ¶ 1336 ("The university reserves the right to prohibit assemblies").

19

This is not a case where the University, by contrast, promised to follow specific, mandatory disciplinary procedures, *cf. Doe v. George Washington Univ.*, 321 F. Supp. 3d 118, 124 (D.D.C. 2018), or where students plausibly alleged an implied-in-fact contract based on alleged concrete representations and pricing differentials tied to in-person instruction, *cf. Shaffer v. George Washington Univ.*, 27 F.4th 754, 764–65 (D.C. Cir. 2022). To the contrary, as Judge McFadden recently explained in declining to find a binding contractual obligation in a Howard University policy, the type of "precatory, not promissory" language at issue here cannot "create an enforceable obligation vis-à-vis" the Plaintiffs. *Newman*, 715 F. Supp. 3d at 103.

Nor do Plaintiffs allege any mutual "'exchange of promises.'" *Newman*, 715 F. Supp. 3d at 103. Many of the cited policies simply "identif[y] various rights that students have and lis[t] them alongside students' obligations." *Id.* As with the Howard University policies in *Newman*, these provisions do not "sugges[t] that these rights and obligations are reciprocally contingent." *Id.* And as in *Newman*, if a student violates the Code of Conduct, no one contends that he forfeits all other rights. "[I]f that is true, then the Code of Conduct is *not* an enforceable contract." *Id.* at 104.

At most, Plaintiffs allege a failure to meet generalized expectations—not a breach of any enforceable contractual duty. That is not enough to state a claim. *See, e.g.*, *Basch v. George Washington Univ.*, 370 A.2d 1364, 1368 (D.C. 1977) (finding "no contractual obligation" in "broad language in university bulletins").

## 2.    The Implied Covenant Claim Also Fails.

Because Plaintiffs "failed to establish an enforceable contract," their "implied covenant" of good faith and fair dealing claim necessarily fails as well. *Richter v. Catholic Univ. of Am.*, 2019 WL 481643, at *5 (D.D.C. Feb. 7, 2019) (cleaned up). The implied covenant cannot exist independently of a valid contract; it is a derivative duty that presupposes a binding agreement.

Without such an agreement, there is no basis for imposing these derivative obligations.  *See, e.g.*, *Mero v. City Segway Tours of Washington, DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) ("the absence of a contract alone is sufficient to defeat [an] implied covenant claim"); *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004) (dismissing implied covenant claim where plaintiff failed to allege "any express or implied agreement that could give rise to a breach of good faith and fair dealing").

Even if a contract existed, Plaintiffs still fail to state an implied covenant claim.  To survive dismissal, a plaintiff must plausibly allege "more than mere negligence"; it must show that the defendant acted in bad faith or engaged in conduct that was arbitrary or capricious.  *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013); *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006); *see also Alden v. Georgetown Univ.*, 734 A.2d 1103, 1111 n.11 (D.C. 1999) (student failed to argue that the university committees' decisions to dismiss him "were based on bad faith or were arbitrary and capricious"; "[u]nder these circumstances, Georgetown cannot be found liable for breach of the implied covenant of good faith and fair dealing").  Plaintiffs do not come close to meeting that standard.  Their allegations reflect disagreement with the University's policy decisions and disciplinary responses, *see* pp. 15–16, *supra*—not evidence that the University purposefully failed to address reported instances of antisemitism, that its response was "merely a sham." *Wright*, 60 A.3d at 756 (quoting *University of Baltimore v. Iz*, 716 A.2d 1107, 1128 (Md. Ct. Spec. App. 1998), and concluding that plaintiff had failed to "provide adequate support for an implied-covenant claim").

Simply, an implied covenant claim is not a backdoor to "substitut[ing] [Plaintiffs'] judgment improperly for the academic judgment of the school."  *Richter*, 2019 WL 481643, at *5 (quoting *Chenari v. George Washington University*, 847 F.3d 740, 745 (D.C. Cir. 2017), and

dismissing implied covenant claim with prejudice); *cf. Allworth*, 890 A.2d at 202 (courts must "give deference to the discretion exercised by university officials").

## II.    At Minimum, The Court Should Strike The Claims For Injunctive Relief And Dismiss CAPE-Ed Under Rule 12(b)(1).

Separate and apart from the substantive flaws in Plaintiffs' claims, threshold legal defects require striking the claims for injunctive relief and dismissing CAPE-Ed.

### A.    Plaintiffs Lack Standing To Seek Injunctive Relief.

To obtain prospective injunctive relief, a plaintiff must demonstrate a "real and immediate" threat of future injury—not merely past harm or speculative fears. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Here, none of the named Plaintiffs allege that they are currently enrolled at the University. *Cf., e.g.*, Compl. ¶ 130 (Plaintiff Soffer "studied"—past tense—"at GWU's Columbian College of Arts and Sciences"). That alone defeats standing. *See, e.g.*, *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 37 n.13 (D.D.C. 2019) (dismissing injunction claim where plaintiff failed to allege that she was "currently enrolled" in the challenged program); *Thompson v. Trs. of Ind. Univ.*, 2024 WL 4289642, at *7 (S.D. Ind. Sept. 24, 2024) ("The Amended Complaint does not allege that Thompson is a current student at Indiana University . . . . Thompson therefore lacks standing for her first request of injunctive relief because she does not face any real and immediate threat of [future] injury . . . ."); *see also Truesdale v. Dist. of Columbia*, 436 F.2d 288, 289–90 (D.C. Cir. 1970) (per curiam) ("Since the child has now been graduated . . . the claim for injunction is moot.").

