**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SABRINA SOFFER, ARI SHAPIRO, and
COMPLIANCE, ACCOUNTABILITY,
POLICY, ETHICS – ED ("CAPE-ED"),

                    Plaintiffs,

     v.

THE GEORGE WASHINGTON UNIVERSITY,

                    Defendant.

Case No. 1:25-cv-01657-LLA

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION AND FACTUAL BACKGROUND.................................................................. 1

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT .................................................................................................................. 7

    I.    Plaintiffs Plausibly Allege Violations of Title VI ................................................ 7

        A.    GWU's First Amendment Arguments Are Misguided and Improper ........................... 8

            1.    The First Amendment Does Not Excuse GWU from Complying with Title VI......... 8

            2.    Plaintiffs Allege Actionable Harassment ................................................ 12

        B.    Plaintiffs Plausibly Allege that GWU Subjected Them to a Hostile Educational Environment ................................................................................................ 14

        C.    Plaintiffs Plausibly Allege that GWU Engaged in Direct Discrimination Against Jewish and Israeli Students ................................................................................. 18

        D.    The Discrimination that Plaintiffs Experienced Deprived Them of Educational Opportunities and Benefits ................................................................................ 22

    II.    Plaintiffs Plausibly Allege Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing .............................................................................................. 24

        A.    GWU's Policies Create Enforceable Contractual Obligations, Which Plaintiffs Allege Were Breached ............................................................................................... 25

        B.    Plaintiffs Plausibly Allege that GWU Breached the Implied Covenant of Good Faith and Fair Dealing ............................................................................................... 28

    III.    Plaintiffs Have Standing to Seek Both Damages and Injunctive Relief ...................... 30

CONCLUSION ................................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Alden v. Georgetown Univ.*,
    734 A.2d 1103 (D.C. 1999) ........................................................................................29

*Allworth v. Howard Univ.*,
    890 A.2d 194 (D.C. 2006) ..........................................................................................29

\*   *Am. Ass'n of Cosmetology Sch. v. Devos*,
    258 F. Supp. 3d 50 (D.D.C. 2017) ............................................................................31

*Am. Chemistry Council v. DOT*,
    468 F.3d 810 (D.C. Cir. 2006) ...................................................................................32

\*   *Am. Library Ass'n v. FCC*,
    406 F.3d 689 (D.C. Cir. 2005) ...................................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .....................................................................................................7

*Basch v. George Washington Univ.*,
    370 A.2d 1364 (D.C. 1977) ..................................................................................25, 26

*Bellamy v. Mason's Stores, Inc.*,
    508 F.2d 504 (4th Cir. 1974) .......................................................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...............................................................................................32, 33

*Canaan v. Carnegie Mellon Univ.*,
    760 F. Supp. 3d 306 (W.D. Pa. 2024) ..................................................................20, 21

*Canel v. Art Inst. of Chicago*,
    2025 WL 564504 (N.D. Ill. Feb. 20, 2025) ..........................................................18, 19, 20

*Chenari v. George Washington Univ.*,
    847 F.3d 740 (D.C. Cir. 2017) ...................................................................................25

\*   *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) .............................................................15, 16, 18, 22, 23, 24

\*   *Doe v. Am. Univ.*,
    2020 WL 5593909 (D.D.C. Sept. 18, 2020) ........................................................26, 28

\*      *Doe v. George Washington Univ.*,
       321 F. Supp. 3d 118 (D.D.C. 2018) ...................................................................26, 28

       *Felber v. Yudof*,
       851 F. Supp. 2d 1182 (N.D. Cal. 2011) ............................................8, 11, 12, 13, 14

       *Fla. Audubon Soc'y v. Bentsen*,
       94 F.3d 658 (D.C. Cir. 1996) .......................................................................................30

       *Flanagan v. Georgetown Coll.*,
       417 F. Supp. 377 (D.D.C. 1976) .................................................................................30

       *Frankel v. Regents of the Univ. of Cal.*,
       744 F. Supp. 3d 1015 (C.D. Cal. 2024) ......................................................................23

       *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
       765 F. Supp. 3d 245 (S.D.N.Y. 2025) .............................................................11, 12, 24

       *Hajizadeh v. Blinken*,
       2024 WL 3638336 (D.D.C. Aug. 2, 2024) .................................................................6, 7

\*      *Hudgens v. NLRB*,
       424 U.S. 507 (1976) .......................................................................................................9

       *Hunt v. Wash. State Apple Advert. Comm'n*,
       432 U.S. 333 (1977) .....................................................................................................31

\*      *Kestenbaum v. President & Fellows of Harvard Coll.*,
       743 F. Supp. 3d 297 (D. Mass. 2024) ...........................8, 9, 11, 14, 16, 17, 18, 28

\*      *Landau v. Corp. of Haverford Coll.*,
       2025 WL 1796473 (E.D. Pa. June 30, 2025) ..............................11, 12, 14, 22, 24

       *Landau v. Corp. of Haverford Coll.*,
       2025 WL 35469 (E.D. Pa. Jan. 6, 2025) ....................................................................11

       *Lujan v. Defs. of Wildlife*,
       504 U.S. 555 (1992) .....................................................................................................30

\*      *Newman v. Howard Univ. Sch. of Law*,
       715 F. Supp. 3d 86 (D.D.C. 2024) ..............................................................7, 8, 15, 26

       *Porto v. Town of Tewksbury*,
       488 F.3d 67 (1st Cir. 2007) .........................................................................................15

\*    *Pride v. Howard Univ.*,
384 A.2d 31 (D.C. 1978) ......................................................................24

\*    *Ranchers-Cattlemen Action Legal Fund v. USDA*,
573 F. Supp. 3d 324 (D.D.C. 2021) ...................................................31

*Rankin v. McPherson*,
483 U.S. 378 (1987) ..............................................................................9

*Richter v. Catholic Univ. of Am.*,
2019 WL 481643 (D.D.C. Feb. 5, 2019) ...........................................29

\*    *Robertson v. District of Columbia*,
762 F. Supp. 3d 34 (D.D.C. 2025) .....................................................34

*Saidi v. Wash. Metro. Area Transit Auth.*,
928 F. Supp. 21 (D.D.C. 1996) ..........................................................14

\*    *Shaffer v. George Washington Univ.*,
27 F.4th 754 (D.C. Cir. 2022) .........................................24, 26, 27, 28

*Shulse v. W. New Eng. Univ.*,
2020 WL 4474274 (D. Mass. Aug. 4, 2020) ......................................24

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................11, 12, 13

*Speech First, Inc. v. Shrum*,
92 F.4th 947 (10th Cir. 2024) ............................................................32

\*    *Stafford v. George Washington Univ.*,
578 F. Supp. 3d 25 (D.D.C. 2022) ..................................................7, 14

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
742 F. Supp. 3d 133 (D. Mass. 2024) ................................................15

*Turner v. United States*,
16 F.2d 535 (D.C. Cir. 1926) .............................................................13

*Wanko v. Catholic Univ. of Am.*,
2009 WL 3052477 (D.D.C. Sept. 22, 2009) .......................................27

\*    *Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................34

*Wheeler v. Georgetown Univ. Hosp.*,
   788 F. Supp. 2d 1 (D.D.C. 2011) ..................................................................6

*Wright v. Howard Univ.*,
   60 A.3d 749 (D.C. 2013) ...................................................................29, 30

\*   *Yakin v. Univ. of Ill.*,
   508 F. Supp. 848 (N.D. Ill. 1981) ..................................................................21

**Statutes**

42 U.S.C. § 2000d ...................................................................................5

**Other**

Eugene Volokh, *Freedom of Speech and Workplace Harassment*,
   39 UCLA L. REV. 1791 (1992) ..................................................................9

Fed. R. Civ. P. 12 ...................................................................................5, 6, 7

## INTRODUCTION AND FACTUAL BACKGROUND

"GW has an alarming history of antisemitism." Compl. ¶ 119. This observation, made by the Editorial Board of the *GW Hatchet* back in 2021 as the George Washington University ("GWU" or "the University") campus was engulfed in a multi-week outburst of antisemitic mayhem, presaged the antisemitic tornado that would sweep the campus just two years later. *See id.* ¶¶ 304-10. It was also a missed opportunity to quell the storm of antisemitism, that would only fester and grow until it exploded into the entirely foreseeable yet utterly shocking series of events that Jewish and Israeli students at GWU were forced to endure over the past two years.[1]

On October 7, 2023, Hamas terrorists perpetrated a massacre that would become the most fatal day in Jewish history since the Holocaust. *See id.* ¶¶ 389-93. People around the world watched in horror as the news broke of murder, torture, rape, and kidnapping, and Jews and Israelis held their breath as they waited to hear from their loved ones. *See id.* ¶¶ 390, 1154. In the days following the attack, Jews and Israelis needed the support of their communities.

