## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SABRINA SOFFER, ARI SHAPIRO, and COMPLIANCE, ACCOUNTABILITY, POLICY, ETHICS – ED (CAPE-ED), | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01657-LLA |
| THE GEORGE WASHINGTON UNIVERSITY, | Judge Loren L. AliKhan |
| *Defendant*. | **ORAL ARGUMENT REQUESTED** |

## REPLY IN FURTHER SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

Brian A. Richman (s# 230071)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

Jason C. Schwartz (# 465837)
Stuart F. Delery (# 449890)
Jacob T. Spencer (# 1023550)
Abigail B. Dugan (# 1743216)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-5404
(202) 955-8500

*Attorneys for Defendant*

September 15, 2025

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.    The Court Should Dismiss Plaintiffs' Claims Under Rule 12(b)(6) .................................... 3

    A.    The Court Should Dismiss Plaintiffs' Discrimination Claims ..................................... 3

        1.    Plaintiffs Demand What the First Amendment Forbids ...................................... 3

        2.    Plaintiffs' Direct Discrimination Claim Fails ..................................................... 6

        3.    Plaintiffs' Deliberate Indifference Claim Fails .................................................. 9

            a)    GW Responded to Reported Incidents ...................................................... 9

            b)    Plaintiffs Were Not Denied Equal Access To Educational Services........ 16

    B.    The Court Should Dismiss Plaintiffs' Breach of Contract Claim ............................ 18

II.   The Court Should Strike The Claims For Injunctive Relief And Dismiss CAPE-Ed ......... 19

CONCLUSION.................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963)............................................................................................4

*Bob Jones University v. Johnson*,
  396 F. Supp. 597 (D.S.C. 1974)......................................................................8

*Browzin v. Catholic Univ. of Am.*,
  527 F.2d 843 (D.C. Cir. 1975).........................................................................7

*Campbell v. Nat'l Union Fire Ins. Co.*,
  130 F. Supp. 3d 236 (D.D.C. 2015)................................................................14

*Canaan v. Carnegie Mellon University*,
  760 F. Supp. 3d 306 (W.D. Pa. Dec. 17, 2024) ...........................................7, 8

* *Canel v. Art Inst. of Chi.*,
  2025 WL 564504 (N.D. Ill. Feb. 20, 2025) ...................................................2, 9

* *City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)........................................................................................2, 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................................2, 20

*Concerned Jewish Parents v. Liberated Ethnic Stud.*
  *Model Curriculum Consortium*,
  2024 WL 5274857 (C.D. Cal. Nov. 30, 2024).................................................7

*Doe v. George Washington University*,
  321 F. Supp. 3d 118 (D.D.C. 2018)................................................................18

*Fakhreddine v. Univ. of Pa.*,
  2025 WL 345089 (E.D. Pa. Jan. 30, 2025)..................................................18, 19

* *Felber v. Yudof*,
  851 F. Supp. 2d 1182 (N.D. Cal. 2011) .................................2, 3, 5, 10, 11, 12, 14, 15, 17

*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009).........................................................................................8

*Frankel v. Regents of Univ. of Cal.*,
  744 F. Supp. 3d 1015 (C.D. Cal. 2024) .........................................................18

*Fraternal Order of Police/Dep't of Corrections Labor Comm. v. Williams*,
  263 F. Supp. 2d 45 (D.D.C. 2003)..................................................................15

*Gartenberg v. Cooper Union for Advancement of Science & Art*,
  765 F. Supp. 3d 245 (S.D.N.Y. 2025)..............................................................5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Gebser v. Lago Vista Independent School District*,
   524 U.S. 274 (1998)....................................................................................8

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)..................................................................................10

*Hudgens v. NLRB*,
   424 U.S. 507 (1976)....................................................................................4

*Hunt v. Wash. State Apple Advertising Comm'n*,
   432 U.S. 333 (1977)..................................................................................20

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988).....................................................................................5

*Ingram v. Kubik*,
   30 F.4th 1241 (11th Cir. 2022) ...................................................................8

*Jideani v. District of Columbia*,
   2025 WL 1444499 (D.D.C. May 20, 2025).................................................8

*Jones v. City of Detroit*,
   20 F.4th 1117 (6th Cir. 2021) .....................................................................8

*Kestenbaum v. President & Fellows of Harvard College*,
   743 F. Supp. 3d 297 (D. Mass. 2024)....................................................6, 10

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967)....................................................................................7

\* *Landau v. Corp. of Haverford Coll. (Landau I)*,
   780 F. Supp. 3d 548 (E.D. Pa. 2025)......................................................2, 9

\* *Landau v. Corp. of Haverford Coll. (Landau II)*,
   2025 WL 1796473 (E.D. Pa. June 30, 2025)...............1, 5, 9, 11, 16, 18

\* *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)........................................9, 11, 13, 14, 16, 17

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)..................................................................................10

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)....................................................................................5

\* *Newman v. Howard Univ. Sch. of Law*,
   715 F. Supp. 3d 86 (D.D.C. 2024)............................................................12

*Norwood v. Harrison*,
   413 U.S. 455 (1973)....................................................................................4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*NRA v. Vullo*,
    602 U.S. 175 (2024)................................................................................................4

*President and Fellows of Harvard College v. HHS*,
    — F. Supp. 3d —, 2025 WL 2528380 (D. Mass. Sept. 3, 2025).................................4

*Richter v. Catholic Univ. of Am.*,
    2019 WL 481643 (D.D.C. Feb. 7, 2019) .................................................................19

