**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SABRINA SOFFER,<br>875 10th St NW, 533,<br>Washington, D.C.,<br>20001<br><br>ARI SHAPIRO, and<br><br>COMPLIANCE, ACCOUNTABILITY,<br>POLICY, ETHICS – ED (“CAPE-ED”),<br>3525 Del Mar Heights Road<br>Suite 721<br>San Diego, CA 92130<br><br>Plaintiffs,<br><br>v.<br><br>THE GEORGE WASHINGTON UNIVERSITY<br>2121 I St NW,<br>Washington, DC 20052,<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>Case No. 1:25-cv-1657 (TNM) |

**FIRST AMENDED COMPLAINT**

Plaintiffs Sabrina Soffer, Ari Shapiro (the “Individual Plaintiffs”), and Compliance, Accountability, Policy, Ethics – Ed (“CAPE-Ed”) (collectively, “Plaintiffs”), for their First Amended Complaint against Defendant The George Washington University, allege as follows:

**INTRODUCTION**

1. Plaintiffs have been—and are being—denied educational opportunities at George Washington University (“GWU” or the “University”) due to extensive, repeated, and pervasive animosity and hatred directed towards them due to their Jewish faith, ethnicity, and nationality. The hostility towards Plaintiffs’ Jewish faith includes, but is not limited to:

- protesters blocking Plaintiffs' access to areas of campus, including attending classes, libraries, professors' offices, and other GWU resources;
- students and protesters repeatedly calling for Plaintiffs' elimination and death, both individually because of their Jewish identity, and collectively as Jewish people;
- protesters physically attacking and harassing students and their families, including CAPE-Ed Members 1, 2, and 4, as well as unlisted CAPE-Ed members;
- forcing Plaintiffs to conceal their Jewish identity out of fear;
- the school sponsoring speakers who repeatedly suggest that the Jewish homeland and its people be annihilated;
- encampment protests that occupied campus for weeks that disrupted courses and blocked access to various educational opportunities;
- the encouragement of antisemitic behavior by GWU faculty and staff; and
- denying Jewish students, including Plaintiffs, equal access to educational opportunities due to their Jewish identity.

2. For example, during the Spring 2024 encampment that arose on GWU's campus, protesters raised repulsive, antisemitic signs and shouted slogans like "final solution" and "Globalize the Intifada," both calls for violence against Jews. They also included: "Fuck you, Zionist, go die"; "There is only one solution, Intifada revolution"; "Hamas are freedom fighters"; "We don't want no Jewish state"; and "Zionists, go to hell."

3. During Spring 2024, protests engulfed the GWU campus. Protesters broke barricades, threw the broken barricades into the campus plaza, and blocked Jewish students from traversing campus freely, attending class, and otherwise engaging in educational opportunities.

4. Plaintiff Soffer has repeatedly been the subject of intimidation and threats; she was labeled "the most hated Jew on campus."

5. GWU was made aware of these matters and has failed to meaningfully respond.

6. For example, from November 2023 through May 2025, GWU JPULSE, a D.B.A. of CAPE-Ed, repeatedly provided GWU decision-makers with incident reports, supporting

evidence, and proposed solutions that gave the University notice of alleged antisemitic harassment and opportunities to act.

7. GWU dismissed and downplayed these notices and proposals and failed to take effective corrective actions, allowing antisemitism to intensify, from the classroom to the encampments, which subjected and subjects Plaintiffs to denial of equal educational opportunities.

8. In fact, after a lengthy investigation into this matter, the U.S. Department of Justice's ("DOJ") Civil Rights Division concluded, "GWU was deliberately indifferent to the complaints it received, the misconduct that occurred, and the harms that were suffered by its students and faculty, in violation of Title VI of the Civil Rights Act of 1964[.]"[1]

9. Due to GWU's own acts and its failure to act, it has shown deliberate indifference to the safety and well-being of its Jewish students.

10. Thus, GWU violated Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 et seq., and breached its contract with the Plaintiffs.

**JURISDICTION & VENUE**

11. The Court has subject matter jurisdiction over Counts I and II of this action under 28 U.S.C. §§ 1331 and 1343 because these claims arise under federal law.

12. The Court has supplemental jurisdiction over Counts III and IV because they are "so related to [the] claims in [this] action within" the Court's "original jurisdiction that [they] form[] part of the same case or controversy." 28 U.S.C. § 1367.

---

[1] U.S. Dep't of Just., Civ. Rights Div., *Notice of Findings Regarding George Washington University* (Aug. 12, 2025), https://www.justice.gov/crt/media/1410936/dl?inline.

13. The Court has personal jurisdiction over GWU because it is located and conducts business in the District of Columbia.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because GWU is located in the District of Columbia, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District.

**PARTIES**

15. Plaintiff Sabrina Soffer is a dual citizen of the United States and Israel, and was a Jewish undergraduate student who participated in the University Honors Program and studied at GWU's Columbian College of Arts and Sciences. Ms. Soffer graduated from GWU in May 2025.

16. Plaintiff Ari Shapiro is a United States citizen and was a Jewish undergraduate student at GWU's Columbian College of Arts and Sciences. Mr. Shapiro graduated from GWU in May 2025.

17. Plaintiff Compliance, Accountability, Policy, Ethics – Ed ("CAPE-Ed") is a voluntary membership organization composed of GWU students, alumni, and other GWU stakeholders.

18. CAPE-Ed's mission is to protect GWU students and the greater GWU community against antisemitism and discrimination, and to ensure equal access to educational opportunities for all students through lawful means, including litigation.[2]

19. Other than Plaintiffs Ms. Soffer and Mr. Shapiro, CAPE-Ed members are not identified by name in this Complaint because of reasonable fear that they would face retaliation and harassment.

---

[2] *See* GW JPULSE, *GW University Jewish Parent United Leading Student Empowerment*, https://GWUJPULSE.org/ (last visited Nov. 21, 2024).

20. CAPE-Ed Member No. 1 is a Jewish student at GWU in the Elliott School of International Affairs. She is a United States citizen.

21. CAPE-Ed Member No. 2 was a Jewish undergraduate student at GWU's Columbian College of Arts & Sciences and graduated from GWU in May 2024. She is a United States citizen.

22. CAPE-Ed Member No. 3 is a Jewish graduate student at GWU's Columbian College of Arts & Sciences, pursuing a Psy.D. in Clinical Psychology.

23. CAPE-Ed Member No. 4 is an Israeli citizen and was a Jewish graduate student at GWU's Elliott School of International Affairs.

24. Defendant the George Washington University is a private, federally chartered, not-for-profit university located in the District of Columbia.

25. At all times relevant to the allegations included in this Complaint, GWU was and continues to be a recipient of federal funds, primarily received in the form of student loans.[3]

26. In fiscal year 2023, GWU reportedly received $200 million in federal funds.[4]

## FACTUAL ALLEGATIONS

### I. ON JEWISH IDENTITY AND THE MEANING OF ANTISEMITISM.

27. The Jewish people are indigenous to the land of Israel, and their shared history, religion, and ancestry are inextricably tied to the land.

28. Despite periods of forced exile, a continuous Jewish presence has endured there for

[3] Federal loans, referred to as "grants and loans of federal funds" by the U.S. Department of Justice, are an example of federal assistance. *See* Civ. Rights Div., U.S. Dep't of Just., *DOJ Title VI Legal Manual*, https://www.justice.gov/crt/book/file/1364106/dl?inline, Section V at 5 (last visited July 26, 2024).

[4] Kyle Morris, *Billions of taxpayer dollars fund schools with anti-Israel protests*, FOX NEWS (April 29, 2024), https://www.foxbusiness.com/politics/billions-taxpayer-dollars-fund-schools-anti-israel-protests.

millennia.

29. Zionism is the movement for the re-establishment of a sovereign Jewish nation in its ancestral homeland and assures its existence. For the vast majority of Jewish people across time and space, Zionism is and always has been a fundamental part of their Jewish identity and serves as a manifestation of its expression.[5]

30. Criticism of Israel is not inherently antisemitic.

31. Expressions of hatred against "Zionists," however, always are.[6]

32. According to Natan Sharansky's 3-D's test, dehumanization, delegitimization, and imposing double standards on Israel and Zionism is antisemitism. Thus, discrimination against Zionists can be considered discrimination against Jews.

33. The Anti-Defamation League's ("ADL") Pyramid of Hate explains that antisemitic harassment and violence do not arise in a vacuum.[7]

34. It invariably starts with "biased attitudes"—with speech that stereotypes, justifies stereotypes, and demonizes Jews—which forms the base of the Pyramid of Hate.

35. When biased attitudes are left unaddressed, and expressions of the 3-D's are allowed to metastasize as they were at GWU, antisemitism only escalates.

## II. GWU's Student Code of Conduct and Other Relevant Policies.

36. GWU chooses not to enforce its nondiscrimination policy when discrimination is

---

[5] *See* https://www.adl.org/resources/glossary-terms/zionism; https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/; American Jewish Committee, *The State of Antisemitism in America 2024, https://www.ajc.org/AntisemitismReport2024#:~:text=81%25%20of%20American%20Jews%20say,right%20to%20exist%20is%20antisemitism*

[6] U.S. House of Representatives Staff Report on Antisemitism (Dec. 18, 2024).

[7] ADL Pyramid of Hate, https://www.adl.org/sites/default/files/pyramid-of-hate-web-english_1.pdf.

directed at Jewish and Israeli students.

37. The Student Code of Conduct expressly prohibits "discriminatory misconduct," which includes: (i) Unlawful Discrimination, which is adverse treatment of an individual based on a protected characteristic, rather than individual merit; and (ii) Discriminatory Harassment, which is any unwelcome conduct based on a protected characteristic where such conduct creates a hostile environment.

38. As defined in the Student Code of Conduct, unlawful discrimination includes singling out or targeting an individual for different or less favorable treatment because of their protected characteristic and restricting an individual's continued access to an educational program or activity or participation in a student organization or activity based on a protected characteristic.

39. The Student Code of Conduct separately promises that GWU will not tolerate discriminatory harassment, whether blatant and intentional and involving an overt action, a threat or reprisal; or subtle and indirect, with a coercive aspect that is unstated.

40. The Student Code of Conduct explains that discriminatory harassment, among other things: (i) does not have to include intent to harm or be directed at a specific target, (ii) may occur in the classroom, in the workplace, in residential settings, or in any other context or setting connected to the university or related activities, (iii) may occur in digital environments including but not limited to social media, web sites, educational platforms, and electronic mail, and (iv) may be a one-time event or may be part of a pattern of behavior.

41. The Student Code of Conduct also includes the following prohibitions:

- Disorderly Conduct, which includes acting in a manner that threatens, endangers, or harasses others; and disrupting, obstructing, or interfering with the activities of others;
- Interfering with University Events, which is defined as "Interfering with any normal university or university-sponsored events, including but not

limited to studying, teaching, research, university administration, fire, police, or emergency services";

- Non-compliance, which is the failure to comply with reasonable directions of university officials, including University Police officers and representatives of Enrollment and the Student Experience acting in performance of their duties;

- Safety Measures Violations, including the intentional or unintentional throwing, lowering of, or in any way putting any object out of a window or from any building structure including but not limited to a balcony, rooftop deck, stairwell, or any equivalent interior structure of any building;

- Sanction Violation, defined to mean violating the terms of any student conduct sanction assigned in accordance with this Code;

- "Trespass," defined to mean entering or remaining on or in any part of any university premises without proper authorization.

42. Moreover, the Student Code of Conduct states that a student leader may be held responsible for an organization's violations of the Code of Conduct.

43. A student leader who fails to respond to an administration's direction to take action to prevent or end an organization's violations of the Code is individually responsible for a violation of the Code.

44. GWU's Policy on Demonstrations states that the University maintains the right to define the time, place, and manner of, as well as objects utilized during, demonstrations that occur on its campuses and at its facilities.

45. It expressly prohibits demonstrations that "endanger the safety or security of the university community, infringe upon the rights of other members of the community, or cause property damage."

46. This includes the rights of others to conduct class, hold their own meetings, or hear another speaker.

47. In addition, GWU has the authority to "require demonstrators to remove any mask,

hood, or device whereby any portion of the face is hidden, concealed, or covered as to conceal the identity of the wearer."

48. Under the University's Policy on Barring People from Campus, GWU "reserves the right to determine who can and cannot access and/or use university facilities or be present on university property."

49. GWU's Policy on Threats and Acts of Violence states that the University will respond promptly to reports of threats or acts of violence and reserves the right to take immediate action to protect members of its community.

## III. THE PARTNERSHIP BETWEEN THE GWU FACULTY AND THE MIDDLE EAST STUDIES ASSOCIATION CREATED A PIPELINE OF HATE THAT HELPED CULTIVATE THE RAMPANT ANTISEMITISM PERMEATING THE UNIVERSITY.

50. The systemic and institutional antisemitism described throughout this First Amended Complaint did not materialize on its own.

51. In 2007, GWU founded the Institute for Middle East Studies ("IMES") and housed it within the University's Elliott School of International Affairs.

52. IMES is the GWU institute responsible for hosting the unrelenting anti-Israel events in the wake of the October 7th terror attacks.

53. IMES faculty has included a disproportionate number of members who have a documented history of anti-Israel activism, which, in many cases, has been reflected in courses and IMES events in which Jewish students have been censored, shamed, and humiliated.

54. Plaintiffs argue that these contested characterizations were presented without meaningful examination of contrary perspectives or evidence.