Even if Plaintiffs were currently enrolled, the Complaint still fails to allege any imminent threat of future harm. It does not claim that any antisemitic protest is ongoing or imminent. The encampment described in the Complaint has been cleared (Compl. ¶¶ 854, 866); the students involved have been disciplined (*id.* ¶¶ 935–36); and the University has taken extensive steps to

address antisemitism on campus—including public condemnations (*id.* ¶¶ 439, 550, 791), disciplinary actions (*id.* ¶¶ 596–97, 935–36), enhanced physical barriers (*id.* ¶ 970), and backing initiatives (*id.* ¶¶ 874–75, 972).  Plaintiffs do not allege any facts suggesting that similar protests are expected to recur, let alone that such protests would "overwhel[m]" University police or security measures.  *Id.* ¶ 740.  To the contrary, the Complaint concedes that fencing installed over the summer "presents an *obstacle* to large-scale extended protests."  *Id.* ¶¶ 970–71 (emphasis added).

Absent a credible threat of imminent, future injury, Plaintiffs' claims for injunctive relief must be dismissed.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) ("speculative chain of possibilities does not establish" that future injury "is certainly impending"); *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 35 (D.D.C. 2021) (fears of police reaction to future protests "are too speculative to confer standing"); *Chang v. United States*, 738 F. Supp. 2d 83, 91 (D.D.C. 2010) (plaintiff "cannot establish standing to seek an injunction based on 'what happened'" at earlier protest).

## B.    CAPE-Ed Must Be Dismissed.

CAPE-Ed is a voluntary membership organization.  Compl. ¶ 136.  It seeks prospective injunctive relief and damages.  *See id.* (Prayer for Relief).  It lacks standing for either.

### 1.    CAPE-Ed Cannot Seek Injunctive Relief.

To seek injunctive relief on behalf of its members, an association must show that its members would have standing to seek such relief in their own right.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But as discussed above, Plaintiffs have not shown—and cannot show—that any CAPE-Ed member faces a credible risk of imminent, future injury.  *See* pp. 22–23, *supra*.

Allegations concerning "unidentified members" are insufficient.  *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("it is not enough to aver that unidentified members

have been injured"). To claim associational standing, Plaintiffs "must specifically 'identify members'" who face a credible risk of future harm. *Id.* at 199–200 (quoting *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006)).

Here, the only specifically identified members—Plaintiffs Soffer and Shapiro—are former students. Former students have no plausible basis to claim a real and immediate threat of future harm. *See, e.g.*, *Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975); *see also* p. 22, *supra*.

### 2.    CAPE-Ed Cannot Seek Damages.

An association may sue on behalf of its members only when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. CAPE-Ed's damages claim fails this test because it necessarily requires individualized proof of harm. Courts—including in campus unrest cases—"have consistently rejected" associational standing to seek monetary (as opposed to injunctive or declaratory) relief. *Telecomm. Rsch. & Action Ctr. ex rel. Checknoff v. Allnet Commc'ns Servs., Inc.*, 806 F.2d 1093, 1095 (D.C. Cir. 1986) (R.B. Ginsburg, J.); *see, e.g.*, *StandWithUs*, 742 F. Supp. 3d at 140 ("MIT is correct that SCLJ lacks standing to seek damages").

As the Supreme Court has emphasized, damages claims are "not common to the entire membership, nor shared by all in equal degree." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Organizations therefore typically have "no standing to claim damages on [members'] behalf." *Id.* at 516; *see, e.g.*, *Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 193 (D.D.C. 2007).

Because CAPE-Ed lacks standing to seek any form of relief—injunctive or monetary—it cannot proceed as a plaintiff and must be dismissed from this action.

24

## CONCLUSION

For all the reasons stated above, the Complaint fails to state a claim under Title VI, the D.C. Human Rights Act, or contract law. Plaintiffs do not allege that the University itself engaged in intentional discrimination, nor do they show deliberate indifference or a denial of access to educational services. Their contract claim rests on aspirational policy language, not enforceable promises. And their claims for injunctive relief fail for lack of standing. And CAPE-Ed lacks standing to seek any form of relief and must be dismissed.

The Court should dismiss the Complaint in its entirety, with prejudice.

Dated: July 28, 2025                          Respectfully submitted,

                                              /s/ Jason C. Schwartz
                                              _____
                                              Jason C. Schwartz (# 465837)
Brian A. Richman (# 230071)                   Stuart F. Delery (# 449890)
GIBSON, DUNN & CRUTCHER LLP                   Jacob T. Spencer (# 1023550)
2001 Ross Avenue Suite 2100                   Abigail B. Dugan[*] (# 1743216)
Dallas, TX 75201-2923                         GIBSON, DUNN & CRUTCHER LLP
(214) 698-3100                                1700 M Street, N.W.
                                              Washington, D.C. 20036-5404
                                              (202) 955-8500

                              *Attorneys for Defendant*

---

[*] D.D.C. application forthcoming

25

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the CM/ECF system on July 28, 2025, which will send an electronic notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Jason C. Schwartz*

Jason C. Schwartz (# 465837)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-5404
(202) 955-8500

*Attorney for Defendant*