At GWU, however, they found none. Almost immediately, GWU students, student organizations, and faculty members began to celebrate Hamas' attack, praising the "martyrs" and "resistance fighters" who fought for the "Final Solution" and taunting any Jewish or Israeli student who dared express anything other than total capitulation. *See, e.g., id.* ¶¶ 41-42, 398, 406, 473-79, 512, 759, 1155. By April 2024, hundreds of GWU students occupied University Yard—the beating

---

[1] The antisemitic environment at GWU—and the GWU administration's role in enabling it—was recently recognized by the U.S. Department of Justice's Civil Rights Division, which announced on August 12, 2025 that "[t]he Department finds that GWU students and faculty were subjected to a hostile educational environment that was objectively offensive, severe, and pervasive." Harmeet K. Dhillon, *Notice of Findings*, U.S. DEP'T OF JUST. (Aug. 12, 2025), https://www.justice.gov/crt/media/1410936/dl?inline. As the Department noted, "[t]he antisemitic, hate-based misconduct by GWU students directed at Jewish GWU students, faculty, and employees was, in a word, shocking," and "[t]he behavior was demonstrably abhorrent, immoral, and, most importantly, illegal." *Id.*

1

heart of the GWU campus—with an encampment, where they continued their pro-Hamas celebrations, chanted genocidal statements, held signs with antisemitic slurs, and attacked Jewish and Israeli students. *See, e.g.*, *id.* ¶¶ 57, 64, 90-94. Instead of condemning this behavior, some faculty members joined the encampments themselves, canceled classes to encourage their students to attend the encampments instead, and bragged that the antisemitic demonstrators were "enacting what [the GWU faculty members] teach." *See, e.g.*, *id.* ¶¶ 95, 474, 824. In other words, GWU's "alarming history" of antisemitism turned out to be alarmingly current.

While this eruption of hate affected all GWU community members, Plaintiffs Sabrina Soffer ("Ms. Soffer"), Ari Shapiro ("Mr. Shapiro"), and the members of Compliance, Accountability, Policy, Ethics – Ed ("CAPE-Ed") (collectively, "Plaintiffs") suffered from and were damaged by the antisemitism at GWU directly.

Ms. Soffer is a former GWU student who documented antisemitism on campus through numerous op-eds in the *GW Hatchet*, *Jerusalem Post*, and other publications. *Id.* ¶¶ 1053-54. She led efforts to combat antisemitism, including commissioning a Student Government Task Force to Combat Antisemitism before it was disbanded. *Id.* ¶¶ 131-32, 330, 446. She met with GWU administrators to seek concrete action to protect Jewish students, only to be told that the University could not take action against antisemitic incidents unless they were "overtly violent"—an express admission that GWU would do nothing to protect Jewish and Israeli students like her from the severe harassment they faced. *Id.* ¶¶ 1106-08, 332. She was stalked and threatened by other students, including being photographed and told, "[w]e know who you are," and she received anonymous hate mail. *Id.* ¶¶ 1087-89. During the encampment, she and another Plaintiff were confronted by a mob of approximately fifty protesters and forced to flee for their safety. *Id.* ¶¶ 1111-15. The problems within GWU's academic institutions became so severe that she was forced

to change her major from International Politics with a focus on Middle East studies to Philosophy. *See id.* ¶¶ 131, 1055-66.

Mr. Shapiro is a former GWU student who experienced severe antisemitic harassment both within his fraternity and across campus. *See id.* ¶¶ 134-35, 904. Two of his fraternity brothers refused to attend social events where he was present due to his Jewish identity, one of whom engaged in repeated verbal, antisemitic harassment during fraternity meetings. *Id.* ¶¶ 904-16. Despite providing clear evidence of this discrimination, GWU determined that "verbal harassment was too challenging to prove" and refused to take action against the perpetrators. *Id.* The harassment became so severe that Mr. Shapiro withdrew from his fraternity. *Id.* ¶ 910.

During the encampment, Mr. Shapiro was repeatedly targeted by protesters who "shouted [antisemitic] slurs and screamed at him" and he was physically confronted and coerced out of University Yard by organized groups of protesters on multiple occasions. *Id.* ¶¶ 1130-45. He submitted reports to the administration asking for protection for Jewish students but received no response, and when he reported a professor who used final exam review time to praise the antisemitic encampment, the administration again failed to respond. *Id.* ¶¶ 1138-40, 841-47.

CAPE-Ed Member No. 1 is a current Jewish student at GWU and rising junior at the Elliott School. *Id.* ¶ 139. She was mocked, laughed at, and taunted by classmates, including the president of GWU Students for Justice in Palestine ("SJP"), when she appeared visibly upset in class after learning that loved ones had been killed or were missing following the October 7 attacks. *Id.* ¶¶ 1154-55. She was spat at while fundraising for medical aid organizations, and despite filing a detailed incident report with witness corroboration, GWU failed to investigate properly. *Id.* ¶¶ 1159-92. The harassment forced her to change her course study to avoid continued contact with

her harassers. *Id.* ¶ 1157. During the encampment, she was followed and intimidated by "marshals" who called her "ugly, fat, and stupid" for being a "Zionist." *Id.* ¶¶ 1203-07.

CAPE-Ed Member No. 2 is a former GWU student. *Id.* ¶ 141. She was spat at and subjected to chants including "Fuck you, Zionist, go die" while quietly holding an Israeli flag near the encampment. *Id.* ¶¶ 1216-18. She was stalked by protesters who filmed her and called her by name, making her fear for her safety. *Id.* ¶¶ 1221-22. She received anonymous death threats on Instagram stating "Kill yourself, Jew. Filthy kike. Watch your back." *Id.* ¶ 1224. When she reported these incidents to GWU, the administration claimed it could take no action because the perpetrator had recently graduated, even though Member No. 2 was aware of instances in which GWU disciplined recently graduated students. *Id.* ¶ 918.

CAPE-Ed Member No. 3 is a current GWU graduate student. *Id.* ¶ 143. She witnessed an incident where a Jewish guest lecturer—who was not present to speak about Israel—was shouted into silence by a student protester who called her a "Nazi," "rapist," and "murderer," while the faculty member who invited her did nothing and then applauded the protester. *Id.* ¶¶ 144, 1233-48. She reported this incident to a GWU official, but GWU did nothing. *Id.* ¶¶ 1247-48.

CAPE-Ed Member No. 4 is an Israeli graduate student at the Elliott School who had been awarded a scholarship for his work on peace-building initiatives. *Id.* ¶¶ 67, 145, 1250. While silently holding a small Israeli flag, he was surrounded by a mob of protesters who snatched and desecrated his flag while threatening to "find him and kill him." *Id.* ¶¶ 67-72, 1259-71. Despite his pleas for assistance, GWU police officers took no action to stop the harassment and instead forcefully removed him from University Yard. *Id.* ¶¶ 1274-75.

These experiences did not happen in a vacuum. Instead, they happened because "GWU *nurtured* antisemitism on campus," creating a "deeply entrenched pipeline of hate" through its

academic departments while turning a blind eye to—if not actively emboldening—antisemitic harassment both inside and outside the classroom. *Id.* ¶¶ 14-17. In so doing, GWU not only failed to "make good on its pledge to not tolerate antisemitism," as the *GW Hatchet* Editorial Board described—it also violated its obligations under the Civil Rights Act of 1946, 42 U.S.C. § 2000d ("Title VI"), and broke its contractual agreements with Plaintiffs.

These violations entitle Plaintiffs to relief. GWU, however, argues erroneously in its motion to dismiss, which cites *no binding authority that would mandate dismissal*, that its "public statements," platitudes, and nominal "commitment to protecting its Jewish community" are enough to foreclose Plaintiffs' ability to state plausible claims for relief under Rule 12(b)(6). *See* Mot. at 3-4. GWU further argues that Plaintiffs lack standing and should have their claims struck or dismissed under Rule 12(b)(1). GWU is incorrect in every regard.

*First*, Plaintiffs describe a series of incidents in which GWU was aware of—but chose to ignore—pervasive and severe antisemitic harassment on its campus. Plaintiffs submitted reports, met with administrators, and did everything they could to seek protection, but GWU responded with empty promises at best or complete silence or outright denials at worst. Moreover, Plaintiffs detail how antisemitism became institutionalized at GWU through a patchwork of academic departments, including the Eliot School of International Affairs' Institute for Middle East Studies ("IMES") and the Middle East Studies Association ("MESA"), an advocacy organization that, until recently, was housed within GWU. Plaintiffs also allege how these incidents deprived them of the benefits of their education, forcing them to forgo academic opportunities, avoid parts of campus, and face other concrete harms. These allegations are more than sufficient to state a claim for relief under Title VI for deliberate indifference and direct discrimination, and GWU's vain attempt to use the First Amendment as a shield for its failures is supported by neither the facts nor the law.