*Rodgers v. Smith*,
    842 F. App'x 929 (5th Cir. 2021) ...........................................................................8

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2010) .................................................................................7

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*,
    647 F.3d 156 (5th Cir. 2011) ...........................................................................4, 16

*Shaffer v. George Washington Univ.*,
    27 F.4th 754 (D.C. Cir. 2022)...............................................................................19

\* *Snyder v. Phelps*,
    562 U.S. 443 (2011)............................................................................................5, 7

\* *StandWithUs Ctr. for Legal Just. v. MIT*,
    742 F. Supp. 3d 133 (D. Mass. 2024) ...............................................2, 10, 12, 14

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998).................................................................................................20

*Yakin v. University of Illinois*,
    508 F. Supp. 848 (N.D. Ill. 1981) ...........................................................................8

\* *Yakoby v. Trs. of Univ. of Pa.*,
    2025 WL 1558522 (E.D. Pa. June 2, 2025)....................................................1, 9, 14

**Rules**

Fed. R. Civ. P. 12(b)(1)...............................................................................................2, 20

Fed. R. Civ. P. 12(b)(6)...................................................................................................3

**Other Authorities**

Eugene Volokh, *Freedom of Speech and Workplace Harassment*,
    39 UCLA L. Rev. 1791, 1817 (1992) .......................................................................6

## INTRODUCTION

Plaintiffs' Opposition (Dkt. 13) confirms why their claims cannot proceed. As the allegations in Plaintiffs' own Complaint acknowledge, GW condemned antisemitism, investigated complaints, disciplined students and organizations, imposed restrictions on demonstrations, and ultimately cleared the encampment with law enforcement. This case is not about whether antisemitic activity occurred on campus or whether GW could have responded better or faster in Plaintiffs' view. The only question before the Court is whether, accepting the allegations in the Complaint as true, the University can be liable to Plaintiffs for damages or injunctive relief. The answer is no as a matter of law. The Court should dismiss the Complaint in its entirety.

First, Plaintiffs' Title VI theory is unconstitutional. They would turn Title VI into a campus speech code—requiring GW to censor protected expression and punish students as harshly and as quickly as they personally would prefer. Plaintiffs concede that their reading of Title VI would compel private universities to do what the First Amendment forbids the government to do: suppress political speech. Courts have uniformly rejected that approach.

Second, Plaintiffs' discrimination claims fail on their own terms. They identify no discriminatory policy by GW, no action by a GW decisionmaker, and no facts showing intentional bias by GW. Their allegations boil down to disagreement with academic content in certain programs and dissatisfaction with GW's response to campus unrest—neither of which states a Title VI claim. Nor can Plaintiffs salvage their case with a deliberate-indifference theory. That standard requires actual knowledge of unlawful harassment and an official deliberate decision not to act. The allegations they invoke from the Complaint show the opposite: GW did respond, and Plaintiffs do not even try to distinguish the uniform line of cases rejecting nearly identical claims against similar responses, including *Felber*, *Landau*, *Yakoby*, and *StandWithUs*. *See Landau v. Corp. of Haverford Coll.* (*Landau II*), 2025 WL 1796473 (E.D. Pa. June 30, 2025); *Yakoby v. Trs. of Univ.*

1

*of Pa.*, 2025 WL 1558522 (E.D. Pa. June 2, 2025); *Canel v. Art Inst. of Chi.*, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025); *Landau v. Corp. of Haverford Coll.* (*Landau I*), 780 F. Supp. 3d 548 (E.D. Pa. 2025); *StandWithUs Ctr. for Legal Just. v. MIT*, 742 F. Supp. 3d 133 (D. Mass. 2024); *Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011).

Third, Plaintiffs have not alleged the denial of educational access that Title VI demands. They continued to attend classes, complete coursework, and exercise their own speech rights. Temporary disruptions and subjective discomfort do not state a federal claim.

Fourth, Plaintiffs' contract theory fails because they identify no enforceable promise. The provisions they cite—such as statements that GW "will not permit unlawful discrimination"—are classic examples of aspirational language, not contractual commitments. Plaintiffs accordingly try to shift the focus to allegations that GW failed to follow "procedures," but they do not identify any specific procedures—much less language indicating that GW intended those procedures to create binding contractual obligations.

Finally, Plaintiffs lack standing to seek the relief they demand. Article III requires a plaintiff seeking prospective relief to show a "real and immediate threat" of future injury—not merely past harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Ms. Soffer and Mr. Shapiro admit they are former students, which forecloses any claim for injunctive or declaratory relief. And CAPE-Ed concedes it cannot seek damages and offers no facts showing any imminent harm to its members. Speculation about hypothetical future incidents does not suffice. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). With no damages claim and no basis for prospective relief, CAPE-Ed has no remedy it could obtain in this case. Because no Plaintiff faces a continuing injury, the claims for injunctive relief should be stricken and CAPE-Ed dismissed under Rule 12(b)(1).

**ARGUMENT**

**I.    The Court Should Dismiss Plaintiffs' Claims Under Rule 12(b)(6)**

Plaintiffs' claims fail as a matter of law.  Their own allegations, and the concessions in their opposition, confirm that the Complaint does not state a claim under Title VI or contract law. Each theory—discrimination, deliberate indifference, and breach of contract—collapses under precedent and the facts Plaintiffs themselves allege.

**A.    The Court Should Dismiss Plaintiffs' Discrimination Claims**

Plaintiffs offer no viable theory of discrimination.  Their Opposition confirms that the claims rest on constitutionally protected speech, academic content, and generalized dissatisfaction with the University's response to campus unrest, none of which give rise to a private civil claim under Title VI.