55. In the aftermath of Hamas's horrific October 7th attacks, many IMES faculty openly defended and supported Hamas's terrorism as rightful "resistance."

56. IMES programming has been uniformly and unreasonably hostile towards Israel and Zionism, referring to the Jewish state as a perpetrator of "genocide," "the occupation," "settler-colonialism," and "apartheid" – the very rhetoric echoed by students at antisemitic protests.[8]

57. While the Individual Plaintiffs were enrolled at GWU, IMES did not allow speakers to present alternative perspectives to many of those views to the GWU students enrolled in its programming.

58. Plaintiff Soffer expressed repeated concern to GWU officials over IMES and insisted that its events include viewpoint diversity – to no avail.

59. When department heads and university administrators exclude, or allow for the exclusion of pro-Israel scholars and historians from academic discussions about Israel and the Middle East, they deny students access to education and rigorous debate, and nurture an antisemitic campus environment, which incites hate.

60. The anti-Israel bias evident in the IMES department is shared by other faculty and departments, including the American Studies and Psychology departments, on the GWU campus and spreads incitement of hate, leading to fear and censorship.

61. In addition to IMES's presence, in 2019, GWU announced that the Middle East Studies Association ("MESA") had decided to move its operations from the University of Arizona to GWU, where it would be affiliated with IMES at GWU's Elliott School.

62. For decades, MESA has been recognized as an antisemitic outpost masquerading as an academic organization.

---

[8] https://gwhatchet.com/2024/11/14/op-ed-in-forming-fsjp-faculty-perpetuate-a-pipeline-of-hate/.

63. For years, MESA and some GWU faculty have taught that Zionism is evil, taught that Israel is the evil product of Zionism, and promoted allegations of dual loyalty, all antisemitic according to the International Holocaust Remembrance Alliance definition of antisemitism.

64. In March 2022, from its headquarters in the Elliott School, MESA adopted a resolution endorsing the Boycott, Divestment, and Sanctions ("BDS") movement.

65. The BDS movement operates as a coordinated and sophisticated effort to destroy the economic and financial stability of the State of Israel. It also attempts to cause direct harm to the economic interests of persons conducting business in and with Israel, or with people that the movement deems to be affiliated with Israel in some way, often simply because they are Jewish.

66. MESA's adoption of the BDS resolution violated GWU's own policy, which rejects calls for divestment and academic boycotts of Israel.

67. While GWU issued a statement expressing that MESA's BDS resolution did not reflect GWU's position, it nonetheless remained partnered with MESA and allowed it to continue its activities on campus.

68. On May 2, 2023, the Louis D. Brandeis Center wrote to then-President Mark Wrighton urging GWU to end its partnership with MESA. The letter warned that MESA's endorsement of BDS threatened academic freedom and raised concerns about antisemitism at GWU. It cited research that universities whose faculty actively supported BDS were 3.6 times more likely to experience acts targeting Jewish and pro-Israel students for physical harm.[9]

69. GWU stated that MESA's BDS resolution did not reflect the University's position

[9] https://www.investigativeproject.org/documents/1173-brandeis-center-letter-to-gw-re-mesa.pdf.

and announced in July 2023 that its partnership with MESA would expire at the end of that year.

70. Plaintiffs allege that, notwithstanding the announced end of the formal partnership, GWU's IMES continued through September 2026 to sponsor programming that dehumanized and delegitimized Zionism and Israel. Plaintiffs have repeatedly brought much of this programming to GWU's attention.

71. One example was the April 2024 IMES conference, "Middle East Knowledge Production in the Aftermath of October 7." The panels featured about fifteen scholars without a single speaker offering perspectives that challenged distorted and demonizing narratives about Zionism and Israel.

72. Another was the October 18, 2023, screening and discussion of the anti-Israel film, *Israelism*,[10] - incentivized by her professor with extra credit - where Ms. Soffer asked respectful questions, expressed her views, and was ultimately publicly shamed and targeted by the film director over her Israeli-American Jewish identity. The professor in discussion with the film maker did not intervene and no like extra credit opportunities were offered by the professor to attend pro Israel events.

73. Plaintiffs had reported to GWU department heads and professors the ongoing incitement of hate and subverted programming, along with the continued promulgation of MESA activism, which contributed to a hostile educational environment.

74. By allowing MESA activism to persist via IMES, GWU violated its own codes.

---

[10] The film *Israelism* is featured by Al-Jazeera, a news network funded in part by Qatar that has ties to Hamas and promotes pro-Hamas propaganda. https://www.aljazeera.com/video/featured-documentaries/2024/10/24/israelism-the-awakening-of-young-american-jews; https://www.fdd.org/analysis/2025/11/17/does-al-jazeera-collaborate-with-hamas/.

### IV. THE CULTURE OF HATE SPREADING FROM IMES PERMEATED GWU'S CAMPUS LONG BEFORE THE OCTOBER 7TH HAMAS TERROR ATTACKS.

75. In the months and years leading up to October 7, 2023, GWU was already aware that antisemitism was being cultivated throughout the University and that its Jewish students had been subjected to pervasive and severe antisemitic discrimination and harassment.

76. GWU has, for years, received reports of antisemitic discrimination made by students, parents, and other members of the GWU community.

77. In November 2021, the editorial board of the GW Hatchet, GWU's student newspaper, acknowledged what everyone on campus knew: "GW has an alarming history of antisemitism."

78. Currently, the U.S. House of Representatives Committee on Education and the Workforce ("House Committee") is investigating GWU as part of its broader investigation into antisemitism on college and university campuses.

79. Indeed, the DOJ Task Force on Antisemitism recently included GWU among the ten universities it visited as part of its campus antisemitism investigations.[11]

80. Furthermore, in the two years leading up to October 7, 2023, GWU's administration was confronted with consistent reports of antisemitic discrimination and harassment on campus, yet it failed to act to protect Jewish and Israeli members of the community.

81. Those acts included the numerous separate incidents involving the desecration of Jewish religious items, harassment with Nazi imagery, and the plastering of antisemitic messages

[11] United States Department of Justice, Office of Public Affairs, *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism* (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

on the GWU Hillel Center (including phrases such as "Zionists Fuck off").

82. The signs on the Hillel Center property were plastered with extra-strong adhesive, and the removal caused thousands of dollars in property damage.

83. The leaders of the student organizations that committed those unlawful acts, and the organizations themselves, faced no discipline.[12]

84. GWU's deliberate indifference to antisemitism lent the vandals and antisemitic provocateurs a veneer of legitimacy, emboldened perpetrators to take more aggressive discriminatory actions, and encouraged others to escalate the hatred.

85. In March 2023, Sabrina Soffer, commissioner of a then-existing GWU Student Government Presidential Task Force to Combat Antisemitism, explained in an article: "My own school [GWU] has not been spared from this wave of hate. A number of my Jewish friends tend to conceal their Jewish insignia when walking around campus. They're often confronted or heckled."[13]

86. Several months after her article was published, and the Task Force work was underway, the GWU Student Association Presidential Task Force to Combat Antisemitism was disbanded by the incoming GWU student president.

87. In the years following, administrators dismissed Soffer's repeated appeals to re-establish a task force under their purview and failed to take concrete steps to address antisemitism.

---

[12] A. Rosenfeld, *GW clears student activist and club of wrongdoing in 'F— Zionists' postering*, The Forward (Dec. 19, 2022), https://forward.com/fast-forward/529048/gw-clears-student-activist-and-club-of-wrongdoing-in-f-zionists-postering/.

[13] Sabrina Soffer, "I've Been Asked to Help Tackle Antisemitism at George Washington University; Here's My Take," The Algemeiner (March 13, 2023), https://www.algemeiner.com/2023/03/13/ive-been-asked-to-help-tackle-antisemitism-at-george-washington-university-heres-what-i-plan-to-do/

## V. THE OCTOBER 7TH ATROCITIES BRING ANTISEMITISM TO THE FOREFRONT OF THE GWU COMMUNITY, AND THE GWU ADMINISTRATION ALLOWS IT TO BOIL OVER.

88. During the Fall 2023 semester, the already-hostile environment on campus became even more intolerable for Jewish and Israeli students.

89. On October 7, 2023, Hamas perpetrated the most gruesome attack against Israel in the Nation's history, murdering, torturing, and mutilating over a thousand innocent men, women, children, and babies; raping and sexually assaulting women; and kidnapping hundreds of innocent civilians, including the elderly, the infirm, and children.

90. Palestinian terrorists from Gaza murdered more than 1,200 people that day, including more than forty Americans. Two hundred fifty-one people were abducted.

### A. GWU-funded student organizations celebrate Hamas while threatening Jewish and Israeli students, without meaningful repercussions.

91. In the wake of the October 7th attacks, several GWU student groups and supporters openly celebrated the terrorist attacks and honored "martyred" terrorists killed in the attacks, while taunting pained and grieving Jewish and Israeli students.

92. On October 9, 2023, while Jewish and Israeli students were still reeling from the attacks, the University issued its first statement.

93. In an open letter to the University community, GWU President Ellen Granberg stated that she was "deeply shocked and saddened"—but not specifically by the carnage inflicted by Hamas on Jewish Israelis.

94. She chose *not* to include "Israelis." She chose *not* to call out "Hamas" by name, condemn its attacks as "terrorism," or condemn celebrations of terrorism.

95. And in contrast to University statements issued in the wake of other terror or hate-driven attacks, Granberg did not extend condolences to the devastated Israeli students on campus.

96. She offered only that "[t]imes of war are fraught with many difficult and complex emotions, and I recognize that we all may feel a combination of fear, anxiety and anger right now."

97. Her equivocation left Jewish and Israeli students abandoned and gave purchase to virulent antisemitism.

98. Within hours, GWU Students for Justice in Palestine ("GWU SJP") issued its own statement, cheering Hamas's terrorist attacks on unarmed civilians.

99. GWU SJP declared Hamas "our resistance fighters," and proclaimed that it maintains "unwavering support for our people's resistance, in all its forms."

100. GWU SJP also "call[ed] upon all our people and those in solidarity with us to join us in this struggle."

101. And GWU SJP made clear that "this struggle" was not confined to peaceful protest.

102. GWU SJP's statement and celebrations of Hamas, particularly in light of the pattern of antisemitic harassment on campus, induced more anxiety among Jewish and Israeli students.

103. Moreover, it constituted a violation of, among other things, (i) GWU's Policy on Threats and Acts of Violence, which prohibits threats, defined as "words or actions intended, causing, or reasonably likely to cause fear, pain, harm, injury, or damage to any person or property"; and (ii) GWU's Student Code of Conduct, Prohibitions Against Discriminatory Harassment, and of Disorderly Conduct, which prohibits "[a]cting in a way that threatens, endangers, or harasses others, including verbal, written, or any other form of communication."

104. Jewish and Israeli students reported the GWU SJP statement to the administration and explained the threatening language, and the fear and anxiety it provoked.

105. The administration, however, determined that the "[a]llegations if true would not have constituted a violation of GW policy."[14]

106. On October 10, 2023, GWU SJP hosted a "Vigil for Martyrs" on Kogan Plaza, the center of the mid-campus yard, bordered by the Gelman Library, academic buildings, residence halls, and dining halls.

107. A crowd of approximately 120 protesters filled Kogan Plaza. Using megaphones and drums, they cheered Hamas's attacks and mourned the terrorists killed during the attack.

108. The protesters filled the Plaza with chants such as "We will honor all our martyrs," and "Intifada, intifada, long live the intifada."

109. The term "intifada" refers to violent uprisings involving attacks on Israeli civilians.

110. The crowd of protesters then engaged in a loud call-and-response of "From the River to the Sea, Palestine will be free," followed by shouting the chant in its original Arabic, the cornerstone of the Hamas charter: "min il-ṃayye la-l-ṃayye, Falasṭīn ʿarabiyye," which means "from the water to the water, Palestine will be Arab";[15] i.e., free from Jews.

111. In other words, in the middle of the GWU campus, a crowd of protesters was calling for the elimination of Jews from the land of Israel.

112. A protest leader, his voice amplified by megaphone, shouted that Jews would be

[14] Letter to the Hon. Virginia Foxx, Chair, Committee on Education and the Workforce dated October 11, 2024, and attachment entitled George Washington University Incident Overview ("House Committee Submission").

[15] Mary Margaret Olohan (@MaryMargOlohan), X (October 10, 2023), https://x.com/MaryMargOlohan/status/1711888705093353931/video/1.

vanquished through "intifada," more terrorist attacks on civilians.

113. For Jewish and Israeli students on campus, a target had been placed on their backs.[16]

114. As the "Vigil for Martyrs" was underway, some fourteen Jewish students, including Ms. Soffer, met with President Granberg and Vice Provost and Dean of Students Colette Coleman to address President Granberg's October 9 statement and notify the administration of an increasingly hostile campus environment.

115. The students explained they felt unsafe on campus and asked President Granberg and Dean Coleman to take concrete action to protect the safety of Jewish and Israeli students.

116. To be certain, the students were not asking for the University to stifle free speech.

117. They did, however, plead for protection against the threatening conduct beginning to rear its head throughout campus and asked that GWU enforce its Codes of Conduct.

118. President Granberg's only concrete response to the students' concern for their safety was emblematic of the administration's tolerance of antisemitism – she instructed them to *avoid* Kogan Plaza, where the "Vigil for Martyrs" was taking place.