*Second*, Plaintiffs detail exactly how GWU violated express or implied contractual provisions that promise to provide an educational environment free from discrimination and punish wrongdoers. Plaintiffs explain the procedures they followed when reporting antisemitic discrimination, and the procedures that GWU violated when it ignored their complaints, obfuscated investigations, and selectively enforced its policies to protect all students *other* than Jews and Israelis. These allegations support Plaintiffs' claims for breach of contract and the implied covenant of good faith and fair dealing.

*Third*, Plaintiffs have standing to pursue the relief they seek. As former students, Ms. Soffer and Mr. Shapiro retain standing to seek damages for the harms they suffered while enrolled at GWU. Furthermore, CAPE-Ed has associational standing to pursue injunctive relief on behalf of its members, as half are current students who face ongoing harm, the interests sought to be protected are germane to the organization's purpose of combating antisemitism and discrimination, and injunctive relief does not require individual member participation.

## LEGAL STANDARD

"When the sufficiency of a complaint is challenged under Rule 12(b)(6), the factual allegations presented in it must be presumed true," and all reasonable inferences are drawn in the plaintiff's favor. *Wheeler v. Georgetown Univ. Hosp.*, 788 F. Supp. 2d 1, 2-3 (D.D.C. 2011) (citing *Leatherman v. Tarrant Cty. Narcotics & Coordination Unit*, 507 U.S. 163, 164 (1993)); *see also Hajizadeh v. Blinken*, 2024 WL 3638336, at *2 (D.D.C. Aug. 2, 2024). "[T]he notice pleading rules" codified in Rule 12(b)(6) are "not meant to impose a great burden on a plaintiff," *Wheeler*, 788 F. Supp. 2d at 2 (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)), and "'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, a court must permit a complaint

to survive a Rule 12(b)(6) challenge when the plaintiff has pleaded enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," such that there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

Likewise, "[i]n reviewing a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1)," a court will "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Hajizadeh*, 2024 WL 3638336, at *2 (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)).

## ARGUMENT

### I.    Plaintiffs Plausibly Allege Violations of Title VI

"Title VI protects individuals from being 'excluded from participation in,' 'denied the benefits of,' or 'subjected to discrimination under any program or activity receiving Federal financial assistance,'" on account of race, color, or national origin. *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 105-06 (D.D.C. 2024) (quoting 42 U.S.C. § 2000d). "[A]s under other federal antidiscrimination statutes, federally funded institutions may be liable for intentional discrimination" under Title VI if they (1) directly discriminate, or (2) "have been 'deliberately indifferent' to known acts of harassment that give rise to a hostile educational environment." *Stafford v. George Washington Univ.*, 578 F. Supp. 3d 25, 36 (D.D.C. 2022), *rev'd on other grounds*, 56 F.4th 50 (D.C. Cir. 2022) (quotation omitted). The D.C. Human Rights Act, which also prohibits discrimination on the basis of protected status, is interpreted under the same legal framework as Title VI. *See Newman*, 715 F. Supp. 3d at 105 (citations omitted). Because Plaintiffs plausibly allege that they were deprived of educational opportunities because GWU both

deliberately ignored the hostile antisemitic environment that it fostered on its campus and intentionally discriminated against them on the basis of their Jewish and Israeli identities, this Court should deny the motion to dismiss Counts I-III of the Complaint.

### A.    GWU's First Amendment Arguments Are Misguided and Improper

Plaintiffs describe a series of incidents in which they and other Jewish and Israeli students were targeted with discriminatory conduct by various GWU community members. These incidents—which range from targeted harassment to outright threats—are more than sufficient to support Plaintiffs' Title VI claims. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 307 (D. Mass. 2024) ("Title VI protects Jewish students from harassment, and discrimination based on actual or perceived Israeli identity is of course discrimination based on national origin."). GWU, however, attempts to sidestep this Title VI analysis by re-framing Plaintiffs' claims as a First Amendment matter. *See* Mot. at 4-5, 8-11. This attempt, which is little more than a red herring, is improper for two reasons. First, it misapplies inapposite caselaw to suggest a legal standard that does not exist—namely, that private universities enforcing their Title VI obligations are subject to the same constraints as state actors. Second, it fails to acknowledge Plaintiffs' robust allegations of targeted antisemitic abuse, which would support a Title VI action even under GWU's incorrect legal standard.

### 1.    The First Amendment Does Not Excuse GWU from Complying with Title VI

According to GWU's flawed logic, a private university is exempted from enforcing its Title VI obligations whenever the discriminatory conduct in question can be construed as "political speech" or "expressive conduct." Mot. at 8 (quoting *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011)). This extreme and legally unsupported approach, however, would render both Title VI and the body of related federal antidiscrimination statutes entirely toothless. Further, it is

precisely the sort of effort to "hide behind the First Amendment to justify avoidance of [a university's] Title VI obligations" that courts have repeatedly rejected. *Kestenbaum*, 743 F. Supp. 3d at 309.

As a threshold matter, "[i]t is, of course," understood "that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976) (citing *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 (1973)). Within the context of federal antidiscrimination statutes, then, "[t]here is no question that private [entities] may implement their own antiharassment policies" to comply with federal laws that aim to prevent discrimination in the workplace and at educational institutions. *See* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1794 n.7 (1992) (citing *Hudgens*, 424 U.S. at 513). This means that, in complying with federal antidiscrimination law, private entities will inevitably take action that would not be permissible in the state actor context.[2] *Cf. Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974) (holding that the First Amendment's free association protections did not constrain a private business who fired an employee for joining the Ku Klux Klan).

This proposition is uncontroversial. In fact, in other parts of its motion to dismiss, GWU lauds itself for taking disciplinary actions that run afoul of its own hybrid First Amendment-Title

---

[2] In some contexts, however, even government entities have leeway to manage their internal affairs and combat harassment without violating the First Amendment. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (noting that, "[b]ecause [the government employee's] statement addressed a matter of public concern, *Pickering* next requires that we balance [the employee's] interest in making her statement against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees,'" and recognizing "as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise" (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568-73 (1968))).

VI standard. For example, GWU argues that it sufficiently satisfied its Title VI obligations by "suspend[ing] one student and two student organizations" who "projected antisemitic phrases on the exterior wall of Gelman Library," claiming that these actions "reflect a prompt and meaningful response" to campus antisemitism. Mot. at 14. In the context of GWU's overarching argument that the First Amendment *prevents* it from complying with Title VI, this position is clearly one of convenience, not principle.

Even if GWU's argument that the First Amendment prevents it from complying with Title VI is sincere, the law nevertheless disagrees. As noted above, GWU is a private university. This enables it to act or react to certain speech in a way that public entities may not. *See Hudgens*, 424 U.S. at 513. Accordingly, most of the cases that GWU cites are inapplicable to the instant matter, as they deal with the irrelevant issue of viewpoint discrimination by state actors. *See* Mot. at 9-10 (citing *Gerwaski v. Nevada ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 2025 WL 1294107 (D. Nev. May 5, 2025) (claims for violating the Antiterrorism Act and intentional infliction of emotional distress); *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of Univ. Sys. of Md.*, 2024 WL 4361863 (D. Md. Oct. 1, 2024) (alleging First Amendment violations); *Hajur El-Haggan v. Bd. of Educ. of Montgomery Cnty.*, 2025 WL 1952516 (D. Md. July 16, 2025) (same, with an additional employment discrimination claim that was dismissed due to no adverse action); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) (challenging state anti-sedition statutes); *Brown v. Hartlage*, 456 U.S. 45 (1982) (challenging state anti-corruption statutes)). Indeed, nothing in these cases prevents a private institution like GWU from complying with its Title VI obligations by responding to antisemitic discrimination.

To circumvent this reality, GWU turns to four out-of-circuit cases to support its claim that the First Amendment excuses its inaction in the context of its Title VI obligations. The first is

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011), which GWU characterizes as "particularly instructive." Mot. at 10. In that case, however, the court did not analyze the Title VI obligations of a private institution. Instead, it merely held that one of the "several reasons" plaintiffs failed to state a claim under Title VI was that the law did not require *state actors* like the University of California to punish protected speech, which represented "a very substantial portion of the conduct to which plaintiffs object[ed]." *Felber*, 851 F. Supp. 2d at 1187-88. Moreover, the district court cited *Snyder v. Phelps*, 562 U.S. 443 (2011), which considered whether a homophobic protest on *public property* could support a state *tort* suit. 851 F. Supp. 2d at 1188. Entirely absent is any analysis supporting the expansion of *Snyder* from state tort law to federal civil rights laws prohibiting racial discrimination in education.