**1.    Plaintiffs Demand What the First Amendment Forbids**

Plaintiffs' opposition confirms the constitutional defect at the core of their case.  They do not dispute that the vast majority of the conduct they challenge—student protests, chants, signs, academic programming, and faculty speech (*see, e.g.*, Compl. ¶¶ 59, 92, 758, 1083, 1241)—is "pure political speech" protected by the First Amendment.  *Felber*, 851 F. Supp. 2d at 1188; *see* GW Mot. 8–11.  Instead, they ask this Court to read Title VI as requiring private universities to suppress speech "in a way that public entities may not."  Opp. 10.  Plaintiffs ask the Court to create from whole cloth two different versions of Title VI—one that applies to public universities and one that applies to private universities.  The law does not permit this unconstitutional dichotomy.

Plaintiffs concede that under their reading of Title VI "private entities will inevitably take action that would not be permissible in the state actor context."  Opp. 9.  That is not a minor concession—it is, to borrow Plaintiffs' words, an "extreme and legally unsupported approach." *Id.* at 8.  It is "axiomatic" that the government "may not induce, encourage or promote private

persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).  As the Supreme Court reaffirmed just last Term, the government "cannot do indirectly" what the First Amendment forbids it "from doing directly"—"coerce a private party to punish or suppress disfavored speech." *NRA v. Vullo*, 602 U.S. 175, 190 (2024); *accord Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963).  As *Vullo* explained, "the critical takeaway is that the First Amendment prohibits" the government "from wielding [its] power" to "suppress speech," either directly or—as Plaintiffs would have the government do here—indirectly "through private intermediaries."  602 U.S. at 198.

Earlier this month, a Judge in the District of Massachusetts applied this precise principle in *President and Fellows of Harvard College v. HHS*, — F. Supp. 3d —, 2025 WL 2528380 (D. Mass. Sept. 3, 2025), holding that the government violated the First Amendment by attempting to use Title VI to condition federal funding on a university's agreement to suppress third-party speech.  *Id.* at 27.  As the court explained, *Vullo* squarely prohibits direct or indirect coercion of private entities to suppress disfavored speech, and the government's use of Title VI to compel such suppression is "not permissible."  *Id.*

Plaintiffs' response—that because GW is a "private" university, it is free to punish speech and therefore must do so to satisfy Title VI—conflates two distinct questions. Opp. 9.  The issue is not whether GW could, under its own policies, discipline certain expression.  *Cf. id.* 9–10 (citing *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976)).  Or whether GW complied with its own policies. *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011). It is whether federal law can impose civil liability for failing to suppress speech the Constitution protects.  As *Vullo* confirms, it cannot.  602 U.S. at 190.  That principle applies even if a private actor has discretion to act on its own. The First Amendment forbids the government from

leveraging civil liability to compel censorship, and it likewise forbids private plaintiffs from using federal law to achieve the same unconstitutional result. The Supreme Court has made clear that the First Amendment "serve[s] as a defense" to private civil claims and bars using civil liability to "punis[h] the speaker." *Snyder v. Phelps*, 562 U.S. 443, 451, 461 (2011). The government has no "authority" to create private, civil causes of action that create liability for constitutionally protected speech. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–52 (1988) (rejecting claim for intentional infliction of emotional distress based on First Amendment-protected activity); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (same for libel).

Every court to consider this issue under Title VI has reached the same conclusion. *See* GW Mot. 9 (collecting cases). Plaintiffs try to wave away this consensus as merely "out-of-circuit cases" (Opp. 10), but they cite no decision that actually adopts their theory. That omission underscores the novelty—and implausibility—of their position. The case law is not divided; it is unanimous. *Felber*, *Landau*, and *Gartenberg*, for example, all rejected nearly identical claims, even where plaintiffs alleged hostile environments involving anti-Semitic expression. *See Landau II*, 2025 WL 1796473, at *2 (holding that "institutions cannot be threatened with civil liability for declining to censor First Amendment protected speech"); *Gartenberg v. Cooper Union for Advancement of Science & Art*, 765 F. Supp. 3d 245, 271 (S.D.N.Y. 2025) (ruling that "speech on matters of public concern" "cannot itself support a claim for an objectively hostile educational environment"); *Felber*, 851 F. Supp. 2d at 1187–88 (dismissing complaint where "a very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct"). These are not outliers—they are the only decisions on point, and they all confirm that Title VI cannot be used to punish protected speech.

Plaintiffs' lone citation, *Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024), only underscores the problem. Opp. 11–12. *Kestenbaum*, to start, is readily distinguishable: the court denied dismissal only because the complaint alleged repeated reports of physical threats and assaults that the university allegedly ignored altogether—allegations wholly absent from Plaintiffs' theory here. *See* pp. 9–16, *infra*. Moreover, the court there may have been "reluctant to make . . . a determination," but it nonetheless acknowledged the constitutional limits at issue—conceding that the University "may be correct" that "it cannot be that the federal government could require private universities to enforce policies against speech that the government itself could not enforce at a public middle school." *Id.* at 309 n.11. That is not a lifeline to Plaintiffs—it is a warning shot, foreshadowing the conclusion dictated by Supreme Court precedent and reinforced by Plaintiffs' own cited authority. Professor Eugene Volokh's conclusion—cited on page nine of Plaintiffs' opposition—is unequivocal: the government "clear[ly]" cannot evade First Amendment scrutiny by "forcing someone else, on pain of liability, to implement that restriction." *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791, 1817 (1992). Plaintiffs' reliance on Volokh is self-defeating.