119. Jewish and Israeli students reported the "Vigil for Martyrs" to the administration because it violated, among other things, (i) GWU's Policy on Threats and Acts of Violence; (ii) GWU's Policy on Demonstrations; and (iii) GWU's Student Code of Conduct, Prohibitions Against Discriminatory Harassment, and of Disorderly Conduct.

120. Although President Granberg's directive to the Jewish and Israeli students recognized the threat posed to them, the GWU administration concluded that the "[a]llegations if true would not have constituted a violation of GW policy," despite the clear transgressions of the

[16] Mary Margaret Olohan (@MaryMargOlohan), X (October 10, 2023), https://x.com/MaryMargOlohan/status/1711887828806738386/video/1

policies listed in the previous paragraph.

121. On October 11, 2023, President Granberg issued another statement to the University community, which said that "as the extent of this brutal violence and the staggering loss of innocent lives has continued to come to light," she felt moved to "condemn these acts of terrorism."

122. She added:

> [M]embers of the GW community, including our student organizations, have the right to be vocal and engaged within the boundaries of the law and our university policies. However, we are also a shared community, and I not only condemn terrorism, but I also abhor the celebration of terrorism and attempts to perpetuate rhetoric or imagery that glorifies acts of violence.

123. While her statement belatedly condemned Hamas's attacks as terrorism and stated her abhorrence for the celebrations of terrorism on the GWU campus, she did not announce any concrete plans or actions to protect the safety and educational access of Jewish and Israeli students.

124. The abundant hateful rhetoric and harassment of Jewish and Israeli students has led a number of students to hide their Jewish identity on campus.

125. Many stopped wearing clothing that was identifiably Jewish or Israeli, and tucked necklaces with Jewish pendants under their clothing.

126. Some even avoided attending Jewish prayer services, enrolling in Judaic Studies courses, and events to escape being ostracized, accosted, or photographed and targeted by protesters.

127. Some avoided areas of campus out of fear for their physical safety, and others chose not to speak in or outside the classroom fearing retaliation from faculty and peers.

**B. A series of antisemitic events, all of which left out speakers with a firm stance on Israel, arose in the aftermath of October 7th.**

128. While President Granberg's statement came to condemn celebrations of terrorism,

the administration permitted IMES to sponsor a series of purportedly educational programs about the conflict – which uniformly vilified Israel and lent academic legitimacy to those celebrations of terror and antisemitism.

129. The series of programs not only denied the Jewish people's historical connection to the land of Israel, but demonized them by falsely painting them as foreign oppressors and teaching that Israel was engaged in a genocide of the Palestinian people.

130. The IMES programs were not only themselves biased, but refused to permit scholars, diplomats, and experts with diverse viewpoints – namely, with Zionist viewpoints – to participate in their programs.

131. There was never any counter perspective from scholars who, for example, support Israel's military actions in Gaza, or consider Israel a sanctuary of human rights in the Middle East.

132. For all intents and purposes, pro-Israeli and even simply Israel-normal positions have been ultimately censored by GWU in its IMES programs.

133. Students knowledgeable about the Middle East, Israel, and the war in Gaza who challenged what they regarded as distorted classroom narratives reported being shamed, humiliated, and attacked by speakers who spoke with authority from the University as faculty, professors and guest lecturers sponsored by the University.

134. Students in the classroom who were not previously knowledgeable about the Middle East were unduly influenced by these pro-Palestinian lecturers, and they were denied a balanced and accurate presentation of the curriculum. These students were then mobilized into the protests and encampments.

135. Plaintiffs allege that this treatment caused some of them to suppress their views and

refrain from participating in class for fear of further mistreatment or retaliation.

136. In other departments, pro-Palestine students and faculty who shamed and were hostile towards Zionists and Israelis were praised by some GWU faculty members.

137. When University-sponsored programming allows academics to use their authority to target and humiliate students and incite hate – that is not academic freedom but a violation of GWU's professional standards as delineated in its Faculty Code of Conduct.

138. GWU's Faculty Code of Conduct states that faculty "shall be guided by the requirements of … adherence to scholarly standards" and is "responsible for the character of the instruction, the maintenance of good order, and the observance of university regulations" – meaning that the censorship of viewpoints, deliberate omission of context and facts, promotion of Israel vilification, and mobilizing students toward anti-Israel events are a form of misconduct, nothing to do with free speech.[17]

139. In the fall of 2023, Ms. Soffer and other Jewish and Israeli students, alarmed by the pervasive anti-Israel bias and antisemitism in IMES's programming so soon after the October 7th attacks, reported their concerns to the GWU administration.

140. The Jewish and Israeli students *did not* seek to cancel IMES's events, but asked that IMES include academic diversity in the programming.

141. The administration refused to get involved and instead told the students to speak to the Dean of the Elliott School.

142. In or around late October 2023, the students met with Dean Alyssa Ayres of the Elliott School and expressed their concerns.

---

[17] https://provost.gwu.edu/sites/g/files/zaxdzs5926/files/2023-05/faculty-code.pdf.

143. Dean Ayres suggested the students propose speakers for another panel.

144. The students soon thereafter presented Dean Ayres with a list of academics, prominent diplomats, and other experts on the Middle East, including GWU faculty members, who were willing to appear on IMES panels.

145. Dean Ayres, however, never invited any of the proposed speakers.

146. From October 2023 through at least April 2024, IMES continued holding events with an anti-Israel bent while censoring counter-perspectives. In violation of its own policies, the University has permitted instruction that incites hate and emboldens violations of good order to go unchallenged while denying students access to balanced and scholarly sound instruction.

147. Between November 2023 and February 2024, GWU JPULSE reported to GWU antisemitic incidents, distorted and hateful anti-Israel curriculum, the exclusion of competing perspectives, and the resulting impact on students. GWU JPULSE also prepared a comprehensive report proposing solutions to address these concerns. Despite these reports and proposed solutions, GWU administrators ended their dialogue with the organization. GWU JPULSE continued to notify administrators of these concerns, but Plaintiffs allege that GWU continued to choose not to act.

148. GWU's actions and inactions, at a minimum, demonstrate that it was aware that antisemitism had infected all areas of the University and that it was deliberately indifferent to the

anti-Israel activity that naturally progressed from rhetoric to violence, vandalism, and disruption.

149. Moreover**,** since October 7th, numerous faculty have incited and motivated antisemitic hate through school-sponsored programming and course curriculum, for instance, mobilizing students toward anti-Israel events by incentivizing them with extra credit, taking class time to make way for anti-Israel activism, and allowing and emboldening the shaming and shunning of expressions of Jewish identity on campus – amounting to violations of GW's Faculty Code of Conduct.

150. Despite repeated warnings to the University about the dangers of the encampment and antisemitism on campus, Defendant failed to take action. The hostility persists.

151. In February 2026, Plaintiff Soffer and two current GWU students testified before the U.S. Commission on Civil Rights, describing persistent antisemitism on campus and condemning GWU's failure to respond adequately to their reports and concerns regarding students and faculty wielding antisemitism. *See, e.g.*, *Students, alum condemn GW's handling of campus antisemitism in U.S. Commission testimon*y, The GW Hatchet (Feb. 23, 2026).

### C. As expected, GWU-funded student organizations, with the tacit approval of the GWU faculty and administration, increase their hostility toward, and disruption of life on campus for, GWU's Jewish and Israeli students.

152. On October 24, 2023, during another GWU SJP protest in Kogan Plaza, four GWU SJP students projected antisemitic phrases on the exterior wall of Gelman Library, including "GLORY TO OUR MARTYRS," "DIVESTMENT FROM ZIONIST GENOCIDE," "FREE PALESTINE FROM THE RIVER TO THE SEA," and "YOUR TUITION IS FUNDING GENOCIDE IN GAZA."

153. When individuals or institutional actors assert that anti-Zionism is distinct from antisemitism or characterize their conduct as merely supporting Palestine (while simultaneously glorifying or justifying acts of terrorism committed by Hamas and omitting the group's well-

documented atrocities), such behavior constitutes antisemitism under the widely adopted International Holocaust Remembrance Alliance ("IHRA") Working Definition.[18]

154. This pattern of conduct reflects not only a discriminatory bias against Jewish identity as expressed through Zionist affiliation, but it also creates a hostile and threatening educational environment for Jewish students.

155. The day after the antisemitic projections on the Gelman Library, President Granberg issued a statement acknowledging the "images included antisemitic phrases that have caused fear and anxiety for many members of our Jewish and broader GW community" in "violation of our university policy."

156. On November 3rd, the day of President Granberg's inauguration at the Smith Center, GWU SJP led a "Shut It Down" march from Kogan Plaza to the inauguration venue.

157. Protesters wore keffiyehs and masks to hide their faces, and carried banners, including one that read "From the River to the Sea"; led chants by megaphone, including "Granberg you can't hide, you're complicit in genocide"; and banged on pots.

158. One GWU SJP leader was recorded referring to President Granberg as a "fucking Jew."

159. When they arrived at the Smith Center, speakers used a megaphone to disrupt the inauguration, chanting, among other things:

[18] The United States, forty-two other countries, thirty-three states, and numerous colleges and universities have adopted the IHRA working definition. That working definition defines antisemitism as "a certain perception of Jews, which may be expressed as hatred toward Jews." It acknowledges that Zionism cannot be separated from the identity of most Jews.

> We are here to make it clear that every single day, from now to Granberg's inauguration to the end of her f*cking term, that we will be here on the streets demanding that she divest and that she end all financial ties between this University and the Israeli occupation of Palestine.[19]

160. The protesters achieved exactly what they wanted – shutting down the inauguration.

161. GWU decided that the protest posed a "heightened safety risk" and rescheduled the inauguration to a later date and virtual format.[20]

162. The protests constituted disorderly conduct under D.C. criminal law, which prohibits, among other things, "loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering."[21]

163. The protests also violated the Student Code of Conduct provisions on Student-Sponsored Forums, which prohibits demonstrations that interfere with the processes of the university, and the prohibitions against discriminatory harassment and interference with University events, and the Policy on Demonstrations and Disruptions of University Functions.

164. Under the Student Code of Conduct, the student groups involved in the protests "may be held collectively responsible," and their officers "may be held individually responsible when violations of the Code by those associated with the group or organization have occurred."

165. Hillel stands as one of the few campus sanctuaries for Jewish and Israeli students.

166. But that was compromised on November 3, 2023, following GWU SJP's successful protest to shut down President Granberg's inauguration.

---

[19] *Pro-Palestinian students protest outside Granberg inauguration*, GW Hatchet (Nov. 4, 2023), https://gwhatchet.com/2023/11/04/pro-palestinian-students-protest-outside-granberg-inauguration/.

[20] F. Riley and R. Moon, *Pro-Palestinian students protest outside Granberg inauguration*, The GW Hatchet (Nov. 4, 2023), https://gwhatchet.com/2023/11/04/pro-palestinian-students-protest-outside-granberg-inauguration/.

[21] D.C. Code § 22–1321 (2024).

167. Shortly before the Jewish Sabbath, a protester, a GWU student, entered the Hillel Center without authorization and tore down posters of Israeli hostages held by Hamas.

168. On November 10, 2023, at 1 pm, GWU SJP and other student organizations led a student walkout of classes and sit-in at the entrance to Gelman Library, in another call to "Shut It Down for Palestine" protest.

169. About two hundred students (and some professors) "engulfed the right side of Gelman Library, wearing face masks, keffiyehs draped over their shoulders and holding up cardboard and poster signs."[22]

170. The protest prevented students from entering Gelman Library.

**D. GWU's response emboldens the antisemitic perpetrators.**

171. President Granberg's remarks in a meeting with alumni on November 16, 2023, revealed the University's double standard in the enforcement of its nondiscrimination policy, which tolerates a far greater range of discriminatory harassment of Jewish and Israeli students than any other racial or ethnic minority.

172. In that meeting, a number of alumni questioned her on the University's failure to discipline students who engaged in blatant antisemitic harassment.

173. President Granberg explained the University's standard for determining when discipline for antisemitic harassment is warranted:

**E.** Would that be something that, say, the FBI would arrest someone for? And if the answer is no, then it's not a speech that GW can punish. And I really wish it were.

174. But GWU's own policies and Code of Conduct authorize the University to act when

---

[22] *Students gather at library steps for pro-Palestinian sit-in, march on State Department*, GW Hatchet (November 10, 2023), https://gwhatchet.com/2023/11/10/students-gather-at-library-steps-for-pro-palestinian-sit-in-march-on-state-department/#.

students engage in discrimination and harassment, even if it falls short of a federal crime.

175. Indeed, D.C. and federal law, including Title VI, compel it to do so, including for the protection of educational opportunities and benefits.

176. On November 14, 2023, President Granberg announced that the administration had completed its review of the antisemitic imagery projected onto Gelman Library.

177. Following a hearing, the administration formally determined that the students who projected the images, including GWU SJP president Lance Lokas, violated the Gelman Library Buildings Use Policy, which limits where students may post and prohibits offensive postings and postings that do not identify student organization sponsorship; and their refusal to stop projecting the images as directed by the GW Police Department ("GWPD") officer and Dean Joyce constituted "non-compliance" under the Code of Conduct, which prohibits "[f]ailure to comply with reasonable directions of university officials."

178. The administration failed to take meaningful disciplinary action to protect the safety and educational opportunities of Jewish and Israeli students and instead announced a wholly empty and meaningless gesture.