It is, thus, unsurprising that few courts have applied *Felber* in the fourteen years since it was decided. That the other three out-of-circuit cases GWU cites to support its argument are the only meaningful examples of courts following *Felber* does not repair its flawed reasoning. *See* Mot. at 8-11 (citing *Gartenberg v. Cooper Union for Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025); *Landau v. Corp. of Haverford Coll.*, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025) ["*Landau I*"]; *Landau v. Corp. of Haverford Coll.*, 2025 WL 1796473 (E.D. Pa. June 30, 2025) ["*Landau II*"]). This is precisely why other courts have approached private universities' First Amendment defenses to Title VI actions with skepticism, noting that—at least at the motion to dismiss stage— "whether this argument has any teeth is a decision best reserved for a later day." *Kestenbaum*, 743 F. Supp. 3d at 309; *see also id.* (stating "[i]t may be true that, as a policy matter, Harvard has elected not to curtail the protests in the interest of protecting free speech (although as a private institution, it is not constitutionally required to do so)," but noting "[t]he record is too thin to determine whether Harvard in fact acted to protect free speech rights as it contends Title VI

required it to do and whether the protest activity itself comes within the protections of the First Amendment").

### 2.    Plaintiffs Allege Actionable Harassment

Even if GWU correctly represents the relationship between the First Amendment and Title VI, Plaintiffs nevertheless allege sufficient instances of targeted harassment to state a claim for relief under Title VI. Indeed, the events that Plaintiffs describe go far beyond what *Felber* and its ilk describe as "pure political speech and expressive conduct, in a public setting, regarding matters of public concern." 851 F. Supp. 2d at 1188; *see also Gartenberg*, 765 F. Supp. 3d at 261-63; *Landau II*, 2025 WL 1796473, at *1.

According to GWU, Plaintiffs' Complaint is little more than a series of objections to "offensive 'chant[s],' 'sign[s],' and 'slogan[s]' used by student protesters" and "academic content and curricular decisions." Mot. at 8-9. This mischaracterization entirely ignores Plaintiffs' detailed allegations of the verbal abuse, stalking, physical intimidation, and assault that they experienced on GWU's campus.

For example, Ms. Soffer describes an instance in which a member of GWU Students for Justice in Palestine photographed her and her Jewish friends without their permission. Compl. ¶¶ 1087-88. "Concerned that the photos would be used to target them for harassment" based on prior experiences, Ms. Soffer and her friends asked the photographer to stop. *Id.* Instead of stopping, two other masked protesters approached Ms. Soffer and threatened her, saying she should "shut the fuck up" because "[w]e know who you are." *Id.* ¶ 1089; *cf. Synder*, 562 U.S. at 454 (discussing the difference between signs that are "designed . . . to reach as broad a public audience as possible" and targeted "private speech"). Mr. Shapiro recounts similar incidents, including one in which a "mob of protesters" physically "intimidated and then coerced" him and his Jewish friends out of

University Yard to prevent them from watching a different mob attempt to attack the mother of a GWU student. Compl. ¶¶ 1133-45. So does Member No. 1, who describes an incident when so-called encampment "marshals" physically intimidated her. *Id.* ¶¶ 1203-04. When she attempted to walk away, one of the marshals followed her, while loudly yelling that "Zionist[s]" like her were "so ugly, fat, and stupid." *Id.* ¶¶ 1205-06.

In fact, many of the events that Plaintiffs describe involved targeted verbal abuse and threats in addition to physical intimidation. Mr. Shapiro notes that "he remained a target of protesters, who regularly shouted slurs and screamed at him" due to his Jewish identity. *Id.* ¶¶ 1130-31. Member No. 2 "was heckled and cursed at by protesters," who "screamed epithets at her" and told her to "die" and "go to hell." *Id.* ¶¶ 1216-18. A mob of protesters "block[ed] [Member No. 4's] path into University Yard," "crowded and pressed against him," and "shout[ed] slurs at him." *Id.* ¶¶ 1259-60. Ms. Soffer and Member No. 2 each received anonymous online death threats. *Id.* ¶¶ 1088, 1224. These examples of targeted, private harassment are distinct from the broad political speech at issue in cases like *Felber* and *Snyder. See, e.g.*, *Felber*, 851 F. Supp. 2d at 1188 (informational tables and leaflets); *Synder*, 562 U.S. at 455 (public-facing signs).

Worse yet, several Plaintiffs describe incidents that rise to the level of criminal violence. Member No. 4, for example, "silently held his Israeli flag in a generally open space" when a mob of protesters descended upon him, snatched and desecrated his flag, and threatened to "find him and kill him." Compl. ¶¶ 1259-71. This meets the legal definition of common-law robbery, which the D.C. Circuit has described for almost a century as "the felonious and forcible taking from the person of another of goods or money to any value, by violence or putting in fear." *Turner v. United States*, 16 F.2d 535, 536 (D.C. Cir. 1926). Likewise, several Plaintiffs describe students spitting at them, Compl. ¶¶ 1159-63, 1216, which may constitute criminal assault under the laws of the

District of Columbia. *See Saidi v. Wash. Metro. Area Transit Auth.*, 928 F. Supp. 21, 26 (D.D.C. 1996) (citing *Ray v. United States*, 575 A.2d 1196, 1199 (D.C. 1990)).

These allegations—among others in the Complaint—are far from conclusory or speculative. Unlike the allegations in "[t]he out-of-circuit district court cases on which [GWU] relies," Plaintiffs provide the "dates, times, and identities of the students allegedly harassing Jewish students," to the extent that information is available. *Kestenbaum*, 743 F. Supp. 3d at 308 n.10 (citation omitted). It is likewise not the case that "the conduct alleged occurred at times and in places where plaintiffs were not present," *Felber*, 851 F Supp. 2d at 1188, nor can it be said that the targeted threats and acts of violence that Plaintiffs faced were simply "[s]peech 'on matters of public concern, directed to the college community.'" *Landau II*, 2025 WL 1796473, at *3 (quoting *Gartenberg*, 765 F.Supp.3d at 265); *cf.* Compl. ¶¶ 1259-71 (mob threatened to "find" and "kill" Member No. 4); *Id.* ¶ 1089 (masked individuals told Ms. Soffer she should "shut the fuck up" because "[w]e know who you are"). Accordingly, Plaintiffs' allegations are more than sufficient to survive even GWU's (incorrectly) heightened Title VI pleadings standard, as well as the correct standard to which this Court has adhered in the past. *See, e.g.*, *Stafford*, 578 F. Supp. 3d at 30-34 (describing the widespread use of racial slurs directed at plaintiff as a "pattern of harassment").

**B.    Plaintiffs Plausibly Allege that GWU Subjected Them to a Hostile Educational Environment**

GWU's deliberate indifference to the hostile antisemitic environment on its campus violates Title VI. A plaintiff can state a claim under this theory of Title VI liability by pleading: (1) they experienced harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to educational opportunities"; (2) the university had actual knowledge of the harassment; and (3) despite its awareness, the university was deliberately indifferent towards the harassment. *Newman*, 715 F. Supp. 3d at 106 (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804

F.3d 398, 408 (5th Cir. 2015)); *see also Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir.

2007); *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

"[D]eliberate indifference means affirmatively choosing to do the wrong thing, or doing nothing,

despite knowing what the law requires," *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,

742 F. Supp. 3d 133, 142 (D. Mass. 2024), which can be shown by pleading that the university

"either did nothing or failed to take additional reasonable measures after it learned that its initial

remedies were ineffective." *Porto*, 488 F.3d at 74. Here, Plaintiffs' allegations demonstrate that

GWU not only failed to take reasonable measures in response to known harassment but actively

signaled to antisemitic perpetrators that their harassment would be tolerated.

Throughout their Complaint, Plaintiffs describe how they repeatedly sought GWU's

protection, only to be met with indifference or outright dismissal. For example, when Ms. Soffer

met with Dean Coleman and Vice Dean Joyce in February 2024 to report antisemitic incidents,

they "told her they could not take action against antisemitic incidents unless they were 'overtly

violent.'" Compl. ¶¶ 1106-07. This shocking admission—that GWU required "an overt act of

physical violence against Jewish or Israeli students before the University administration would

take action to protect them," *id.* ¶ 1108—is a shocking "official decision . . . not to remedy"

antisemitic harassment and a gross abdication of the obligations of Title VI. *Davis*, 526 U.S. at 642

(quotation omitted).