### 2.    Plaintiffs' Direct Discrimination Claim Fails

Plaintiffs' Opposition confirms that their direct discrimination theory is untethered from law, fact, and precedent. They do not allege that GW adopted any discriminatory policy or acted with discriminatory intent. *Contra* Opp. 18. Instead, they run through a "years-long" litany of grievances about academic programming and faculty viewpoints. *Id.* Their objections center on academic events, classroom discussions, movie screenings, and scholarly perspectives they find objectionable. *See id.* at 19–20. But Title VI does not authorize courts to second-guess pedagogical choices or suppress disfavored ideas.

Courts have consistently held that curriculum decisions—even those involving controversial or politically charged topics—are protected by academic freedom and do not give rise to Title VI liability. Allegations that the conduct continued over a period of years does not transform protected activity into a legal violation. As the Supreme Court cautioned, the First Amendment does not permit the government—or private plaintiffs invoking federal law, *see, e.g.*, *Snyder*, 562 U.S. at 451—to cast a "pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The Ninth Circuit has similarly rejected efforts to treat faculty speech as harassment, explaining that it "doubt[s] that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify . . . judicial intervention." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010). And as the University explained (GW Mot. 10), courts have refused to entertain Title VI claims based on alleged ideological bias in curriculum—even where plaintiffs alleged anti-Israel content. *See Concerned Jewish Parents v. Liberated Ethnic Stud. Model Curriculum Consortium*, 2024 WL 5274857, at *20–23 (C.D. Cal. Nov. 30, 2024); *cf. Browzin v. Catholic Univ. of Am.*, 527 F.2d 843, 846 n.2 (D.C. Cir. 1975) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding . . . .").

Plaintiffs do not address this authority at all. Nor do they cite a single case—state or federal, in any jurisdiction—holding that a university's academic programming or faculty speech can constitute intentional discrimination under Title VI. Plaintiffs' only citation—a "*see also*" to *Canaan v. Carnegie Mellon University*, 760 F. Supp. 3d 306 (W.D. Pa. Dec. 17, 2024) (Opp. 20)—immediately retreats to a "deliberate indifference" standard, implicitly conceding that faculty speech or academic programming alone cannot establish direct discrimination by the University—

and, unlike here, concerns a university that allegedly "took no action." *Canaan*, 760 F. Supp. 3d at 315, 323.

Even if Plaintiffs could overcome the First Amendment barrier, their theory fails for a second reason: Title VI does not permit vicarious liability for faculty speech (Opp. 19–21). Plaintiffs' cited cases—*Bob Jones University v. Johnson*, 396 F. Supp. 597 (D.S.C. 1974) (Opp. 21), and one of their principal authorities, *Yakin v. University of Illinois*, 508 F. Supp. 848 (N.D. Ill. 1981) (Opp. 21)—do not even address vicarious liability. *See* Opp. at vi (identifying *Yakin* as an authority on which Plaintiffs principally rely). And even if they did, they were decided years before the Supreme Court's holding in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), which squarely rejected vicarious liability under Title IX. *Id.* at 288. Because Title IX was "modeled after Title VI," *id.* at 286, *Gebser*'s rejection of vicarious liability applies equally to Title VI. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("[Congress] passed Title IX with the explicit understanding that it would be interpreted as Title VI was."). Thus, as Judge Chutkan recently reaffirmed, "there is no liability via *respondeat superior* under Title VI." *Jideani v. District of Columbia*, 2025 WL 1444499, at *5 (D.D.C. May 20, 2025); *accord Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022); *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam). The doctrinal consensus is clear—and Plaintiffs offer nothing to the contrary.

Plaintiffs' theory depends entirely on imputing liability for faculty speech—something Title VI does not allow and the First Amendment squarely forbids. They cite no discriminatory policy, no action by a decisionmaker, and no pattern of discriminatory conduct. They do not even attempt to show that GW itself acted with discriminatory intent.

### 3.    Plaintiffs' Deliberate Indifference Claim Fails

Plaintiffs' Opposition confirms what the Complaint already makes clear: their deliberate indifference theory rests on atmosphere, not concrete allegations sufficient to state a claim under Title VI.  Plaintiffs offer a sprawling narrative of campus unrest—interweaving incidents involving different individuals, at different times, in different contexts, many of whom are not even parties to this case.  Members "No. 2" and "No. 4," for example, are cited throughout the Opposition but are neither parties to this case nor current students.  *See* Opp. 4, 13, 14, 16, 17, 32, 33; *see also* Compl. ¶¶ 141, 145 (each of "No. 2" and "No. 4" "was"—past tense—a student).  More broadly, Plaintiffs routinely fail to clarify who was affected by the alleged conduct, whether it was reported, to whom, when, or whether any plaintiff was engaged in an educational activity at the time.

As the court explained in *Landau II*, such "*gestalt* pleading" is not enough.  2025 WL 1796473, at *2.  Title VI requires actual knowledge of harassment and an official decision not to act.  *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999).  That means Plaintiffs must allege "who complained to whom," "about what, and when"—because that is "a critical element of a hostile environment claim."  *Landau I*, 780 F. Supp. 3d at 559–60.  They must also identify what *decision* by the University allegedly amounted to turning a blind eye to harassment.  *See id.*  The Complaint is devoid of such allegations. It offers only a running list of grievances, without connecting specific incidents to specific plaintiffs, and it fails to show actual notice to a relevant university official and deliberate indifference.