179. It suspended GWU SJP and another student organization, and only for ninety days.

180. It only suspended one student.

181. Meanwhile, the students responsible for the antisemitic imagery, and for noncompliance with directions of University officials, remained on campus, free to organize and continue their campaign of disruption and antisemitic harassment under a different temporary banner from their nominally suspended groups.

182. Hours after the GWU SJP suspension was announced, its leaders announced they had formed a new organization, the "George Washington University Student Coalition for

Palestine" ("GWU SCP"), an organization that described itself as dedicated to the destruction of the "violent Zionist system."

183. The GWU SJP student leaders simply reconstituted the same organization under a new name and promptly resumed their antisemitic agenda without missing a beat.

184. GWU SCP announced that it would be holding a protest at Kogan Plaza the following day, November 15th, to demand the reinstatement of GWU SJP.

185. But the administration did nothing to stop it.

186. On November 15th, leading up to GWU SCP's protest, a protester shouting "Free Palestine" threw a rock at a bright pink "JewBelong" box truck parked along an adjacent street.

187. JewBelong is an independent organization, unaffiliated with GWU, "supporting Judaism and combating antisemitism."[23]

188. The rock shattered a glass panel on the truck.

189. The University identified the perpetrating student, who was found to have committed discriminatory harassment and disorderly conduct.

190. But, once again, the University decided not to remove the violent student from campus, and she remained an everyday threat to Jewish and Israeli students.

191. GWU SCP protested on Kogan Plaza "in solidarity with GW SJP," and led a crowd of protesters in chants, including "No Justice, No Peace."

192. This protest violated the Student Code of Conduct and University Policies.

193. GWU received reports of antisemitic harassment during the protests.

194. The reports were listed as a possible act of "community disturbance," but the

[23] *Person throws rock, damages truck showing anti-Hamas message*, GW Hatchet (November 15, 2023), https://gwhatchet.com/2023/11/15/person-throws-rock-damages-truck-showing-anti-hamas-message/.

administration declined to hold the perpetrators responsible.

195. Despite the obvious evasion of disciplinary action, the administration did nothing and declined to investigate whether the formation of GWU SCP violated the intent of its suspension of GWU SJP.

**F. GWU's decision to suspend GWU SJP, but none of its members, allowed GWU SJP's members to continue terrorizing Jewish and Israeli students under a new banner.**

196. On November 17, 2023, GWU SCP held another protest, returning to the front of Gelman Library.

197. Announcements for the event reminded attendees to wear keffiyehs and masks to conceal their identities.

198. A crowd of nearly two hundred protesters, led by speakers using megaphones chanting genocidal slogans against the Jewish nation (like those aforementioned), blocked the entrance to Gelman Library, preventing access for students.

199. GWU SCP's protest violated the Student Code of Conduct and University Policies.

200. On November 29, 2023, GWU SCP held a sit-in at the Elliott School, which obstructed the entrance to the building and disrupted classes with those same aforementioned slogans.

201. At least one professor was forced to cancel class because of the protest.

202. The University took no action against the organization, its leaders, or other persons who participated in the protests.

203. The administration knew that GWU SCP was a transparent proxy for the suspended GWU SJP, and that it was organized by the leaders of GWU SJP.

204. The administration had advance knowledge of their scheduled events, and knew all along that GWU SCP had not complied with requirements to be a recognized student organization and therefore was ineligible to schedule an event on campus.

205. The administration also knew that the very purpose of GWU SCP's protests was to disrupt University functions—indeed, many of its protests, including its march on President Granberg's scheduled inauguration, were expressly advertised as "Shut It Down" protests.

206. The administration, however, declined to prohibit GWU SCP's disruptive and antisemitic protests and discriminatory harassment of Jewish and Israeli students, or to hold its leaders to account.

207. GWU SCP continued to hold protests that disrupted campus life and constituted discriminatory harassment of Jewish and Israeli students unabated.

208. The multiple letters sent by GWU JPULSE to President Granberg and Dean Coleman were ignored.

### G. Congress alerts the University that it is aware of pervasive campus antisemitism, worse at GWU than virtually any other school.

209. By December 2023, the GWU administration not only knew the campus was a hostile environment for Jewish and Israeli students, but was also warned by Congress that antisemitic harassment on college campuses demanded "steps to provide Jewish students the safe learning environment they are due under law."

210. In a statement on December 7, 2023, House Committee Chairwoman Virginia Foxx announced that the House Committee was opening a formal investigation of several universities based on "the rampant antisemitism displayed on their campuses by students and faculty."

211. Within months, the Committee's investigation formally included GWU.

212. Yet the administration declined to act and allowed antisemitism to flourish, even after GWU JPULSE sent emails, reports, and notices to GWU.

## VI. AN ANTISEMITIC ENCAMPMENT OCCUPIES CAMPUS FOR MORE THAN TWO WEEKS, BUT WHILE JEWS AND ISRAELIS ARE HARASSED DAILY, GWU DECLINES TO ENFORCE ITS OWN RULES AND POLICIES.

213. Between January and April 2024, GWU JPULSE, Plaintiffs, alumni, and other organizations repeatedly reported antisemitic conduct on campus and in classrooms, including within the School of Medicine and Health Sciences, Film and Media Studies, American Studies, IMES and other academic programs. Despite these reports, GWU disregarded or downplayed the complaints, permitted curricular content promoting the BDS movement to persist, failed to take effective measures to deter hostility and harassment, and imposed little or no discipline on pro-Palestinian students or faculty members who violated applicable codes of conduct.

214. These repeated failures culminated in the establishment of the unlawful encampment and the escalation of hostility, harassment, and violence on campus.

215. On April 25, 2024, GWU SCP organized a takeover of University Yard and established an encampment of hundreds of people and remained there for fifteen days.

216. The takeover of University Yard violated GWU's policies, and with each passing day, the GWU administration witnessed firsthand an increasingly ugly assault on Jewish and Israeli students.

217. GWU failed to take appropriate action to protect those vulnerable students.

### A. GWU knew that an antisemitic occupation was in the works, but it nonetheless promised its students a quiet campus during finals week.

218. The GWU administration knew that student organizations on other college campuses had taken over campus centers and erected encampments, filling yards with tents and

holding chaotic 24-hour protests that had created hostile environments for Jewish and Israeli students.

219. The GWU administration was also monitoring GWU SCP's social-media sites and knew that it was organizing an April 25th takeover of University Yard, the largest green space on campus with diagonal pathways that are the main arteries through campus, bordered by the GWU School of Law, other academic buildings, and residence and dining halls.

220. The GWU administration also knew that an occupation of University Yard would disrupt final exams, exacerbate the harassment of Jewish and Israeli students, and limit even further their ability to participate in campus life and educational opportunities.

221. Yet the administration failed to take any meaningful measures to prevent the takeover of University Yard, and did not have plans in place to mitigate the impact of an occupation.

222. The ensuing encampment succeeded in its purpose—"frighten, intimidate, and deny Jewish, Israeli, and American-Israeli students free and unfettered access to GWU's educational environment."[24]

**B. The encampment arose.**

223. On April 25, 2024, GWU protesters, led by the leaders of GWU SCP (the same student organizers who had led GWU SJP), wrapped their faces in keffiyehs and masks to hide their identities, and descended on University Yard.

224. GWU JPULSE warned GWU that such events were likely to take place during finals week, but GWU took no action.

---

[24] U.S. Dep't of Just., Civ. Rights Div., *Notice of Findings Regarding George Washington University* (Aug. 12, 2025), https://www.justice.gov/crt/media/1410936/dl?inline.

225. The protesters fortified blockades and marked the sidewalk with warnings, "No Zionists here," while others screamed, "Death to Zionists!"

226. Speakers broadcast hate-filled speech over sound systems and megaphones, while hundreds of protesters chanted in response and banged drums, buckets, and pots.

227. Protesters had the backing of well-funded organizations with direct links to Hamas.

228. Invited speakers exhorted the growing crowd that "Zionism is no less evil than white supremacy," and that "we will bring this poison of Zionism to an end."

229. Faced with the predictable events resulting in the takeover of University Yard, the administration failed to adhere to the restriction it had imposed over University Yard, including its earlier designation of University Yard as a 24-hour quiet zone.

230. Instead, the administration agreed to allow the protesters to occupy University Yard for that day, subject to the following conditions:

- Demonstrators must move with their tents to Anniversary Park at F Street NW between 21st and 22nd streets. GW will prohibit all non-GW individuals from participating in any demonstration on university property.
- GW does not permit overnight encampments on university property.
- Students may demonstrate until 7 p.m. if they abide by the university's free expression guidelines, the Code of Student Conduct, and other applicable policies.
- At 7 p.m., the students will be required to remove tents and disperse.

231. President Granberg issued her own statement that day, warning:

> 1. Occupying campus grounds, establishing outdoor encampments, and blocking access to buildings create safety concerns and can disrupt learning and study, especially during this critical final exam period. . . . [W]e will not allow students from other local colleges or unaffiliated individuals to trespass on our campus.

232. By the 7 p.m. deadline to disperse, approximately six hundred protesters, including individuals not affiliated with GWU, remained crowded into University Yard.

233. As usual, the GWU administration took no action to enforce its 7 p.m. deadline.

234. Faced with flagrant violations of its policies and authority, GWU capitulated.

235. The following day, April 26th, President Granberg announced that no other protesters would be permitted to enter University Yard, and the University would initiate disciplinary proceedings to suspend and administratively bar from campus protesters who had not abided by the prior 7 p.m. deadline to leave University Yard.

236. GWPD placed barricades around the encampment to curtail new protesters from entering University Yard.

237. But at the same time, GWU accommodated the protesters by permitting food deliveries, allowing access to restrooms, and authorizing other persons to enter University Yard.

238. More protesters soon swelled H Street, taking it over and erecting approximately thirty additional tents in the street.

239. On April 28th, President Granberg and Provost Bracey issued a joint statement, acknowledging the protesters had violated the law, University policies, and clearly defined rules of conduct and behavior:

> Free expression and activism, however, are not unlimited. Our highest priority is, and always will be, maintaining a safe campus environment that allows for the world-class academic experience our students and their families have entrusted us with providing. The encampment on University Yard violates our clearly defined rules of conduct and behavior. Further, the actions of some protesters have been highly offensive to many members of our community. The protest is jeopardizing our ability to meet the priorities of our university community, and the hateful language being displayed has no place on our campus.

240. But President Granberg and Provost Bracey refused to act.

241. Indeed, the DOJ concluded regarding GWU's handling of the encampment that "GWU took no meaningful action and instead was deliberately indifferent to the hostile educational environment on its campus in violation of Title VI."[25]

242. That evening, a large contingent of protesters on H Street overwhelmed police officers stationed along the barricade of University Yard and overran the barricade.

243. Protesters hauled sections of the metal barricade and piled them in the middle of University Yard. The protesters then planted a Palestinian flag.

244. More protesters began pitching tents throughout University Yard.

245. GWPD took no action to stop the additional protesters from unlawfully trespassing and occupying University Yard.

246. H Street remained blocked with the overflow of protesters, larger tents, and shade structures.

247. That same evening, Dean Coleman arrived at University Yard and spoke to GWPD and Metropolitan Police Department ("MPD") officers outside the northwestern corner of University Yard.

248. A protest leader called out over a microphone: "Unless Dean Colette Coleman is here to meet our demands, get the fuck out of our liberation zone."

249. She acquiesced and left.

250. Provost Bracey was also at the encampment after the barricades had been overrun and personally witnessed the protesters' aggressiveness.

[25] U.S. Dep't of Just., Civ. Rights Div., *Notice of Findings Regarding George Washington University* (Aug. 12, 2025), https://www.justice.gov/crt/media/1410936/dl?inline.

251. By the following day, the number of protesters, many without any affiliation to GWU, swelled University Yard and H Street, limiting access to campus buildings.

252. The photo below illustrates the extent to which access to campus was obstructed by protesters and left Jewish and Israeli students anxious to traverse.



253. Protesters chalked entrances to University Yard with clear warnings: "No Zionists."

254. Signs affixed to barricades around the encampment stated, among other things, "zionist pigs get out"; "[s]tudents will go back home when Israelis go back to Europe, US, etc (their real homes)"; and "Students will leave when Israelis leave."

255. And if those were not sufficiently threatening to keep out Jews and Israelis, there were others in the encampment more explicit, including: "Zionism is Fascism—Colonizers Out of DC," "Final Solution," and swastikas.

256. Protest leaders, using megaphones, regularly led crowds of protesters in discriminatory chants, including:

> "We want justice, you say how - Zionists off our campus now"; "Say it loud and say it clear, we don't want no Zionists here"; "There is no solution but intifada revolution"; "We don't want no Israeli pigs"; and "Settlers go back

home, Palestine is ours alone."

257. During the two weeks of the encampment, the protesters hosted a regular assortment of speakers, including many who had no connection to GWU, and many who spewed incendiary and hateful exclusionary messages.

258. On May 7th, one invited speaker led the crowd in a celebration of Hamas: "Hamas is me. Hamas is you. Hamas is our children. I don't care what the imperialists called them."[26]

259. Vice Provost and Dean of Students Colette Coleman was in the encampment during the entire speech.

260. She did nothing.

261. Jewish and Israeli students spotted in or around the encampment—including Mr. Shapiro, CAPE-Ed Member No. 2, and CAPE-Ed Member No. 4—were confronted by coordinated and aggressive patrols of protesters.