Similarly, Mr. Shapiro submitted multiple reports documenting the harassment and

intimidation he experienced at the encampment, described above. Compl. ¶¶ 1129-48. However,

he "received no response" from GWU. *Id.* ¶ 1140. This pattern of ignoring reports demonstrates

deliberate indifference, and reflects "GWU's playbook: announcing, but never enforcing, rules,

and then engaging in tortuously slow accountability measures that do little to deter or impose

consequences on those antisemitic bad actors who feel emboldened to terrorize GWU's Jewish and Israeli students." *Id.* ¶ 444; *cf. Kestenbaum*, 743 F. Supp. 3d at 309 (finding deliberate indifference where university's response was "indecisive, vacillating, and at times internally contradictory").

Even when GWU initiated investigations, it routinely abandoned them without explanation or consequence. The University's treatment of Mr. Shapiro's discrimination complaint exemplifies this pattern. Despite Mr. Shapiro providing evidence that two fraternity brothers engaged in antisemitic harassment—including one "screaming conspiratorial antisemitic epithets" and both refusing to attend events where Mr. Shapiro was present due to his Jewish identity— "GWU determined that verbal harassment was too challenging to prove" and refused to take action against the perpetrators. Compl. ¶¶ 904-16. While GWU may claim that this was a reasonable "disciplinary decision," *see generally* Mot. at 14-16, the fact that GWU failed to respond to similar complaints from Member No. 1 and Member No. 2 underscores its unwillingness to protect Jewish students, even when presented with clear evidence of discrimination. *See* Compl. ¶¶ 917-28, 1165-76. In reality, Mr. Shapiro's case shows that GWU was likely ignoring these reports altogether, with the individual responsible for receiving reports within the GWU administration telling him that he never received a related report submitted on Mr. Shapiro's behalf. *See id.* ¶ 914.

GWU's deliberate indifference extended to its security apparatus. Indeed, even after GWU Administrators saw that barricades around the encampment "had been overrun and [GWU administrators] personally witnessed the protesters' aggressiveness," the GWU Police Department ("GWPD") took no action to stop students from unlawfully trespassing and occupying University Yard. *Id.* ¶¶ 740-48. Instead, GWU administrators simply sent emails that highlighted the rules that were being broken at the encampment, while GWPD officers sat idly by as encampment

16

protesters circled, threatened, and attacked Jewish and Israeli students like Member No. 4. *See id.* ¶¶ 1262-76.

Perhaps most egregiously, GWU not only failed to discipline those who harassed Jewish students but actively rewarded them. After suspending GWU SJP for organizing antisemitic demonstrations and turning a blind eye to their continued on-campus activities, the administration "continued to meet with and negotiate the[ir] demands." *Id.* ¶ 966. This occured despite the fact that GWU SJP "promoted antisemitic discrimination and harassment, and demanded the University adopt antisemitic and unlawful policies." *Id.* ¶¶ 966-67. This approach—negotiating with and legitimizing groups that foster antisemitism, even while nominally suspending them— sends a clear message that harassment of Jewish students carries no meaningful consequences.

GWU's deliberate indifference becomes even clearer when contrasted with its swift response to other forms of discrimination. As Plaintiffs allege, GWU "promptly investigates discrimination against minorities other than Jews and Israelis, and then metes out serious discipline to offenders." *Id.* ¶ 902; *see also id.* ¶¶ 938-47. In fact, in at least once instance, GWU forced a professor to leave the University because three students complained that he "requested permission from the students to read aloud an original text that included the N-word" in his class on universal human rights, even though he never actually said the word in class. *Id.* ¶¶ 938-943. While it is unclear what policy the professor violated (in contrast to the antisemitic perpetrators discussed in the Complaint), GWU actions show that it is willing to do everything it can to protect students from discrimination and harassment—*unless* those students are Jewish or Israeli.[3] *See id.* ¶ 903.

---

[3] Interestingly, GWU's decision to discipline the professor for his curricular decisions seems to violate the First Amendment legal framework that GWU now purports to adopt when it comes to complaints by Jewish and Israeli students. *See supra* Section I.A.

GWU's response—or lack thereof—to the hostile environment on its campus was not merely imperfect. It represented an official decision not to remedy harassment, *Davis*, 526 U.S. at 642, which emboldened perpetrators and abandoned Jewish students to an increasingly dangerous campus environment. While GWU seeks to hide behind the fact that it *sometimes* attempted to prevent wrongdoing, this is not enough to overcome Plaintiffs' numerous allegations of GWU's failure to act. "Indeed, in many instances, [GWU] did not respond at all," and "[t]o conclude that [Plaintiffs have] not plausibly alleged deliberate indifference would reward [GWU] for virtuous public declarations that for the most part . . . proved hollow when it came to taking disciplinary measures against offending students and faculty." *Kestenbaum*, 743 F. Supp. 3d at 310.

## C. Plaintiffs Plausibly Allege that GWU Engaged in Direct Discrimination Against Jewish and Israeli Students

While GWU's deliberate indifference towards the hostile antisemitic environment it fostered on its campus is enough to show that it "failed its Jewish students" for purposes of Plaintiffs' Title VI claim, *id.*, Plaintiffs have also alleged that GWU directly discriminated against them. Direct discrimination occurs when "plaintiff[s] [are] excluded from participation in or denied the benefits of an educational program," and "the educational institution in question discriminated against plaintiff[s] based on" race, color, or national origin. *Canel v. Art Inst. of Chicago*, 2025 WL 564504, at *14 (N.D. Ill. Feb. 20, 2025) (quoting *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019)).

In the Complaint, Plaintiffs lay out the years-long process by which "[a]ntisemitism festered and became firmly entrenched on campus." Compl. ¶ 18. This process, Plaintiffs allege, was no accident: indeed, "GWU *nurtured* antisemitism on campus" through a series of deliberately discriminatory decisions that rewarded antisemitism, excluded Jews and Israelis, and institutionalized the disparate treatment that Plaintiffs faced. *Id.* ¶ 17. These decisions, which had

the intent and effect of discriminating against Jewish and Israeli students, are sufficient to support Plaintiffs' claims of direct discrimination.

According to GWU, however, this is not enough. Instead, GWU claims that Plaintiffs "do not plausibly allege that the University itself engaged in discriminatory conduct," ostensibly because some University officials were *also* targets of antisemitism. Mot. at 11-12. But this fundamentally misconstrues Plaintiffs' claims, ignoring both the well-pleaded factual allegations in the Complaint and applicable law.

One of the primary examples of GWU's deliberate institutionalization of antisemitic discrimination alleged in the Complaint is the Elliot School of International Affairs' Institute for Middle East Studies ("IMES"), "the GWU organization responsible for hosting the unrelenting anti-Zionist and antisemitic events in the wake of the October 7th terror attacks." Compl. ¶ 189. Faculty members such as Dr. Michael Barnett, Dr. Shira Robinson, and Dr. William Youmans— have, respectively, defended the October 7th Hamas massacre as legitimate "resistance," "defended antisemitism," accused Jewish and Israeli students of "weaponiz[ing] . . . antisemitism," and defended Hamas leader Yahya Sinwar. *Id.* ¶¶ 200-09. Moreover, GWU maintained a longstanding institutional partnership with the Middle East Studies Association ("MESA")—an advocacy organization that demonizes the Jewish homeland, promotes the antisemitic boycott, divestment, and sanctions ("BDS") movement, and defends "murders, rapes, and abductions" of Jews as "legitimate acts of resistance." *See, e.g.*, *id.* ¶ 479. At GWU, IMES has actively promoted and organized campus events that antagonize Jewish and Israeli students. *Id.* ¶¶ 18-29, 469-87. As Plaintiffs allege, IMES deliberately excludes Jewish and Israeli voices from its programming, such that "[e]very IMES event surrounding Israel" is "explicitly hostile" towards Jews and Israelis and employs "the same vilifying rhetoric" against

Jews and Israelis. *Id.* ¶¶ 455-67, 291-94; *see also Canaan v. Carnegie Mellon Univ.*, 760 F. Supp. 3d 306, 320 (W.D. Pa. 2024) (noting that allegations regarding "the totality of [antisemitic] comments and behaviors" from various professors supported direct discrimination claim).