### a)    GW Responded to Reported Incidents

The Opposition does not meaningfully engage with *Yakoby*, *Canel*, *Landau I*, *Landau II*, *StandWithUs*, or *Felber*—all cited in GW's opening memorandum, *see, e.g.*, GW Mem. 16, and all rejecting nearly identical claims of deliberate indifference.  *See Landau II*, 2025 WL 1796473; *Yakoby*, 2025 WL 1558522; *Canel*, 2025 WL 564504; *Landau I*, 780 F. Supp. 3d 548;

*StandWithUs*, 742 F. Supp. 3d 133; *Felber*, 851 F. Supp. 2d 1182.  Instead, Plaintiffs identify five incidents they claim illustrate GW's deliberate indifference (Opp. 14–18) and attempt to analogize to *Kestenbaum* (Opp. 16, 18)—a case that found deliberate indifference only where the university routinely "did not respond at all" to repeated complaints.  743 F. Supp. 3d at 310.

That is not what the Complaint alleges here.  Even taken at face value, each of Plaintiffs' examples, described in further detail below, reflects institutional engagement.  As *Kestenbaum* itself recognized, a university that "did respond" with the "consistent sense of purpose in returning civil order and discourse to its campus"—even if the response was "perhaps overly measured"— does not act with deliberate indifference.  743 F. Supp. 3d at 310 (citing *StandWithUs*, 742 F. Supp. 3d at 143).  The same is true here.

### (1)    The February 2024 Meeting with Dean Coleman and Vice Dean Joyce

Plaintiffs allege in a bare-bones one-sentence paragraph that, when Ms. Soffer met with administrators in February 2024, she was told the University "could not take action against antisemitic incidents unless they were 'overtly violent.'"  Opp. 15 (quoting Compl. ¶ 1107).  That is not a "shocking admission" (*id.*)—it is an accurate shorthand description of constitutional law.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972).  But more importantly, Plaintiffs never allege what Ms. Soffer actually reported.  The Complaint states only that Ms. Soffer informed administrators about "antisemitic incidents."  Compl. ¶ 1106.  The complaint identifies no specific incident, no identified harasser, and no conduct that plausibly triggered Title VI obligations.  Without that, the anecdote fails to allege a Title VI violation.

And even if the report had been more specific, Plaintiffs do not allege any detail about the context of the response by the administrators.  What the Complaint does do, however, is concede

that (regardless of the alleged statement by unnamed administrators) GW actually did respond during this period: it met repeatedly with students (including Ms. Soffer), designated quiet zones, restricted access, erected barricades, and worked with the D.C. Metropolitan Police Department (MPD) to clear the Yard and make arrests. Compl. ¶¶ 710, 724–35, 854. That is not deliberate indifference—it is institutional engagement. *See, e.g.*, *Felber*, 851 F. Supp. 2d at 1188 ("plaintiffs fail to show how defendants have acted with 'deliberate indifference,'" where "campus police . . . made arrests of disruptive protestors" and the administration "engaged in an ongoing dialogue with the opposing parties").

### (2)    Mr. Shapiro's Encampment Reports and the Claim of "No Response"

Plaintiffs say Mr. Shapiro "'received no response'" after reporting on May 4, 2024, that protesters surrounded and coerced him from the Yard. Opp. 15 (quoting Compl. ¶ 1140). But the same pleading details constant, visible institutional activity addressing the very conditions he describes: GW University Police (GWPD) presence at the site, access controls, barricades, restrictions on non-GW participants, campus-wide messages about policy violations, and coordination with MPD culminating in the encampment's clearance and arrests on May 8, 2024—just four days later, despite delays in MPD's response to GW's request for assistance. *See* Compl. ¶¶ 724–34, 854–63. That is the opposite of inaction. At most, Plaintiffs quarrel with the adequacy or timing of measures—precisely the kind of disagreement that does not constitute deliberate indifference under *Davis*. *See, e.g.*, *Davis*, 526 U.S. at 648 ("courts should refrain from second-guessing the disciplinary decisions made by school administrators"); *Landau II*, 2025 WL 1796473, at *12 (even if the university "took too soft an approach to campus regulation, and failed to communicate as boldly and effectively as Plaintiffs would have liked," the "question is not" whether the university "could have handled each situation better"; the "question is whether [the university]

was so indifferent to known acts of harassment that it caused students to undergo harassment");

*StandWithUs*, 742 F. Supp. 3d at 142 ("MIT could have done things differently," but "that is not the applicable standard").

Moreover, the incident Mr. Shapiro describes—being present in University Yard "to observe the protest" (Compl. ¶ 1141)—"did not occur in the context of [his] educational pursuits." *Felber*, 851 F. Supp. 2d at 1188.  As in *Felber*, where the court dismissed a Title VI claim because the alleged harassment occurred in a public forum and not in connection with the plaintiff's education, Mr. Shapiro's presence at a protest site as an observer—rather than as a participant in any academic program—does not plausibly support a claim that he was denied access to any educational opportunity.  *See id.*  Title VI requires more than unpleasant encounters in public spaces (however regrettable they may be); it requires a denial of meaningful access to education.

### (3) The Fraternity Incident: "Verbal Harassment Too Challenging to Prove"

Plaintiffs next fault GW's handling of Mr. Shapiro's complaint about two fraternity members, asserting GW "refused to take action" because verbal harassment was "'too challenging to prove.'"  Opp. 16 (quoting Compl. ¶ 904).  But their own narrative shows the University investigated the matter: the Area Coordinator for Fraternity & Sorority Life contacted Mr. Shapiro; GW's Student Rights and Responsibilities Office "performed an investigation"; and the University evaluated evidence (including social-media posts) before concluding the reported conduct did not support discipline under campus standards.  Compl. ¶¶ 911–16.  That is a reasoned disciplinary judgment, not an abdication.  Title VI does not convert every contested credibility call or evidentiary shortfall into "deliberate indifference."  *See, e.g.*, *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 109 (D.D.C. 2024) (rejecting deliberate indifference claim even though the "investigation may not have produced the result [plaintiff] wanted").