262. Member No. 4 at one point during the antisemitic tide of the encampment was pushed down and threatened with death.

263. With linked arms and often chanting antisemitic slurs, the protesters encircled Jewish and Israeli students and physically coerced them out of University Yard.

264. GWU SCP designated certain protesters as "marshals," who wore yellow vests and were ostensibly responsible for maintaining so-called order.

265. In the GWU SCP encampment, the "marshals'" duties also included intimidating Jewish and Israeli students.

266. When the GWU student leaders spotted a Jewish or Israeli student, they called for

[26] Stu (@thestustustudio), X (May 8, 2024, 7:20 PM), https://x.com/thestustustudio/status/1788348395146326095.

marshals to follow and intimidate them and organized other protesters to confront Jewish or Israeli students, forcing them to leave.

267. In a May 5th community message, President Granberg finally, belatedly, acknowledged what everyone knew:

> [W]hen protesters overrun barriers established to protect the community, vandalize a university statue and flag, surround and intimidate GW students with antisemitic images and hateful rhetoric, chase people out of a public yard based on their perceived beliefs, and ignore, degrade, and push GW Police Officers and university maintenance staff, the protest ceases to be peaceful or productive. All of these things have happened at GW in the last five days.

268. President Granberg's statement squarely acknowledged that protesters were not peaceful and were engaged in discriminatory harassment of Jewish and Israeli students and recognized that protesters were chasing them out of the campus center.

269. That recognition triggered an obligation on the part of the GWU administration to respond – to do something to eliminate that hostile environment.

270. But the administration chose to do nothing.

**C. When voices of reason were needed the most, many GWU faculty and staff members join in the antisemitic propaganda.**

271. The GWU administration also knew that GWU students were not the only members of the community violating the law and University policies by participating in the encampment.

272. GWU faculty members promoted and joined the encampment, defying the GWU administration's direction to protesters to leave University Yard.

273. Indeed, the faculty's encouragement and indoctrination of students fueled the animus that led to the encampment on GWU's campus.

274. Several faculty members participated in the encampment.

275. For instance, Professor Youmans spoke publicly at GWU's encampment, sharing words of support for the antisemitic protesters.

276. Professor Youmans is a faculty member formally affiliated with IMES who previously stated, "[e]ven the faculty that don't turn up, many have sympathy for you [encampment protesters] because you are enacting what we teach."

277. Moreover, GWU faculty members banded together, linking arms with other faculty members, including individuals not affiliated with GWU, around the protesters explicitly to prevent police officers who might try to enforce the law and University policies.

278. During the encampment, Member No. 1 witnessed twenty to thirty faculty and staff members with their arms linked to "protect" the encampment protesters.

279. Some GWU faculty members used class time and resources explicitly to encourage students to express their solidarity with the protesters by joining the encampment—and also outed Jewish and Israeli students who declined.

280. In shows of support for the protesters, faculty members altered class formats and schedules, changed exam formats or eliminated exams, and some even abandoned grades altogether.

281. Rather than fulfilling their duty to de-escalate tensions and maintain a safe academic environment, these professors effectively conferred tacit approval upon the perpetrators, enabling the escalation of destructive activism and violence. Their conduct not only condoned but actively contributed to an environment of hostility, thereby exacerbating the threat to student safety and institutional integrity.

282. Professor Attiya Ahmad, for example, announced that all classes would be conducted remotely via Zoom, to the detriment of Jewish and Israeli students who were deprived of the benefits of live classroom instruction.

283. Member No. 2 had to request to take the final exam over Zoom due to fear over being on campus as a Jewish student during the encampment. This fear was particularly acute, given that Professor Ahmad, as well as many of her classmates, were in attendance at the encampment.

284. On April 29th, in Mr. Shapiro's Geography of Africa class, the professor decided to forgo the scheduled class lesson and instead dedicated the class to discussing his support for the encampment.

285. Mr. Shapiro and other Jewish students in the class were forced to listen to their professor and classmates pay tribute to an encampment that had incited an enormous crowd in the center of campus to hate and threaten Jewish and Israeli students.

286. After class, Mr. Shapiro reported the incident in an email to the administration, adding that the University was "not just failing to combat antisemitism. It is actively fostering a culture and environment in which it thrives."

287. He received no response from the administration.

288. Given the number of faculty members who either attended the encampment, modified class schedules, or voiced approval of the encampment, it is unsurprising that at least two petitions in support of the encampment were circulated among GWU faculty.

### D. The encampment is cleared, and then immediately reforms in front of a GWU freshman residence hall (i.e., *home* for GWU students).

289. On May 8, 2024, the MPD cleared the encampment in University Yard and arrested thirty-three people.

290. After the encampment was finally cleared, protesters lost no time instigating another protest on the GWU campus.

291. On May 9, 2024, the protest resumed a few blocks away from University Yard, in

front of Thurston Hall, a freshman residence hall.

292. By early evening, the GWU administration issued a safety alert, announcing that Thurston Hall was in emergency mode, which meant that no one was allowed to enter or leave the building.

293. The students were told the building was on lockdown, and they were prohibited from entering their residence hall.

294. The exhausted Jewish and Israeli students were left standing in the middle of an antisemitic protest, deemed by the administration to present a heightened security risk, with nowhere to go and no one to protect them.

295. Thurston remained on lockdown until well past midnight, when MPD finally shut down the protest.

296. For the Individual Plaintiffs and CAPE-Ed members, the protests provoked significant anxiety and fear.

297. Many were compelled to seek accommodations, and some left campus altogether.

## VII. GWU'S DOUBLE STANDARD (PUNISHING HATE DIRECTED TOWARD ALL GROUPS *EXCEPT* JEWISH AND ISRAELI STUDENTS) UNDERSCORES THE LEGAL AND MORAL VIOLATION PERPETUATED BY THE UNIVERSITY.

298. The administration has refused to meaningfully discipline students who, among other things, have engaged in a consistent pattern of antisemitic discrimination and harassment against Jewish students.

299. The GWU administration neglected to enforce the University's Code of Conduct, failed to ensure the safety and well-being of all students, and allowed hostility toward Jewish and Israeli students to escalate unchecked.

300. The GWU administration acts differently, however, when it comes to enforcing its nondiscrimination policy and Code of Conduct when the subject of discrimination is minorities

other than Jews by enforcing its nondiscrimination policy and Code of Conduct when the subject of discrimination is minorities other than Jews and it promptly investigates discrimination against minorities other than Jews and Israelis and metes out serious discipline to offenders.[27]

### A. The University fails to apply its antidiscrimination policy when Jews are the subject of discrimination and fails to meaningfully investigate or punish antisemitic discrimination and harassment.

301. For example, when Mr. Shapiro experienced active discrimination and harassment from two of his fellow fraternity brothers—Brothers A and B—because of his Jewish identity, GWU determined that verbal harassment was too challenging to prove.

302. Following October 7, Mr. Shapiro was subject to verbal antisemitic harassment (i.e., antisemitic epithets about "Jews and money" and "Jews and loyalty") and social ostracization from Brothers A and B.

303. Mr. Shapiro confirmed with two other fraternity brothers that the negative treatment and social ostracization he was receiving from Brothers A and B was a function of his Jewish identity.

304. Mr. Shapiro withdrew from the fraternity due to this antisemitic harassment and intimidation.

305. Following the event, Mr. Shapiro was contacted in November 2023 by E'Quince Smith, the Area Coordinator for Fraternity and Sorority Life at GWU, to discuss the incidents. No action was taken by Mr. Smith vis-à-vis the two fraternity brothers.

306. Mr. Shapiro then raised the matter with GWU's Office of Student Rights and Responsibilities ("SRR"), now called Conflict Education & Student Accountability ("CESA"),

---

[27] *GW Replaces Professor Who Defended Racial Slur, as Ongoing Racism Frustrates Students*, GW HATCHET (Sept. 26, 2022), https://gwhatchet.com/2022/09/26/gw-replaces-professor-who-defended-use-of-racial-slur-as-ongoing-racism-frustrates-students/.

which supposedly performed an investigation.

307. SRR eventually concluded that none of the incidents described by Mr. Shapiro were actionable because, among other things, verbal harassment was too difficult to prove.

308. Neither Brother A nor Brother B was ever punished.

309. Member No. 1 separately reported to SRR an incident from October 17, 2023, when GWU SJP member Lance Lokas spat at Member No. 1 while she was staffing a table in University Yard to raise money for a nonprofit medical and disaster emergency response service that is Israel's official representative to the International Red Cross.

310. Although Member No. 1 and another student positively identified the harassing student and his misconduct, and the administration acknowledged that the conduct constituted discriminatory harassment and disorderly conduct, the administration refused to discipline the student, purportedly because the incident was not captured on security camera footage.

311. Member No. 2, meanwhile, was the subject of vile antisemitic harassment and threats, and was also physically spat at during the first days of the encampment in April 2024.

312. When Member No. 2 reported such incidents to SRR, the administration said it was unable to take any action because the offender had recently graduated, even though the administration had previously disciplined recently graduated Jewish students.

313. GWU's purported inability to identify GWU students and faculty who taunted, harassed, intimidated, surrounded and assaulted Jewish and Israeli students in the encampment stemmed not from a technical inability to obtain such information, but from willfully ignoring the acts and refusing to conduct any meaningful investigation into the pervasive antisemitic discrimination and harassment emanating from the encampment.

314. The persons responsible were in University Yard for at least two weeks, and many,

emboldened by the lack of any consequences, had shed their masks.

315. The University deliberately averted its eyes to avoid pursuing offenders.

316. On April 26, 2024, President Granberg *said* that the University was initiating disciplinary action against all protesters who failed to leave University Yard by the 7 p.m. deadline.

317. Hundreds remained after the deadline.

318. Over the next two weeks, more GWU students and faculty members joined the encampment.

319. GWU students violated local law, vandalized and destroyed University property, held events and occupied University space in violation of University Policies and the Student Code of Conduct, and harassed and intimidated Jewish and Israeli students.

320. When MPD finally cleared the encampment weeks later, only six GWU students were arrested *after* refusing officers' repeated directions to leave University Yard *and* resisting the officers' attempts to clear University Yard.

321. But for the entire year following October 7, 2023, the GWU administration suspended only a single student, placed sixteen students on disciplinary probation, censured three students, and issued warnings to three others.

322. All but the single suspended student were welcomed back to campus for the Fall semester.

**B. The University's impermissible double standard is demonstrated by the immediacy with which it has policed discrimination against other minority groups.**

323. The GWU administration's responsiveness to discriminatory harassment of students of other racial and ethnic identities starkly reveals the double standard applied to antisemitic harassment.

324. For example, in September 2022, a GWU Human Rights professor, during his class on universal human rights, requested permission from the students to read aloud an original text that included the N-word.

325. The request was made explicitly for academic purposes, in the context of analyzing the role of language in systemic prejudice.

326. Although he did not use the N-word in class, three student complaints were filed against him, the University promptly announced he would be replaced with another instructor, and he was forced to leave the University.[28]

327. At no point did the professor target African American students, nor did he label or demean any individual or group.

328. In January 2022, a professor teaching anti-racism in STEM was suspended after a lecture on a Norman Rockwell painting that features the N-word.

329. While describing the painting, the professor inadvertently uttered the N-word.[29]

330. In September 2019, in response to a sorority president's private Snapchat post of a photo of a plantation gift shop with the caption, "I wonder if they sell slaves," then-Vice President of Student Affairs and Dean of Students Cissy Petty rightly determined that "[t]he post was insensitive, insulting and racist, . . . [and] also part of a larger challenge of building the appropriate culture on our campus."

---

[28] *GW Replaces Professor Who Defended Racial Slur, as Ongoing Racism Frustrates Students*, GW HATCHET (Sept. 26, 2022), https://gwhatchet.com/2022/09/26/gw-replaces-professor-who-defended-use-of-racial-slur-as-ongoing-racism-frustrates-students/.

[29] *Officials Planning Future of Anti-Racist GWTeach Course After White Professor Reads N-Word*, GW HATCHET (Jan. 31, 2022), https://gwhatchet.com/2022/01/31/officials-planning-future-of-anti-racist-gwteach-course-after-white-professor-reads-n-word/.

331. Dean Petty levied discipline against *all* sororities on campus, banning them from informally recruiting new members or participating in any social activities this fall.[30]

### VIII. ANTISEMITISM CONTINUES TO FESTER ON GWU'S CAMPUS AND IN THE GWU CLASSROOMS, SHOWING THAT GWU HAS ALLOWED HATE TO WIN.

332. At the very start of the Fall 2024 semester, on August 22, 2024, GWU SCP protesters, led by GWU students (and joined by members from affiliated pro-Hamas groups), marched on President Granberg's home and vandalized a University monument.

333. At least one Jewish student on campus at the time was surrounded by a group of protesters and physically intimidated.

334. On the anniversary of the October 7th Hamas attacks on Israel, GWU SCP, again led by GWU students, held a vigil for Hamas terrorists killed in the attacks.

335. Earlier that day, Ms. Soffer was in class when the lecture was interrupted by the chanting and drums.

336. The protest re-emerged that night.

337. GWU SCP was ineligible to reserve University space, so it announced that its vigil would be held at nearby James Monroe Park.

338. About two hundred people amassed there.

339. Despite being prohibited from holding an event on campus, GWU SCP almost immediately began to march on University Yard.

340. Once there, the crowd of protesters, amplified by megaphones and backed by drums, shouted antisemitic statements and bullied Jewish students in the area.