Plaintiffs describe several examples of IMES and MESA's antisemitic programming, which has continued even after the University nominally cut ties with MESA in 2023. *See* Compl. ¶¶ 271-75. One such example is an April 19, 2024 conference called "Middle East Knowledge Production in the Aftermath of October 7," which "was unabashedly designed to develop strategies for promoting anti-Zionist hate." *Id.* ¶¶ 521-23. At the conference, panelists affiliated with both GWU and MESA encouraged other professors to advocate for antisemitic boycott movements "quietly in the classroom" in states with anti-BDS laws, perpetuated antisemitic tropes, and argued that anyone who does not subscribe to IMES and MESA's anti-Isael ideology should be excluded from "Palestine study." *Id.* ¶¶ 524-33. This conference, like several others described in the Complaint, had the intent and effect of censoring and demonizing the "pro-Israeli and even simply non-antisemitic positions" of Plaintiffs and other Jewish and Israeli students. *Id.* ¶¶ 463.

Notably, the goals that IMES and MESA discussed at these conferences were not just aspirational—they were put into practice in GWU classrooms. For example, Ms. Soffer describes how IMES professor Arie Dubnov compelled her and other Jewish and Israeli students "to view an antisemitic propaganda film followed by a biased panel discussion" to "improve their class grade and to keep up with the curve." *Id.* ¶¶ 500-01. Mr. Shapiro and the CAPE-Ed members each state that their professors either cancelled or modified their classes to support the encampment. *See id.* ¶¶ 834-44. One instructor even "invited students to join her 'in solidarity'" with the encampment—an invitation which "outed Jewish and Israeli students in the class who declined to

20

participate"—while Dr. Youmans lauded antisemitic demonstrators for "enact[ing] what we teach." *Id.* ¶¶ 835-36, 543.

While IMES, MESA, and their affiliated faculty members are responsible for the brunt of GWU's institutional hostility towards Jewish and Israeli students like Plaintiffs, other components of GWU also contribute to this phenomenon. For example, Plaintiffs describe how GWU's American Studies and History Departments used official communication channels to justify Hamas terror and support antisemitic demonstrators, as well as how a cross-university collection of "Faculty and Staff for Justice in Palestine" encouraged colleagues and students to participate in the unlawful and antisemitic encampment. *Id.* ¶¶ 220-25. Moreover, Plaintiffs note how GWU's administration has empowered individuals like Dr. Illana Feldman—who has a "well-known antipathy to Israel"—with positions such as interim Elliot School Dean, Faculty Senate Executive Committee Chair, and chief negotiator on behalf of the encampment demonstrators. *Id.* ¶¶ 191-99.

GWU's motion to dismiss, however, ignores these factual allegations, with the sweeping misstatement that "the Complaint does not allege that the University itself discriminated." Mot. at 11. But neither the facts nor the law support this argument: indeed, when a university department engages in discrimination, the university is liable, as every department and program is part of the university for purposes of Title VI. *See Yakin v. Univ. of Ill.*, 508 F. Supp. 848, 850 (N.D. Ill. 1981) (citing *Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 601-04 (D.S.C. 1974), *aff'd*, 529 F.2d 514 (4th Cir. 1975)). Thus, it makes no difference whether the discrimination came from IMES, MESA, or any other component part of GWU. Plaintiffs allege that GWU directly discriminated against them due to their Jewish and Israeli identities.

**D.    The Discrimination that Plaintiffs Experienced Deprived Them of Educational Opportunities and Benefits**

GWU's assertion that Plaintiffs suffered no cognizable deprivation of educational benefits ignores both the law and Plaintiffs' detailed allegations. Courts recognize that denial of educational benefits occurs when "the harassment had a concrete, negative effect on [the plaintiff's] ability to receive an education," *Davis*, 526 U.S. at 654, and Plaintiffs' Complaint details several ways in which their educational opportunities were denied, limited, or otherwise negatively impacted by the antisemitism that GWU both committed and allowed to foster on its campus. *See Landau II*, 2025 WL 1796473, at *12 (discussing the "many forms" in which deprivation can be alleged).

Plaintiffs, for example, describe how they were repeatedly physically excluded from educational spaces. On November 29, 2023, protesters "obstructed the entrance to the [Elliott School] building and disrupted classes," forcing "[a]t least one professor . . . to cancel class because of the protest." Compl. ¶¶ 636-39. Protesters also blocked access to Gelman library around the same time. *Id.* ¶ 579. Similarly, during the encampment, protesters created a hostile environment that physically excluded Jewish and Israeli students like Plaintiffs, with signs warning "No Zionists" and telling them to "go back to Europe." *Id.* ¶¶ 757-59. Protesters acted on these threats on several occasions, blocking Plaintiffs from accessing University property or chasing them off of University property altogether. *See id.* ¶¶ 1111-13, 1133-45, 1203-04, 1259-60. Despite GWU's insistence that *Felber*—which discussed a single protest at a public university—suggests that this Court should ignore Plaintiffs' allegations of physical obstruction, *see* Mot. at 18, the Supreme Court has made it clear that "an overt, physical deprivation of access to school resources" is more than sufficient to show a negative impact on education. *Davis*, 526 U.S. at 631; *see also Frankel v. Regents of Univ. of California*, 744 F. Supp. 3d 1015 (C.D. Cal. 2024), *appeal dismissed*,

2024 WL 4803385 (9th Cir. Aug. 26, 2024) (granting preliminary injunction when Jewish plaintiffs were prevented from accessing parts of campus by anti-Israel protests).

Physical obstruction was not the only way in which the antisemitic environment at GWU disrupted Plaintiffs' educational opportunities. As noted above, multiple of Plaintiffs' professors either cancelled or modified their classes to support the encampment, with one using a final exam review session to praise the encampment (instead of reviewing for the exam), and another cancelling class and inviting students to join her at the encampment. *See* Compl. ¶¶ 834-44. In other instances, the harassment that Plaintiffs experienced both in and around the classroom forced them to alter their educational paths: Ms. Soffer was forced to change her major, *id.* ¶ 131, while Member No. 1 had to "change her course study" to avoid harassment from her classmates. *Id.* ¶ 1157. Member No. 1 even felt compelled to seek help from a mental health counselor, having been so "deeply affected" by the "antisemitic harassment she experienced, and the University's failure to respond to it." *Id.* ¶ 1211; *cf.* Mot. at 17 ("tangible impact[s]" can include "retention of a therapist for serious anxiety" (quoting *Landau II*, 2025 WL 1796473, at *15)). Moreover, all Plaintiffs allege "hav[ing] at times been forced to withdraw from class discussions and to sanitize their Jewish identity from class participation and presentations," which has made them feel "compelled to avoid classes and professors inhospitable to Jewish and Israeli students, to forgo attending certain events, and to refrain from walking through certain areas of campus—all out of fear that they will be discriminated against based on their shared identity." Compl. ¶¶ 1047-50.

There is no question that these consequences of the antisemitic harassment on GWU's campus "so undermine[] and detract[] from the victims' educational experience, that the victims are effectively denied equal access to [GWU's] resources and opportunities." *Davis*, 526 U.S. at 631 (citation omitted). In fact, even the cases that GWU cites to support other parts of its motion

to dismiss agree with this proposition. In *Gartenberg*, for example, the court acknowledged that the plaintiff did in fact plausibly allege a loss of educational benefits or opportunities, recognizing that "harassment that 'discouraged [the plaintiff] from more active involvement' in campus activities or which 'simply created a disparately hostile educational environment relative to her peers' is properly 'construed as depriving [the plaintiff] of the benefits and educational opportunities available at [her institution].'" *Gartenberg*, 765 F. Supp. 3d at 278 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 750 (2d Cir. 2003)). Likewise, the court in *Landau II* recognized that a plaintiff's showing of educational deprivation "can take many forms," including by alleging "that they were forced to change their study habits or change schools," or that "they developed anxiety sufficient to require intervention." *Landau II*, 2025 WL 1796473, at *12 (citations omitted). That GWU chooses to ignore these allegations in its motion to dismiss does not change the fact that Plaintiffs far exceed the threshold for pleading that they were denied educational benefits.

## II.    Plaintiffs Plausibly Allege Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

"[T]he relationship between a university and its students is contractual in nature." *Shaffer v. George Washington Univ.*, 27 F.4th 754, 763 (D.C. Cir. 2022) (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977) (per curiam)). This contract can be either express or implied and can be based on a variety of "university publications," including the Student Code of Conduct and other policies. *Id.*; *see also, e.g.*, *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (Code of Conduct printed in the student manual constituted a part of the contract between the university and its students); *Shulse v. W. New Eng. Univ.*, 2020 WL 4474274, at *9 (D. Mass. Aug. 4, 2020) ("[A] valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials." (quotation

omitted)). A university may thus breach its contract with its students by failing to fulfill the promises in such publications, and may also breach the implied covenant of good faith and fair dealing through "bad faith or conduct that is arbitrary and capricious." *Chenari v. George Washington Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017) (quotation omitted). Plaintiffs have plausibly alleged both breach of express contract and breach of the implied covenant of good faith and fair dealing.