Moreover, Mr. Shapiro's complaint is based in part on the allegation that fraternity "Brothers A and B refused to participate in social events at which Mr. Shapiro was present." Compl. ¶ 908. That is assuredly unpleasant, if true. But it is not actionable. Title VI does not require universities to police social preferences or compel interpersonal engagement. Plaintiffs cite no case—nor could they—holding that a university violates federal law by failing to force students to attend private social events with one another. *See* Opp. 16.

Plaintiffs try to bolster their argument with "Member No. 1" and "Member No. 2," Opp. 16 (citing Compl. ¶¶ 917–28, 1165–76), but this too fails to support a claim of deliberate indifference. Neither "Member No. 1" nor "Member No. 2" are parties to this case. "Member No. 2" is not even enrolled. *See* Compl. ¶ 141 ("Member No. 2 *was* a Jewish undergraduate student" (emphasis added)). And neither has standing to seek relief by virtue of belonging to CAPE-Ed. *See* pp. 19–20, *infra*.

In any event, the allegations concerning these non-parties that lack standing reflect institutional engagement and case-specific responses: GW's Student Rights and Responsibilities Office met with Member No. 1, reviewed security video, and explained evidentiary limits—the alleged event occurred "outside the range of the security camera." Compl. ¶¶ 1168–79. Member No. 2's anonymous Instagram threat was reported to GWPD and MPD and referred to the Federal Bureau of Investigation but the sender could not be identified. *Id.* ¶¶ 1225–29. And when Member No. 2 reported that a student protester nicknamed "Beans" had confronted her and filmed her (*id.* ¶ 1221), GW's Student Rights and Responsibilities Office investigated and advised her that "Beans" had graduated and was no longer subject to university discipline (*id.* ¶ 1228). That is not an "official decision . . . not to remedy"—it is a jurisdictional limitation. *Davis*, 526 U.S. at 642. Title VI does not require universities to discipline former students who are no longer under their

authority—or to catch anonymous social media users that even federal law enforcement cannot trace. *See id.* at 644 ("Deliberate indifference makes sense as a theory . . . only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.").

### (4)    Campus Safety Measures During the Encampment

Plaintiffs assert that GWPD "took no action" even after barricades were overrun and administrators "personally witnessed the protesters' aggressiveness," while Jewish students were "circled, threatened, and attacked." Opp. 16–17 (quoting Compl. ¶¶ 743, 748). But that is not what the Complaint says. The operative pleading repeatedly acknowledges a series of escalating safety measures: designation of Kogan Plaza and the University Yard as 24-hour quiet zones during finals; conditions on demonstrations (no overnight encampments; removal of tents by 7:00 p.m.); barricades around the Yard; limits on participation by persons unaffiliated with GW; and, ultimately, coordination with MPD to clear the encampment and make arrests, and subsequent disciplining of students, including issuing warnings, censuring students, placing students on disciplinary probation, and suspending at least one student. *See* Compl. ¶¶ 710, 724–35, 854–56, 858–62, 936–37. These are textbook responses that courts have found incompatible with deliberate indifference—even where plaintiffs insist the measures should have been harsher or faster. *See, e.g.*, *StandWithUs*, 742 F. Supp. 3d at 142 (university suspended students from non-academic activities and warned protesters not to violate policies); *Yakoby*, 2025 WL 1558522, at *7 & n.3 (university created action plan); *Felber*, 851 F. Supp. 2d at 1188 (university deployed campus police and negotiated with protesters).

GW cited all of these cases in its opening memorandum. *See, e.g.*, GW Mem. 16. Plaintiffs do not respond to them at all—much less offer any basis for distinguishing their holdings or suggesting a contrary result. This lack of engagement with precedent is fatal to their claim of

deliberate indifference. *See, e.g.*, *Campbell v. Nat'l Union Fire Ins. Co.*, 130 F. Supp. 3d 236, 259 (D.D.C. 2015) (dismissing claim where plaintiff failed "to even attempt to distinguish her case from the precedents relied upon by Defendants"); *Fraternal Order of Police/Dep't of Corrections Labor Comm. v. Williams*, 263 F. Supp. 2d 45, 48 (D.D.C. 2003) ("Plaintiffs have failed to distinguish these precedents or to point to any basis for this Court to come to any different conclusion. Therefore, Plaintiffs' claims . . . must be dismissed.").