---

[30] *GW Suspends Panhel Informal Recruitment, Social Activities This Fall Amid Racist Post*, GW HATCHET (Sept. 7, 2019), https://gwhatchet.com/2019/09/07/officials-suspend-panhel-informal-recruitment-social-activities-amid-racist-snapchat-post/.

341. A Jewish student filming the event for a documentary stood behind the protest.

342. He was suddenly surrounded by about fifteen protesters dispatched by organizers to intimidate him, many shoving signs in his face, shouting antisemitic slurs, and ordering him to stop filming.

343. On the following day, October 8, 2024, an unauthorized protest took place in Kogan Plaza during afternoon classes.

344. Approximately one hundred fifty protesters filled Kogan Plaza, and Palestinian and Lebanese flags and signs were draped from the tops of Rome and Phillips halls in violation of University Policy.

345. The protesters, amplified by megaphones, called for "Intifada," chanted, and banged on drums, disrupting classes in the neighboring buildings.

346. Dean Coleman stood nearby observing the protest, and Assistant Dean of Student Life Brian Joyce watched alongside it.[31]

347. But neither they, nor anyone else in the GWU administration, did anything to stop the unauthorized, disruptive protest or to later discipline the organizers.

348. On February 25, 2025, the office of Israeli GWU faculty member Joseph Pelzman, an economics professor with expertise in international trade policy, was vandalized by supporters of GWU SJP.

349. Academic papers were torn down, and a sign with an antisemitic and threatening message was posted on his office door.

350. The sign concluded with a clear and present threat to Prof. Pelzman:

[31] *Pro-Palestinian Protesters Walk Out of Classes, Rally on Day Two of 'Week of Rage,'* GW HATCHET (Oct. 11, 2024), https://gwhatchet.com/2024/10/11/pro-palestinian-protesters-walkout-of-classes-rally-in-day-two-of-week-of-rage/.

> The proprietors of this eviction notice demand your **immediate** removal. If you choose to remain on the premises, and if GWU continues to harbor your malignant presence on this campus, every sector of this community will be mobilized against you. The students of GWU will hold you and this university accountable for your crimes. (emphasis in original).

351. That same day, GWU SJP posted photos of the defaced door of Prof. Pelzman's office, copies of the signs strewn along the hallway, and the text of the sign.

352. Its post also included threats:

> Pelzman's tenure is only one pernicious symptom of the bloodthirsty Zionism permeating this campus and the students demand his immediate removal. If Pelzman wants [sic] plan the mass expulsion of the people of Gaza from their land, we will remove him from his ivory tower office. . . . Pelzman and GWU administration will be held accountable for their crimes.

353. These are the same set of protesters who had publicly called for the murder of several administrators just a few months prior.

354. After Prof. Pelzman filed a complaint against GWU SJP, GWU retaliated against Prof. Pelzman with research misconduct charges while the anti-Israel and anti-Zionist faculty continued to promote distorted and false narratives without punishment.

355. GWU continues to fail to enforce its policies and Code of Conduct, and to take any other action to protect the safety, well-being, and educational opportunities of the Jewish and Israeli community from the hostile environment on campus.

356. The faculty and administration of GWU's Professional Psychology Program continue to foster antisemitism and discriminate against Jewish and Israeli students—after the U.S. Department of Education's Office for Civil Rights ("OCR") investigated that same Program because of egregious discrimination against Jewish and Israeli students in Professor Lara Sheehi's mandatory diversity class, and after OCR ordered GWU to take action to remedy the discrimination and expunge the students' records.

357. Despite the OCR order, the GWU administration continues to tolerate antisemitic discrimination by the Program's administration and faculty while simultaneously refusing to adopt the IHRA definition of antisemitism.

358. Throughout the GWU academic community, anti-Israel narratives are allowed to proceed unchallenged, while individuals who express pro-Israel views are routinely ostracized, threatened, and demonized.

359. Such actions create a chilling effect on constitutionally protected speech by fostering an environment of antisemitic harassment and discrimination based on shared ancestry and ethnic identity, and impede the right of Jewish students to express their religious liberty.

### IX. THE EXPERIENCE OF THE PLAINTIFFS AND THE CAPE-ED MEMBERS SHOWS THE EXTENT TO WHICH GWU'S HOSTILE ENVIRONMENT HAS DEPRIVED GWU JEWISH AND ISRAELI STUDENTS OF THEIR EDUCATIONAL OPPORTUNITIES.

360. Antisemitic discrimination and GWU's double standard have taken a significant psychological, emotional, and physical toll on Individual Plaintiffs and CAPE-Ed members.

361. All have been subjected to discriminatory harassment on a pervasive basis, and some have been victims of severe harassment.

362. They have been denied their rights to equal access to educational benefits, including an inclusive environment free of threats of assault and mob violence, unimpeded access to classrooms, libraries, professors, and other University resources, the ability to fully and freely participate in classes and extracurriculars, as well as to express their Jewish identity on campus.

363. The Individual Plaintiffs and members of CAPE-Ed, at times, were forced to withdraw from class discussions, sanitize their Jewish identity from class participation and presentations, felt compelled to avoid classes and professors inhospitable to Jewish and Israeli students, forgo attending certain events, and to refrain from walking through certain areas of campus—all out of fear of anti-Jewish harassment.

### A. Sabrina Soffer[32]

364. Ms. Soffer was well-known at GWU as a Jewish and Israeli advocate and writer.

365. Ms. Soffer did not know about the antisemitism or anti-Israel bias at GWU before she began her undergraduate studies there. She applied to GWU precisely because of its reputation for having vibrant Jewish life, which in her mind meant that antisemitism was a non-issue.

366. From the outset of her time at GWU, she was open about her Jewish and American-Israeli identity in classes and at public events, notably during an event about antisemitism that took place in her freshman year, organized in response to incidents on campus.

367. Throughout her time at GWU, Ms. Soffer remained involved in Jewish life. As antisemitism on campus intensified, she spoke and wrote about it in various outlets.

368. Ms. Soffer regularly sent those many articles to GWU administrators and faculty to spread awareness about antisemitism and Israel, hoping that they would act.

369. Ms. Soffer was accepted into GWU's Honors Program and planned on majoring in International Politics at GWU's Elliott School. She was particularly interested in Middle East studies and intended to take courses offered by IMES.

370. During her freshman year, Ms. Soffer flew home for a week due to distress over the ostracism she faced based on her Jewish identity and the ideological conformity around her.

371. Ms. Soffer was shocked to find that most IMES professors were BDS activists.

372. Eventually, she figured that she needed to change her major free of anti-Israel activity, and that would foster open inquiry and enable her to examine sources of the hostility.

373. She reluctantly changed her major to Philosophy and would later add a second

---

32 https://www.washingtonjewishweek.com/the-doj-confirmed-why-im-suing-george-washington-university/

major in Judaic Studies.

374. By 2022, as Ms. Soffer got further involved with Jewish life on campus, she was invited to speak at an event featuring Israel's then-ambassador. After the event, a friend informed her that some SJP students intended to vandalize the event venue by throwing beer bottles.

375. Her friend successfully diverted the protesters that night, but from that moment on, Ms. Soffer's fear increased, and she did not feel safe walking alone around campus knowing that SJP students who expressed annihilationist ideas knew her and had a target on her back.

376. Ms. Soffer was vilified as she attempted to pass an antisemitism task force – composed of Jews and non-Jews, pro- and anti-Israel students – that the student government appointed her to commission; some students tried to, by shaming Ms. Soffer during the hearings, convince student committees that she was unfit to lead the charge because she was "racist" against Palestinians, citing Ms. Soffer's condemnations of Palestinian terrorism and BDS in her writings.

377. In February 2024, Ms. Soffer met with Dean Coleman and Vice Dean Joyce to notify the administration about antisemitic incidents occurring on campus, including the protests, inflammatory posters, and harassment of Jewish and Israeli students.

378. The administrators told her they could not take action against the ongoing antisemitism unless "overtly violent."

379. One day, she and CAPE-Ed Member No. 2 were nonetheless confronted by a large crowd of protesters on H Street with Rudy Rochman, an Israeli activist they knew, who was having a respectful conversation with a protester on the edge of the encampment.

380. Ms. Soffer and Member No. 2 joined Mr. Rochman and within minutes, a protest leader on a megaphone called attention to Mr. Rochman. They were almost immediately

confronted by a mob of about fifty protesters that began to close in, encircling them.

381. Ms. Soffer and Member No. 2 were forced to flee for their safety.

382. A GWU SCP organizer asserted that their warnings that Zionists were prohibited from entering University Yard should be taken seriously. As the GW Hatchet reported, the organizer shouted: "When we say Zionists off our campus, we mean it so f*cking literally."

383. Despite her frustration with GWU's failure to course correct, Ms. Soffer met with Dean Coleman and Christy Anthony at the beginning of the 2024 Fall semester to offer suggestions for curbing antisemitism.

384. She suggested adding an antisemitism faculty working group to the array of the six other working groups created, which included "Academic Freedom" and even a group on "Humanitarian Aid in Gaza and Beyond." Her efforts went unanswered.

385. Ms. Soffer's efforts for over three years to address the antisemitic campus climate at GWU were met with indifference by its officials.

386. Hostility against Ms. Soffer persisted until the end, as she was booed by a handful of her peers at her graduation.

**B. Ari Shapiro**

387. Mr. Shapiro periodically observed the encampment.

388. In the first two days of the protest, he wore identifiably Jewish clothing in and around University Yard, but after being subjected to harassment, he stopped wearing anything that overtly identified him as Jewish.

389. In light of his reputation on campus, he remained a target of protesters, who regularly shouted slurs and screamed at him.

390. Mr. Shapiro also was confronted by signs conveying antisemitic tropes, such as those accusing Jews of controlling money.

391. As he approached University Yard, he was typically monitored by approximately three to ten protesters, who would follow him closely in a show of intimidation.

392. On at least two occasions, he was physically confronted by groups of protesters dispatched to intimidate and force him out of University Yard.

393. The protesters, including so-called "marshals," crowded against him, shouting and sometimes banging drums, and invaded his personal space to coerce him to leave the area.

394. At those times, he felt concerned for his physical safety.

395. He returned to University Yard only because he believed it was important to document the hostile environment, and he would only return with friends for support.

396. Mr. Shapiro submitted reports to the administration asking for protection for Jewish students.

397. In a May 4 report to SRR, he complained that while he and his friends were in University Yard, they were surrounded by a mob of protesters that intimidated and then coerced them out of University Yard.

398. He received no response.

399. On May 4, Mr. Shapiro and a Jewish friend were in University Yard to observe the protest.

400. He saw a crowd of as many as forty protesters confront a GWU student and his parents.

401. A protest leader with a megaphone identified them as "Israeli pigs," and the protesters crowded around them, banging drums and chanting "Zionists get out, we don't want no Israeli pigs."

402. He saw one protester attempt to strike the mother of the student, but she fended off the blow.

403. While Mr. Shapiro was recording the incident, a separate gang of protesters surrounded him and his friend (obscuring their view of the harassment of the Jewish family), linked arms, and then forcefully walked him and his friend out of University Yard.

404. On May 4, Mr. Shapiro emailed SRR to report the protesters' discriminatory harassment of the Jewish student and his family.

405. Even outside of University Yard, Mr. Shapiro was harassed.

406. He was a victim of "doxing," in which at least one student-maintained social-media account shared screenshots of his private Instagram account, and added captions, including "he's a Zionist."

**C. CAPE-Ed Member No. 1**

407. Member No. 1 is identifiably Jewish.

408. She wears jewelry and clothing with Jewish symbols and served on the executive board of a pro-Israel student organization. She has friends and family in Israel and knows of several people who were killed during the October 7 attacks and in the subsequent war.

409. Member No. 1 is studying for a minor in Arabic and Hebrew Language and Culture. During the Fall of 2023, she was in a small Egyptian dialect Arabic class.

410. A number of her classmates were members of GWU SJP, including its president, Lance Lokas.

411. Those classmates did not speak to her.

412. Member No. 1 appeared in her first class immediately following the October 7th attacks visibly upset, as she had previously left class to speak with friends in Israel regarding loved ones who had been killed or were missing.

413. Lokas and other students stared, laughed, and pointed at her in a taunting fashion in front of the professor, who said and did nothing.

414. Member No. 1 was afraid to complain to the administration because she feared retaliation by the students and the professor.

415. Instead, to avoid the anxiety caused by being in a class with Lokas and other GWU SJP supporters, she decided at the end of the semester to change her course of study from Egyptian dialect to Lebanese dialect.

416. Member No. 1 was devastated, and shared her frustration with Jewish friends, including other members of GW for Israel.

417. On October 17, 2023, Member No. 1 and other members of GW for Israel were staffing a table in University Yard to raise money for a nonprofit medical and disaster emergency response service that is Israel's official representative to the International Red Cross.

418. Member No. 1 noticed Lance Lokas nearby.

419. Lokas was wearing a hooded sweatshirt and headphones, and while looking at her, began to walk towards the table.

420. As Lokas approached the table, he slowed, stared at Member No. 1 and her friend, Witness No. 1, and then spat at them.

421. He then continued along the pathway. Member No. 1 and Witness No. 1 were shocked and frightened.

422. Member No. 1 was particularly anxious, because of her regular contact with Lokas in their Arabic class.

423. Member No. 1 and Witness No. 1 submitted an incident report to SRR.

424. In the report, both Member No. 1 and Witness No. 1 unequivocally identify Lance Lokas as the perpetrator, and note that Member No. 1 and Lokas were in the same Arabic class.