### A.    GWU's Policies Create Enforceable Contractual Obligations, Which Plaintiffs Allege Were Breached

GWU's attempt to characterize its policies and promises as merely "aspirational" (and therefore unenforceable) fundamentally misrepresents both the law and the language of its own policies. *See* Mot. at 19. While courts in the D.C. Circuit have indeed distinguished between aspirational language and enforceable promises, the analysis depends on the specific language used, not GWU's post-hoc characterizations. GWU's policies contain concrete, promissory language rather than aspirational statements. Therefore, they create enforceable promises that properly sustain a breach of contract action.

Here, the policies that Plaintiffs cite include provisions that promise "[t]he university *will not* permit unlawful discrimination," Compl. ¶ 1336 (quoting GWU Student Code of Conduct, Basic Assumptions, Freedom from Unlawful Discrimination) (emphasis added), and "*will respond* promptly to reports of threats or acts of violence." *Id.* (quoting GWU Policy on Threats and Acts of Violence) (emphasis added). Unlike the language at issue in cases like *Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977) (discussing "the words 'estimated,' 'approximate,' and 'projected,' found in the tuition paragraph in the bulletin"), and *Newman*, 715 F. Supp. 3d at 103 (the university would "strive" to eliminate discrimination), the language in GWU's policies is *not* "too illusory to be construed as laying down a contractual obligation on the

part of the University" by "a reasonable person in the position of the parties." *Basch*, 370 A.2d at 1367 (citations omitted); *see also Shaffer*, 27 F.4th at 763 ("[T]he court should view the language of the document as would a reasonable person in the position of the parties." (quoting *Pride*, 384 A.2d at 34)).

GWU, however, argues that, even if the language in its policies is not simply "aspirational," it is still "insufficient to create contractual liability" because it "mirror[s] existing legal duties." Mot. at 19. This is not so. As this Court has held, policies that "govern[] student behavior while studying at the University" and "set forth clear procedures that impose requirements on the University" when those behavioral standards are violated are indeed enforceable contract provisions—regardless of whether the behavioral standards and procedures serve to comply with federal law. *Doe v. George Washington Univ.*, 321 F. Supp. 3d 118, 124 (D.D.C. 2018) ["*Doe I*"] (procedures related to Title IX enforcement sufficient to establish enforceable contract); *see also Doe v. Am. Univ.*, 2020 WL 5593909, at *11 (D.D.C. Sept. 18, 2020) ["*Doe II*"] (same).

The reason for this is clear: "GW has agreed to provide its students with an education and, upon satisfactory completion, a degree," and in exchange, students agree to "certain terms—tuition, attendance, behavior under the Code, etc." *Doe I*, 321 F. Supp. 3d at 123-24. This agreement "expresse[s] a clear intent to be bound," and the relevant provisions are "binding on the University," such that "failure to follow them, as alleged, would constitute a breach of contract." *Id.* at 124. While it is true that this Court has dismissed contract claims for want of consideration when the plaintiff "[did] not make any allegation that the University promised to provide anything [to] him more than it was already obligated to provide him under Title VI," *Wanko v. Cath. Univ. of Am.*, 2009 WL 3052477, at *4 (D.D.C. Sept. 22, 2009) that is not the case here, where Plaintiffs

26

allege concrete procedural violations in the form of ignored reports and improperly conducted investigations. *See, e.g.*, Compl. ¶¶ 914, 1091-1104, 1165-92.[4]

Accordingly, the policies at issue create enforceable contractual obligations in at least two ways. First, to the extent the policies use specific, promissory language with concrete procedures, they create express contractual obligations. Second, even if some provisions are less specific, they create implied contractual obligations based on reasonable student expectations. *See Shaffer*, 27 F.4th at 763 (holding that, even if "Plaintiffs fail to plausibly allege the parties had *express* contracts," students' reasonable expectations are "largely sufficient to avoid motions to dismiss for failure to state causes of action on their implied contract claims").

Regardless of whether GWU's contractual promises are express or implied, Plaintiffs plausibly allege that GWU breached them by failing to abide by proper investigative procedures. For example, when Mr. Shapiro reported that one of his professors cancelled a scheduled review session and replaced it with a class session focused on "the professor's unwavering support for the antisemitic encampment at the center of campus," he received no response from the administration. Compl. ¶¶ 841-47. Similarly, Mr. Shapiro received "no response" to a report he submitted to GWU's Office of Student Rights and Responsibilities ("SRR") that asked "for protection for Jewish students" in light of the hostile environment on University Yard during the encampment. *Id.* ¶¶ 1137-40. A University official also informed him that an earlier SRR report submitted on his behalf was "never [] received" by the responsible party. *Id.* ¶ 914. Likewise, when Member No. 1

---

[4] One of the procedural provisions referenced in the Complaint is cited as Code of Conduct, IX.J.iv. *See* Compl. ¶ 1101. However, now that GWU's Office of Student Rights and Responsibilities ("SRR") has been reconstituted as Conflict Education & Student Accountability ("CESA"), the relevant Code of Conduct provisions have been renumbered. *See* Code of Conduct, VII.H, *available at* https://students.gwu.edu/sites/g/files/zaxdzs6881/files/2025-07/073125%20Code%20of%20Student%20Conduct.pdf.

Case 1:25-cv-01657-LLA    Document 13    Filed 08/25/25    Page 34 of 41

submitted a report to SRR regarding the spitting incident, GWU administrators assured both her and Ms. Soffer (who was in contact with the administration regarding the report) that they would "pursue the case" and "follow up" on at least two occasions, but failed to do so. *Id.* ¶¶ 1165-86. Instead, GWU opted to obfuscate its investigatory process, telling Member No. 1 that it "knew the identity of the perpetrator and chose not to discipline him" but telling Congress that an "[a]dditional reporting party provided information indicating that initial accusation was mistaken identification." *Id.* ¶¶ 1180-92. Contrary to GWU's assertions, this is not just "a failure to meet generalized expectations," Mot. at 20—it is a failure to follow binding procedures, which both this Court and others evaluating similar cases have deemed sufficient to sustain a breach of contract claim. *See Doe I*, 321 F. Supp. 3d at 124; *Doe II*, 2020 WL 5593909, at *11-13; *Kestenbaum*, 743 F. Supp. 3d at 311-12 ("Plaintiffs' cognizable breach of contract theory is that Harvard failed to follow the complaint-handling procedures that the Policies prescribe.").

## B.    Plaintiffs Plausibly Allege that GWU Breached the Implied Covenant of Good Faith and Fair Dealing

"Under D.C. law, '[a]ll contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Doe II*, 2020 WL 5593909, at *13 (quoting *Doe v. George Washington Univ.*, 366 F. Supp. 3d 1, 7 (D.D.C. 2018)). Because Plaintiffs sufficiently allege that an enforceable contract existed between them and GWU, their implied covenant claim may also proceed due to their plausible allegations of "bad faith or conduct that is arbitrary and capricious." *Wright v. Howard Univ.*, 60 A.3d 749, 754 (D.C. 2013) (citing *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1112 n. 11 (D.C. 1999)).

Here, Plaintiffs allege that GWU acted in bad faith by responding to complaints from Jewish and Israeli students with dishonesty and improper procedures, *see, e.g.*, Compl. ¶¶ 914,

1165-92, or by ignoring them altogether. *See, e..g.*, *id.* ¶¶ 841-47, 1137-40. Despite GWU's assertion that these responses represented "mere negligence," Mot. at 21 (quoting *Wright*, 60 A.3d at 754), these are clear examples of the "lack of diligence" and "purposeful failure to perform" that D.C. courts consider sufficient allegations of bad faith. *Wright*, 60 A.3d at 754.

Additionally, Plaintiffs allege that GWU approached its obligations in an arbitrary of capricious manner. For example, the Complaint notes that GWU administrators told Ms. Soffer they would only respond to antisemitic incidents that were "overtly violent," Compl. ¶ 1107, even as GWU in the past disciplined professors for using (or even suggesting that they *might* use) racial slurs in an academic context. *See id.* ¶¶ 939-45. This constitutes arbitrary and capricious enforcement of University policy in a manner that is inconsistent with the implied covenant of good faith and fair dealing.