### (5)     Engaging with (and Sanctioning) SJP

Finally, Plaintiffs argue that GW "rewarded" harassers because, after suspending Students for Justice in Palestine, administrators "'continued to meet with and negotiate their demands.'" Opp. 17 (cleaned up) (quoting Compl. ¶ 966).  That theory fails on both the facts and the law. First, Plaintiffs concede that GW imposed discipline: SJP was suspended, and individual students were placed on probation, censured, or warned.  *See* Compl. ¶¶ 596, 936–37.  Second, continued dialogue with student leaders—particularly amid ongoing safety concerns—is a recognized de-escalation tool.  *See id.* ¶¶ 955, 961 (administration meetings with "GWU SJP student leaders," "student protest leaders," and other "student (Jewish) leaders and participants (JVP and JSTREET) of the encampment").  In *Felber*, the court rejected a nearly identical claim, holding that where "the administration has engaged in an ongoing dialogue with the opposing parties," the fact that "the University may not have acted as plaintiffs would prefer does not rise to 'deliberate indifference.'" 851 F. Supp. 2d at 1188.  The same is true here.  Plaintiffs' own Complaint acknowledges that GW met not only with pro-Palestinian representatives but also with Jewish students and organizations during this period.  *See, e.g.*, Compl. ¶ 959.  Those parallel meetings underscore that GW was managing a campus crisis—not favoring one group over another.  Far from "rewarding" misconduct, GW imposed restrictions, enforced discipline, and engaged broadly with stakeholders to restore order.  That is not indifference—it is active conflict management.  Indeed, and

significantly, Plaintiffs do not allege that GW made any kind of "deal" with SJP in response to their "demands," because they cannot: no "deal" was made.

*    *    *

In short, deliberate indifference requires allegations that the University made an official decision not to remedy known harassment that was so severe, pervasive, and objectively offensive that it effectively denied access to education—and that the response was clearly unreasonable. *See Davis*, 526 U.S. at 642–49. Plaintiffs do not meet that standard. Their own pleadings show that GW imposed restrictions, engaged with students, investigated complaints, disciplined organizations and individuals, engaged its own police force, coordinated with D.C. and federal law enforcement, and took steps to restore order. *See* Compl. ¶¶ 596, 710, 724–35, 854–63, 970.

### b) Plaintiffs Were Not Denied Equal Access To Educational Services

Even assuming Plaintiffs plausibly alleged harassment—which they have not—the Opposition still fails to identify any instance where a plaintiff was denied access to educational services. Title VI requires more than discomfort or disagreement; as Plaintiffs concede (Opp. 14), the standard is "severe, pervasive, and objectively offensive" conduct that effectively bars access to education. *Davis*, 526 U.S. at 650.

Plaintiffs' allegations do not come close to this high bar. Their Opposition does not even mention Mr. Shapiro in the section on educational harm (Opp. 22–24). As for Ms. Soffer, Plaintiffs claim she "was forced to change her major" (Opp. 23), but the Complaint attributes that decision to "classroom ostracism" and a "thirst for free inquiry" (Compl. ¶ 131)—neither of which remotely satisfies the *Davis* standard. Courts have rejected similar allegations as "the sort of unpleasant conflict that takes place every day" and "not the proper stuff of a federal harassment claim." *Sanches*, 647 F.3d at 167; *see also Landau II*, 2025 WL 1796473, at *15 (rejecting Title

16

VI claim where plaintiffs alleged emotional distress, social ostracization, and self-censorship, but failed to plead any specific academic harm such as missed classes or reduced grades).

Plaintiffs also gesture at being "physically excluded" from campus spaces (Opp. 22–23), but they never link those allegations to a loss of access to educational services, *Felber*, 851 F. Supp. 2d at 1188, let alone "equal access" to such services, *Davis*, 526 U.S. at 651. As *Felber* explained, even if a university yard is "an important campus thoroughfare," activities there do not "necessarily" impede access to the University's educational offerings. 851 F. Supp. 2d at 1188. Here, Plaintiffs describe encounters in public spaces like University Yard and Kogan Plaza, but they do not allege those incidents prevented them from attending class, using academic resources, or completing coursework. To the contrary, the Complaint shows Plaintiffs were "attempting to exercise [their own] free speech rights in a public forum"—outside "the context of [their] educational pursuits." *Id.*; *see, e.g.*, Compl. ¶¶ 1112–13 (Ms. Soffer crossed the street to "have a respectful conversation with a protester"); *id.* ¶ 1256 (Member No. 4 staged "a unitary, silent, and peaceful protest in the encampment").

The few disruptions Plaintiffs cite—a library closed for three hours (Compl. ¶ 580) and "at least one" class cancelled (*id.* ¶ 638)—were temporary, non-pervasive, and applied equally to all students, the opposite of the "severe" and "pervasive" conduct that Title VI targets. *Davis*, 526 U.S. at 631. Title VI, moreover, does not guarantee a disruption-free environment; it requires "equal access" to educational opportunities. *Id.* Equal-impact measures—like a brief library closure or a single class cancellation affecting the entire student body—do not deny *equal* access. This is not a case—cited by Plaintiffs (Opp. 22)—where "other students retained access." *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1026 (C.D. Cal. 2024).

Finally, Plaintiffs' fallback to emotional harm fares no better. Their examples—such as seeking therapy—concern non-parties (Opp. 23). Title VI requires a showing that *the Plaintiffs* were denied meaningful, equal access to education, not other people. Plaintiffs have not made that showing. Regardless, general emotional distress is not a concrete deprivation of educational rights. *See Landau II*, 2025 WL 1796473, at *15.

### B.    The Court Should Dismiss Plaintiffs' Breach of Contract Claim

Plaintiffs' contract theory fails at the threshold: they identify no specific, enforceable promise that GW breached. That omission is fatal. Courts have repeatedly dismissed similar claims for want of a definite contractual obligation. *See* GW Mem. 19–20.

Plaintiffs try to reframe their claim as one about GW's failure to follow "binding procedures" in handling complaints. Opp. 27–28. But they identify no such procedures—let alone language showing GW intended those procedures to create contractual obligations. Their reliance on *Doe v. George Washington University*, 321 F. Supp. 3d 118 (D.D.C. 2018), underscores the gap. *Doe* involved "clear procedures" in the Code of Student Conduct governing appeals from disciplinary decisions—mandatory steps such as fixed deadlines and guaranteed rights of review that the court found specific and enforceable. *Id.* at 124. Here, by contrast, Plaintiffs cite only broad statements about nondiscrimination and campus values, and vague references to processes for addressing complaints. They point to no provision requiring GW to take particular actions within a set timeframe, to impose specific sanctions, or to reach a prescribed outcome. Courts consistently reject attempts to convert such aspirational or discretionary language into enforceable promises. *See, e.g.*, *Fakhreddine v. Univ. of Pa.*, 2025 WL 345089, at *7 (E.D. Pa. Jan. 30, 2025) (language affirming "freedom of thought" and "academic freedoms" was "mere aspirational language" and "not sufficiently definite to create an enforceable obligation" (cleaned up)); *cf. Shaffer v. George Washington Univ.*, 27 F.4th 754, 764–65 (D.C. Cir. 2022) (finding implied contract only

where students alleged concrete representations and pricing differentials promising in-person instruction). Plaintiffs allege nothing comparable here. At most, they challenge GW's discretionary judgments about how to respond to campus unrest—decisions that are not contractual.

Plaintiffs also invoke *Shaffer v. George Washington University*, 27 F.4th 754 (D.C. Cir. 2022), to argue that "less specific" policies create implied obligations. Opp. 27. But that misreads *Shaffer*. The court there found a plausible implied contract only because students alleged concrete representations and pricing differentials promising in-person instruction. 27 F.4th at 764–65. Plaintiffs allege no such representations here—only broad statements about nondiscrimination and campus values. Such aspirational language does not constitute an enforceable promise. *See, e.g.*, *Fakhreddine*, 2025 WL 345089, at *7.

The implied covenant claim rises and falls with the contract claim. *See Richter v. Catholic Univ. of Am.*, 2019 WL 481643, at *5 (D.D.C. Feb. 7, 2019) ("The absence of a contract alone is sufficient to defeat an implied covenant claim." (quotation marks omitted)). Additionally, Plaintiffs allege no bad faith or arbitrary conduct necessary to state a claim. *See* GW Mem. 21. To the contrary, as discussed, their own Complaint shows GW responded to antisemitic incidents, including disciplining students and organizations.

## II.    The Court Should Strike The Claims For Injunctive Relief And Dismiss CAPE-Ed

Plaintiffs' Opposition confirms that none of them has standing to seek prospective relief.

First, Ms. Soffer and Mr. Shapiro admit they are former students. Opp. 2–3, 30. That ends the inquiry: former students cannot seek injunctive or declaratory relief because they face no "real and immediate threat" of future harm—and Plaintiffs do not argue otherwise. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Second, CAPE-Ed implicitly concedes it cannot seek damages and limits its claim to prospective relief. Opp. 30. That alone is dispositive because an organization that cannot obtain any

19

remedy lacks standing.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.").  And CAPE-Ed cannot obtain the one remedy it seeks: an injunction.  To seek an injunction, CAPE-Ed's members would have to have standing to seek an injunction in their own right.  *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Half of its members are former students (Opp. 30), however, who—like Ms. Soffer and Mr. Shapiro—face no ongoing risk of harm and therefore cannot seek injunctive relief.  *See City of Los Angeles*, 461 U.S. at 102 (past injury does not confer standing for prospective relief absent a "real and immediate threat" of future harm).  As to current members, CAPE-Ed offers no facts showing any imminent injury.  Speculation about hypothetical future incidents is not enough.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 (2013) ("Allegations of possible future injury are not sufficient"; threatened harm must be "certainly impending").  And CAPE-Ed—in its opposition—does not even go that far; at no point does CAPE-Ed even argue, let alone identify pleaded facts to demonstrate, that a current member faces imminent injury.  In short, CAPE-Ed has no remedy it could obtain in this case, and its claims should be dismissed under Rule 12(b)(1).

Because no Plaintiff faces a real and immediate threat of future harm, the Court should strike the claims for injunctive relief and dismiss CAPE-Ed—which cannot seek any relief—under Rule 12(b)(1).

## CONCLUSION

The University takes seriously its obligation to provide a safe, inclusive, and respectful environment for all members of its community, including Jewish and Israeli students, faculty, and staff.  Antisemitism has no place at GW (or anywhere else), and as GW emphasized in its opening brief, it is deeply committed to ensuring that its campus remains safe and welcoming for Jewish students.  To that end, the University has taken—and continues to take—significant steps to

address antisemitic conduct and to foster a campus climate grounded in mutual respect.  Could reasonable people disagree with the University's response?  Yes.  But that is a far cry from "deliberate indifference."  The Court should dismiss the Complaint with prejudice.

Dated: September 15, 2025                    Respectfully submitted,

                                             */s/ Jason C. Schwartz*
                                             _____
                                             Jason C. Schwartz (# 465837)
Brian A. Richman (# 230071)                  Stuart F. Delery (# 449890)
GIBSON, DUNN & CRUTCHER LLP                  Jacob T. Spencer (# 1023550)
2001 Ross Avenue Suite 2100                  Abigail B. Dugan (# 1743216)
Dallas, TX 75201-2923                        GIBSON, DUNN & CRUTCHER LLP
(214) 698-3100                               1700 M Street, N.W.
                                             Washington, D.C. 20036-5404
                                             (202) 955-8500

                    *Attorneys for Defendant*

21

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing using the CM/ECF system on September 15, 2025, which will send an electronic notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Jason C. Schwartz*
_____

Jason C. Schwartz (# 465837)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-5404
(202) 955-8500

*Attorney for Defendant*