425. The report adds that Witness No. 1 was anxious about filing the report knowing that Lokas leads an organization on campus that has a huge following.

426. In response to the report, Anna Martin, an SRR officer, scheduled a Zoom meeting with Member No. 1.

427. Member No. 1 described the incident in detail, including positively identifying Lokas as the perpetrator, and describing the anxiety she was experiencing.

428. Ms. Martin offered to refer Member No. 1 to the University's mental health services for counseling.

429. Member No. 1 told the SRR officer that she was not interested in counseling and instead wanted the University to condemn the incident and pursue disciplinary action.

430. On October 27th, Ms. Martin sent Member No. 1 a clip from the Kogan Plaza security cameras and asked if the GW for Israel table was visible.

431. Member No. 1 replied by email, reporting that the table was beyond the range of the camera.

432. In her email, Member No. 1 "reaffirm[ed] that I do want the university to take disciplinary action against this antisemitic incident (being spat at). I would like to know what actions you are taking against this issue."

433. Ms. Martin assured Member No. 1 that "we are going to do all we can to take disciplinary action. If you want to participate and be involved, we would use you as a witness. If not, we'll will [sic] still pursue the case without you."

434. SRR, however, did not investigate any further or pursue a disciplinary action.

435. Member No. 1 contacted Ms. Martin about the status of the investigation.

436. Although Ms. Martin had assured her that the University would continue to investigate the report, notwithstanding that the event took place outside the range of the security camera, Ms. Martin now said the University had decided not to proceed.

437. Member No. 1 was shocked and felt wholly abandoned by the University.

438. Witness No. 1 was scheduled to speak to a different SRR officer, Cameron Furbeck, on October 27th, but Witness No. 1 was ill and asked to reschedule the meeting. By the time she felt better, Member No. 1 told her that SRR had decided not to pursue disciplinary action against Lokas.

439. Based on Member No. 1's experience, Witness No. 1 concluded that a meeting with SRR would be a waste of time, since SRR had already decided not to pursue disciplinary action, and she did not reschedule her SRR meeting.

440. GWU's submission to the House Committee investigating antisemitism mischaracterized its response to Member No. 1 and Witness No. 1's incident report by falsely describing the reason GWU did not pursue disciplinary action in response to the report:

> Insufficient information provided. Additional reporting party provided information indicating that initial accusation was mistaken identification.

441. GWU's mischaracterization of its failure to respond reflects a tacit admission of deliberate indifference to misconduct that constituted discriminatory harassment of Jewish students.

442. GWU knew the identity of the perpetrator and chose not to discipline him, but rather than admit that, it mischaracterized its failure to respond in its report to Congress.

443. During the Spring 2024 semester encampment, Member No. 1 suffered anxiety and

avoided University Yard.

444. She took longer routes to get to class, adding up to four blocks to her walk.

445. She had a class in Bell Hall, which bordered University Yard, and during class, heard a constant refrain of antisemitic chants, amplified by megaphones and speakers, and banging drums, which disrupted her focus and ability to focus on the lecture or course material.

446. She stopped using the CVS pharmacy due to its proximity to the encampment.

447. She also avoided the library and the GWU student center due to the close proximity of both to the encampment.

448. She similarly avoided main areas of campus in fear of being spotted by encampment supporters who knew her.

449. The encampment and antisemitic harassment she experienced, and the University's failure to respond to it, have deeply affected Member No. 1. During the encampment, she sought help from a GWU mental health counselor. The counselor, however, suggested that the emotional distress she felt was within her control, and she just needed to handle it.

450. The harassment and the failures of the University administration and its mental health services to recognize and support her as a victim of discrimination have left her fearful and adversely affected her sense of well-being and academic focus.

**D. CAPE-Ed Member No. 2**

451. On April 25, the first day of the encampment, Member No. 2 stood just inside the perimeter of University Yard, holding an Israeli flag, alongside three other students. While Member No. 2 was standing quietly, she was heckled and cursed at by protesters. One protester spat at her.

452. The following day, on April 26th, despite being unnerved and frightened by her experience the day before, Member No. 2 returned to show support for Israel. But this time, she stood across the street from University Yard.

453. She quietly held the Israeli flag, while protesters screamed epithets at her and others, including, among other things, "Fuck you, Zionist, go die"; "There is only one solution, Intifada revolution!"; "Hamas are freedom fighters!"; "We don't want no Jewish state!"; "It is our right to rebel, Israel go to hell"; "Zionists, go to hell!"; "Say it loud say it clear we don't want any Zionists here!"; "From the river to the sea, Palestine will be free"; and, in Arabic, "From the water to the water, Palestine is Arab," a reference to ethnically cleansing Israel of Jews.

454. Member No. 2 entered the encampment one other time to observe it, but without an Israeli flag, since her decision to stand with an Israeli flag alongside the encampment had made her an easily recognizable target for abuse.

455. She was quickly stalked by protesters.

456. A student protester who was in one of her classes, nicknamed "Beans," confronted her, shoved a camera into her face, and began filming her.

457. With the camera in her face, he snickered, "how's your night going," and may have called her by name.

458. Feeling anxious and concerned for her safety, Member No. 2 left.

459. Soon thereafter, Member No. 2 received an anonymous direct message on Instagram, image below, that said, "Kill yourself, Jew. Filthy kike. Watch your back."




460. Member No. 2 reported the incident to the GWPD and the MPD, and she also informed them about being spat at and cursed by protesters, as well as her interaction with "Beans."

461. The incident report was later referred to the FBI, but the perpetrator could not be identified.

462. The GWPD also sent a copy of the incident report to the University administration.

463. In June 2024, an SRR officer contacted Member No. 2, and advised her that "Beans" had graduated, and there was nothing else that could be done.

464. SRR subsequently closed its investigation.

**E. CAPE-Ed Member No. 3**

465. Despite assurances from the GWU administration that antisemitism has been properly addressed in the wake of the encampment, Member No. 3 does not find such assurances to be accurate.

466. Indeed, on March 25, 2025, Dr. Laura Brown, a groundbreaking scholar in the field of feminist therapy theory, visited campus to give a guest lecture to students in Member No. 3's Clinical Psychology program.

467. Dr. Brown identified herself at the outset of her presentation as a Jewish, lesbian feminist.

468. In the middle of her lecture (on the subject of decolonial, intersectional feminist therapy), she was abruptly interrupted by a student leader of anti-Zionist protests.

469. When the guest lecturer confirmed that she is a Zionist and supported a peaceful two-state solution, the student protest leader shouted and screamed at the guest lecturer, refusing to let her proceed with the lecture, calling her, among other things, a "Nazi," and a "murderer," and asserting that she had blood on her hands.

470. Member No. 3 was horrified by the support that the protester received from GWU faculty members in attendance at Dr. Brown's lecture.

471. GWU had personnel present who could have acted but did not do so.

472. Following the lecture, the Clinical Psychology department issued a statement but failed to condemn the behavior of the protester or directly address antisemitism.

473. Meanwhile, because Member No. 3 found the behavior deeply antisemitic, her contact information was provided to GWU officials so that she could provide her account of the incident.

474. After doing so, Member No. 3 spoke with a GWU official who handles cases of student misconduct.

475. However, to Member No. 3's knowledge, GWU never pursued the investigation further regarding the department's failure to intervene or faculty behavior generally.

### F. CAPE-Ed Member No. 4

476. Member No. 4 is a 32-year-old native Israeli who was a graduate student in the Elliott School of International Affairs.

477. He received a scholarship to attend GWU because of his work in Israel on peace-building initiatives between Palestinian and Jewish populations, particularly among children.

478. He worked for the Peres Center for Peace and Innovation as an educator to build coexistence between Palestinian and Jewish children.

479. He also worked for the municipality of Lod, an Israeli city with a population nearly evenly divided between Palestinian and Jewish Israeli citizens.

480. On April 25th, the first day of the encampment, Member No. 4 stopped by the Hillel Center for coffee and saw a number of young GWU students anxious and despondent about the encampment.

481. Member No. 4, older and over six feet tall, decided to show the Jewish and Israeli students that there was no need to be frightened, and that he would stage a unitary, silent, and peaceful protest in the encampment.

482. He picked up a small hand-held Israeli flag and walked to the sidewalk just in front of the entrance to University Yard.

483. He went there alone and stood there alone.

484. He silently held his Israeli flag in a generally open space, but almost immediately, he was confronted by a mob of protesters, their arms linked together, shouting slurs at him.

485. The mob not only blocked his path into University Yard but also crowded and pressed against him.

486. He began repeatedly shouting that he was "pro peace and against terror and violence."

487. Member No. 4 began to be concerned by the press of hostile strangers against him, and he called to nearby police officers for help.

488. The police officers refused to step in.

489. He asked the police why they were letting the protesters make a human chain around him, since he just wanted to stand with a flag.

490. Even though the protesters got closer and closer to him while threatening him, the police declined to protect him, instead repeating over and over again that he needed to leave.

491. After a few minutes, Member No. 4 became very uncomfortable and decided to leave.

492. As he turned around and walked away, one protester snatched his Israeli flag and ran into the encampment.

493. One of them pushed him from behind when they stole his flag.

494. Member No. 4, with Jewish and Israeli students watching, decided he could not leave on that note, his Israeli flag stolen and desecrated.

495. He reached into his backpack, pulled out a tiny flat Israeli flag, and turned back to the encampment.

496. When he walked away, some of them followed him, threatened his life, saying that they would find him and kill him, and shouted racist slogans against him as a Jew.

497. He again was hemmed in by a mob of protesters, tighter still, with individual protesters bumping into him.

498. He called to the officers for help, agitated that he was being trapped in a circle, unable to walk in the center of his own campus.

499. Finally, the nearby officers forcefully grabbed him, removed him from the demonstration, and told him not to return to the Yard anymore.

500. Member No. 4 did not return to the Yard.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000D (DIRECT DISCRIMINATION)

501. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 500 as if fully set forth herein.

502. Title VI of the Civil Rights Act of 1964 prohibits all forms of harassment tied to a person's ancestry or ethnic characteristics, including antisemitism. It applies to any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

503. On December 11, 2019, President Trump issued Executive Order 13899—Combating Antisemitism, which states that Title VI prohibits discrimination rooted in antisemitism to the same extent as all other forms of discrimination prohibited by Title VI, and that in enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies charged with enforcing Title VI shall consider the IHRA working definition of antisemitism.

504. On September 28, 2023, the Biden Administration noted in a Fact Sheet that "eight federal agencies clarified . . . that Title VI of the Civil Rights Act of 1964 prohibits certain forms of antisemitic, Islamophobic, and related forms of discrimination in federally funded programs and activities."

505. It also reiterated that "Title VI of the 1964 Civil Rights Act applies to all programs and activities supported by federal financial assistance.

506. Thus, these protections are wide-ranging and provide important tools to prevent and curb discrimination."[33]

507. On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they:

> [H]ave a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . . Harassing conduct can be verbal or physical and need not be directed at a particular individual.

U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics 2 (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

508. On May 7, 2024, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that:

> The fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs, however, does not relieve a school of its obligation to respond under Title VI as described below, if the harassment creates a hostile environment in school for a student or students. Schools have a number of tools for responding to a hostile environment—including tools that do not restrict any rights protected by the First Amendment. To meet its obligation, a university can, among other steps, communicate its opposition to stereotypical, derogatory opinions; provide counseling and support for students affected by harassment; or take steps to establish a welcoming and respectful school campus, which could include making clear that the school values, and is determined to fully include in the campus community, students of all races, colors, and national origins.

[33] *Fact Sheet: Biden-Harris Administration Takes Landmark Step to Counter Antisemitism*, White House (Sept. 28, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-antisemitism/.

509. OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* And it repeats its longstanding admonition that "[s]chools must take immediate and effective action to respond to harassment that creates a hostile environment." *Id.*

510. On January 29, 2025, President Trump issued an Executive Order titled Additional Measures To Combat Anti-Semitism. In Section 1. Purpose, the Order reaffirms Executive Order 13899, which ensured that the "enforcement of the Nation's civil rights laws would 'protect American Jews to the same extent to which all other American citizens are protected,'" and further:

> [D]irects additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault.

511. In Section 2, the Order states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."

512. GWU receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

513. Individual Plaintiffs and CAPE-Ed Members No. 1–4 are all of Jewish descent, and therefore, are members of a protected class within the scope of Title VI's protection.

514. Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed—who at all relevant times paid tuition to GWU—were qualified to continue the pursuit of their education.

515. Individual Plaintiffs and CAPE-Ed Members No. 1 and 3 and other members of CAPE-Ed have the right (and for graduates, had the right) to the benefits of educational and other programs at GWU.

516. While on notice of the discrimination against and hostile environment for Jewish members of the community (as shown by, inter alia, its public statements, and as evidenced by multiple instances in which antisemitic harassment has been brought to the University's attention), GWU failed to take adequate and effective corrective action.

517. As a direct result of being members of a protected class, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed suffered several adverse actions while at GWU and were subjected to discrimination by GWU based on their Jewish ethnicity and ancestry.

518. GWU violated Title VI by subjecting Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed to a series of intentional hostile acts and adverse actions while they were in pursuit of their education.

519. These acts were designed to deprive Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed of the benefits of their education and derail their academic pursuit because of their national origin, ethnicity, and ancestry.

520. GWU's failure to enforce its policies has created an environment that is hostile towards Jews. The hostility towards Jewish members of the GWU community is severe enough that it interferes with their ability to participate in the programs and activities of the school. Students are not free to move about campus without being stopped and harassed. Jewish members of the community receive hate mail.

521. Jewish and Israeli students face physical intimidation from student protesters. Many students have had to miss class as a result of the hostile environment on campus, or participate in classes remotely to avoid the hostile environment on the GWU campus. Students have refrained from using the dining halls, libraries, and other public areas.

522. While on notice of the discrimination against and hostile environment for Jewish members of the community, GWU has failed to take adequate and effective corrective action.

**COUNT II**
**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000d**
**(HOSTILE EDUCATIONAL ENVIRONMENT)**

523. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 522 as if fully set forth herein.

524. The May 25, 2023, OCR Letter states, "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment."

525. The August 24, 2023, OCR Letter notes: "OCR could find a Title VI violation in its enforcement work if: (1) a hostile environment based on race existed; (2) the school had actual or constructive notice of the hostile environment; and (3) the school failed to take prompt and effective steps reasonably calculated to (i) end the harassment, (ii) eliminate any hostile environment and its effects, and (iii) prevent the harassment from recurring."[34]

526. "OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome race-based conduct that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive, that it limits or denies a

---

[34] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rts., U.S. Dep't of Educ. to Colleague at 4-6 (Aug. 24, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20230824.pdf.

person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment). . . . To redress a hostile environment, a school has a legal duty to take prompt and effective steps that are reasonably calculated to: (1) end the harassment, (2) eliminate any hostile environment and its effects, and (3) prevent the harassment from recurring."[35]

527. Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed are Jewish, and therefore, are members of a protected class within the scope of Title VI's protections.

528. As a direct result of their being members of a protected class, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed suffered several adverse actions while at GWU and have been subjected to discrimination by GWU based on their Jewish shared ancestry and Israeli identity.

529. GWU had actual knowledge of the discrimination against Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed, and yet it was deliberately indifferent to such discrimination.

530. Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed have been denied the benefits of educational and other programs at GWU.

531. Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed faced harassment because of their race, national origin, and/or religion and were subject to a hostile educational environment.

532. GWU had actual knowledge of these incidents and was deliberately indifferent to them because its responses to reports were either inadequate, delayed, or nonexistent.

---

[35] *Id.*

533. The harassment was so severe and objectively offensive that it deprived Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed of access to educational benefits and opportunities provided by GWU.

534. As a direct and proximate result of GWU's actions and inactions, Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed were deprived of access to educational opportunities and benefits, including the ability to receive an education in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time and group learning.

## COUNT III
## DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
## D.C. CODE ANN. § 2-1401.01
## (DISCRIMINATION)

535. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 534 as if fully set forth herein.

536. The D.C. Human Rights Act ("DCHRA"), D.C. Code Ann. § 2-1401.01 *et seq.*, provides that every individual is entitled to an equal opportunity to partake in "all aspects of life," including, but not limited to, education. D.C. Code Ann. § 2-1402.01.

537. Under Section 2-1402.41, an educational institution may not "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason," including on the basis of race, religion, and national origin.

538. Individual Plaintiffs and CAPE-Ed Members No. 1–4 are all Jewish and/or of Israeli descent.

539. GWU intentionally subjected, and/or failed to sufficiently respond to, frequent harassment, discrimination, and intimidation of Individual Plaintiffs and CAPE-Ed Members No. 1–4 and other members of CAPE-Ed because they were all Jewish and/or of Israeli descent.

540. Individual Plaintiffs and CAPE-Ed Members No. 1–4 were denied access to GWU's facilities, services, programs and benefits on account of harassment, discrimination, and intimidation.

## COUNT IV
## BREACH OF CONTRACT

541. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 540 as if fully set forth herein.

542. GWU offered admission to attend the University, subject to and consistent with GWU's policies and its Student Code of Conduct, to the Individual Plaintiffs and CAPE-Ed Members No. 1–4, and the Individual Plaintiffs and CAPE-Ed Members No. 1–4 accepted GWU's offer of admission and have since paid tuition and other fees and charges to matriculate in the University.

543. Plaintiffs assert that GWU intended to be bound by these policies.

544. At all relevant times, an implied and/or express contractual relationship existed between GWU and the Individual Plaintiffs and CAPE-Ed Members No. 1–4 by matriculation in the University, and as defined by and through GWU's policies, procedures and its Student Code of Conduct, including but not limited to, GWU's (i) Student Code of Conduct, including the Basic Assumption of Freedom from Unlawful Discrimination; (ii) Policy on Disruptions of University Functions; (iii) Policy on Demonstrations; (iv) Non-Retaliation Policy; and (v) Policy on Threats and Acts of Violence.

545. Through the documents and materials it publishes and provides to students, GWU

makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

546. The relationship between a student and a university is contractual in nature, and the terms of the Code of Conduct, student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

547. The Individual Plaintiffs and CAPE-Ed Members No. 1–4 complied with their obligations under these contracts.

548. GWU breached its agreements with the Individual Plaintiffs and CAPE-Ed Members No. 1–4, and failed to comply with its obligations under these contracts, throughout the course of their enrollment at GWU, including by, among other things, failing to comply with the following provisions:

- The university will not permit unlawful discrimination on grounds of age, color, disability, gender, gender identity or expression, genetic information, marital or familial status, national origin, pregnancy, race, religion, sex, sexual orientation, veteran status, and/or other characteristics protected by applicable law in any university-recognized area of student life. (Student Code of Conduct, Basic Assumptions, Freedom from Unlawful Discrimination).

- Meeting rooms, technological resources, other university facilities, and funding should be made available, on an equitable basis, only to registered student organizations. (Student Code of Conduct, B. Student Organizations, 3. Use of University Facilities).

- Students shall have the right to assemble, to select speakers, and to discuss issues of their choice, provided that the assembly is lawful in nature, does not interfere with the processes of the university, and does not infringe upon the rights of others. The university reserves the right to prohibit assemblies having in its judgment the clear likelihood of failing to meet one or more of these conditions. (Student Code of Conduct, C. Student Sponsored Forums).

- Therefore, student organizations and individual students shall have the right to engage in behaviors such as distributing pamphlets, collecting names for petitions, and conducting orderly demonstrations provided these actions are not disruptive of normal university functions and do not encompass the

physical takeover or occupation of university facilities and spaces, whether or not they are in use at that time. (Student Code of Conduct, D. Assembly, Petitions and Demonstrations).

- Community Disturbance: Making excessive noise either inside or outside a building, including but not limited to shouting, pounding objects or surfaces, or playing music or other electronics at a loud volume in a manner that disturbs others. (Student Code of Conduct, V. Prohibited Conduct, C. Community Disturbance).

- Discriminatory Misconduct: Prohibited Discrimination and Discriminatory Harassment Prohibited Discrimination is the adverse treatment of an individual or group(s) that meets both of the following criteria: (i) Based on a protected characteristic, rather than individual merit and (ii) Interferes with an individual's participation in a university program or activity. This could include, but is not limited to, restricting an individual's continued access to or participation in an education program or activity, including co-curricular and residential experiences. This also includes singling out or targeting an individual for different or less favorable treatment (for example, higher expectations, denial of a leadership role). Discriminatory Harassment is (i) is any unwelcome conduct (ii) based on a protected characteristic (iii) where such conduct creates a hostile environment. (Student Code of Conduct, V. Prohibited Conduct, D. Discriminatory Misconduct: Prohibited Discrimination and Discriminatory Harassment).

- Prohibited Conduct, Disorderly Conduct: Disorderly conduct may include but is not limited to: Acting in a way that threatens, endangers, or harasses others, including verbal, written, or any other form of communication; Disrupting, obstructing, or interfering with the activities of others, including university events. (Student Code of Conduct, V. Prohibited Conduct, F. Disorderly Conduct).

- Responsible demonstration may not be exercised in such a manner as to endanger the safety or security of the university community, infringe upon the rights of other members of the community, or cause damage to property. This includes the rights of others to conduct class, hold their own meetings, or hear another speaker. The University may require demonstrators to remove any mask, hood, or device whereby any portion of the face is hidden, concealed, or covered as to conceal the identity of the wearer. (GWU Policy on Demonstrations).

- Property owned, controlled, or leased by the university is private property, and the university reserves the right to determine who can and cannot access and/or use university facilities or be present on university property. (GWU Policy on Barring People from Campus).

- The university will respond promptly to reports of threats or acts of violence

> and reserves the right to take immediate action to protect members of its community. (GWU Policy on Threats and Acts of Violence).

549. GWU has also breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Individual Plaintiffs and CAPE-Ed Members No. 1–4.

550. Among other things, the University selectively applies or enforces its Student Code of Conduct, policies, student handbooks, university bulletins, regulations, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including Individual Plaintiffs and CAPE-Ed Members No. 1–4 in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

551. As a direct, proximate, and foreseeable consequence of the foregoing breaches, the Individual Plaintiffs and CAPE-Ed Members No. 1–4 have suffered irreparable harm, and continue to suffer irreparable harm, which can be remedied only through an order of specific performance compelling GWU to adhere to its contractual obligations.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a. Entry of judgment against Defendant on all Counts.

b. An injunction preliminarily and permanently requiring Defendant to adopt a definition of antisemitism as part of its nondiscrimination policies and codes of conduct, and to include examples of activities that target Zionists which would constitute a violation of its nondiscrimination policies and codes of conduct.

c. An injunction preliminarily and permanently enjoining Defendant from (i) funding any student organization that harasses or excludes Zionists or, more generally, Jews; and (ii) granting official recognition to any student organization that harasses or excludes Zionists or, more generally, Jews.

d. An injunction preliminarily and permanently ordering Defendant to enforce its Student Code of Conduct and hold the leaders of student organizations personally responsible for discriminatory harassment of Jewish and Israeli students and other violations of the Student Code of Conduct.

e. An injunction preliminarily and permanently requiring Defendant to enforce its Policy on Nondiscrimination, Student Code of Conduct, Policy on Demonstrations, and Policy on Disruptions of University Functions on an evenhanded basis, consistent with the level of enforcement of those policies provided where the victims are in protected categories other than Jewish shared identity, and ensuring that Jewish members of the GWU community are protected, with respect to their physical safety and otherwise, from discrimination on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

f. An injunction preliminarily and permanently mandating that Defendant take action to end the hostile environment on campus by (i) communicating to the entire GWU community via broadcast e-mail or a similar medium that GWU will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others, on the basis of their ethnic or ancestral background, including harassment of Zionists; and (ii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that deny equal protection to Jewish members of the GWU community including those for whom Zionism is an integral part of their identity.

g. An injunction preliminarily and permanently mandating that Defendant provide expert training on combating antisemitism and the IHRA definition for SRR and DEI staff involved in reviewing complaints of discrimination,

and broadly require annual training for the University community focused on recognizing and combating antisemitism in all its forms.

h. An injunction preliminarily and permanently mandating that Defendant take all necessary action to remedy the culture of antisemitic bias and the hostile antisemitic environment and to stop the harassment of Jewish and Israeli students at GWU.

i. Appointment of an independent outside monitor, subject to approval and in collaboration with the Plaintiffs, to oversee and ensure Defendant's full compliance with all injunctive and equitable relief ordered by the Court. The monitor shall be empowered to audit, report, and recommend corrective actions for such duration and scope as the Court deems just and necessary.

j. A declaratory judgment that the failure of Defendant to enforce its policies to protect Jewish members of the GWU community has violated Plaintiffs' rights under (i) Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and (ii) D.C. Code Ann. § 2-1401.01 et seq.

k. A declaratory judgment that Defendant has breached its express and implied contractual obligations to Individual Plaintiffs and CAPE-Ed Members 1–4.

l. An award to Plaintiffs of compensatory, consequential, and punitive damages in amounts to be determined at trial or through settlement, including but not limited to damages for emotional distress, reputational harm, educational disruption, economic losses, and any other injuries suffered as a direct and proximate result of Defendant's misconduct, negligence, and/or willful and malicious conduct.

m. Equitable and injunctive relief as deemed appropriate by the Court, including but not limited to the implementation of structural reforms, training mandates, oversight mechanisms, and/or other corrective actions necessary to remedy the harms alleged herein and prevent future violations.

n. Insofar as it may be needed, Plaintiffs seek an extension, modification, or reversal of existing law.

o. An award of attorneys' fees and costs under 42 U.S.C. § 1988.

p. Such other and further relief as this Court may deem just and appropriate.

*/s/ Erin Elizabeth Mersino*
Erin Elizabeth Mersino, MI0060
**Advocates for Faith and Freedom**
http://www.faith-freedom.com
Phone: (888) 588-6888
Fax: (951) 600-4996
Email: emersino@faith-freedom.com

*Counsel for Plaintiffs Sabrina Soffer and Compliance, Accountability, Policy, Ethics – Ed ("CAPE-Ed")*

*/s/ Jerome M. Marcus*
Jerome M. Marcus (DCB# 50708)
Jesse S. Wenger (admitted *pro hac vice*)
**The Deborah Project, Inc.**
P.O. Box 212
Merion Station, PA 19066
Phone: (610) 880-0100
Email: jmarcus@deborahproject.org

*Counsel for Plaintiff Ari Shapiro*

Dated: September 30, 2026