Contrary to GWU's claims, this is not a case where Plaintiffs seek to substitute their judgment for the "academic judgment of the school." Mot. at 21. In such cases, including those that GWU cites, the plaintiff bases an implied covenant claim on purely *academic* decisions. *See, e.g.*, *Richter v. Cath. Univ. of Am.*, 2019 WL 481643, at *1 (D.D.C. Feb. 7, 2019) (claim based on academic dismissal from law school due to 2.021 grade point average); *Alden v. Georgetown Univ*, 734 A.2d 1103, 1103-04 (D.C. 1999) (claim based on academic dismissal from medical school due to failing grades); *Wright*, 60 A.3d at 750-51 (claim based on tenure denial); *Allworth v. Howard Univ.*, 890 A.2d 194, 196 (D.C. 2006) (same). By contrast, Plaintiffs here do not merely disagree with GWU's academic judgments. Instead, they allege a systematic pattern of deliberately ignoring or mishandling contractual obligations towards Jewish and Israeli students, while the University rigorously enforces the same policies to protect other groups. This conduct far exceeds "mere negligence" or academic disagreement and plausibly alleges the bad faith or arbitrary and

capricious conduct necessary to support a claim for breach of the implied covenant. *See Wright*, 60 A.3d at 754.

### III.  Plaintiffs Have Standing to Seek Both Damages and Injunctive Relief

Each Plaintiff has standing to seek relief from this Court. Given that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), determining that a plaintiff has standing is an essential "predicate to any exercise of [the Court's] jurisdiction." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996). In addition to challenging Plaintiffs' standing on the basis of the injuries suffered, GWU also challenges Plaintiffs' standing on the basis of the relief sought—more specifically, GWU argues that not a single Plaintiff can seek injunctive relief. This is incorrect. First, Ms. Soffer and Mr. Shapiro have standing to seek damages due to their status as former students. *See Flanagan v. President & Directors of Georgetown Coll.*, 417 F. Supp. 377, 379 n.1 (D.D.C. 1976). Second, CAPE-Ed has standing to pursue injunctive relief against GWU on behalf of its members, half of whom are current students. Therefore, the claims for injunctive relief outlined in the Complaint should not be struck.

CAPE-Ed is a voluntary membership organization composed of GWU students, alumni, and other GWU stakeholders whose mission is to advocate against antisemitism and other forms of discrimination within the GWU community, including via litigation. As described herein, CAPE-Ed has standing to pursue the various injunctions defined in the Complaint.

Generally speaking, a membership organization has standing to bring claims on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Within the D.C. Circuit, a membership organization need show only that one member of the organization has standing for the organization as a whole to have standing. *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005).

*First*, the Complaint identifies members of CAPE-Ed who would otherwise have standing to sue in their own right. GWU argues that CAPE-Ed cannot demonstrate that one member has standing because the allegations concern only "unidentified members," and this Circuit has stated that organizations must "identify members" who have suffered the requisite harm. Mot. at 23 (citations omitted). GWU's assertion, however, misinterprets both the verb "identify" and the position of this Circuit on the matter.

The verb "identify" is not synonymous with the naming of the actual member—though obviously that is one method of singling out a member. Rather, to "identify" a member means to locate a member. While some courts have made naming a requirement of identification, "[c]ases in this district suggest that a plaintiff-association must *identify* injured parties at the pleading stage, not necessarily that they be *named* in the complaint." *Am. Ass'n of Cosmetology Schs. v. Devos*, 258 F. Supp. 3d 50, 68 (D.D.C. 2017). As the court continued, "[t]o conclude that an individual member must be *named* to ensure that it is identified is unwarranted." *Id.* This Court also has held that the naming of individual members need not be a requirement at the motion to dismiss stage for the organization to have standing. *Ranchers-Cattlemen Action Legal Fund v. USDA*, 573 F. Supp. 3d 324, 336 (D.D.C. 2021) ("R-CALF will, of course, be required to show more at successive stages of the litigation. . . . [A]t least for now, R-CALF can survive a facial challenge to its standing without identifying specific, injured members by name in its complaint." (internal quotation marks and citations omitted)). As the Tenth Circuit aptly explained,

> [T]o identify or to name a person does not require the use
> of the legal name. An assailant can be *identified* as "Number
> 6" in the lineup; someone can be *named* "Country Music
> Star of 2023." The preeminent legal dictionary says that to
> *name* is simply to "identify[] or designat[e] a person or
> thing" and to "distinguish[] that person or thing from
> others."

*Speech First, Inc. v. Shrum*, 92 F.4th 947, 952 (10th Cir. 2024) (quoting Black's Law Dictionary (11th ed. 2019)).

Here, Plaintiff CAPE-Ed has identified four specific members who have suffered injuries as a result of GWU's conduct and provided unique details about each—CAPE-Ed Member No. 1, CAPE-Ed Member No. 2, CAPE-Ed Member No. 3, and CAPE-Ed Member No. 4. *Contra Am. Chemistry Council v. DOT*, 468 F.3d 810, 819 (D.C. Cir. 2006) ("[P]etitioners only hinted at the possibility of associational standing by stating no more than that each association has numerous members that are subject to the rules at issue, and would have individual standing to file for review of the final rule." (quotation omitted)).

Each of the identified members of CAPE-Ed have standing to sue in their own right insofar as each has suffered an injury-in-fact that has a causal connection to the conduct of GWU and is redressable by a favorable decision. *See Bennett v. Spear*, 520 U.S. 154, 167 (1997). In all the instances identified, GWU stood idly by as its Jewish students were spat on, harassed, mocked, stalked, physically obstructed from gaining access to parts of campus, and forced to listen to Holocaust revisionism. *See* discussion *supra* Part I. CAPE-Ed Member No. 1 was spat at; taunted and laughed at; and stalked by an encampment member, who uttered, "Imagine being a Zionist, they're so ugly, fat, and stupid" as he followed her across campus. *See* Compl. ¶¶ 1154-92, 1203-07. In no instance were her harassers punished. CAPE-Ed Member No. 2 was spat at while holding an Israeli flag, as well as subjected to chants such as "Fuck you, Zionist, go die"; "There is only

one solution, Intifada revolution!"; "Hamas are freedom fighters!"; "We don't want no Jewish state!"; "It is our right to rebel, Israel go to hell"; "Zionists, go to hell!"; "Say it loud say it clear we don't want any Zionists here!"; "From the river to the sea, Palestine will be free"; and, in Arabic, "From the water to the water, Palestine is Arab." *See id.* ¶¶ 918, 1216-24. In no instance did GWU or the GWPD intervene to stop the behavior. CAPE-Ed Member No. 3 witnessed her classmate scream at an Israeli guest lecturer (who was not discussing Middle East politics), referring to her as a "Nazi," "rapist," and "murderer." *See id.* ¶¶ 144, 1233-48. *Rather than disciplining the disrupter, the GWU Director of Clinical Training praised him. See id.* ¶¶ 1240-41. CAPE-Ed Member No. 4 was surrounded, threatened, and blocked from walking across campus for the mere crime of waving a small Israeli flag. At no point did GWU or the GWPD intervene to stop CAPE-Ed Member No. 4's harassers, despite him pleading for assistance. *See id.* ¶¶ 67-72, 1259-75.

*Second*, the interests CAPE-Ed seeks to protect are germane to its purpose. As described in the Complaint, CAPE-Ed is committed to combating discrimination in its many forms, including antisemitism. *See id.* ¶ 137. Litigation such as the instant case is one method for doing so.

*Third*, injunctive relief does not require participation from the individual members. The Supreme Court has concluded that "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party *indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added). The CAPE-Ed Members are not "indispensable" to the relief sought, for the injunctive relief is designed to address pervasive and systemic violations of GWU policy, Title VI, D.C. law, and the common law, across GWU's various schools. "Generally, individual member participation is not required

when an organization seeks prospective or injunctive relief." *Robertson v. District of Columbia*, 762 F. Supp. 3d 34, 62 (D.D.C. 2025) (citation omitted). Therefore, CAPE-Ed has standing to pursue injunctive relief against GWU.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendant's motion to dismiss.

DATED: August 25, 2025                              Respectfully submitted,

                                                   */s/ Jason B. Torchinsky*
                                                   Jason B. Torchinsky (# 976033)
                                                   HOLTZMAN VOGEL BARAN
                                                   TORCHINSKY & JOSEFIAK, PLLC
                                                   2300 N Street, N.W., Suite 643
                                                   Washington, D.C. 20037
                                                   (202) 737-8808
                                                   jtorchinsky@holtzmanvogel.com

                                                   *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the forgoing using the CM/ECF system on August

25, 2025, which will send an electronic notification of such filing to all counsel of record.

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky